IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

   v.

TOWN OF LAC DU FLAMBEAU,

        Defendant.

Case No. 3:23-cv-00355

## ANSWER AND COUNTERCLAIM OF INTERVENING DEFENDANTS

Intervening Defendants, listed on <u>Exhibit A</u>, ("Intervening Defendants") by and through

their attorneys, Reinhart Boerner Van Deuren s.c., respond to Plaintiff United States of

America's ("Plaintiff") Complaint as follows:

## <u>NATURE OF THE ACTION</u>

1.     This is a civil action brought pursuant to the federal common law of trespass to
protect land to which the United States holds title in trust for the Band and the Allottees, seeking
declaratory relief, damages, and ejectment to remedy the Town of Lac du Flambeau's ("Town")
intentional and unauthorized use and occupancy of that land as part of the Town's road system.

    <u>ANSWER</u>:  Intervening Defendants admit that the United States brings this action under

the theory of federal common law of trespass and seeking the remedies contained in Paragraph 1,

including ejectment.  Upon information and belief, Intervening Defendants admit that the United

States, acting through the Bureau of Indian Affairs ("BIA"), holds fee title to the lands at issue

for the benefit of the Lac du Flambeau Band of Lake Superior Chippewa Indians (the "Band")

and the seventy-six individual Indian landowners (the "Allottees").  Intervening Defendants deny

the remaining allegations in said paragraph, including that any of the Intervening Defendants

committed any intentional or unauthorized use or occupancy of the land referred therein.

2.     The United States, acting through the Bureau of Indian Affairs ("BIA"), holds fee title to the lands at issue for the benefit of the Band and the Allottees. In its capacity as trustee, the BIA in the 1960s granted either Ronald Niske and Northwoods Land Office, Inc. ("Northwoods") or T.J. Patterson and Patterson Brothers, Inc. ("Patterson") five separate easements for right-of-way ("ROW") for roads over and across tribal trust and allotted lands within the exterior boundary of the Lac du Flambeau Reservation ("Reservation"), each for a term of fifty years. The BIA granted the ROWs, with the requisite consent of the Band and the Allottees, pursuant to the Indian Right-of-Way Act, 25 U.S.C. §§ 323-328, and the implementing regulations found in 25 C.F.R. Part 169 ("ROW Act"). At some point during the fifty-year term, the United States is informed and believes, Northwoods or Patterson assigned each ROW to the Town.

ANSWER:     Some or all of the allegations contained in Paragraph 2 of the Complaint

call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required.

To the extent that the paragraph contains any factual allegations, upon information and belief, the

Intervening Defendants admit that the United States, acting through the BIA, holds fee title to the

lands at issue for the benefit of the Band and the seventy-six individual Allottees and that in its

capacity as trustee, the BIA in the 1960s granted either Ronald Niske and Northwoods Land

Office, Inc. ("Northwoods") or T.J. Patterson and Patterson Brothers, Inc. ("Patterson") five

separate easements for right-of-way ("ROW") for roads over and across tribal trust and allotted

lands within the exterior boundary of the Lac du Flambeau Reservation ("Reservation").  The

Intervening Defendants deny that all of the ROWs were limited to fifty-year terms, and

affirmatively assert that at least one of the five ROWs referenced in the United States's

complaint was granted for an unlimited term.  The Intervening Defendants admit that all five of

the ROWs were assigned, or were intended to be assigned, to the Town.  The Intervening

Defendants lack sufficient information and belief as to the truth or falsity of the remaining

allegations, and therefore, deny same, putting the United States to its burden of proof.

3.     The term of the ROW for Elsie Lake Lane, which began on October 23, 1961, expired on October 22, 2011. The term of the ROW for East Ross Allen Lake Lane, which began on March 17, 1964, expired on March 16, 2014. The terms of the two ROWs for Annie Sunn Lane, which began on April 28, 1964 and February 19, 1968, respectively, expired on April 27, 2014 and February 18, 2018, respectively. And the term of the ROW for Center Sugarbush Lane, which began on July 28, 1964, expired on July 27, 2014. The Town failed to submit timely

renewal applications for the ROWs and has not applied for new ROWs. The Town continues to use the Band's and Allottees' lands unlawfully, without a valid grant or authorization from the BIA.

ANSWER:     Some or all of the allegations contained in Paragraph 3 of the Complaint

call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required.

To the extent that the paragraph contains any factual allegations, the Intervening Defendants

deny that all five of the ROWs referenced in the Complaint have expired.  Upon information and

belief, the Intervening Defendants admit that the Town has not applied for rights of way for the

portions of Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane or Elsie Lake

Lane (the "Four Roads") lying on lands at issue in this case since at least January 1, 2014.  The

Intervening Defendants deny that the Town is currently using the Four Roads unlawfully, and

affirmatively assert that the Town has been paying for temporary access permits from the Band

to use the Four Roads since mid-March 2023.  The Intervening Defendants lack sufficient

information and belief as to the truth or falsity of the remaining allegations, and therefore, deny

same, putting the United States to its burden of proof.

4.      In remedy for the Town's continuing trespass on lands to which the United States holds title for the benefit of the Band and the Allottees, the United States brings this action. The United States prefers a negotiated resolution that would allow the aforementioned roads to have their ROWs renewed pursuant to the ROW Act and remain part of the Town's road system. If a negotiated resolution is not possible, the United States seeks all just and appropriate remedies, including, but not limited to, a declaration that the Town is in trespass; damages or mesne profits in compensation for the past unlawful use and occupancy; and, if the Town refuses to comply with the ROW Act, ejectment from further unauthorized and unlawful use of the Band's and Allottees' land and full restoration and remediation of the property.

ANSWER:     The allegations in Paragraph 4 of the Complaint are asserted against the

Town, and therefore, the Intervening Defendants affirmatively assert that they are not required to

answer said allegations.  To the extent that an answer is required, the Intervening Defendants

lack sufficient information and belief as to the truth or falsity of the allegations, and therefore,

generally deny same, putting the United States to its burden of proof.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (Federal Question) and 1345 (United States as Plaintiff) because the action arises under the Constitution, treaties, and laws of the United States, and is brought by the United States.

ANSWER:     The Intervening Defendants admit the allegations contained in Paragraph 5 of the Complaint.

6.     The allegations of this Complaint give rise to an actual controversy within the meaning of 28 U.S.C. §§ 2201-2202 (Declaratory Judgments).

ANSWER:     The Intervening Defendants admit the allegations contained in Paragraph 6 of the Complaint.

7.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because the real property that is the subject of this action is situated in the judicial district and most, if not all, of the events giving rise to this action occurred there.

ANSWER:     The Intervening Defendants admit the allegations contained in Paragraph 7 of the Complaint.

## PARTIES

8.     Plaintiff is the United States of America, suing on its own behalf in its sovereign governmental capacity and in its capacity as trustee for the Band and the Allottees.

ANSWER:     Upon information and belief, the Intervening Defendants admit the allegations contained in Paragraph 8 of the Complaint.

9.     The Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin is an Indian Tribe recognized by the Secretary of the Interior and eligible for funding and services from the United States. 88 Fed. Reg. 2112, 2113 (Jan. 12, 2023).

ANSWER:     Upon information and belief, the Intervening Defendants admit the allegations contained in Paragraph 9 of the Complaint.

10.     Defendant Town of Lac du Flambeau is a municipal corporation situated in Vilas County, Wisconsin.

<u>ANSWER</u>:     Upon information and belief, the Intervening Defendants admit the

allegations contained in Paragraph 10 of the Complaint.

## <u>FACTUAL ALLEGATIONS</u>

### A.     The Lac du Flambeau Reservation

11.     The Reservation is the permanent homeland of the Band. The Reservation was
established in the 1854 Treaty with the Chippewa, 10 Stat. 1109.

<u>ANSWER</u>:     Some or all of the allegations contained in Paragraph 11 of the Complaint

call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required.

To the extent that the paragraph contains any factual allegations, upon information and belief, the

Intervening Defendants admit the allegations contained in said paragraph.

12.     The Reservation was subject to allotment under the Indian General Allotment Act,
also known as the Dawes Act. By 1901, 578 allotments had been distributed, and approximately
45,000 acres had passed into fee simple ownership.

<u>ANSWER</u>:     Some or all of the allegations contained in Paragraph 12 of the Complaint

call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required.

To the extent that the paragraph contains any factual allegations, the Intervening Defendants lack

sufficient information and belief as to the truth or falsity of said allegations, and therefore, deny

same, putting the United States to its burden of proof.

13.     In 1934, the passage of the Indian Reorganization Act ("IRA") reversed the
allotment system, and tribes held elections to decide whether to reorganize their governments. In
1935, the Band voted to organize under the IRA and adopted an IRA constitution in 1936.

<u>ANSWER</u>:     Some or all of the allegations contained in Paragraph 13 of the Complaint

call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required.

To the extent that the paragraph contains any factual allegations, the Intervening Defendants lack

sufficient information and belief as to the truth or falsity of said allegations, and therefore, deny

same, putting the United States to its burden of proof.

14.     Wisconsin became a territory in 1836 and remained in that form until joining the Union as the thirtieth State on May 29, 1848. Until 1875, the area now known as Vilas County was part of Marathon County. The area subsequently became part of Lincoln County, until 1885, and then part of Oneida County, until 1893. On April 12, 1893, Vilas County, with its current geographical boundaries, was created.

ANSWER:     Some or all of the allegations contained in Paragraph 14 of the Complaint

call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required.

To the extent that the paragraph contains any factual allegations, the Intervening Defendants lack

sufficient information and belief as to the truth or falsity of said allegations, and therefore, deny

same, putting the United States to its burden of proof.

15.     The Town was established on June 5, 1900. At that time, the Township extended north to the Michigan border. Following divisions to the Town of Presque Isle in 1907 and the Town of Manitowish Waters in 1928, the Town assumed its present boundaries.

ANSWER:     The Intervening Defendants lack sufficient information and belief as to the

truth or falsity of the allegations contained in Paragraph 15 of the Complaint, and therefore, deny

same, putting the United States to its burden of proof.

16.     Today, the Reservation consists of approximately 86,600 acres of land. The United States holds legal title to 39,403 acres of land held in trust for the Band, and to 18,532 acres of allotted land in trust for individual Indian beneficial owners, including the Allottees.

ANSWER:     The Intervening Defendants lack sufficient information and belief as to the

truth or falsity of the allegations contained in Paragraph 16 of the Complaint, and therefore, deny

same, putting the United States to its burden of proof.

17.     Due to allotment and the subsequent issuance of fee patents for some of the allotments, portions of the lakefront property on the Reservation have transferred to private ownership. Tracts of privately owned, non-Indian land thus lie amidst the Band's and Allottees' lands constituting the subject matter of this Complaint.

ANSWER:     Upon information and belief, the Intervening Defendants admit the

allegations contained in Paragraph 17 of the Complaint.

## B.    The Expired ROWs

### *Annie Sunn Lane*

18.    Exercising its authority under the ROW Act, the BIA approved three ROWs granted to Northwoods for the construction and use of Annie Sunn Lane across land owned by the United States in trust for the Band and fifty-six Allottees. Two of these ROWs are at issue in this case.

ANSWER:    Some or all of the allegations contained in Paragraph 18 of the Complaint

call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required.

To the extent that the paragraph contains any factual allegations, the Intervening Defendants

admit that three rights of way for Annie Sunn Lane were granted to Northwoods, as the

developer of the lands now owed by the Annie Sunn Lane residents, and affirmatively assert that

the rights of way were granted for the benefit of the Annie Sunn Lane residents, including, but

not limited to, some of the named Intervening Defendants.  The Intervening Defendants lack

sufficient information and belief as to the truth or falsity of the remaining allegations, and

therefore, deny same, putting the United States to its burden of proof.

19.    On April 28, 1964, the BIA approved ROW 432-2575964 for a segment of Annie Sunn Lane (the "First Annie Sunn Lane ROW"). A copy of ROW 432-2575964 is attached hereto as Exhibit 1 and incorporated by reference herein.

ANSWER:    The Intervening Defendants admit that a survey of the east-west segment

of Annie Sunn Lane at issue in this case is attached as Exhibit 1 to the Complaint, and that said

survey is in writing and speaks for itself, and deny all allegations characterizing the survey,

reciting what it allegedly states, or describing its alleged legal effect.  The Intervening

Defendants lack sufficient information and belief as to the truth or falsity of the remaining

allegations in Paragraph 19 of the Complaint, and therefore, deny same, putting the United States

to its burden of proof.  The Intervening Defendants affirmatively assert that a right of way for the

east-west segment of Annie Sunn Lane may not have been necessary because the allottees of the

SE 1/4 of the SE 1/4 of Section 9, the SW 1/4 of the SW 1/4 of Section 10, the NW 1/4 of the

NW 1/4 of Section 15 and the NE 1/4 of the NE 1/4 of Section 16 of Township 41 North, Range

5 East (the parcels of land on which the east-west segment of Annie Sunn Lane sits) previously

granted permission to use the land to build transportation routes for vehicular access by signing

forms entitled, "Permission of the Allottee or Owner to Place Improvements On and Across His

(Their) Land for the Performance of Useful Public Work for the Relief of Unemployment

Pursuant to Executive Order of May 12, 1933," which provided that the allottees "grant[ed] to

the United States right of ways on and across said allotments and tracts of land on the said

Reservation of the opening and establishing of necessary roadways, trails, and all other uses…."

20.     The term of the First Annie Sunn Lane ROW was fifty years, beginning April 28, 1964, and expiring April 27, 2014.

<u>ANSWER</u>:     Some or all of the allegations contained in Paragraph 20 of the Complaint

call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required.

To the extent that the paragraph contains any factual allegations, the Intervening Defendants

admit that a survey of the east-west segment of Annie Sunn Lane at issue is attached as Exhibit 1

to the Complaint, and that said survey is in writing and speaks for itself, and deny all allegations

characterizing the survey, reciting what it allegedly states, or describing its alleged legal effect.

The Intervening Defendants lack sufficient information and belief as to the truth or falsity of the

remaining allegations, and therefore, deny same, putting the United States to its burden of proof.

The Intervening Defendants affirmatively assert that the First Annie Sunn Lane ROW was never

recorded in the Register of Deeds office for Vilas County or any other searchable recording

system available to the public that would provide notice of the alleged expiration of the right of

way contained therein, and that the Intervening Defendants are bona fide purchasers for value

who took title to their homes without notice of the alleged expiration of the right of way over the east-west segment of Annie Sunn Lane.

21.     The United States is informed and believes, and on that basis alleges, that Northwoods assigned the First Annie Sunn Lane ROW to the Town at some point during the ROW term.

ANSWER:     Upon information and belief, the Intervening Defendants deny that Northwoods expressly assigned the First Annie Sunn Lane ROW to the Town, but affirmatively assert that Northwoods intended to assign the First Annie Sunn ROW along with the Second Annie Sunn ROW to the Town for the purpose of providing public access for the Annie Sunn Lane residents who purchased lots from the developer.  The Intervening Defendants lack sufficient information and belief as to the truth or falsity of the remaining allegations contained in Paragraph 21 of the Complaint, and therefore, deny same, putting the United States to its burden of proof.

22.     The First Annie Sunn ROW expired by its own terms on April 27, 2014.

ANSWER:     Some or all of the allegations contained in Paragraph 22 of the Complaint call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required. To the extent that the paragraph contains any factual allegations, the Intervening Defendants lack sufficient information and belief as to the truth or falsity of said allegations, and therefore, deny same, putting the United States to its burden of proof.

23.     The Town never applied to renew the First Annie Sunn ROW prior to its expiration; the Band and the Allottees never consented to renewal of the First Annie Sunn ROW; and the BIA never granted a renewal.

ANSWER:     Upon information and belief, the Intervening Defendants admit the allegations contained in Paragraph 23 of the Complaint, but affirmatively assert that the Town may not be required by law or in equity to renew the First Annie Sunn Lane ROW.

24. In a letter dated February 6, 2014, the BIA notified local residents that the First Annie Sunn ROW would expire by its terms on April 27, 2014.

ANSWER: The Intervening Defendants admit that some residents on Annie Sunn Lane received a letter from the BIA, dated February 6, 2014, but affirmatively assert that said letter is in writing and speaks for itself, and deny all remaining allegations in Paragraph 24 of the Complaint characterizing the letter, reciting what it allegedly states, or describing its alleged legal effect.

25. On February 19, 1968, the BIA approved ROW 432-1521 for a second segment of Annie Sunn Lane (the "Second Annie Sunn Lane ROW"). A copy of ROW 432-1521 is attached hereto as Exhibit 2 and incorporated by reference herein.

ANSWER: The Intervening Defendants admit that a survey of the north-south segment of Annie Sunn Lane at issue in this case is attached as Exhibit 2 to the Complaint, and that said survey is in writing and speaks for itself, and deny all allegations characterizing the survey, reciting what it allegedly states, or describing its alleged legal effect. The Intervening Defendants lack sufficient information and belief as to the truth or falsity of the remaining allegations in Paragraph 25 of the Complaint, and therefore, deny same, putting the United States to its burden of proof. The Intervening Defendants affirmatively assert that a right of way for the north-south segment of Annie Sunn Lane may not have been necessary because the Town previously had the right to build a public road in the NE ¼ and the SE 1/4 of the NE 1/4 of Section 16 of Township 41 North, Range 5 East (the parcels of land on which the north-south portion of Annie Sunn Lane sits).

26. The term of the Second Annie Sunn Lane ROW was fifty years, beginning February 19, 1968, and expiring February 18, 2018.

ANSWER: Some or all of the allegations contained in Paragraph 26 of the Complaint call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required. To the extent that the paragraph contains any factual allegations, the Intervening Defendants

admit that a survey of the north-south section of Annie Sunn Lane at issue in this case is attached as Exhibit 2 to the Complaint, and that said survey is in writing and speaks for itself, and deny all allegations characterizing the survey, reciting what it allegedly states, or describing its alleged legal effect. The Intervening Defendants deny that the right of way grant contains a limited term of years, and affirmatively assert that the Band passed a tribal resolution expressly providing that Northwoods was authorized to assign the right of grant to the Town and that the right of way grant was "without limitation as to term of years." The Intervening Defendants lack sufficient information and belief as to the truth or falsity of the remaining allegations, and therefore, deny same, putting the United States to its burden of proof. The Intervening Defendants affirmatively assert that the Second Annie Sunn Lane ROW was never recorded in the Register of Deeds office for Vilas County or any other searchable recording system available to the public that would provide notice of the alleged expiration of the right of way contained therein, and that the Intervening Defendants are bona fide purchasers for value who took title to their homes without notice of the alleged expiration of the right of way over the north-south segment of Annie Sunn Lane.

27. The United States is informed and believes, and on that basis alleges, that Northwoods assigned the Second Annie Sunn Lane ROW to the Town at some point during the ROW term.

ANSWER: The Intervening Defendants admit that Northwoods assigned an "easement for public road right-of-way dated February 19, 1968 covering Lac du Flambeau tribal lands," which are owned by the United States, in the E 1/2 of the NE 1/4 of Section 16 of Township 41 North, Range 5 East (the parcel of land on which the north-south segment of Annie Sunn Lane sits) to the Town by an Assignment of Easement, dated September 22, 1971. The Intervening Defendants lack sufficient information and belief as to the truth or falsity of the remaining

allegations contained in Paragraph 27 of the Complaint, and therefore, deny same, putting the

United States to its burden of proof.

28.    The Second Annie Sunn Lane ROW expired by its own terms on February 18, 2018.

ANSWER:    Some or all of the allegations contained in Paragraph 28 of the Complaint

call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required.

To the extent that the paragraph contains any factual allegations, the Intervening Defendants

deny the allegations.

29.    The Town never applied to renew the Second Annie Sunn Lane ROW prior to its expiration; the Band and the Allottees never consented to the renewal of the Second Annie Sunn Lane ROW; and the BIA never granted a renewal.

ANSWER:    Upon information and belief, the Intervening Defendants admit the

allegations contained in Paragraph 29 of the Complaint, but affirmatively assert that the Town

was not required by law or in equity to renew the Second Annie Sunn Lane ROW.

### *Center Sugarbush Lane*

30.    Exercising its authority under the ROW Act, the BIA approved ROW 432-4391964 granting an easement to Northwoods for the construction and use of Center Sugarbush Lane across land owned by the United States in trust for the Band and fifteen Allottees (the "Center Sugarbush Lane ROW"). A copy of ROW 432-4391964 is attached hereto as Exhibit 3 and incorporated by reference herein.

ANSWER:    Some or all of the allegations contained in Paragraph 30 of the Complaint

call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required.

To the extent that the paragraph contains any factual allegations, the Intervening Defendants

admit that a survey of the segment of Center Sugarbush Lane at issue in this case is attached as

Exhibit 3 to the Complaint, and that said survey is in writing and speaks for itself, and deny all

allegations characterizing the survey, reciting what it allegedly states, or describing its alleged

legal effect.  The Intervening Defendants admit that a right of way for Center Sugarbush Lane

was granted to Northwoods, as the developer of the lands now owed by the Center Sugarbush Lane residents, and affirmatively assert that the rights of way were granted for the benefit of the Center Sugarbush Lane residents, including, but not limited to, some of the named Intervening Defendants. The Intervening Defendants lack sufficient information and belief as to the truth or falsity of the remaining allegations, and therefore, deny same, putting the United States to its burden of proof. The Intervening Defendants affirmatively assert that a right of way for Center Sugarbush Lane may not have been necessary because the allottees of the SE 1/4 of the NW 1/4 of Section 20 of Township 41 North, Range 5 East (the parcel of land on which Center Sugarbush Lane sits) previously granted permission to use the land to build a transportation route known as Sugar Bush Trail by signing forms entitled, "Permission of the Allottee or Owner to Place Improvements On and Across His (Their) Land for the Performance of Useful Public Work for the Relief of Unemployment Pursuant to Executive Order of May 12, 1933," which provided that the allottees "grant[ed] to the United States right of ways on and across said allotments and tracts of land on the said Reservation of the opening and establishing of necessary roadways, trails, and all other uses…."

31. The term of the Center Sugarbush Lane ROW was fifty years, beginning July 28, 1964, and expiring July 27, 2014.

ANSWER: Some or all of the allegations contained in Paragraph 31 of the Complaint call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required. To the extent that the paragraph contains any factual allegations, the Intervening Defendants admit that a survey of the segment of Center Sugarbush Lane at issue in this case is attached as Exhibit 3 to the Complaint, and that said survey is in writing and speaks for itself, and deny all allegations characterizing the survey, reciting what it allegedly states, or describing its alleged legal effect. The Intervening Defendants lack sufficient information and belief as to the truth or

falsity of the remaining allegations, and therefore, deny same, putting the United States to its burden of proof. The Intervening Defendants affirmatively assert that the Center Sugarbush Lane ROW was never recorded in the Register of Deeds office for Vilas County or any other searchable recording system available to the public that would provide notice of the alleged expiration of the right of way contained therein, and that the Intervening Defendants are bona fide purchasers for value who took title to their homes without notice of the alleged expiration of the right of way over Center Sugarbush Lane.

32. The United States is informed and believes, and on that basis alleges, that Northwoods assigned the Center Sugarbush Lane ROW to the Town at some point during the ROW term.

<u>ANSWER</u>: The Intervening Defendants admit that Northwoods deeded a strip of land, 66 feet in width, for purposes of a public road in the SE 1/4 of the NW 1/4 of Section 20 of Township 41 North, Range 5 East (the parcel of land on which Center Sugarbush Lane sits) with a legal description that matches the current location of Center Sugarbush Lane, to the Town by Quit Claim Deed, dated January 20, 1965 and recorded on March 30, 1965 in Vol. 185, Page 93, as Document No. 120360. The Intervening Defendants lack sufficient information and belief as to the truth or falsity of the remaining allegations contained in Paragraph 32 of the Complaint, and therefore, deny same, putting the United States to its burden of proof.

33. In a letter dated December 4, 2013, the BIA notified local residents that the Center Sugarbush Lane ROW would expire by its terms on July 27, 2014.

<u>ANSWER</u>: The Intervening Defendants admit that some residents on Center Sugarbush Lane received a letter from the BIA, dated December 4, 2013, but affirmatively assert that said letter is in writing and speaks for itself, and deny all remaining allegations in Paragraph 33 of the Complaint characterizing the letter, reciting what it allegedly states, or describing its alleged legal effect.

34.     In a letter dated January 2, 2014, the Town informed residents of Center Sugarbush Lane that the Town was aware of the impending expiration of the Center Sugarbush Lane ROW and that "[t]he Town Board intends to protect the road as a Town Road." The letter thus requested that residents "<u>not</u> engage in further communication with the BIA" about renewing the Center Sugarbush Lane ROW "because it is important that all communications come through the Town Board and its attorney."

ANSWER:     The Intervening Defendants admit that some residents on Center Sugarbush Lane received a letter from the Town, dated January 2, 2014, but affirmatively assert that said letter is in writing and speaks for itself, and deny all remaining allegations in Paragraph 34 of the Complaint characterizing the letter, reciting what it allegedly states, or describing its alleged legal effect.

35.     The Center Sugarbush Lane ROW expired by its own terms on July 27, 2014.

ANSWER:     Some or all of the allegations contained in Paragraph 35 of the Complaint call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required. To the extent that the paragraph contains any factual allegations, the Intervening Defendants lack sufficient information and belief as to the truth or falsity of said allegations, and therefore, deny same, putting the United States to its burden of proof.

36.     The Town never applied to renew the Center Sugarbush Lane ROW prior to its expiration; the Band and the Allottees never consented to renewal of the Center Sugarbush Lane ROW; and the BIA never granted a renewal.

ANSWER:     Upon information and belief, the Intervening Defendants admit the allegations contained in Paragraph 36 of the Complaint, but affirmatively assert that the Town may not be required by law or in equity to renew the Center Sugarbush Lane ROW.

### ***East Ross Allen Lake Lane***

37.     Exercising its authority under the ROW Act, the BIA approved ROW 432-1869964 granting an easement to Northwoods for the construction and use of East Ross Allen Lake Lane across land owned by the United States in trust for the Band (the "East Ross Allen Lake Lane ROW"). A copy of ROW 432-1869964 is attached hereto as Exhibit 4 and incorporated by reference herein.

ANSWER: Some or all of the allegations contained in Paragraph 37 of the Complaint call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required. To the extent that the paragraph contains any factual allegations, the Intervening Defendants admit that a survey of the segment of East Ross Allen Lake Lane at issue in this case is attached as Exhibit 4 to the Complaint, and that said survey is in writing and speaks for itself, and deny all allegations characterizing the survey, reciting what it allegedly states, or describing its alleged legal effect. The Intervening Defendants admit that a right of way for East Ross Allen Lake Lane was granted to Northwoods, as the developer of the lands now owed by the East Ross Allen Lake Lane residents, and affirmatively assert that the rights of way were granted for the benefit of the East Ross Allen Lake Lane residents, including, but not limited to, some of the named Intervening Defendants. The Intervening Defendants lack sufficient information and belief as to the truth or falsity of the remaining allegations, and therefore, deny same, putting the United States to its burden of proof.

38.     The term of the East Ross Allen Lake Lane ROW was fifty years, beginning March 17, 1964, and expiring March 16, 2014.

ANSWER: Some or all of the allegations contained in Paragraph 38 of the Complaint call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required. To the extent that the paragraph contains any factual allegations, the Intervening Defendants admit that a survey of the segment of East Ross Allen Lake Lane at issue in this case is attached as Exhibit 4 to the Complaint, and that said survey is in writing and speaks for itself, and deny all allegations characterizing the survey, reciting what it allegedly states, or describing its alleged legal effect. The Intervening Defendants lack sufficient information and belief as to the truth or falsity of the remaining allegations, and therefore, deny same, putting the United States to its burden of proof. The Intervening Defendants affirmatively assert that the East Ross Allen Lake

Lane ROW was never recorded in the Register of Deeds office for Vilas County or any other searchable recording system available to the public that would provide notice of the alleged expiration of the right of way contained therein, and that the Intervening Defendants are bona fide purchasers for value who took title to their homes without notice of the alleged expiration of the right of way over East Ross Allen Lake Lane.

39. The United States is informed and believes, and on that basis alleges, that Northwoods assigned the East Ross Allen Lake Lane ROW to the Town at some point during the ROW term.

ANSWER: The Intervening Defendants admit that Northwoods conveyed its rights, title and interest in the "right-of-way granted by the Lac du Flambeau Tribal Council under Tribal Resolution No. 79(63), dated September 23, 1963" for purposes of a public road in Government Lot 6, Section 2 of Township 40 North, Range 4 East (the parcel of land on which East Ross Allen Lake Lane sits) to the Town by Quit Claim Deed, dated January 20, 1965 and recorded on March 30, 1965 in Vol. 185, Page 94, as Document No. 120361. The Intervening Defendants lack sufficient information and belief as to the truth or falsity of the remaining allegations contained in Paragraph 39 of the Complaint, and therefore, deny same, putting the United States to its burden of proof.

40. In a letter dated December 5, 2013, the BIA notified local residents that the East Ross Allen Lake Lane ROW would expire by its terms on March 16, 2014.

ANSWER: The Intervening Defendants admit that some residents on East Ross Allen Lake Lane received a letter from the BIA, dated December 5, 2013, but affirmatively assert that said letter is in writing and speaks for itself, and deny all remaining allegations in Paragraph 40 of the Complaint characterizing the letter, reciting what it allegedly states, or describing its alleged legal effect.

41. In a letter dated January 2, 2014, the Town informed residents of East Ross Allen Lake Lane that the Town was aware of the impending expiration of the East Ross Allen Lake

Lane ROW and that "[t]he Town Board intends to protect the road as a Town Road." The letter thus requested that residents "not engage in further communication with the BIA" about renewing the ROW "because it is important that all communications come through the Town Board and its attorney."

ANSWER:    The Intervening Defendants admit that some residents on East Ross Allen Lake Lane received a letter from the Town, dated January 2, 2014, but affirmatively assert that said letter is in writing and speaks for itself, and deny all remaining allegations in Paragraph 41 of the Complaint characterizing the letter, reciting what it allegedly states, or describing its alleged legal effect.

42.    The East Ross Allen Lake Lane ROW expired by its own terms on March 16, 2014.

ANSWER:    Some or all of the allegations contained in Paragraph 42 of the Complaint call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required. To the extent that the paragraph contains any factual allegations, the Intervening Defendants lack sufficient information and belief as to the truth or falsity of said allegations, and therefore, deny same, putting the United States to its burden of proof.

43.    The Town never applied to renew the East Ross Allen Lake Lane ROW prior to its expiration; the Band never consented to renewal of the East Ross Allen Lake Lane ROW; and the BIA never granted a renewal.

ANSWER:    Upon information and belief, the Intervening Defendants admit the allegations contained in Paragraph 43 of the Complaint, but affirmatively assert that the Town may not be required by law or in equity to renew the East Ross Allen Lake Lane ROW.

### *Elsie Lake Lane*

44.    Exercising its authority under the ROW Act, the BIA approved ROW 432-11462961 granting an easement to Patterson for the construction and use of Elsie Lake Lane across land owned by the United States in trust for the Band and seven Allottees (the "Elsie Lake Lane ROW"). A copy of ROW 432-11462961 is attached hereto as Exhibit 5 and incorporated by reference herein.

ANSWER:    Some or all of the allegations contained in Paragraph 44 of the Complaint call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required. To the extent that the paragraph contains any factual allegations, the Intervening Defendants admit that a survey of the north-south segment of Elsie Lake Lane at issue in this case is attached as Exhibit 5 to the Complaint, and that said survey is in writing and speaks for itself, and deny all allegations characterizing the survey, reciting what it allegedly states, or describing its alleged legal effect. The Intervening Defendants admit that a right of way for Elsie Lake Lane was granted to a developer of the lands now owed by the Elsie Lake Lane residents, and affirmatively assert that the right of way was granted for the benefit of the Elsie Lake Lane residents, including, but not limited to, some of the named Intervening Defendants. The Intervening Defendants lack sufficient information and belief as to the truth or falsity of the remaining allegations, and therefore, deny same, putting the United States to its burden of proof.

45.    The term of the Elsie Lake Lane ROW was fifty years, beginning October 23, 1961, and expiring October 22, 2011.

ANSWER:    Some or all of the allegations contained in Paragraph 45 of the Complaint call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required. To the extent that the paragraph contains any factual allegations, the Intervening Defendants admit that a survey of the north-south segment of Elsie Lake Lane at issue in this case is attached as Exhibit 5 to the Complaint, and that said survey is in writing and speaks for itself, and deny all allegations characterizing the survey, reciting what it allegedly states, or describing its alleged legal effect. The Intervening Defendants lack sufficient information and belief as to the truth or falsity of the remaining allegations, and therefore, deny same, putting the United States to its burden of proof. The Intervening Defendants affirmatively assert that the Elsie Lake Lane ROW was never recorded in the Register of Deeds office for Vilas County or any other searchable

recording system available to the public that would provide notice of the alleged expiration of the right of way contained therein, and that the Intervening Defendants are bona fide purchasers for value who took title to their homes without notice of the alleged expiration of the right of way over Elsie Lake Lane.

46. The United States is informed and believes, and on that basis alleges, that Patterson assigned the Elsie Lake Lane ROW to the Town at some point during the ROW term.

ANSWER: Upon information and belief, the Intervening Defendants admit that Patterson conveyed its rights, title and interest in the Elsie Lake Lane ROW to the Town. The Intervening Defendants lack sufficient information and belief as to the truth or falsity of the remaining allegations contained in Paragraph 46 of the Complaint, and therefore, deny same, putting the United States to its burden of proof.

47. The Elsie Lake Lane ROW expired by its own terms on October 22, 2011.

ANSWER: Some or all of the allegations contained in Paragraph 47 of the Complaint call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required. To the extent that the paragraph contains any factual allegations, the Intervening Defendants lack sufficient information and belief as to the truth or falsity of said allegations, and therefore, deny same, putting the United States to its burden of proof.

48. The Town never applied to renew the Elsie Lake Lane ROW prior to its expiration; the Band and the Allottees never consented to renewal of the Elsie Lake Lane ROW; and the BIA never granted a renewal.

ANSWER: Upon information and belief, the Intervening Defendants admit the allegations contained in Paragraph 48 of the Complaint, but affirmatively assert that the Town may not be required by law or in equity to renew the Elsie Lake Lane ROW.

**C.  The Town of Lac du Flambeau's Continuing Trespass**

49. At various times since expiration of the First Annie Sunn Lane ROW, the Second Annie Sunn Lane ROW, the Center Sugarbush Lane ROW, the East Ross Allen Lake Lane

ROW, and the Elsie Lake Lane ROW, the Town, local residents, and title insurance companies have engaged in negotiations with the Band to resolve the issue of the expired ROWs. The parties have not reached an agreement to bring any of the ROWs into compliance with Federal law.

ANSWER:    Some or all of the allegations contained in Paragraph 49 of the Complaint call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required. To the extent that the paragraph contains any factual allegations, upon information and belief, the Intervening Defendants admit that the Town, local residents and title insurance companies have engaged in negotiations with the Band to resolve the road issues on the Lac du Flambeau reservations for more than a decade, well before the First Annie Sunn Lane ROW, the Second Annie Sunn Lane ROW, the Center Sugarbush Lane ROW, the East Ross Allen Lake Lane ROW, and the Elsie Lake Lane ROW allegedly expired, and that said negotiations were unsuccessful as to Annie Sunn Lane, Center Sugarbush, East Ross Allen Lake Lane and Elsie Lake Lane.  The Intervening Defendants affirmatively assert that, because the Band listed all four of the roads on the National Tribal Transportation Facilities Inventory ("Inventory") in the Tribal Transportation Program ("TTP"), formerly known as the Indian Reservation Roads Program ("IRR"), said roads were under the jurisdiction of and maintained by a "public authority" (a federal, state, county, town or township, Indian Tribe, municipal or instrumentality with authority to maintain the road) and as a result must remain open for public use under federal law, and therefore, rights of way for said roads were and are not required.  The Intervening Defendants lack sufficient information and belief as to the truth or falsity of the remaining allegations, and therefore, deny same, putting the United States to its burden of proof.

50.    On or about January 19, 2023, the Band notified the Town, local residents, and title insurance companies that because negotiations to resolve the issue of the expired ROWs were stalled, the Band intended, beginning January 31, 2023, to limit public access over and across those portions of Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane, and Elsie Lake Lane situated on land owned by the United States in trust for the Band and the Allottees.

<u>ANSWER</u>:     The Intervening Defendants deny that the Band notified them that it intended to close Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane or Elsie Lake Lane, and affirmatively assert that some residents of these roads received a letter from the Band, dated January 19, 2023, stating that "commencing on January 31, 2023, the Tribe reserves the right to limit access[, which] may include, but is not limited to, posting of signs, road checkpoints, and/or physical barriers." The Intervening Defendants lack sufficient information and belief as to the truth or falsity of the remaining allegations in Paragraph 50 of the Complaint, and therefore, deny same, putting the United States to its burden of proof.

51.     On January 31, 2023, the Band began limiting public access over and across those portions of Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane, and Elsie Lake Lane situated on land owned by the United States in trust for the Band and the Allottees, and the Band continued to limit public access over and across those roads until March 13, 2023.

<u>ANSWER</u>:     The Intervening Defendants admit that members of the Band's tribal council and other tribe members completely barricaded Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane, and Elsie Lake Lane, using concrete cinder blocks and metal chains, from January 31, 2023 through March 13, 2023. The Intervening Defendants lack sufficient information and belief as to the truth or falsity of the remaining allegations in Paragraph 51 of the Complaint, and therefore, deny same, putting the United States to its burden of proof.

52.     On February 2, 2023, the Band formally requested the BIA's assistance in remedying the Town's unauthorized use and occupancy of those portions of Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane, and Elsie Lake Lane situated on land owned by the United States in trust for the Band and the Allottees.

<u>ANSWER</u>:     The Intervening Defendants lack sufficient information and belief as to the truth or falsity of the allegations in Paragraph 52 of the Complaint, and therefore, deny same, putting the United States to its burden of proof.

53.     On March 13, 2023, the Band reopened those portions of Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane, and Elsie Lake Lane situated on land owned by the United States in trust for the Band and the Allottees to public access pursuant to an agreement between the Band and the Town providing that the Band would permit temporary public access over and across those roads for up to ninety days.

ANSWER:     The Intervening Defendants admit that, on March 13, 2023, the Band opened the barricades, which allowed for homeowners' access to resume. Upon information and belief, the Intervening Defendants admit that the Band reopened the roads pursuant to temporary access permits issued to the Town, which required the Town to pay $20,000 per month ($5,000 for each of the four roads) in exchange for one month of homeowners' access and was renewable for three months, and that the Band has since required the Town to pay $2,000 per month in addition to the amount paid for the prior permit (an escalation clause that would effectively double the monthly payment within 10 months). The Intervening Defendants affirmatively assert that the temporary access permits by their own terms and the terms of the tribal resolution implementing the permits' scheme do not permit public access but rather temporary access for the homeowners. The Intervening Defendants lack sufficient information and belief as to the truth or falsity of the remaining allegations in Paragraph 53 of the Complaint, and therefore, deny same, putting the United States to its burden of proof.

54.     On or about March 15, 2023, the Band's Council formally requested that the BIA remove those portions of Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane, and Elsie Lake Lane situated on land owned by the United States in trust for the Band and the Allottees from the National Tribal Transportation Facilities Inventory ("Inventory") pursuant to 25 C.F.R. § 170.444(b)(1). Indian tribes become eligible to receive funding from the Tribal Transportation Program for planning, construction, improvement, and maintenance of roads that tribes choose to list on the Inventory. The Band never expended any federal transportation funds on Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane, and Elsie Lake Lane, and the Council decided to remove the roads from the Inventory.

ANSWER:     Some or all of the allegations contained in Paragraph 54 of the Complaint call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required. To the extent that the paragraph contains any factual allegations, upon information and belief, the

Intervening Defendants admit that the Band requested the BIA remove Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane, and Elsie Lake Lane from the Inventory to circumvent the causes of action brought by some of the Intervening Defendants in their lawsuit against the Band's tribal council members who barricaded the roads. The Intervening Defendants lack sufficient information and belief as to the truth or falsity of the remaining allegations, and therefore, deny same, putting the United States to its burden of proof. Upon information and belief, the Intervening Defendants affirmatively assert the Band received federal transportation funds for listing the four roads on the NTTFI for decades, and that the Band had no need to expend any federal transportation funds they received because the Town and the residents of Annie Sunn Lane maintained the roads.

55. On March 30, 2023, the BIA notified the Band that, effective March 24, 2023, the BIA approved the Band's update request and removed Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane, and Elsie Lake Lane from the Inventory pursuant to 25 C.F.R. § 170.444(b)(3). The BIA first determined pursuant to 25 C.F.R. § 170.444(b)(2)(i) that the Band had not expended any federal transportation funds on the roads and otherwise validated the Band's request.

ANSWER: Some or all of the allegations contained in Paragraph 55 of the Complaint call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required. To the extent that the paragraph contains any factual allegations, the Intervening Defendants deny that the BIA had the authority to remove Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane, and Elsie Lake Lane from the Inventory, including via the unconstitutional and unlawful process by which the BIA attempted to remove the roads from the Inventory and denies the homeowners any appeal rights, which violates 25 C.F.R. Part 2 and the U.S. Constitution, including the Fifth Amendment. The Intervening Defendants affirmatively assert that the BIA did not, and continues to fail to, follow the proper constitutional and regulatory procedures in purportedly removing the four roads from the Inventory. The

Intervening Defendants affirmatively assert that some of the Intervening Defendants have appealed the BIA's ineffective decision and are continuing to pursue their appellate rights. The Intervening Defendants affirmatively assert that because the BIA failed and continues to fail to follow the relevant regulations under 25 C.F.R. Part 2, the BIA decision to remove the roads was and remains ineffective and not final; thus, the roads remain on the Inventory. The Intervening Defendants lack sufficient information and belief as to the truth or falsity of the remaining allegations, and therefore, deny same, putting the United States to its burden of proof.

56. Notwithstanding the Band's and the Town's temporary access agreement, the Town has not brought the portions of Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane, and Elsie Lake Lane situated on land owned by the United States in trust for the Band and the Allottees into conformity with the requirements of the ROW Act, and as a result continued use of the roads by the Town constitutes a trespass.

ANSWER: Some or all of the allegations contained in Paragraph 56 of the Complaint call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required. To the extent that the paragraph contains any factual allegations, the Intervening Defendants deny that the Town is required to obtain new rights of way for Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane, and Elsie Lake Lane under the ROW Act for all the reasons set forth above in the responses to the preceding paragraphs. The Intervening Defendants also affirmatively assert that the temporary access permits grant the Town permission to use the four roads as public roadways and therefore the continued use of the roads by the Town cannot constitute trespass by law or in equity. The Intervening Defendants lack sufficient information and belief as to the truth or falsity of the remaining allegations, and therefore, deny same, putting the United States to its burden of proof.

57. Since the expiration of the First Annie Sunn Lane ROW, the Second Annie Sunn Lane ROW, the Center Sugarbush Lane ROW, the East Ross Allen Lake Lane ROW, and the Elsie Lake Lane ROW, the Town has operated, and continues to operate, those portions of Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane, and Elsie Lake Lane situated on

land owned by the United States in trust for the Band and the Allottees as public roads in violation of the requirements of the ROW Act.

ANSWER: Some or all of the allegations contained in Paragraph 57 of the Complaint call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required. To the extent that the paragraph contains any factual allegations, the Intervening Defendants deny that all of the rights of way for Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane, and Elsie Lake Lane have expired and deny that the Town is required to obtain new rights of way for the four roads under the ROW Act for all the reasons set forth above in the responses to the preceding paragraphs. The Intervening Defendants affirmatively assert that Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane, and Elsie Lake Lane are public roads under the Federal-Aid Highway Act of 1956, as amended 23 U.S.C. § 101 *et seq*. ("Federal-Aid Highway Act"). The Intervening Defendants lack sufficient information and belief as to the truth or falsity of the remaining allegations, and therefore, deny same, putting the United States to its burden of proof.

58. Notwithstanding expiration of the First Annie Sunn Lane ROW, the Second Annie Sunn Lane ROW, the Center Sugarbush Lane ROW, the East Ross Allen Lake Lane ROW, and the Elsie Lake Lane ROW, the Town, based on the most recently available records of the State of Wisconsin Department of Transportation, holds itself out as the public authority responsible for operating and maintaining Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane, and Elsie Lake Lane, including those portions of the roads situated on land owned by the United States in trust for the Band and the Allottees.

ANSWER: Some or all of the allegations contained in Paragraph 58 of the Complaint call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required. To the extent that the paragraph contains any factual allegations, the Intervening Defendants deny that all of the rights of way for Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane, and Elsie Lake Lane have expired and deny that the Town is required to obtain new rights of way for the four roads under the ROW Act for all the reasons set forth above in the

responses to the preceding paragraphs. The Intervening Defendants affirmatively assert that

Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane, and Elsie Lake Lane are

public roads under the Federal-Aid Highway Act, and that the Town continues to operate and

maintain the four roads, except for the east-west segment of Annie Sunn Lane, as it is required to

do by law. The Intervening Defendants lack sufficient information and belief as to the truth or

falsity of the remaining allegations, and therefore, deny same, putting the United States to its

burden of proof.

59. The Town's use and occupation of those portions of Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane, and Elsie Lake Lane situated on land owned by the United States in trust for the Band and the Allottees, as described above, has been and continues to be knowing, intentional, willful, without valid consent, and contrary to Federal law.

ANSWER: Some or all of the allegations contained in Paragraph 59 of the Complaint

call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required.

To the extent that the paragraph contains any factual allegations, the Intervening Defendants

deny that the Town needs additional consent to use Annie Sunn Lane, Center Sugarbush Lane,

East Ross Allen Lake Lane, and Elsie Lake Lane because they are public roads under the

Federal-Aid Highway Act, and deny that such use and occupation is contrary to federal law. The

Intervening Defendants lack sufficient information and belief as to the truth or falsity of the

remaining allegations, and therefore, deny same, putting the United States to its burden of proof.

## FIRST CLAIM FOR RELIEF
### Trespass

60. The United States incorporates by reference each of the preceding paragraphs above as though fully set forth herein.

ANSWER: The Intervening Defendants incorporate by reference all of their answers

and affirmative assertions to the allegations contained in the preceding paragraphs, as though

fully set forth herein.

61.    Since at least October 23, 2011, without authorization and legal right, the Town has willfully occupied and used the Band's and Allottees' lands described in the Elsie Lake Lane ROW and any appurtenances located thereon in the continuing operation of the Town's road system. As a result of its unauthorized and continuing unlawful use, the Town has committed and is now committing a continuing willful trespass on the Band's and Allottees' lands, to which the United States holds title for the benefit of the Band and the Allottees.

ANSWER:    Plaintiff United States' cause of action for Trespass is against defendant

Town of Lac du Flambeau, and therefore, Intervening Defendants affirmatively assert that they

are not required to answer the allegations contained in Paragraph 61 of the Complaint.  Some or

all of the allegations contained in said paragraph also call for a legal conclusion, and therefore,

no answer from the Intervening Defendants is required.  To the extent that an answer is required,

Intervening Defendants incorporate by reference all of their answers and affirmative assertions to

the allegations contained in the preceding paragraphs, including, but not limited to, paragraphs

44 through 48, as though fully set forth herein.  Intervening Defendants lack sufficient

information and belief as to the truth or falsity of the remaining allegations contained therein,

and therefore, deny same, putting the United States to its burden of proof.

62.    Since at least March 17, 2014, without authorization and legal right, the Town has willfully occupied and used the Band's lands described in the East Ross Allen Lake Lane ROW and any appurtenances located thereon in the continuing operation of the Town's road system. As a result of its unauthorized and continuing unlawful use, the Town has committed and is now committing a continuing willful trespass on the Band's lands, to which the United States holds title for the benefit of the Band.

ANSWER:    Plaintiff United States' cause of action for Trespass is against defendant

Town of Lac du Flambeau, and therefore, Intervening Defendants affirmatively assert that they

are not required to answer the allegations contained in Paragraph 62 of the Complaint.  Some or

all of the allegations contained in said paragraph also call for a legal conclusion, and therefore,

no answer from the Intervening Defendants is required.  To the extent that an answer is required,

Intervening Defendants incorporate by reference all of their answers and affirmative assertions to

the allegations contained in the preceding paragraphs, including, but not limited to, paragraphs

37 through 43, as though fully set forth herein. Intervening Defendants lack sufficient

information and belief as to the truth or falsity of the remaining allegations contained therein,

and therefore, deny same, putting the United States to its burden of proof.

63.    Since at least April 28, 2014, without authorization and legal right, the Town has
willfully occupied and used the Band's and Allottees' lands described in the First Annie Sunn
Lane ROW and any appurtenances located thereon in the continuing operation of the Town's
road system. As a result of its unauthorized and continuing unlawful use, the Town has
committed and is now committing a continuing willful trespass on the Band's and Allottees'
lands, to which the United States holds title for the benefit of the Band and the Allottees.

ANSWER:    Plaintiff United States' cause of action for Trespass is against defendant

Town of Lac du Flambeau, and therefore, Intervening Defendants affirmatively assert that they

are not required to answer the allegations contained in Paragraph 63 of the Complaint. Some or

all of the allegations contained in said paragraph also call for a legal conclusion, and therefore,

no answer from the Intervening Defendants is required. To the extent that an answer is required,

Intervening Defendants incorporate by reference all of their answers and affirmative assertions to

the allegations contained in the preceding paragraphs, including, but not limited to, paragraphs

19 through 24, as though fully set forth herein. Intervening Defendants lack sufficient

information and belief as to the truth or falsity of the remaining allegations contained therein,

and therefore, deny same, putting the United States to its burden of proof.

64.    Since at least July 28, 2014, without authorization and legal right, the Town has
willfully occupied and used the Band's and Allottees' lands described in the Center Sugarbush
Lane ROW and any appurtenances located thereon in the continuing operation of the Town's
road system. As a result of its unauthorized and continuing unlawful use, the Town has
committed and is now committing a continuing willful trespass on the Band's and Allottees'
lands, to which the United States holds title for the benefit of the Band and the Allottees.

ANSWER:    Plaintiff United States' cause of action for Trespass is against defendant

Town of Lac du Flambeau, and therefore, Intervening Defendants affirmatively assert that they

are not required to answer the allegations contained in Paragraph 64 of the Complaint. Some or

all of the allegations contained in said paragraph also call for a legal conclusion, and therefore,

no answer from the Intervening Defendants is required.  To the extent that an answer is required, Intervening Defendants incorporate by reference all of their answers and affirmative assertions to the allegations contained in the preceding paragraphs, including, but not limited to, paragraphs 30 through 36, as though fully set forth herein.  Intervening Defendants lack sufficient information and belief as to the truth or falsity of the remaining allegations contained therein, and therefore, deny same, putting the United States to its burden of proof.

65.     Since at least February 19, 2018, without authorization and legal right, the Town has willfully occupied and used the Band's and Allottees' lands described in the Second Annie Sunn Lane ROW and any appurtenances located thereon in the continuing operation of the Town's road system. As a result of its unauthorized and continuing unlawful use, the Town has committed and is now committing a continuing willful trespass on the Band's and Allottees' lands, to which the United States holds title for the benefit of the Band and the Allottees.

ANSWER:     Plaintiff United States' cause of action for Trespass is against defendant Town of Lac du Flambeau, and therefore, Intervening Defendants affirmatively assert that they are not required to answer the allegations contained in Paragraph 65 of the Complaint.  Some or all of the allegations contained in said paragraph also call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required.  To the extent that an answer is required, Intervening Defendants incorporate by reference all of their answers and affirmative assertions to the allegations contained in the preceding paragraphs, including, but not limited to, paragraphs 25 through 29, as though fully set forth herein.  Intervening Defendants lack sufficient information and belief as to the truth or falsity of the remaining allegations contained therein, and therefore, deny same, putting the United States to its burden of proof.

66.     As a direct and proximate result of the Town's continuing willful trespass, the Town has denied the Band and the Allottees full enjoyment of their property interests and damaged and continues to damage the Band and the Allottees and their land, and the governmental interests of the United States, and will continue to do so unless and until the trespass is remedied.

ANSWER: Plaintiff United States' cause of action for Trespass is against defendant Town of Lac du Flambeau, and therefore, Intervening Defendants affirmatively assert that they are not required to answer the allegations contained in Paragraph 66 of the Complaint. Some or all of the allegations contained in said paragraph also call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required. To the extent that an answer is required, Intervening Defendants incorporate by reference all of their answers and affirmative assertions to the allegations contained in the preceding paragraphs, as though fully set forth herein. Intervening Defendants lack sufficient information and belief as to the truth or falsity of the remaining allegations contained therein, and therefore, deny same, putting the United States to its burden of proof.

## SECOND CLAIM FOR RELIEF
### Ejectment

67. The United States incorporates by reference each of the preceding paragraphs above as though fully set forth herein.

ANSWER: The Intervening Defendants incorporate by reference all of their answers and affirmative assertions to the allegations contained in the preceding paragraphs, as though fully set forth herein.

68. Since at least October 23, 2011, without authorization and legal right, the Town has willfully occupied and used the Band's and Allottees' lands described in the Elsie Lake Lane ROW and any appurtenances located thereon in the continuing operation of the Town's road system.

ANSWER: The United States' cause of action for Ejectment is against the Town, and therefore, Intervening Defendants affirmatively assert that they are not required to answer the allegations contained in Paragraph 68 of the Complaint. Some or all of the allegations contained in said paragraph also call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required. To the extent that an answer is required, upon information and belief,

the Intervening Defendants deny the allegations, and affirmatively assert that the Elsie Lake

Lane residents have the right to use Elsie Lake Lane for public access to their homes for the

reasons set forth in the Intervening Defendants' counterclaims against the United States.

69.     Since at least March 17, 2014, without authorization and legal right, the Town has willfully occupied and used the Band's lands described in the East Ross Allen Lake Lane ROW and any appurtenances located thereon in the continuing operation of the Town's road system.

ANSWER:     The United States' cause of action for Ejectment is against the Town, and

therefore, Intervening Defendants affirmatively assert that they are not required to answer the

allegations contained in Paragraph 69 of the Complaint.  Some or all of the allegations contained

in said paragraph also call for a legal conclusion, and therefore, no answer from the Intervening

Defendants is required.  To the extent that an answer is required, upon information and belief,

the Intervening Defendants deny the allegations, and affirmatively assert that the East Ross Allen

Lake Lane residents have the right to use East Ross Allen Lake Lane for public access to their

homes for the reasons set forth in the Intervening Defendants' counterclaims against the United

States.

70.     Since at least April 28, 2014, without authorization and legal right, the Town has willfully occupied and used the Band's and Allottees' lands described in the First Annie Sunn Lane ROW and any appurtenances located thereon in the continuing operation of the Town's road system.

ANSWER:     The United States' cause of action for Ejectment is against the Town, and

therefore, Intervening Defendants affirmatively assert that they are not required to answer the

allegations contained in Paragraph 70 of the Complaint.  Some or all of the allegations contained

in said paragraph also call for a legal conclusion, and therefore, no answer from the Intervening

Defendants is required.  To the extent that an answer is required, upon information and belief,

the Intervening Defendants deny the allegations, and affirmatively assert that the Annie Sunn

Lane residents have the right to use Annie Sunn Lane for public access to their homes for the reasons set forth in the Intervening Defendants' counterclaims against the United States.

71.  Since at least July 28, 2014, without authorization and legal right, the Town has willfully occupied and used the Band's and Allottees' lands described in the Center Sugarbush Lane ROW and any appurtenances located thereon in the continuing operation of the Town's road system.

ANSWER:  The United States' cause of action for Ejectment is against the Town, and therefore, Intervening Defendants affirmatively assert that they are not required to answer the allegations contained in Paragraph 71 of the Complaint.  Some or all of the allegations contained in said paragraph also call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required.  To the extent that an answer is required, upon information and belief, the Intervening Defendants deny the allegations, and affirmatively assert that the Center Sugarbush Lane residents have the right to use Center Sugarbush Lane for public access to their homes for the reasons set forth in the Intervening Defendants' counterclaims against the United States.

72.  Since at least February 19, 2018, without authorization and legal right, the Town has willfully occupied and used the Band's and Allottees' lands described in the Second Annie Sunn Lane ROW and any appurtenances located thereon in the continuing operation of the Town's road system.

ANSWER:  The United States' cause of action for Ejectment is against the Town, and therefore, Intervening Defendants affirmatively assert that they are not required to answer the allegations contained in Paragraph 72 of the Complaint.  Some or all of the allegations contained in said paragraph also call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required.  To the extent that an answer is required, upon information and belief, the Intervening Defendants deny the allegations, and affirmatively assert that the Annie Sunn Lane residents have the right to use Annie Sunn Lane for public access to their homes for the reasons set forth in the Intervening Defendants' counterclaims against the United States.

73.     In the absence of valid grants of easement for right-of-way, the Town continues to unlawfully use and occupy the Band's and the Allottees' lands described in the Elsie Lake Lane ROW, the East Ross Allen Lake Lane ROW, the First Annie Sunn Lane ROW, the Center Sugarbush Lane ROW, and the Second Annie Sunn Lane ROW. As a direct and proximate result of its unauthorized and continuing illegal occupation and use, the Town has prevented and continues to prevent the Band and the Allottees from enjoying and using their lands, which the United States owns in trust for the benefit of the Band and the Allottees.

ANSWER:     The United States' cause of action for Ejectment is against the Town, and therefore, Intervening Defendants affirmatively assert that they are not required to answer the allegations contained in Paragraph 73 of the Complaint.  Some or all of the allegations contained in said paragraph also call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required.  To the extent that an answer is required, upon information and belief, the Intervening Defendants deny the allegations, and affirmatively assert that the Intervening Defendants have the right to use said roads for public access to their homes for the reasons set forth in the Intervening Defendants' counterclaims against the United States.  Intervening Defendants also affirmatively assert that the Band and the Allottees benefit from the roads because the roads provide the sole means of access to lots owned by the Band and tribal members and constitute improvements to the lands owned by the United States and held in trust for the Band and the Allottees, which increases its fair market value.

74.     The Town lacks any and all lawful right to use and occupy the Band's and Allottees' lands described in the Elsie Lake Lane ROW, the East Ross Allen Lake Lane ROW, the First Annie Sunn Lane ROW, the Center Sugarbush Lane ROW, and the Second Annie Sunn Lane ROW or otherwise to possess those lands in any way.

ANSWER:     The United States' cause of action for Ejectment is against the Town, and therefore, Intervening Defendants affirmatively assert that they are not required to answer the allegations contained in Paragraph 74 of the Complaint.  Some or all of the allegations contained in said paragraph also call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required.  To the extent that an answer is required, upon information and belief,

the Intervening Defendants deny the allegations, and affirmatively assert that the Intervening Defendants have the right to use said roads for public access to their homes for the reasons set forth in the Intervening Defendants' counterclaims against the United States.

75. The Town has defied, and continues to defy, the authority of the United States, acting through the BIA, by failing to comply with the ROW Act.

ANSWER: The United States' cause of action for Ejectment is against the Town, and therefore, Intervening Defendants affirmatively assert that they are not required to answer the allegations contained in Paragraph 75 of the Complaint. Some or all of the allegations contained in said paragraph also call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required. To the extent that an answer is required, upon information and belief, the Intervening Defendants deny the allegations, and affirmatively assert that the Intervening Defendants have the right to use said roads for public access to their homes for the reasons set forth in the Intervening Defendants' counterclaims against the United States.

76. The Town's occupation and use of the Band's and Allottees' lands is unlawful, and as a direct and proximate result of its trespass, the Town has damaged and continues to damage the Band and the Allottees and their land, and the governmental interests of the United States, and will continue to do so unless and until the parties reach a negotiated resolution that allows the Town's roads to remain in place pursuant to the ROW Act or, if the parties are unable to reach such a negotiated resolution, unless and until the Town's roads and any associated appurtenances located thereon are removed from the Band's and the Allottees' lands.

ANSWER: The United States' cause of action for Ejectment is against the Town, and therefore, Intervening Defendants affirmatively assert that they are not required to answer the allegations contained in Paragraph 76 of the Complaint. Some or all of the allegations contained in said paragraph also call for a legal conclusion, and therefore, no answer from the Intervening Defendants is required. To the extent that an answer is required, upon information and belief, the Intervening Defendants deny the allegations, and affirmatively assert that the Intervening Defendants have the right to use said roads for public access to their homes for the reasons set

forth in the Intervening Defendants' counterclaims against the United States. Intervening Defendants also affirmatively assert that the Band and the Allottees benefit from the roads because the roads provide the sole means of access to lots owned by the Band and tribal members and constitute improvements to the lands owned by the United States and held in trust for the Band and the Allottees, which increases its fair market value.

## AFFIRMATIVE DEFENSES

Further answering the Complaint and as additional defenses thereto, the Intervening Defendants incorporate herein by reference those affirmative defenses set forth by Rule 8(c) of the Federal Rules of Civil Procedure and the affirmative defenses set forth in the Answers above. In addition, Intervening Defendants assert the following affirmative defenses without assuming the burden of proof when such burden would otherwise be on Plaintiff, and without prejudice to Intervening Defendant's right to plead additional defenses as discovery into the facts of the matter warrant, to the full extent permitted by law. Intervening Defendants specifically reserve the right to amend its pleadings to assert any such defenses.

1. Plaintiff fails to state a claim upon which relief can be granted for the reasons set forth in Intervening Defendants' answers above and Intervening Defendants' counterclaims below.

2. Intervening Defendants are bona fide purchasers for value who took title to their homes without notice of the alleged expiration of the right of way over the Roadways because none of the alleged expiring right of ways (the First Annie Sunn Lane ROW, the Second Annie Sunn Lane ROW, the Center Sugarbush ROW, the East Ross Allen Lake Lane ROW or the Elsie Lake Lane ROW) were ever recorded in the Register of Deeds office for Vilas County or any

other searchable recording system available to the public that would provide notice of the alleged expiration of the right of way contained therein.

3.      At all times relevant hereto, Intervening Defendants were permitted by law and/or in equity to use Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane and Else Lake Lane for access to and from their respective residences, including but not limited to the Federal-Aid Highway Act, the Tribal Transportation Program and implementing regulations, and Intervening Defendants acted in good faith without violating any rights that Plaintiff might have in the subject property under the United States Constitution, and any federal, state, or local laws, rules, regulations, or guidelines.

4.      The Federal-Aid Highway Act, the Tribal Transportation Program and implementing regulations required, and still require, the Roadways to be open and available for public use.

5.      To the extent the acts and regulations cited by Plaintiff preclude the Intervening Defendants from using the Roadways, such acts and regulations are unconstitutional and in violation of the Fourth Amendment, the Fifth Amendment, the Tenth Amendment and the Fourteenth Amendment.

6.      At all times relevant hereto, Plaintiff and the Band implicitly and expressly consented to the Intervening Defendants' use of the Roadways.

7.      By their own terms, some of the ROWs did not contain expiration provisions, and the other ROWs provided that they were subject to renewal upon compliance with applicable regulations, which the Band has impeded by making an absurd monetary demand and by its other acts and failures to act.

8. At all times relevant hereto, the Intervening Defendants' use of the Roadways was open and obvious.

9. Both public and private necessity privileged the Intervening Defendants to use the Roadways and allows them to continue using the Roadways without obtaining additional permits and/or express easements.

10. Plaintiffs' claims are barred by the equitable doctrines of waiver and/or equitable estoppel.

11. Plaintiff has unclean hands as it relates to its claims and requested relief.

12. Plaintiff's complaint is barred by the doctrine of *in pari delicto*.

13. Plaintiff and the Band contributed to or were the sole cause for the alleged claims and damages.

14. Upon information and belief, Plaintiff and the Band have failed to mitigate their damages, if any.

15. Any injuries or damages sustained by Plaintiff or the Band were proximately caused by third parties over whom the Intervening Defendants neither controlled nor had the right to control.

16. Plaintiff may have failed to join necessary and indispensable third parties to this action.

17. Plaintiff's claims are barred by the applicable statute of limitations and/or the doctrine of laches.

18. Intervening Defendants hereby incorporate as additional affirmative defenses each and every Counterclaim that they set forth below.

**HOMEOWNERS' COUNTERCLAIMS**

Intervening Defendants, listed on <u>Exhibit A</u>, by and through their attorneys, Reinhart

Boerner Van Deuren s.c., as and for their Counterclaims against the United States of America,

allege as follows:

## <u>NATURE OF THE COUNTERCLAIMS</u>

1.      Intervening Defendants seek declaratory and injunctive relief against plaintiff

United States of America ("United States" or "government") based on past, continuing, and

threatened future violations of the United States Constitution and federal law.

2.      Intervening Defendants (hereinafter, the "Homeowners"), some of whom are

plaintiffs in related case No. 3:23-cv-135 (the "Related Case"), own lands with homes that can

be accessed by road only via Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake

Lane, or Elsie Lake Lane (individually, "Roadway," and collectively, the "Roadways").

3.      The portions of the Roadways at issue in this action are located on lands to which

the United States holds legal title in trust for the Lac du Flambeau Band of Lake Superior

Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin ("Band" or "Tribe") and

seventy-six individual Indian landowners ("Allottees").

4.      The Roadways including the portions on lands owned by the United States in trust

for the Band and Allottees are, and have been for approximately six decades, public roads that

are maintained by defendant Town of Lac du Flambeau (the "Town") except for one of the two

segments of Annie Sunn Lane.

5.      The Roadways are required to remain open and available for public use pursuant

to the Federal-Aid Highway Act of 1956, 23 U.S.C. §101 *et seq*. (the "Federal-Aid Highway

Act"), as amended, and its Tribal Transportation Program, 23 U.S.C. §§ 201–202 (the "Tribal

Transportation Program") and implementing regulations at 25 C.F.R. Part 170.

6.      Between January 31, 2023 to March 13, 2023, members of Tribal Council and other tribal members unlawfully barricaded the Roadways preventing the Homeowners from traveling to and from their homes via the Roadways, which, *inter alia*, created a public and private nuisance for the Homeowners, falsely imprisoned many of the Homeowners and violated the Homeowners' due process rights under federal law, including, but not limited to, violating the Indian Civil Rights Act, which applies to tribal members and non-tribal members and specifically provides in relevant part:

No Indian tribe in exercising powers of self-government shall—

**(2) violate the right of the people to be secure in their persons, houses, papers, and effects against unreasonable** search and **seizures**, nor issue warrants, but upon probable cause; …

**(8) deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law**;

25 U.S. Code § 1302(a) (emphasis added).

7.      Since then, the Tribe has been unlawfully requiring the Town to pay an escalating amount of money each month for the Homeowners to have temporary access to their homes.

8.      As the legal owner and governmental body charged with enforcing federal laws and regulations applicable to the Roadways, such as the Federal-Aid Highway Act, the United States is required to prevent or cause cessation of unlawful activity occurring on its property, including deconstructing the illegal barricades and ceasing the ongoing temporary access permit regime.

9.      To date, the United States has failed to take any affirmative action to ensure that the Roadways remain open and available for public use, and its failure resulted in the Homeowners being wholly or significantly deprived of their private property, which constitutes a taking of the Homeowners' private property in violation of the Fifth Amendment.

10.     Given the Homeowners' liberty and property interests at stake when they were barricaded in and out of their homes, the decision-making process whereby government officials decided not to take action to deconstruct the barricades on the Roadways without giving the Homeowners any notice or opportunity to be heard also violated the Due Process Clause.

11.     Moreover, as applied to the Homeowners, the Indian Right-of-Way Act, 25 U.S.C. §§ 323-328 and the implementing regulations found in 25 C.F.R. Part 169 ("ROW Act"), is unconstitutional under the Fifth Amendment's Taking Clause and Due Process Clause.

12.     The Homeowners' Fifth Amendment rights continue to be threatened because the Tribe is only allowing the Roadways to remain open under a temporary access permit regime with an escalating monthly payment requirement that will eventually become unaffordable.

13.     The prior road closures, and anticipated future road closures, have caused and will continue to cause irreparable harm to the Homeowners.

14.     Under the circumstances, the Homeowners are entitled to a declaration that the Roadways must remain open, unrestricted and available for public use under federal law and that the United States violated the Homeowners' Fifth Amendment rights by failing to cause the cessation of conduct on its lands that violates federal law, including barricading of the Roadways and the temporary access permit regime.

15.     The Homeowners are further entitled to an injunction and/or order in the form of a writ of mandamus requiring the United States to take all necessary actions to ensure the Roadways remain open, unrestricted and available for public use as required by federal law, including requiring the United States to take necessary actions to prevent tribal members from closing the Roadways, and, reopen the Roadways if barricades were to be constructed again.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over the claims alleged herein pursuant to 28 U.S.C. §§ 1331, 1346 and 1367 because this case arises under the Constitution, laws, or treaties of the United States and the claims herein are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy.

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(2) & (e)(1) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and the real property that is the subject of the action is situated in this judicial district.

## PARTIES

18.     Plaintiff United States of America brought suit on its own behalf in its sovereign governmental capacity and in its capacity as trustee for the Tribe and Allottees. The United States Department of the Interior ("DOI") is a part of the United States of America, as it is an executive agency of the United States of America. The Bureau of Indian Affairs ("BIA") is also a part of the United States, having the DOI as its parent agency.

19.     Defendant Town of Lac du Flambeau is a municipal corporation situated in Vilas County, Wisconsin.

**Annie Sunn Lane Homeowners**

20.     Intervening Defendants Gordon Anderson and Mary Anderson (the "Andersons") are adult individuals and the trustees of the Gordon C. Anderson and Mary K. Anderson Joint Income Only Trust Dated October 10, 2016, which owns a residence at the address of 3968 S. Annie Sunn Lane in Lac du Flambeau, Wisconsin.

21.     Intervening Defendants James Baird and Karen Baird (the "Bairds") are adult individuals who own a residence at the address of 3963 S. Annie Sunn Lane in Lac du Flambeau, Wisconsin.

22.     Intervening Defendant Big Crooked Lake TOP, LLC ("Big Crooked LLC") is a Wisconsin limited liability company, which owns a residence at the address of 4006 Annie Sunn Lane in Lac du Flambeau, Wisconsin.

23.     Intervening Defendants Paul Capps, Jr. and Barbara Capps (the "Capps") are adult individuals and the trustees of the Paul F. Capps, Jr. Revocable Living Trust and the Barbara A. Capps Revocable Living Trust, which owns a residence at the address of 3994 S. Annie Sunn Lane in Lac du Flambeau, Wisconsin.

24.     Intervening Defendants Gregg Johnson, Kim Johnson and Douglas Johnson (the "Johnsons") are adult individuals and the trustees of the G K D Johnson Trust, which owns a residence at the address of 4008 Annie Sunn Lane in Lac du Flambeau, Wisconsin.

25.     Intervening Defendant James Milne ("Milne") is an adult individual who owns a residence at the address of 3935 S. Annie Sunn Lane in Lac du Flambeau, Wisconsin.

26.     Intervening Defendants Donald Pollard and Bonnie Pollard (the "Pollards") are adult individuals who own a residence at the address of 4000 Annie Sunn Lane and the neighboring vacant lot having Tax Parcel No. 10-2513-0001 in Lac du Flambeau, Wisconsin.

27.     Intervening Defendant Nancy C. Mirhashemi ("Mirhashemi") is an adult individual and trustee of the Margorie C. Stolz Living Trust, which owns a residence at the address of 4010 Annie Sunn Lane in Lac du Flambeau, Wisconsin.

28.     Intervening Defendants Scott Rewey, Steven Rewey and Jennifer Rewey (the "Reweys") are adult individuals.  Steven Rewey and Jennifer Rewey are also trustees of the

Steven J. Rewey Revocable Trust (the "Rewey Trust"). Scott Rewey and the Rewey Trust jointly own a residence at the address of 3978 Annie Sunn Lane in Lac du Flambeau, Wisconsin.

29. Intervening Defendant Sandra Thompson ("Thompson") is an adult individual who owns a residence at the address of 3984 S. Annie Sunn Lane in Lac du Flambeau, Wisconsin.

30. Intervening Defendants Toni Vlna and Nancy Pfohl ("Vlna/Pfohl") are adult individuals and the trustees of the Gordon W. Johnson Revocable Trust Dated January 8, 2003, which owns a residence at the address of 3958 S. Annie Sunn Lane in Lac du Flambeau, Wisconsin.

31. The Andersons, the Bairds, Big Crooked LLC, the Capps, the Johnsons, Mr. Milne, the Pollards, Ms. Mirhashemi, the Reweys, Ms. Thompson, and Vlna/Pfohl are herein collectively referred to as the "Annie Sunn Lane Homeowners."

**Center Sugarbush Lane Homeowners**

32. Intervening Defendant Chester Busse (the "Busse") is an adult individual and the trustee of the Chester E. Busse Jr. 2016 Trust, which owns a residence at the address of 3645 Center Sugarbush Lane in Lac du Flambeau, Wisconsin.

33. Intervening Defendants Kevin Christensen and Barbara Christensen (the "Christensens") are adult individuals who own a residence at the address of 3675 Center Sugarbush Lane in Lac du Flambeau, Wisconsin.

34. Intervening Defendants David Kievet and Teresa Kievet (the "Kievets") are adult individuals and the trustees of the David M. and Teresa R. Kievet Living Trust, which owns a residence at the address of 3625 Center Sugarbush Lane in Lac du Flambeau, Wisconsin.

35.     Intervening Defendants Jeffrey Lang and Maren Lang (the "Langs") are adult individuals who own a residence at the address of 3655 Center Sugarbush Lane and 3659 Center Sugarbush Lane in Lac du Flambeau, Wisconsin.

36.     Intervening Defendant Susan Peterson ("Peterson") is an adult individual and the trustee of the Mark J. Peterson and Susan M. Peterson Revocable Living Trust Dated March 22, 2001, which owns a residence at the address of 3685 Center Sugarbush Lane in Lac du Flambeau, Wisconsin.

37.     Intervening Defendant Patricia Rubeck ("Rubeck") is an adult individual and the trustee of The Rubeck Revocable Family Trust, which owns a residence at the address of 3635 Center Sugarbush Lane in Lac du Flambeau, Wisconsin.

38.     Intervening Defendant Spanton Contracting LLC ("Spanton LLC") is a Wisconsin limited liability company, which owns a residence at the address of 3681 Center Sugarbush Lane in Lac du Flambeau, Wisconsin.

39.     Mr. Busse, the Christensens, the Kievets, the Langs, Ms. Peterson, Ms. Rubeck, and Spanton LLC are herein collectively referred to as the "Center Sugarbush Lane Homeowners."

**East Ross Allen Lake Lane Homeowners**

40.     Intervening Defendants William Abrahamson and Kristine Abrahamson (the "Abrahamsons") are adult individuals who own a residence at the address of 14890 Redpoll Lane in Lac du Flambeau, Wisconsin.

41.     Intervening Defendants Michael Clark and Nancy Brandt-Clark (the "Clarks") are adult individuals who own a residence at the address of 14900 Redpoll Lane in Lac du Flambeau, Wisconsin.

42.     Intervening Defendants Duaine Doehling and Lori Doehling (the "Doehlings") are adult individuals and the trustees of the Doehling Family Land Irrevocable Trust, which owns a residence at the address of 14836 Big Thunder Lane in Lac du Flambeau, Wisconsin.

43.     Intervening Defendants Joseph Fermanich and Sally Fermanich are adult individuals who own a residence at the address of 14906 Redpoll Lane and adjoining lots having Tax Parcel No. 10-85-02 and Tax Parcel No. 10-85-03 in Lac du Flambeau, Wisconsin.

44.     Intervening Defendants Dean Greeneway and Stephanie Greeneway (the "Greeneways") are adult individuals who own a residence at the address of 14746 Big Thunder Lane and two vacant lots having Tax Parcel No. 10-83-08 and Tax Parcel No. 10-84-03 in Lac du Flambeau, Wisconsin.

45.     Intervening Defendant Michael Hornbostel ("Hornbostel") is an adult individual who owns a residence at the address of 14886 Redpoll Lane in Lac du Flambeau, Wisconsin.

46.     Intervening Defendants Joseph Hunt and Martha Hunt (the "Hunts") are adult individuals who own a residence at the address of 14862 Redpoll Lane in Lac du Flambeau, Wisconsin.

47.     Intervening Defendants Stanley Johnson and Jennifer Gridley Johnson (the "Johnsons") are adult individuals who own a residence at the address of 2411 East Ross Allen Lake Lane in Lac du Flambeau, Wisconsin.

48.     Intervening Defendant Pamela Kester ("Kester") is an adult individual who owns a residence at the address of 14896 Redpoll Lane in Lac du Flambeau, Wisconsin.

49.     Intervening Defendants Darwin Lohse and Dianne Lohse (the "Lohses") are adult individuals and the trustees of the Darwin L. Lohse and Dianne M. Lohse Revocable Trust, which owns a residence at the address of 14856 Big Thunder Lane, a lot located at the address of

14728 Big Thunder Lane, and a vacant lot having Tax Parcel No. 010-83-06 in Lac du Flambeau, Wisconsin.

50.     Intervening Defendants Andrew Long and Mary Downs ("Long/Downs") are adult individuals who own a residence at the address of 2419 East Ross Allen Lake Road in Lac du Flambeau, Wisconsin.

51.     Intervening Defendants Anthony Markovich and Nancy Markovich (the "Markoviches") are adult individuals who own a residence at the address of 14857 Big Thunder Lane in Lac du Flambeau, Wisconsin.

52.     Intervening Defendants David Miess and Sandra Schlosser ("Miess/Schlosser") are adult individuals who own a residence at the address of 14880 Redpoll Lane in Lac du Flambeau, Wisconsin.

53.     Intervening Defendants Dennis Pearson and Rachel Pearson (the "Pearsons") are adult individuals who own a residence at the address of 2540 East Ross Allen Lake Lane in Lac du Flambeau, Wisconsin.

54.     Intervening Defendant John Rock ("Rock") is an adult individual who own a residence at the address of 14858 Big Thunder Lane in Lac du Flambeau, Wisconsin.

55.     Intervening Defendants Michael Thomas and Victoria Thomas (the "Thomases") are adult individuals who own a vacant lot having Tax Parcel No. 10-20-01 in Lac du Flambeau, Wisconsin.

56.     Intervening Defendants Peter Venturi and Linda Venturi (the "Venturis") are adult individuals and the trustees of the Venturi Living Trust, which owns a residence at the address of 2379 East Ross Allen Lake Lane and adjoining lot having Tax Parcel No. 10-90-29 in Lac du Flambeau, Wisconsin.

57.     Intervening Defendants David Wagner, Tammy Wagner and Gloria Pertroski ("Wagner/Pertroski") are adult individuals who own a residence at the address of 2439 East Ross Allen Lake Lane in Lac du Flambeau, Wisconsin.

58.     Intervening Defendants Patrick Wittlinger and Jennifer Wittlinger (the "Wittlingers") are adult individuals who own a residence at the address of 14852 Big Thunder Lane in Lac du Flambeau, Wisconsin.

59.     The Abrahamsons, the Clarks, the Doehlings, the Fermanichs, the Greeneways, Mr. Hornbostel, the Hunts, the Johnsons, Ms. Kester, the Lohses, Long/Downs, the Markoviches, Miess/Schlosser, the Pearsons, Mr. Rock, the Thomases, the Venturis, Wagner/Pertroski and the Wittlingers are herein collectively referred to as the "East Ross Allen Lake Lane Homeowners."

**Elsie Lake Lane Homeowners**

60.     Intervening Defendants Robert Beer, Jr. and Nicole Beer (the "Beers") are adult individuals who own a residence at the address of 12583 Elsie Lake Lane in Lac du Flambeau, Wisconsin.

61.     Intervening Defendants Brian Bloczynski and Robin Bloczynski (the "Bloczynskis") are adult individuals who own a residence at the address of 12691 Elsie Lake Lane and adjoining lot having Tax Parcel No. 10-3544 in Lac du Flambeau, Wisconsin.

62.     Intervening Defendants Gary Huck and Christine Huck (the "Hucks") are adult individuals and the trustees of the Gary J. Huck & Christine A. Huck Revocable Trust Dated October 7, 2016, which owns a residence at the address of 12615 Elsie Lake Lane in Lac du Flambeau, Wisconsin.

63.    Intervening Defendant Julie Kilger ("Kilger") is an adult individual who owns a residence at the address of 12605 Elsie Lake Lane in Lac du Flambeau, Wisconsin.

64.    Intervening Defendants Steven Lefeber, Sharon Lefeber and Ryan Lefeber (the "Lefebers") are adult individuals. Steven Lefeber and Sharon Lefeber are also trustees of the Steven P. and Sharon A. Lefeber Revocable Family Trust U/A.D 8-17-11 (the "Lefeber Trust"). The Lefeber Trust and Ryan Lefeber jointly own a residence at the address of 12662 Elsie Lake Lane, and the Lefeber Trust owns a residence at the address of 3297 Walnut Lane in Lac du Flambeau, Wisconsin.

65.    Intervening Defendants Jesse Moffitt and Emily Moffitt (the "Moffitts") are adult individuals who own a residence at the address of 3310 Walnut Lane in Lac du Flambeau, Wisconsin.

66.    Intervening Defendants John Disch and Mary Possin ("Disch/Possin") are adult individuals who own a residence at the address of 12591 Elsie Lake Lane and 12593 Elsie Lake Lane in Lac du Flambeau, Wisconsin.

67.    Intervening Defendants Eric Paljieg and Erin Shea-Paljieg (the "Paljiegs") are adult individuals who own a residence at the address of 12607 Elsie Lake Lane in Lac du Flambeau, Wisconsin.

68.    Intervening Defendants Thomas Walsh, Jr. and Julie Maryott-Walsh (the "Walshes") are adult individuals who own a residence at the address of 12601 Elsie Lake Lane in Lac du Flambeau, Wisconsin.

69.    The Beers, the Bloczynskis, the Hucks, Ms. Kilger, the Lefebers, the Moffitts, Disch/Possin, the Paljiegs and the Walshes are herein collectively referred to as the "Elsie Lake Lane Homeowners."

## THE ROADWAYS AT ISSUE

70.     Each of the Homeowners are adult individuals who own homes, or are trustees of trusts that own homes, at addresses that are serviced solely by one of the four Roadways.

71.     Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane, and Elsie Lake Lane (i.e., the Roadways) cross over land to which the United States holds title in trust for the Tribe and Allottees as well as non-Indian land within the exterior boundaries of the Lac du Flambeau Reservation.

72.     Each Roadway, including the portions that cross United States land held in trust for the Tribe and Allottees and the portions that cross non-Indian land, is a "public road," as defined in 23 U.S.C. § 101(a)(23).

73.     A survey, filed as an exhibit to Plaintiffs' Amended Complaint in the Related Case, was completed in 2019 by Steigerwaldt Land Surveying, LLC ("Steigerwaldt") and shows and describes the 1916.1 feet (approximately .36 miles) of Annie Sunn Lane at issue. *See* Case No. 3:23-cv-00135, Ex. A to Plaintiffs' Amended Complaint, ECF No. 26-1. In addition to the portion of Annie Sunn Lane shown on the survey, tribal members barricaded that portion of Annie Sunn Lane (approximately .5 miles) running in a northerly and southerly direction between Little Trout Road and that portion shown on the survey.

74.     A survey, filed as an exhibit to Plaintiffs' Amended Complaint in the Related Case, was completed in 2018 by Steigerwaldt and shows and describes the 745.4 feet (approximately .14 miles) of Center Sugarbush Lane at issue. *See* Case No. 3:23-cv-00135, Ex. B to Plaintiffs' Amended Complaint, ECF No. 26-2.

75.     A survey, filed as an exhibit to Plaintiffs' Amended Complaint in the Related Case, was completed in 2018 by Steigerwaldt and shows and describes the 159.5 feet

(approximately .03 miles) of East Ross Allen Lake Lane at issue. *See* Case No. 3:23-cv-00135, Ex. C to Plaintiffs' Amended Complaint, ECF No. 26-3.

76. A survey, filed as an exhibit to Plaintiffs' Amended Complaint in the Related Case, was completed in 2019 by Steigerwaldt and shows and describes the 450.2 feet (approximately .085 miles) and the 781.2 feet (approximately .15 miles) of Elsie Lake Lane at issue. *See* Case No. 3:23-cv-00135, Ex. D to Plaintiffs' Amended Complaint, ECF No. 26-4.

77. The Roadways are the sole means of Homeowners' vehicular access to their respective properties, and serve as the sole means of vehicular access to dozens of other parcels of property owned by persons who are not parties to this lawsuit.

78. The Homeowners purchased their respective homes without notice that the rights of way over the portions of the Roadways on lands the United States holds in trust for the Band and Allottees had any alleged limitation of years.

79. Since purchasing their respective properties, many Homeowners have substantially improved their properties, including, but not limited to, building and remodeling homes and outbuildings.

## THE TRIBE ILLEGALLY BLOCKED THE HOMEOWNERS' ACCESS TO AND FROM THEIR PROPERTIES

80. The Homeowners possess protectable property interests in their respective properties referenced in the above paragraphs.

81. The only roadway access to the properties owned by the Annie Sunn Lane Homeowners is via Annie Sunn Lane, which access was blocked for approximately six weeks— from January 31, 2023 to March 13, 2023—because of the barricade that tribal members placed on the Roadway.

82. The only roadway access to the properties owned by the Center Sugarbush Lane Homeowners is via Center Sugarbush Lane, which access was blocked for approximately six weeks—from January 31, 2023 to March 13, 2023—because of the barricade that tribal members placed on the Roadway.

83. The only roadway access to the properties owned by the East Ross Allen Lane Homeowners is via East Ross Allen Lake Lane, which access was blocked for approximately six weeks—from January 31, 2023 to March 13, 2023—because of the barricade that tribal members placed on the Roadway.

84. The only roadway access to the properties owned by the Elsie Lake Lane Homeowners is via Elsie Lake Lane, which access was blocked for approximately six weeks— from January 31, 2023 to March 13, 2023—because of the barricade that tribal members placed on the Roadway.

85. With the Roadways closed by the barricades from January 31, 2023 to March 13, 2023, the Homeowners' properties were completely landlocked.

86. The barricades on the Roadways prevented Homeowners who did not flee prior to the placement of the barricades on the Roadways from freely leaving their residential neighborhood, even to obtain basic necessities such as food, household items and health supplies, and prevented the Homeowners from receiving United States Postal Service mail on a daily basis.

87. The barricades on the Roadways prevented Homeowners from freely entering and exiting their respective properties and residential neighborhoods.

88. The barricades on the Roadways prevented Homeowners from any reasonable entrance to and exit from their properties.

89.     The Homeowners were threatened that if they leave for any reason other than medical appointments or prescription medication pickup, they would not be allowed back through the barricades to return to their properties.

90.     The Homeowners were not only unable to drive vehicles past the barricades, but they were also threatened with the inability to return to their homes if they went around the barricades on foot or by any other means.

91.     A camera was installed near the barricade at East Ross Allen Lake Lane to monitor Homeowners' movements under the pretext of property protection.

92.     Although some Homeowners had some limited ability to access basic necessities such as food by walking or snowmobiling across frozen lakes in the area, Homeowners' ability to do so disappeared, because as the weather warmed up and the ice on the lakes melted, the lakes became impassible by foot or snowmobile.

93.     Some Homeowners were forced to flee their homes to ensure that critical care for infirm family members or for themselves was not interrupted by the barricades on the Roadways.

94.     While the barricades were in place, tribal members attempted to purchase the Homeowners' properties for a mere fraction of their assessed values.

95.     Because of the Federal-Aid Highway Act, Tribal Transportation Program and implementing regulations, specifically, 23 U.S.C. §§ 101(a)(22), (23), and (33), 23 U.S.C. §§ 201–202, and 25 C.F.R. §§ 170.5 & 170.114(a), tribal members violated, and continue to violate, federal law by restricting or prohibiting public access to, and by closing and threatening to reclose, the Roadways.

96.     The Tribe violated and continue to violate federal law (25 C.F.R. § 170.114(a)) by failing to consult with the Secretary of the Interior and the Homeowners before restricting road

use or closing the roads by barricading the Roadways and issuing access permits that do not allow the public to use the Roadways.

97.     When the chains connecting the cement blocks on the Roadways are relocked such that the Roadways are again barricaded upon the end of the temporary access permit regime, such barricading will be in contravention of 25 C.F.R. § 170.114(a).

### THE ROADWAYS ARE PUBLIC UNDER FEDERAL LAW AND MUST BE KEPT OPEN TO THE HOMEOWNERS AND PUBLIC

98.     The federal Tribal Transportation Program (the "TTP"), formerly known as the Indian Reservation Roads Program ("IRR"), was established in part to help provide safe and adequate transportation and public road access to and within Indian reservations and lands.

99.     The Tribe voluntarily participates in the federal TTP, and for many years prior to March 2023 the Tribe has had the Roadways included in the TTP and on the NTTFI list, as described further below.

100.    The Tribe has identified roads that are part of its "Tribal Transportation System." Such roads were visibly listed in a recent online inventory of tribal transportation facilities, as described below.

101.    The Secretary of the Interior, in cooperation with the Secretary of the Federal Highway Administration, maintains the comprehensive inventory. 23 U.S.C. § 202(b)(1)(A).

102.    The inventory is referred to as the National Tribal Transportation Facilities Inventory, or NTTFI.

103.    All roads listed in the NTTFI must be open and available for public use as required by 23 U.S.C. §§ 101(a)(22), (23), and (33); 25 C.F.R. § 170.5; and 25 C.F.R. § 170.114(a).

104. The Tribe for many years elected to list each Roadway in the NTTFI, as shown by the Tribe listing the Roadways in its IRR Inventory described below.

105. A recent IRR Official Indian Reservation Road Inventory (the "IRR Inventory"), dated January 24, 2023 (one week before tribal members barricaded the Roadways), lists the roads and mileage reported by the Tribe.

106. That January 24, 2023 Inventory lists:

- 0.5 miles of Annie Sunn Lane, which includes a substantial portion of the .86 miles at issue on land that was barricaded;

- 0.8 miles of Center Sugarbush Lane, which includes the 745.4 feet (approximately .14 miles) at issue on land that was barricaded;

- 0.6 miles of East Ross Allen Lake Lane, which includes the 159.5 feet (approximately .03 miles) at issue on land that was barricaded; and

- 0.8 miles of Elsie Lake Lane, which includes the 781.2 feet (approximately .15 miles) at issue on land that was barricaded.

107. Only the Secretary of the Interior or the public authority having jurisdiction over a road listed in the NTTFI may restrict road use or close roads temporarily. 25 C.F.R. § 170.114. They may do so only in very limited circumstances and must "consult[] with [the] Tribe and applicable private landowners" in doing so, unless there is a concern about "immediate safety or life-threatening situations." 25 C.F.R. §§ 170.114(a)-(b).

108. On the NTTFI, the Tribe has identified the "owner," i.e., "the public authority that is responsible for operating and maintaining a particular road," as the Town or Vilas County for each of the Roadways. *See* 52 IAM 9-H, § 2.2(2).

109. The Town either built, or after construction took ownership of, Center Sugarbush Lane, East Ross Allen Lake Lane, Elsie Lake Lane, and the north-south portion of Annie Sunn Lane.

110.     For almost six decades, the Town treated the Roadways as town roads under Chapter 82 of the Wisconsin Statutes that were open for public travel, including access to and from the Homeowners' properties.

111.     Prior to January 31, 2023, the Town maintained Center Sugarbush Lane, East Ross Allen Lake Lane, Elsie Lake Lane, and the north-south portion of Annie Sunn Lane. Individual landowners who use Annie Sunn Lane maintained the east-west portion of that road.

112.     Over the years, the Tribe has signed various agreements with the Town of Lac du Flambeau, such as the Acknowledgement of Public Authority Responsibility (APAR) in 2007, whereby the Tribe agreed that the Roadways "will continue to be owned by the Town and opened to the public for travel."

113.     The BIA previously opined that, because the Roadways are listed on the approved NTTFI (formerly IRR), the Roadways "must be open to the public."

114.     Neither the BIA nor any other governmental body has ever recorded a document in the Register of Deeds office for Vilas County or any other searchable recording system available to the public that would provide notice of the alleged expiration of the rights of way over any of the Roadways.

### THE FAILURE TO REOPEN THE ILLEGALLY BLOCKED ROADWAYS

115.     The barricades were placed on the Roadways, specifically, at locations on the Roadways that lie on lands to which the United States holds legal title in trust for the Tribe and Allottees.

116.     Tribal Land Management Officer Jessie Peterson confirmed that the barricades were placed on lands owned by the United States and held in trust for the Tribe. *See* Case No. 3:23-cv-00135, ECF No. 46 ¶ 27.

117. The United States, via the Bureau of Indian Affairs ("BIA") or its parent agency, the Department of the Interior ("DOI"), is charged with managing, controlling, overseeing, or administering lands to which the United States holds title in trust for tribes.

118. The DOI is tasked with enforcing and implementing the regulations set forth in 25 C.F.R. Part 170. *See* 25 C.F.R. § 170.1.

119. Upon information and belief, the United States of America, through the BIA or DOI, had notice of the barricades' presence on the Roadways soon after the barricades' placement on the Roadways on January 31, 2023. *See* Case No. 3:23-cv-00135, Exhibit D to J. Allen Aff., ECF No. 43-4 at 1 (February 2, 2023 letter to BIA Superintendent Diane Baker "Via Email"; "recently closed road access" to the Roadways).

120. Upon information and belief, the United States of America, through the BIA or DOI, knew that the barricades were placed on lands to which the United States holds legal title. *See id.* at 1–2.

121. Upon information and belief, the BIA or DOI decided, after receiving notice of the barricades' erection, to take no action to physically remove the barricades.

122. The BIA or DOI did not physically remove the barricades or take any other action to cause the physical removal of the barricades.

123. The BIA or DOI allowed the barricades to remain on the Roadways for approximately six weeks, without giving the Homeowners any notice or opportunity to be heard despite the BIA's or DOI's inaction causing deprivation of the Homeowners' liberty and property.

124.    In deciding to acquiesce to, or not deconstruct, the barricades on the Roadways, the BIA or DOI did not in any manner give the Homeowners' notice and opportunity to be heard prior to the United States' inaction.

125.    For at least approximately six weeks, the United States failed, as owner of the lands on which the relevant portions of the Roadways traverse and on which the barricades were placed and tasked with enforcing and implementing the regulations set forth in 25 C.F.R. Part 170, to cause the deconstruction of the barricades.

126.    The Homeowners' deprivation or loss of property is the direct, natural, or probable result of the United States' acquiescence or conduct.

127.    The United States' acquiescence or conduct constituted authorization of the barricading of the Roadways.

128.    Such conduct or failure by the United States caused the Homeowners' loss of exclusive possession of their properties and deprived the Homeowners of all beneficial use of their properties in violation of the Fifth Amendment.

129.    Such failure by the United States caused the Homeowners' deprivation of liberty and property without adequate due process of law.

130.    There is a real threat that the Tribe is allowed to close the Roadways in the future as they are only being kept open under the temporary access permit regime.

131.    On March 13, 2023, tribal members removed the chains that connect the pair of cement blocks on each Roadway, but this status is only temporary as indicated by the cement blocks currently remaining on the Roadways.

132. Tribal members have threatened to place the barricades back on the Roadways in connection with their ongoing unlawful access permits regime that only conditionally allows Homeowners to use the Roadways and does not allow the public to use the Roadways.

133. Given the past conduct, the United States is likely to again fail to deconstruct the barricades when they are re-locked on the Roadways again.

134. The Homeowners will suffer catastrophic financial losses and irreparable harm in the future if the United States allows the Tribe to permanently close the Roadways, in violation of the Takings Clause and Due Process Clause.

### THE FAILURE TO CAUSE THE CESSATION OF THE ONGOING UNLAWFUL TEMPORARY ACCESS PERMITS

135. After the initial filing of the Related Case, the Tribe agreed to open the Roadways if the Town paid $20,000 in exchange for a "Lac du Flambeau Access Permit: Conditional Use/Revocable Permit" for each of the four Roadways (the "Revocable Temporary Access Permits" or "Temporary Access Permits").

136. The Temporary Access Permits were issued upon passage of tribal Resolution No. 67(23), which approved the Temporary Access Permits scheme. *See* Related Case, Exhibit F to J. Allen's Aff., ECF No. 43-6.

137. The Town obtained the first of the Temporary Access Permits on March 13, 2023.

138. Due to the Town paying for and obtaining the Revocable Temporary Access Permits, the chains between the cement blocks on the Roadways were removed on March 13, 2023, but the cement blocks that the chains were attached to remain in place on the Roadways.

139. The permits were later renewed for their maximum two renewals in 30-day increments per renewal, upon the Town paying the Tribe, such that the permits' first three 30-day terms expired on or about June 12, 2023.

140.     On May 12, 2023, the Tribe passed Resolution No. 143(23), which allowed for additional renewal for 30-day terms of the Temporary Access Permits.

141.     Resolution No. 143(23) has an escalator condition that increases the cost for the subsequent potential permit renewals by $500 per road per month (for a total of $2,000 more than the prior month).

142.     To date, the temporary access permits have only been renewed through October 12, 2023.

143.     Upon information and belief, the total cost the Town paid for the last 30-day renewal, effective from or around September 13 to October 12, 2023, was $28,000.00.

144.     Upon information and belief, the Town has a finite and limited roads budget that will affect the Town's ability to afford, and the townspersons willingness to pay, potential renewals of the Temporary Access Permits.

145.     Resolution No. 143(23) states: "If the Town elects to seek an extension of the Temporary Access Permits, the fee invoiced by the LDF Land Management Department must be paid prior to the expiration of the Temporary Access Permit, and *failure to renew the Temporary Access Permit <u>will</u> result in the immediate denial of access*." (Emphasis added).

146.     The Revocable Temporary Access Permits each state: "*Failure to renew the temporary access permit will result in immediate denial of access*." (Emphasis in original).

147.     The Revocable Temporary Access Permits are an agreement or agreements between the Town and the Tribe. The Homeowners are not parties to the agreement or agreements relating to the permits.

148.     The Revocable Temporary Access Permits are revocable and temporary.

149. The stated purpose of the Revocable Temporary Access Permits is for "Temporary Access Permit to traverse Tribal Land." *See* Related Case, Exhibit F to J. Allen's Aff., ECF No. 43-6.

150. The Temporary Access Permits restrict use of the Roadways to only "homeowner[s] on [the Roadways] to lawfully access their property for the duration of the Temporary Access Permit." *See* Related Case, Exhibit F to J. Allen's Aff., ECF No. 43-6.

151. The Revocable Temporary Access Permits each state: "Issuance of permit does not imply any Tribal approval for treatment as public road."

152. Resolution No. 67(23) states: "The issuance of any Temporary Access Permits does not imply any Tribal approval for treatment as a public road for the applicable road." *See* Related Case, Exhibit F to J. Allen's Aff., ECF No. 43-6.

153. The Revocable Temporary Access Permits deny that the Roadways are public roads under federal law.

154. The Revocable Temporary Access Permits restrict road use of the Roadways by, in part, prohibiting the public from using the Roadways.

155. The above-described issuance or implementation of the Temporary Access Permits scheme, and the actual Temporary Access Permits themselves, all are in contravention of 25 C.F.R. § 170.114(a).

156. The issuance of the Revocable Temporary Access Permits is an ongoing violation of federal law directly connected to the United States' land in that the permits purport to allow or restrict use of public roads that lie on lands to which the United States holds legal title and that the United States is charged with safeguarding open and public access.

157.    The Revocable Temporary Access Permits themselves are each ongoing violations of federal law directly connected to the United States' land in that the permits purport to allow or restrict use of public roads that lie on lands to which the United States holds legal title and that the United States is charged with safeguarding open and public access.

158.    The United States, through the BIA or DOI, has notice or knows of the ongoing access permits regime relating to the United States' land at issue.

159.    Upon information and belief, the United States, through the BIA or DOI, had notice or knew of the access permits regime soon after the passage of Resolution No. 67(23) or the March 13, 2023 removal of chains connecting the cement blocks on the Roadways.

160.    Upon information and belief, after having received notice of the access permits scheme, the United States, through the BIA or DOI decided, and continues to operate consistent with that decision, to not cause the access permits scheme's cessation.

161.    The United States has failed to cause the cessation of the issuance or implementation of the Temporary Access Permits.

162.    The United States' acquiescence or failure constitutes prior and ongoing authorization of the access permits scheme.

163.    The United States' failure to cause the cessation of the unlawful access permit regime has caused or contributed to causing the significant decrease in value of the Homeowners' properties such that they are deprived of their property without due process of law.

164.    The United States' conduct with respect to the access permits and the land to which it holds legal title, in light of the DOI's duty to enforce the regulations in 25 C.F.R. Part 170 (*see* 25 C.F.R. § 170.1), thus constitutes a violation of the Fifth Amendment Due Process Clause.

165. In deciding to not cause the access permits scheme's cessation, the United States did not in any manner give the Homeowners' notice and opportunity to be heard prior to such decision and failure to act.

166. The United States' conduct with respect to the land to which it holds legal title—i.e., not giving the Homeowners' notice and opportunity to be heard prior to making and acting upon the decision to not cause the access permits scheme's cessation—constitutes a violation of the Fifth Amendment Due Process Clause.

167. Moreover, when the Town is unable or unwilling to pay the permits' renewal cost and there is no alternative funding source for the permits, the Roadways are likely to be re-barricaded by the Tribe.

168. The United States' failure to foreclose such a probable outcome constitutes a likely and imminent additional unconstitutional deprivation of due process and an additional threatened unconstitutional taking of the Homeowners' property, for a putative public purpose, i.e., to allow the Tribe to regain control over land within a reservation that was sold to the Homeowners' predecessors in interest under various Congressional acts, without any compensation, let alone just compensation, to the Homeowners.

169. The United States' failure to foreclose the likely and imminent re-barricading of the Roadways would further deprive the Homeowners of all beneficial use of their respective parcels in their entirety without due process of law.

170. The Homeowners will be irreparably harmed unless the Court issues a judgment pursuant to 28 U.S.C. §§ 2201 & 2202 declaring that the United States, as owner of the lands that underlie the Roadways and enforcer of the regulations in 25 C.F.R. Part 170, is required to prevent or cause the cessation of the barricading of the Roadways and the ongoing Temporary

Access Permits, and grants injunctive relief, pursuant to Fed. R. Civ. P. 65, ordering the United States to take all necessary actions to ensure the Roadways remain open, unrestricted and available for public use as required by federal law, including causing the cessation of the ongoing Temporary Access Permits and preventing the likely and imminent closure of the Roadways in the future.

### AS APPLIED, THE ROW ACT'S PROCESS FOR APPLYING AND OBTAINING RIGHTS-OF-WAY IS UNCONSTITUIONAL UNDER THE FIFTH AMENDMENT

171. Upon information and belief, in or around 2013 the issue regarding expiration of the ROWs for the Roadways started becoming known to non-tribal members. *See* ECF No. 1, U.S. Compl., ¶¶ 2-3.

172. Following that time, numerous meetings between or involving tribal members and Town board members were held.

173. Initially, there was an agreement to collect and share documents regarding all of the nearly 60 roads the Tribe identified as being in question.

174. On March 28, 2014, the Tribe resolved that it would "temporarily suspend further negotiations with the individual homeowners affected until further notice and will allow the ingress/egress routes to remain open until the Memorandum of Understanding Agreement with the Town of Lac du Flambeau options is researched and evaluated for the good of the entire [L]ac du Flambeau Community." Tribal Resolution No. 167(14).

175. Homeowners made numerous FOIA requests to the BIA over a two-year period due to the BIA's lack of response to multiple requests for information regarding the Roadways and right of way issues on the Reservation.

176.   After intervention by and assistance of Congressman Sean Duffy's office, the Homeowners obtained requested documents from the BIA, which Homeowners immediately shared with the Tribe.

177.   During approximately 2014 to 2016, the Town and Tribe continued negotiating a resolution to the Roadways dispute but to no avail.

178.   In 2017, discussions between the Tribe and the Town broke down, and as a result, Homeowners immediately began pursuing the federal procedure for obtaining new rights-of-way.

179.   On January 4, 2017, the Homeowners requested that the BIA provide the names and addresses of the allottees for the purpose of sending the procedurally required notices of intent to apply for rights-of-way and consent to survey.

180.   Upon receipt on the information nine months later, on October 2, 2017, the Homeowners delivered the notices to the Tribe and all of the allottees who were listed for the Roadways.

181.   It then took the Tribe's Tribal Council until June 14, 2018, to pass a resolution to allow the Homeowners to survey the Roadways.

182.   After notice of the tribal resolution, the Homeowners immediately proceeded with the surveys.

183.   The surveyors worked diligently with the Tribe to obtain the necessary Tribal Land Use Permit, and then completed the surveys within two months of the permit being issued.

184.   Upon completion of each survey, Homeowners tendered them to the BIA, which occurred between December 2018 and March 2019.

185.    The BIA then took until August 5, 2020 (almost two years) to approve all of the surveys (each of which was only 1 to 3 pages in length).

186.    During the right of way application process, the Homeowners relied on then-Tribal President Wildcat's assurances that the Roadways would remain open as expressed via various press releases.

187.    While the ROW application process was ongoing, rather than wait for the surveys, Homeowners worked diligently by submitting their applications for new rights-of-way.

188.    On October 21, 2020, the BIA notified Homeowners that the next step in the rights-of-way application process was to complete the appraisals and that a tribal resolution was required before the appraisers could begin their work, and the Homeowners then promptly informed the Tribe of this requirement.

189.    It then took the Tribe until June 2, 2021, almost a year, to pass such a resolution.

190.    The Tribe also required that the Tribe assist the BIA in determining the scope of work for the appraisals, which process occurred between June 2021 and May 2022.

191.    Upon receiving the scope of work, the parties met on a Zoom call with the appraisers to confirm the assignments. The Tribe finally agreed to allow the appraisers to begin their work in July 2022.

192.    Prior to completion of that work, on October 26, 2022, the Homeowners received a $10,000,000.00 demand from the Tribe: "$7M attributed to past trespass on Big Thunder and East Ross Allen Lake Lane; issuance of 50-year ROWs for East Ross Allen Lake Lane[;] $3M attributed to past trespass and issuance of 50-year ROWs for Annie Sunn Lane, Center Sugarbush, and Elsie Lake Lane." Further, "[that] $10M demand amount [was] valid until October 31, 2022." *See* Related Case, ECF No. 12-11 at 2.

193.    The Homeowners informed the Tribe that the appraisals needed to be reviewed by the Homeowners before responding to the demand. But the appraisals have not been provided to the Homeowners and the BIA refuses to provide the appraisals to the Homeowners until the Tribe consents to the BIA releasing the appraisals to the Homeowners.

194.    On January 6, 2023, the Homeowners received a demand from the Tribe doubling the amount they needed to pay to the Tribe for new rights of way: $20,000,000.00. *See* Related Case, ECF No. 12-11 at 1.

195.    To this day, the Tribe refuses to give consent to the BIA to deliver copies of the appraisals to the Homeowners and the Homeowners have not been able to obtain copies.

196.    The $20,000,000 demand from the Tribe for renewal of the ROWs for the Roadways is arbitrary and completely unrelated to any objective value of the property underlying the Roadways and is far beyond any market value for such easements.

197.    In fact, Counsel for the Tribe admitted that the $10,000,000.00 demand was derived from the assessed value of all of the home serviced by the four Roadways, rather than any value calculated from the use of the Roadways on the lands owned by the United States and held in trust for the Band and the Allottees.

198.    The Homeowners have been informed by the BIA that the BIA will defer to the Tribe and allow the Tribe to set the price for renewals of ROWs regardless of the appraised value of the ROWs, thereby allowing the Tribe to be completely unreasonable and demand any amount that the Tribe could care to demand, without limit, and without regard to any Homeowners' ability to pay. This position of the BIA is specifically set forth in 25 C.F.R. § 169.110(a)-(b), which state:

> § 169.110  How much monetary compensation must be paid for a
> right-of-way over or across tribal land?

(a) A right-of-way over or across tribal land may allow for any payment amount negotiated by the tribe, and we will defer to the tribe and not require a valuation if the tribe submits a tribal authorization expressly stating that it:

> (1) Has agreed upon compensation satisfactory to the tribe;

> (2) Waives valuation; and

> (3) Has determined that accepting such agreed-upon compensation and waiving valuation is in its best interest.

(b) The tribe may request, in writing, that we determine fair market value, in which case we will use a valuation in accordance with § 169.114. After providing the tribe with the fair market value, we will defer to a tribe's decision to allow for any compensation negotiated by the tribe.

199.    As applied, the regulatory scheme of the ROW granting and renewal process, and particularly 25 C.F.R. § 169.110, violates the Due Process Clause because it authorizes the process through or by which any amount can be chosen by the Tribe and must be paid by the Homeowners to allow finite use of the public Roadways.

200.    As applied, 25 C.F.R. § 169.110 violates the Takings Clause by authorizing "any payment amount" for lands on which the public Roadways are located, causing Homeowners' inability to obtain new rights of way for the Roadways and thus an inability to have guaranteed free access to their properties. Lack of guaranteed free access due to this regulation has caused the significant decrease of the Homeowners' properties' values.

**THE ROADWAYS MUST BE KEPT OPEN TO THE HOMEOWNERS AND PUBLIC DESPITE THE BIA'S INEFFECTIVE "REMOVAL" OF THE ROADWAYS FROM THE NTTFI**

201.    Two days after the Tribe required the Town to pay for temporary access permits, the Tribe sought to have the BIA remove the Roadways from the NTTFI list.

202.    The Tribe did this purportedly via tribal Resolution No. 69(23), which attempted to "approve and authorize the immediate removal of the Four [Roadways] from the Tribe's entries on the [NTTFI]." *See* Case No. 3:23-cv-00135, Exhibit E to J. Allen's Aff., ECF No. 43-5.

203.    The Tribe delivered Resolution No. 69(23) to the BIA on March 15, 2023.

204.    According to Midwest Regional Director Tammie Poitra, in a letter dated March 30, 2023:

> The Regional Road Engineer reviewed the Resolution and its accompanying documents, verified that the Tribe has not expended federal transportation funds on the Road[ways], and validated the update request. On March 24, 2023, the BIA – Division of Transportation (BIA-DOT) approved the update request and removed the Road[ways] from the NTTFI with immediate effect. As a result, the Road[ways] are no longer on the NTTFI . . . .

*See* Case No. 3:23-cv-00135, Exhibit I to J. Allen's Aff., ECF No. 43-9 (internal citations omitted).

205.    Ms. Poitra is mistaken that the Roadways were "removed . . . from the NTTFI with immediate effect," because 25 C.F.R. Part 2 commands or dictates otherwise. *See* 25 C.F.R. §§ 2.6, 2.7, 2.9.

206.    The Homeowners did not receive any notice of any kind or opportunity of any kind to be heard in March 2023 relating to the BIA's process that resulted in BIA-DOT's purported, but ineffective, removal of the Roadways from the NTTFI.

207.    To date, the Homeowners, via the undersigned, have received no formal, proper notice, and have only received faulty informal notice, of BIA-DOT's March 24, 2023 decision in the form of receiving a courtesy copy of Ms. Poitra's March 30, 2023 letter. *See* 25 C.F.R. § 2.7.

208.    Due to the Homeowners not receiving proper notice under 25 C.F.R. § 2.7(c), the BIA failed to "identify the official to whom" the decision may be appealed and failed to

"indicate the appeal procedures," which left the Homeowners guessing as to whom they should appeal the decision.

209.     Nonetheless, after extensive research into the structure and hierarchy of the BIA and at least two different sets of potentially applicable and interrelated regulations (25 C.F.R. Part 2 & 43 C.F.R. Part 4) with respect to officials who may be the proper recipient of the Homeowners' appeal, on April 12, 2023, the undersigned, on behalf of 30 sets of property owners, filed a Notice of Appeal to appeal the BIA decision purporting to remove the Roadways from the NTTFI. *See* Case No. 3:23-cv-00135, ECF No. 51-1, at 1-2 & PDF pp.7-8.

210.     In a letter dated April 25, 2023, Ms. Poitra denied the Homeowners' April 12, 2023 Notice of Appeal, such that no administrative appeal process resulted, and Ms. Poitra provided the BIA's erroneous interpretation of the applicable regulations regarding the appealability of BIA-DOT's decision. She wrongly claimed and concluded the following:

> The Part 2 appeal procedure "does not apply if any other regulation or Federal statute provides a different administrative appeal procedure applicable to a specific type of decision." The TTP regulations at 25 C.F.R Part 170 provide a limited administrative appeal procedure under 25 C.F.R. § 170.444(c). That appeal procedure, however, grants no right of appeal to any entity other than a Tribe, which may only appeal "the rejection of submitted data on a new or existing facility included in the NTTFI by filing a written notice of appeal to the Director, Bureau of Indian Affairs, with a copy to the BIA Regional Director." Your "Notice of Appeal" on behalf of the third-party Homeowners is not authorized by the TTP regulations at 25 C.F.R. § 170.444(c).

(Internal footnotes omitted.)

211.     Ms. Poitra in her April 25, 2023 letter also wrote: "It appears from [the Homeowners'] letter that the Homeowners are attempting to challenge the Notification [of the NTTFI update regarding the Roadways] under 25 C.F.R. Part 2 (Part 2)." This too is incorrect. The Homeowners were attempting to appeal the substantive BIA-DOT decision to remove the Roadways from the NTTFI, not a derivative action concerning a mere technicality regarding the

BIA's notification to the Tribe of that substantive decision. Thus, in addition to wrongly stating the appealability of the BIA's decision, Ms. Poitra addressed a different decision or action than the Homeowners were seeking to appeal.

212.     Out of an abundance of caution, and because of Ms. Poitra's erroneous interpretation of the regulations with respect to appealability, the Homeowners filed yet another Notice of Appeal, on April 28, 2023, but this time to the Interior Board of Indian Appeals and the Director of the BIA, Darryl LaCounte, attempting to create an appeal of the BIA's decision purporting to remove the Roadways from the NTTFI.

213.     On May 5, 2023, in response to receiving the Homeowners' April 28, 2023 notice of appeal (as well as an appeal by the Town), the Interior Board of Indian Appeals ("IBIA") issued a "Pre-Docketing Notice, Order Consolidating Appeals, Order for Information, Order Concerning BIA's Jurisdiction, Order Concerning Statement of Reasons, and Order Concerning Service List" ("IBIA Order"). Alluding to the utter lack of transparency and due process by the BIA, IBIA noted in its order that it was unclear whether the BIA decision at issue was ripe for IBIA review because it did not have in its possession the March 24, 2023 BIADOT decision "approv[ing] the [Tribe's] update request [regarding the removal of the Roadways from the NTTFI] and remov[ing] the Road[ways] from the NTTFI with [(purportedly)] immediate effect." As such, the IBIA requested that BIADOT provide the IBIA with a copy of that "March 24 Decision and inform the Board whether any BIA official has issued any decision subsequent to the March 24 Decision concerning the removal of the Road[ways] from the NTTFI (and if so, provide the Board with a copy of that decision)." IBIA Order at 3.

214.     IBIA stated in its order: "In accordance with 43 C.F.R. § 4.336, this case will be assigned a docket number 20 days after the date of receipt noted above unless the Board has been

properly notified before that date that the Assistant Secretary – Indian Affairs has assumed jurisdiction over the appeal. If the Assistant Secretary - Indian Affairs properly notifies the Board of an assumption of jurisdiction under 25 C.F.R. § 2.20(c) and 43 C.F.R. § 4.332(b), the parties will be so informed, and the appeal will be transmitted to the Assistant Secretary – Indian Affairs." IBIA Order at 6.

215. On or about May 16, 2023, the Homeowners learned that Assistant Secretary – Indian Affairs Bryan Newland "assum[ed] jurisdiction" over the Homeowners' (and Town's) (attempted) administrative appeals of the above-described BIA decision.

216. On July 7, 2023, the undersigned received an email from a DOI attorney attaching a "Dismissal Order" dated July 5, 2023, and signed by Mr. Newland. Through that Dismissal Order, the BIA again denied the Homeowners' appeal such that again no administrative appeal process resulted. Specifically, in that Dismissal Order, Mr. Newland largely repeated Regional Director Poitra's erroneous argument and conclusion, including ignoring the "specific type of decision" language under 25 C.F.R. § 2.3(b) such that § 2.3(a) is triggered. Mr. Newland wrote:

> The Part 2 appeal procedure "does not apply if any other regulation or Federal statute provides a different administrative appeal procedure applicable to a specific type of decision." 25 C.F.R. § 2.3(b). The TTP regulations at 25 C.F.R Part 170 provide a limited administrative appeal procedure under 25 C.F.R. § l70.444(c). That procedure grants a right of appeal to a Tribe, which may only appeal "the rejection of submitted data on a new or existing facility included in the NTTFI by filing a written notice of appeal to the Director, Bureau of Indian Affairs, with a copy to the BIA Regional Director." Id. I conclude that the above-captioned third-party appeals from the Homeowners and the Town, respectively, are not authorized by the TTP regulations at 25 C.F.R. § 170.444(c). For that reason, I am *sua sponte* ordering the dismissal of both appeals.

217. In his July 5, 2023 "Dismissal Order," Mr. Newland also wrongly stated: "The Homeowners . . . attempt to challenge the Notification [of the NTTFI update regarding the Roadways] under 25 C.F.R. Part 2 (Part 2)." This too is incorrect. The Homeowners were

attempting to appeal the underlying substantive BIA-DOT decision to remove the Roadways from the NTTFI, not a derivative action concerning a mere technicality regarding the BIA's notification to the Tribe of that substantive decision. Thus, in addition to wrongly stating the appealability of the BIA's decision, Mr. Newland addressed a different decision or action than the Homeowners were seeking to appeal.

218.    Even if the BIA takes the position that BIA-DOT's decision to remove the Roadways from the NTTFI is not appealable by the Homeowners, such position is erroneous. Combined with improper notice of the decision at issue and denial of any appeal process initiation such that the time to file a notice of appeal has not started to run under the regulations (and thus the decision at issue is not effective), said BIA procedural flaws continue to cause the BIA decision to be ineffective and not final under 25 C.F.R. Part 2.

219.    25 C.F.R. § 170.444(c) only addresses a *tribe's* appeal process for *rejection* of submitted data, not the appeal process where, as here, the BIA-DOT purports to have *approved* the Tribe's request to remove the Roadways from the NTTFI, and *non-tribal persons* seek to appeal that *approval*.

220.    The specification in 25 C.F.R. § 170.444(c) as to how a *Tribe* may appeal *rejection* of its data has nothing to do with how a *non-tribal person* may appeal *approval* of a Tribe's harmful request to remove a road from the NTTFI, when that road was built to provide access to entire subdivisions, has been relied upon as a public road for decades as a consequence of the road being listed on the NTTFI and provides the only roadway access to homes, thereby creating an undoubted and significant liberty interest, and the integral nature of the sole road that has been public for decades to access a home carries with it undoubted and significant property interests. *See* 25 C.F.R. § 2.3(a)-(b).

221. 25 C.F.R. § 170.444(c) is inapplicable to the Homeowners' ability and right to appeal because that provision applies only to tribes, and only to rejection decisions, and therefore that subsection does not take away non-tribal persons' rights to appeal approval decisions granted elsewhere in 25 C.F.R. Part 2. *See* 25 C.F.R. § 2.3(a).

222. Ms. Poitra and Mr. Newland incorrectly imply that because 25 C.F.R. § 170.444(c) offers a procedure for a tribe to appeal a specific rejection decision, then § 2.3(b) must mean that the Homeowners cannot appeal the BIA-DOT's approval decision. The citation to § 2.3(b) is irrelevant, as non-tribal Homeowners sought to appeal, and they sought to appeal the BIA-DOT's approval of the Tribe's submitted data requesting removal of the Roadways. The citation to § 2.3(b) would only be relevant if the Tribe was the appellant and the BIA decision at issue was a specific rejection of the Tribe's NTTFI update request.

223. Ms. Poitra and Mr. Newland also ignore 25 C.F.R. § 2.3(a) which states: "Except as provided in paragraph (b) of this section, [Part 2] applies to all appeals from decisions made by officials of the Bureau of Indian Affairs by persons who may be adversely affected by such decisions." 25 C.F.R. § 2.3(a). Paragraph (b) does not apply to the Homeowners or their appeal for the reasons stated above. Thus, paragraph (a) applies.

224. The definition of "person[s]" "include[] any Indian or non-Indian individual, corporation, tribe or other organization." 25 C.F.R. § 2.2. Here, the Homeowners are non-Indian individuals and thus are included in the appeal rights granted under 25 C.F.R. § 2.3(a).

225. The Homeowners are clearly "adversely affected" (let alone "*may be* adversely affected") by the BIA's decision to grant the Tribe's request to remove the Roadways from the NTTFI. Indeed, the Tribe sought to remove the Roadways from the NTTFI to vitiate the legal effect of 25 C.F.R. § 170.114(a) that requires the Roadways to be open and available to the

public, which the Tribe realized confers a public right to the Homeowners that they now seek to take away (hence, adverse effect on the Homeowners).

226.    Thus, the Homeowners are included in the appeal rights granted under 25 C.F.R. § 2.3(a).

227.    The adverse effects of the BIA's decision are overwhelmingly evidenced by the pleadings and declarations filed in the Related Case. The Roadways are the sole means of road access to the Appellants' properties and "must be open and available for public use" as required by 23 U.S.C. §§ 101(a)(22), (23), and (33); 23 U.S.C. §§ 201–202; and 25 C.F.R. §§ 170.5 & 170.114(a). People being denied access to their homes is an adverse effect of the decision or act (i.e., the BIA's decision or act) that resulted in or contributes to such denial of access.

228.    Thus, BIA-DOT's decision to approve the Tribe's request to remove the Roadways from the NTTFI is appealable by the Homeowners under 25 C.F.R. Part 2 and/or 43 C.F.R. Part 4, including appealable to Ms. Poitra as the Midwest Regional Director, Interior Board of Indian Appeals, and/or to Mr. Newland as the Assistant Secretary – Indian Affairs.

229.    Pursuant to 25 C.F.R. §§ 2.6, 2.7, and 2.9, the BIA-DOT's decision to remove the Roadways is ineffective and not final.

230.    The Roadways remain "listed in the approved NTTFI" within the meaning of 25 C.F.R. § 170.114.

231.    Specifically, 25 C.F.R. § 2.6(a) states: "No decision, which at the time of its rendition is subject to appeal to a superior authority in the Department, shall be considered final so as to constitute Departmental action subject to judicial review under 5 U.S.C. 704 . . . ."

232.    Despite the BIA officials' assertions to the contrary and rejection of attempted appeals, for the reasons described above, BIA-DOT's decision to remove the Roadways from the

NTTFI "is subject to appeal to a superior authority in the Department" and therefore is not considered "final" Departmental action.

233.    Additionally, 25 C.F.R. § 2.6(b) states: "Decisions made by officials of the Bureau of Indian Affairs shall be effective <u>when the time for filing a notice of appeal has expired and no notice of appeal has been filed</u>." (Emphasis added.)

234.    25 C.F.R. § 2.7(a)-(c) provides:

> (a) <u>The official making a decision shall give all interested parties known to the decisionmaker written notice of the decision</u> by personal delivery or mail.
>
> (b) Failure to give such notice shall not affect the validity of the decision or action but <u>the time to file a notice of appeal regarding such a decision shall not begin to run until notice has been given in accordance with paragraph (c) of this section</u>.
>
> (c) <u>All written decisions</u>, except decisions which are final for the Department pursuant to § 2.6(c), <u>shall include a statement that the decision may be appealed pursuant to this part, identify the official to whom it may be appealed and indicate the appeal procedures, including the 30-day time limit for filing a notice of appeal</u>.

235.    25 C.F.R. § 2.9(a) states, in relevant part: "The notice of appeal must be filed in the office of the official whose decision is being appealed <u>within 30 days of receipt by the appellant of the *notice of administrative action described in § 2.7*</u>." (emphasis added).

236.    The Homeowners are interested parties within the meaning of 25 C.F.R. Part 2 because they are "person[s] whose interests <u>could be adversely affected</u> by a decision in an appeal." (emphasis added).

237.    The United States knew and continues to know that the Homeowners are interested parties.

238.    Such knowledge is demonstrated in part by a government attorney sending the undersigned in the evening on March 30, 2023, a courtesy copy of Ms. Poitra's March 30, 2023 letter.

239.    Ms. Poitra and Mr. Newland rejected the Homeowners' notices of appeal such that, coupled with the improper notice provided to the Homeowners that fails to comply with § 2.7, the 30-day timeframe to file the notice of appeal per § 2.9(a) has not started yet; thus, the BIA-DOT decision remains ineffective per § 2.6(a)-(b).

240.    No transmission to the Homeowners from the BIA, regarding the Roadways' status on the NTTFI, has included "a statement that the decision may be appealed pursuant to this part, identify the official to whom it may be appealed and indicate the appeal procedures, including the 30-day time limit for filing a notice of appeal." Thus, notice of BIA-DOT's decision has not been given to the Homeowners in accordance with 25 C.F.R. § 2.7(c). Therefore, "the time to file a notice of appeal regarding" BIA-DOT's decision has not begun to run. 25 C.F.R. §§ 2.7(b), 2.9(a) ("The notice of appeal must be filed in the office of the official whose decision is being appealed within 30 days of receipt by the appellant of the notice of administrative action described in § 2.7."). Accordingly, "the time for filing a notice of appeal" has not expired. 25 C.F.R. § 2.6(b). Thus, according to § 2.6(b), BIA-DOT's decision is not "effective."

241.    For the foregoing reasons, as a matter of administrative law and based upon the facts, BIA-DOT's decision purporting to remove the Roadways from the NTTFI is not final and is ineffective. Thus, the Roadways by law remain "listed" in the NTTFI, even if they do not visibly appear in the most recent publicly available online list.

242.    Consequently, the Roadways remain "public roads," i.e., roads that are under the jurisdiction of and maintained by a "public authority" (a federal, state, county, town or township,

Indian Tribe, municipal or instrumentality with authority to maintain the road) (23 U.S.C. §§101(a)(22), (23), and (33); 25 C.F.R. § 170.5; and 25 C.F.R. § 170.114(a)) and that must be open and available for public use (*Id.*).

243. Under the plain language of 25 C.F.R. § 170.114(a), the Roadways being "listed" in the NTTFI is sufficient to require that the Roadways remain open and available for public use.

244. The funds or lack of funds received by the Tribe or spent by the Tribe relating to the Roadways via the TTP is irrelevant under 25 C.F.R. § 170.114(a) & (b). *See* 25 C.F.R. § 170.114 ("All Tribal transportation facilities <u>listed</u> in the approved NTTFI . . . ." (underline added)).

245. Given the above averments, the Homeowners possess protectable property interests in the Roadways, particularly given that their public right to use the (still public) Roadways (25 C.F.R. § 170.114(a)) is inextricably intertwined with their liberty and property interests regarding their homes and freedom.

246. Moreover, regardless of whether the BIA officials are correct that the regulations deprive the Homeowners of administrative appeal rights (which is an erroneous conclusion), the deprivation experienced by the Homeowners regarding the complete lack of any notice and any opportunity to be heard with respect to the BIA's decision-making process and subsequent appeal process (i.e., the denial or lack thereof) violates the Fifth Amendment, given the Homeowners' property and liberty interests in the Roadways remaining public roads and in their homes and the intertwined nature of the Roadways and their Homes. On that independent, constitutional basis alone, the BIA's purported removal of the Roadways from the NTTFI is unconstitutional and unlawful and thus rendered invalid as a matter of constitutional law.

## **INJUNCTIVE RELIEF IS APPROPRIATE**

247.     The controversy among the parties is substantial, immediate, and real. The United States claims to own the subject property in trust for the Tribe, and the United States is seeking to eject the Town from continuing to use the land for public roads. The Homeowners claim a right to use the Roadways, and road closures would deprive the Homeowners of all access to their homes and deprive the Homeowners of their liberty and freedoms.

248.     Tribal members, including Tribal Council members, through *ultra vires* acts, barricaded the Roadways for approximately six weeks.  The Tribe only temporarily reopened the Roadways upon the Homeowners filing the Related Case and then upon payment by the Town for monthly Revocable Temporary Access Permits.  However, the Tribe continues to threaten to close, and ostensibly will close, the Roadways if certain terms and conditions are not met, and the Tribe has kept the cement blocks in place on the Roadways for a main purpose of expeditiously re-barricading the Roadways.

249.     The prior Roadway closures and continued threat of closures in the future, including, but not limited to barricading the Roadways, caused irreparable harm to the Homeowners and will cause further irreparable harm in the absence of court intervention. Money damages cannot adequately compensate the Homeowners for the pain and suffering and other injuries endured while the Homeowners are blocked in or blocked out of their homes.

250.     The parties have adverse legal interests. The United States asserts that it can close the Roadways or otherwise limit the use of the Roadways (such as via issuance of permits), and that the Town's maintenance of the Roadways for public travel constitutes trespass. Whereas the Homeowners rely on federal law as indisputably providing that the Roadways are public roads, and must be kept open to the public, pursuant to 23 U.S.C. §§ 101(a)(22), (23) and (33), 23

U.S.C. §§ 201–202, 25 C.F.R. § 170.5, 25 C.F.R. § 170.114(a), and 25 C.F.R. Part 2. These two positions are mutually exclusive.

251.    The Court's decision on whether the Roadways are public and must be kept open to the public pursuant to 23 U.S.C. §§ 101(a)(22), (23) and (33), 23 U.S.C. §§ 201–202, 25 C.F.R. § 170.5, and 25 C.F.R. § 170.114(a) will aid in resolving the controversy between the parties.

252.    Entry of an order ordering the United States to prevent the closure of the Roadways, including deconstruction of any future barricades, is appropriate and proper relief in this action.  The harm caused to the Homeowners by road closures greatly exceeds any harm to the United States if it were ordered to prevent the closure of the Roadways.

253.    Injunctive relief is in the public interest. The Roadways have provided public access to not only the Homeowners, but also the numerous trust beneficiaries of the subject property for decades and actually increase the value of the property. Family, friends, guests, the United States Postal Service, delivery drivers, and many other groups of the public benefit from the Roadways being open and enabling access to the Homeowners' homes; thus, an injunction allowing the public to access the Homeowners' homes and freely and reasonably go to and from the Homeowners' homes is undoubtedly in the public interest.

254.    Without injunctive relief from the Court, the United States will continue to allow the Tribe to threaten to block, and again actually block, the Homeowners from traveling over public roads (and the only roads) to and from their residences and allow the Tribe to barricade the Roadways again upon expiration or nonpayment of the escalating monthly fee or the Tribe's unilateral revocation of the Revocable Temporary Access Permits.

255. The Homeowners will continue to be irreparably harmed and will be again or further irreparably harmed (*see* Related Case, ECF Nos. 13-17, 31-36 (eleven Homeowners' declarations)) unless the Court grants injunctive relief, pursuant to Fed. R. Civ. P. 65, ordering the United States to prevent the Tribe from closing the Roadways and/or otherwise limit the Homeowners' and public's use of the Roadways.

**COUNT I:**
**Violation of Homeowners' Procedural Due Process Rights**
**U.S. Const. Amend. V**

256. The Homeowners hereby incorporate by reference the averments contained in the above paragraphs as though set forth fully herein.

257. The Fifth Amendment to the United States Constitution prohibits the federal government from depriving any person of life, liberty, or property, without due process of law.

258. The Roadways are roads that, under federal law, including 25 C.F.R. Part 170, must be open and available for public use and may be restricted only under a narrow, inapplicable set of circumstances.

259. The Roadways have been public roads for many decades.

260. The Homeowners relied on the Roadways being public roads in perpetuity when they purchased their homes and relied on the Roadways remaining open for many decades in order to continue accessing their homes.

261. The Homeowners' livelihoods and personal liberty and freedom require the Roadways, which are public, to remain open and available for public use.

262. The Homeowners have a liberty interest in freedom to come and go from their homes.

263.     The United States' failure to deconstruct or cause the deconstruction of the barricades on the Roadways deprived and threatens to again deprive the Homeowners of their liberty interest, with a lack of process accompanying such deprivation.

264.     The Homeowners have a property interest in their land and improvements thereon, including their homes.

265.     The Homeowners have a property interest in the form of a public right relating to use of the Roadways which are public roads.

266.     Barricading of the Roadways is unlawful under federal law.

267.     The barricades were placed on lands to which the United States holds legal title in trust for the Tribe and Allottees.

268.     The barricades on the Roadways cause the Roadways to be closed.

269.     The United States is charged with overseeing, administering, managing, and controlling lands that it holds in trust for tribes.

270.     The DOI is charged with enforcing or implementing the regulations in 25 C.F.R. Part 170, including 25 C.F.R. § 170.114, and thus had a duty to deconstruct the barricades or cause the deconstruction of the barricades.

271.     The United States, via the DOI, decided to take no action to deconstruct the barricades or cause the deconstruction of the barricades.

272.     The United States failed to deconstruct or cause the deconstruction of the barricades.

273.     Such United States' decision and action deprived the Homeowners of their property and liberty interests.

274.    The process through or by which the United States came to its decision and action did not include the provision to the Homeowners of any notice and opportunity to be heard prior to its action.

275.    The United States has violated the Homeowners' Fifth Amendment procedural due process rights by depriving the Homeowners of their property and liberty interests without providing the Homeowners notice and opportunity to be heard prior to allowing and not deconstructing or causing the deconstruction of the unlawful barricades placed on public roads on land to which the United States holds title and is charged with administering.

**COUNT II:**
**Violation of Homeowners' Substantive Due Process Rights**
**U.S. Const. Amend. V**

276.    The Homeowners hereby incorporate by reference the averments contained in the above paragraphs as though set forth fully herein.

277.    The Fifth Amendment to the United States Constitution prohibits the federal government from depriving any person of life, liberty, or property, without due process of law.

278.    The Due Process Clause has a substantive component that provides heightened protection against undue government interference with fundamental rights and liberty interests.

279.    The right to be free from bodily restraint without undue government restriction is one of the fundamental rights and interests protected by the Due Process Clause.

280.    The right to freedom of movement and to travel without undue government restriction is one of the fundamental rights and interests protected by the Due Process Clause.

281.    The right to establish a home without undue government restriction is one of the fundamental rights and interests protected by the Due Process Clause.

282. The right of personal liberty without undue government restriction is one of the fundamental rights and interests protected by the Due Process Clause.

283. Barricading of the Roadways is unlawful under federal law.

284. The United States is charged with overseeing, administering, managing, and controlling lands that it holds in trust for tribes.

285. The DOI is charged with enforcing or implementing the regulations in 25 C.F.R. Part 170, including 25 C.F.R. § 170.114, and thus had a duty to deconstruct the barricades or cause the deconstruction of the barricades.

286. The barricades were placed on lands to which the United States holds legal title and is charged with administering.

287. The barricades on the Roadways cause the Roadways to be closed.

288. When the barricades are on the Roadways, some Homeowners are effectively barricaded into their homes and thus prevented from leaving their properties such that they cannot travel or move from their homes.

289. When the barricades are on the Roadways, some Homeowners are effectively barricaded into their homes and thereby bodily restrained.

290. When the barricades are on the Roadways, some Homeowners are effectively barricaded out of their homes and thus prevented from going onto their properties such that they are without a home.

291. The United States, via the DOI, decided to take no action to deconstruct the barricades or cause the deconstruction of the barricades and otherwise failed to deconstruct or cause the deconstruction of the barricades.

292.     Such United States decision and conduct depriving the Homeowners of their personal liberty, freedom from bodily restraint, freedom of movement and to travel, and freedom to establish a home is unconstitutionally arbitrary, does not serve any legitimate government interest and shocks the conscience.

293.     The above circumstances are threatened to occur again and likely to occur again soon when the access permits expire or terminate, at which time the barricades will be re-locked on the Roadways.

294.     The United States has violated the Homeowners' Fifth Amendment substantive due process rights by depriving the Homeowners of their property and liberty interests without providing the Homeowners notice and opportunity to be heard prior to allowing and not deconstructing or causing the deconstruction of the unlawful barricades placed on public roads on land to which the United States holds title and is charged with administering.

**COUNT III:**
**Violation of Takings Clause**
**U.S. Const. Amend. V**

295.     The Homeowners hereby incorporate by reference the averments contained in the above paragraphs as though set forth fully herein.

296.     The Fifth Amendment to the United States Constitution prohibits the federal government from taking private property for public use without just compensation.

297.     The United States Supreme Court has interpreted "public use" "broadly." *See*, *e.g.*, *Kelo v. City of New London*, 545 U.S. 469 (2005).

298.     The Roadways are roads that, under federal law, must be open and available for public use and may be restricted only under a narrow, inapplicable set of circumstances.

299.     The Roadways have been public roads for many decades.

300. The Homeowners relied on the Roadways being public roads in perpetuity when they purchased their homes and relied on the Roadways remaining open for many decades in order to continue accessing their homes.

301. The Homeowners' livelihoods and personal liberty and freedom require the Roadways, which are public, to remain open and available for public use.

302. The Roadways provide the sole roadway access to the Homeowners' respective properties such that when the Roadways are barricaded closed Homeowners who are barricaded out of their properties cannot access their properties containing their homes.

303. The Homeowners have a property interest in their land and improvements thereon, including their homes.

304. The Homeowners have a property interest in the form of a public interest relating to use of the Roadways which are public roads.

305. Barricading of the Roadways is unlawful under federal law.

306. The barricades were placed on lands to which the United States holds legal title in trust for the Tribe and Allottees.

307. The barricades on the Roadways cause the Roadways to be closed.

308. The United States is charged with overseeing, administering, managing, and controlling lands that it holds in trust for tribes.

309. The United States, via the DOI, decided to take no action to deconstruct the barricades or cause the deconstruction of the barricades.

310. The United States did not deconstruct or cause the deconstruction of the barricades.

311.    Such United States' conduct deprived the Homeowners of all beneficial use of their respective properties in their entirety.

312.    Such United States' conduct caused the Homeowners' loss of exclusive possession of their properties.

313.    Such United States' conduct has significantly interfered with the Homeowners' reasonable investment-backed expectations regarding their real property.

314.    Such United States' action has significantly and exponentially decreased the value of the Homeowners' properties.

315.    To the contrary, the United States' action has provided the Tribe the opportunity to purchase land back at a significantly decreased price.  Tribal members have offered Homeowners pennies on the dollar for their properties.

316.    One Homeowner was informed by a Tribe member that the Homeowner will have to sell their home for significantly less than fair market value. That homeowner was also told that affected homes have sold for as low as $5,000.

317.    The United States has not compensated the Homeowners for their properties or the deprivation of their properties.

318.    The character of the United States' action is demonstrated by its failure to vindicate public rights with respect to public roads on its land and by its failure to safeguard private property rights by not deconstructing unlawful barricades on public roads located on United States' lands.

319.    The United States has violated the Takings Clause by failing to cause the cessation of unlawful conduct, i.e., failing to deconstruct barricades on the Roadways, occurring

on public roads located on its lands, thereby depriving the Homeowners of their private property for a public use without just compensation.

320.     The above circumstances, representing unconstitutional government conduct, will exist again when the barricades are re-locked on the Roadways; thus, the Homeowners are threatened with a taking that will result from unconstitutional government conduct.

321.     If the threatened taking were to occur, uncompensable damages and irreparable harm will also be sustained by the Homeowners.

**COUNT IV:**
**Violation of Homeowners' Procedural Due Process Rights**
**U.S. Const. Amend. V**

322.     The Homeowners hereby incorporate by reference the averments contained in the above paragraphs as though set forth fully herein.

323.     The Fifth Amendment to the United States Constitution prohibits the federal government from depriving any person of life, liberty, or property without due process of law.

324.     The Roadways are roads that, under federal law, including 25 C.F.R. Part 170, must be open and available for public use and may be restricted only under a narrow, inapplicable set of circumstances.

325.     The Roadways have been public roads for many decades.

326.     The Homeowners relied on the Roadways being public roads in perpetuity when they purchased their homes and relied on the Roadways remaining open for many decades in order to continue accessing their homes.

327.     The Homeowners' livelihoods and personal liberty and freedom require the Roadways, which are public, to remain open and available for public use.

328.     The Homeowners have a liberty interest in freedom to come and go from their homes.

329.     The United States' failure to cause the cessation of the temporary access permit scheme has deprived, continues to deprive, and threatens to further deprive the Homeowners of their liberty interest, with a lack of process accompanying such deprivation.

330.     The Homeowners have a property interest in their land and improvements thereon, including their homes.

331.     The Homeowners have a property interest in the form of a public right relating to use of the Roadways which are public roads under federal law.

332.     Tribal members' issuance of the ongoing Temporary Access Permits and the permits themselves are unlawful under federal law.

333.     The Temporary Access Permits directly relate to road use for portions of roads that are located on lands to which the United States holds legal title in trust for the Tribe and Allottees.

334.     The United States is charged with overseeing, administering, managing, and controlling lands that it holds in trust for tribes.

335.     The DOI is charged with enforcing or implementing the regulations in 25 C.F.R. Part 170, including 25 C.F.R. § 170.114.

336.     The United States, via the DOI, decided not to take any action to cease the Temporary Access Permits regime and the permits themselves.

337.     The United States has not caused the cessation of the access permits, which are currently in effect.

338.     Such United States decision and failure has deprived the Homeowners of their property and liberty interests.

339.     The process through or by which the United States came to its decision and acted upon such decision did not include providing to the Homeowners any notice and opportunity to be heard prior to making such decision and acting upon such decision.

340.     The United States has violated the Homeowners' Fifth Amendment due process rights by depriving the Homeowners of their property and liberty interests without providing the Homeowners notice and opportunity to be heard prior allowing unlawful ongoing activity occurring on or directly relating to land to which the United States holds title and is charged with administering.

## COUNT V:
### Violation of Homeowners' Due Process Rights
### U.S. Const. Amend. V

341.     The Homeowners hereby incorporate by reference the averments contained in the above paragraphs as though set forth fully herein.

342.     The Fifth Amendment to the United States Constitution prohibits the federal government from depriving any person of life, liberty, or property without due process of law.

343.     As part of the rights-of-way application process under 25 C.F.R. Part 169, the Homeowners hired appraisers to appraise the Roadways according to the scope of work agreed upon by the BIA and the Tribe.

344.     In late 2022, the appraisers completed the appraisals for the lands where the Roadways are located and delivered the completed appraisals to the BIA without providing a copy to the Homeowners.

345.     The Tribe refuses to provide consent to the BIA to deliver the Roadways appraisals to the Homeowners even though the Homeowners paid for the appraisals as required under the ROW application procedure.

346.     The BIA relies on 25 C.F.R. § 169.107 to § 169.114 as the basis upon which the Tribe is authorized to prevent, and has prevented, the BIA from producing to the Homeowners the appraisals that set the price to be paid to the Allottees for rights-of-way.

347.     25 C.F.R. § 169.107 to § 169.114 wholly prevents the Homeowners from any opportunity to obtain appraisals of the lands on which the public Roadways exist, which precludes the Homeowners from knowing how much compensation to pay to the BIA for the Allottees regarding new rights of way for the Roadways.

348.     This prevents the Homeowners from being able to know the fair market value and complete the ROW application packets required under 25 C.F.R. § 169.123.

349.     Because the Homeowners' have property and liberty interests in and relating to the public Roadways, which are vital to their livelihoods as they provide the sole roadway access to their homes, 25 C.F.R. §§ 169.107–169.114's complete denial of the Homeowners' ability to know the value of the lands on which the public roads are located, so that they can complete the ROW application process, violates the Due Process Clause.

### COUNT VI:
### Violation of Homeowners' Due Process Rights
### U.S. Const. Amend. V

350.     The Homeowners hereby incorporate by reference the averments contained in the above paragraphs as though set forth fully herein.

351.     The Fifth Amendment to the United States Constitution prohibits the federal government from depriving any person of life, liberty, or property, without due process of law.

352.     Prior to completion of the appraisers' work for assessing the property values at issue, on October 26, 2022, the Tribe demanded $10,000,000 from the Homeowners for new rights of way over the four Roadways: "$7M attributed to past trespass on Big Thunder and East Ross Allen Lake Lane; issuance of 50-year ROWs for East Ross Allen Lake Lane[;] $3M attributed to past trespass and issuance of 50-year ROWs for Annie Sunn Lane, Center Sugarbush, and Elsie Lake Lane." Further, "[that] $10M demand amount [was] valid until October 31, 2022." *See* Related Case, ECF No. 12-11 at 2.

353.     The Homeowners requested to review the appraisals that calculated the amount the Homeowners were required to pay to the BIA for the benefit of the Allottees before responding to the demand.

354.     On January 6, 2023, the Homeowners received a demand from the Tribe doubling the amount they needed to pay to the Tribe for new rights of way: $20,000,000.00. *See* Related Case, ECF No. 12-11 at 1.

355.     A substantial portion of the $10 Million and $20 Million demands is attributed to the applied-for New rights of way for the Roadways.

356.     25 C.F.R. § 169.110(a) authorizes the Tribe to demand "any payment amount" for rights-of-way to use the public roads at issue. Also, even upon the Tribe being provided with appraisals regarding the fair market value for rights-of-way, 25 C.F.R. § 169.110(b) authorizes "any compensation" amount demand by the Tribe for rights-of-way to use the public roads at issue without regard to the fair market value.

357.     25 C.F.R. § 169.110 authorizes the Tribe to demand an unconstitutional, arbitrarily high payment amount, which Homeowners are unable to afford, in exchange for Homeowners' access to public roads that the Homeowners have a property and liberty interest in.

358.     The demanded amount for an interest in lands that contain the public Roadways is unrealistic and unaffordable to the Homeowners because it requires them to pay approximately twice their collective home values for a limited term right of access.

359.     Because the Homeowners' have property and liberty interests in and relating to the public Roadways, which are vital to their livelihoods as they provide the sole roadway access to their homes, 25 C.F.R. § 169.110's authorization of an unaffordable payment amount, in exchange for a finite term of Homeowners' ability to access public roads, violates the Due Process Clause.

## COUNT VII:
### Violation of Takings Clause
### U.S. Const. Amend. V

360.     The Homeowners hereby incorporate by reference the averments contained in the above paragraphs as though set forth fully herein.

361.     The Fifth Amendment to the United States Constitution prohibits the federal government from taking private property for public use without just compensation.

362.     Prior to completion of the appraisers' work for assessing the property values at issue, on October 26, 2022, the Tribe demanded $10,000,000 from the Homeowners for new rights of way over the four Roadways: "$7M attributed to past trespass on Big Thunder and East Ross Allen Lake Lane; issuance of 50-year ROWs for East Ross Allen Lake Lane[;] $3M attributed to past trespass and issuance of 50-year ROWs for Annie Sunn Lane, Center Sugarbush, and Elsie Lake Lane." Further, "[that] $10M demand amount [was] valid until October 31, 2022." *See* Related Case, ECF No. 12-11 at 2.

363.     The Homeowners informed the Tribe that the appraisals need to be reviewed by the Homeowners before responding to the demand.

364.     On January 6, 2023, the Homeowners received a demand from the Tribe doubling the amount they needed to pay to the Tribe for new rights of way: $20,000,000.00. *See* Related Case, ECF No. 12-11 at 1.

365.     A substantial portion of the $10 Million and $20 Million demands is attributed to the applied-for rights of way for the Roadways.

366.     25 C.F.R. § 169.110(a) authorizes the Tribe to demand "any payment amount" for rights-of-way to use the public roads at issue. Also, even upon the Tribe being provided with the fair market value for rights-of-way, 25 C.F.R. § 169.110(b) authorizes "any compensation" amount demand by the Tribe for rights-of-way to use the public roads at issue.

367.     25 C.F.R. § 169.110 authorizes the Tribe to demand an unaffordable amount for the Homeowners to gain access to lands on which the public roads at issue are located and thereby causes the Homeowners to be unable to have guaranteed free access to their homes in that they are unable to traverse public roads that provide the sole roadway access to their homes.

368.     The lack of guaranteed free access to their homes by being unable to use the public Roadways due to this regulation (25 C.F.R. § 169.110) has caused a significant decreasing in the value of the Homeowners' properties.

369.     The Homeowners have not been offered and have not received just compensation from the United States for the significant decreases in their properties' values caused by this regulation (25 C.F.R. § 169.110).

370.     To the contrary, the United States' action has provided the Tribe the opportunity to purchase land back at a significantly decreased price. Tribal members have offered Homeowners pennies on the dollar for their properties.

371. One Homeowner was informed by a Tribe member that the Homeowner will have to sell their home for significantly less than fair market value. That homeowner was also told that affected homes have sold for as low as $5,000.

372. 25 C.F.R. § 169.110 violates the Takings Clause as applied because it authorizes "any payment amount" or "any compensation" amount for rights-of-way to use the public roads, directly causing the Homeowners' inability to obtain new rights of way for the Roadways and thus an inability to have guaranteed free access to their properties. Lacking guaranteed free access to their homes has significantly deprived the Homeowners of their private property (i.e., the value in their properties), for a public purpose, without just compensation.

## COUNT VIII:
### Easement by Necessity

373. The Homeowners hereby incorporate by reference the averments contained in the above paragraphs as though set forth fully herein.

374. The United States waived sovereign immunity by filing an affirmative suit for trespass and ejectment, thereby putting ownership and possessory interests in the land at issue.

375. The Homeowners have easements by necessity to use the Roadways for access to and from their respective properties.

376. The lands comprising the Lac du Flambeau Indian Reservation, including the Homeowners' properties and the parcels improved by the Roadways, was reserved to the Tribe by the Treaty of 1854, 10 Stats., 1109, and at one time were under common ownership.

377. Parcels of land on the Lac du Flambeau Reservation were later appropriated to individual tribal members pursuant to the Treaty of 1854 and/or other federal law from whose successors Homeowners acquired title.

378.     The only means of access to the Homeowners' properties since severance of the parcels has been by use of the roads within the unallotted part of the reservation, namely, the Roadways.

379.     Without access to and use of the Roadways, the Homeowners' properties are landlocked, and the Homeowners are unable to access public highways.

380.     The Homeowners are entitled to a declaratory judgment confirming that the Homeowners have easements by necessity for the benefit of each of their respective properties.

<u>COUNT IX:</u>
**Implied Easement**

381.     The Homeowners hereby incorporate by reference the averments contained in the above paragraphs as though set forth fully herein.

382.     The United States waived sovereign immunity by filing an affirmative suit for trespass and ejectment, thereby putting ownership and possessory interests in the land at issue.

383.     The Homeowners have implied easements to use the Roadways for access to and from their respective properties.

384.     The land comprising the Lac du Flambeau Indian Reservation, including the Homeowners' properties and the parcels improved by the Roadways, was reserved to the Tribe by the Treaty of 1854, 10 Stats., 1109.

385.     Parcels of land on the Lac du Flambeau Reservation were appropriated to individual tribal members pursuant to the Treaty of 1854 and/or other federal law, who later sold the land to developers for the specific purpose of subdividing the land that was later sold to the Homeowners' predecessors in interest.

386.     The need for access rights to the lots in the subdivision arose at the time of sale to the developer before the subdivision was created.

387.     The only means of access to the Homeowners' properties since severance of the parcels has been by use of the roads within the unallotted part of the reservation, namely, the Roadways, and the Roadways are reasonably necessary to enjoy the lands that were sold to the Homeowners' predecessors in interest.

388.     The Homeowners are entitled to a declaratory judgment confirming that the Homeowners have implied easements for the benefit of their respective properties.

### COUNT X:
### In the alternative, Petition in the Nature of Mandamus

389.     The Homeowners hereby incorporate by reference the averments contained in the above paragraphs as though set forth fully herein.

390.     In the alternative to the above-pleaded counts, the Homeowners petition for an order in the nature of mandamus to compel the United States, through the DOI, to implement the TTP, specifically 25 C.F.R. § 170.114(a), as the Department is clearly required to do so by law, that requires the Roadways remain open and available for public use as required by federal law.

391.     Specifically, the Homeowners petition for an order in the nature of mandamus to compel the DOI to enforce 25 C.F.R. § 170.114(a), including putting a stop to the Tribe's unlawful temporary access permits scheme that makes the public Roadways unavailable for public use, in contravention of the TTP regulations, as well as measures to prevent the public Roadways from being barricaded and thus closed, in contravention of the TTP regulations, and taking all necessary actions to deconstruct any future barricades on the public Roadways that close the public Roadways, in contravention of the TTP regulations.

392.     28 U.S.C. § 1651(a) provides: "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

393.    28 U.S.C. § 1361 provides: "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

394.    The DOI is charged and duty-bound in a mandatory nondiscretionary manner to implement and enforce TTP regulations.

395.    25 C.F.R § 170.1 states that "[Part 170] provides rules . . . for the Department of the Interior (DOI), in cooperation with the Department of Transportation (DOT), to implement the Tribal Transportation Program (TTP)."

396.    Included in the TTP is 25 C.F.R. § 170.114(a), which in relevant part states: "All Tribal transportation facilities listed in the approved NTTFI must be open and available for public use as required by 23 U.S.C. 101(a)(3[3])."

397.    The United States, via the DOI, failed to implement the TTP when it failed and will again fail to deconstruct the barricades on the public Roadways that contravene TTP regulations, namely, 25 C.F.R. § 170.114.

398.    The United States, via the DOI, failed to implement the TTP when it failed and continues to fail to put a stop to the temporary access permits regime which contravene TTP regulations, namely, 25 C.F.R. § 170.114.

399.    The United States, via the DOI, has a clear mandatory, nondiscretionary duty to deconstruct barricades on the Roadways—past, present, and future.

400.    The United States, via the DOI, has a clear mandatory, nondiscretionary duty to put a stop to the temporary access permits scheme.

401.    Thus, in the alternative to the above-pleaded counts, the Homeowners have a clear right to relief in the nature of mandamus for reasons set forth in the above paragraphs, and, in the

alternative to the above-pleaded counts, the Homeowners have no other adequate remedy available to them.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Intervening Defendants respectfully request that the Court enter judgment in their favor and against the United States as follows:

A.      Dismissing Plaintiff's claims for trespass and ejectment with prejudice;

B.      Entering an order, in recordable form, declaring that Intervening Defendants, and their families, guests and invitees, have the right to use Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane and Elsie Lake Lane for access to and from their respective homes in perpetuity;

C.      A declaration that the Roadways remain "listed" on the NTTFI within the meaning of 25 C.F.R. Part 170 such that the Roadways must be open and available for public use as required under federal law unless or until BIA's decision regarding the Roadways' removal from the NTTFI becomes final and effective pursuant to 25 C.F.R Part 2;

D.      A declaration that:

1.      The United States' decision and failure to not cause the cessation of unlawful activity in the form of barricades on the public Roadways that prohibit or restrict use of the Roadways, without giving the Homeowners any notice and opportunity to be heard prior to making and acting upon such decision, violates the Due Process Clause;

2.      The United States' failure to deconstruct unlawful barricades on the Roadways violates the Homeowners' fundamental Constitutional rights to personal liberty, freedom from bodily restraint, freedom of movement and to travel, and establish a home;

3.     The United States' failure to cause the cessation of unlawful activity in the form of not deconstructing unlawful barricades on the public Roadways constitutes a taking of the Homeowners' private property for a public purpose without just compensation, there is a real threat of this occurring again, and its reoccurrence would be unconstitutional government conduct resulting in uncompensable damages and irreparable harm to the Homeowners;

4.     The United States' decision and failure to cause the cessation of ongoing unlawful activity in the form of access permits, which prohibit or restrict use of Roadways, without providing the Homeowners with any notice or opportunity to be heard prior to making and acting upon such decision, violates the Due Process Clause;

5.     As applied, 25 C.F.R. § 169.107 to § 169.114 violates the Homeowners' Due Process rights; and an order requiring the BIA to promptly deliver copies of the appraisals to the Homeowners; and

6.     As applied, 25 C.F.R. § 169.110 violates the Homeowners' Due Process rights and the Takings Clause; and an order requiring the BIA to issue new rights-of-way for the Roadways upon Homeowners' payment of fair market value;

E.     A preliminary injunction requiring the United States to take all necessary actions to ensure the Roadways remain open, unrestricted, and available for public use, including causing the cessation of temporary access permits for use of public roads located on United States' lands, preventing the re-barricading of the public Roadways, and deconstructing all objects on the Roadways that now or will prevent or restrict the public from using public roads on United States' land, until a final order is entered by this Court;

F.     A permanent injunction requiring the United States to take all necessary actions to ensure the Roadways remain open, unrestricted, and available for public use, including causing

the cessation of temporary access permits for use of public roads located on United States' lands, preventing the re-barricading of the public Roadways, and deconstructing all objects on the Roadways that now or will prevent or restrict the public from using public roads on United States' land;

G.      A declaration and injunction pursuant to 28 U.S.C. § 2201 & 2202 that the United States is required to cause the cessation of unlawful conduct on its lands such that the Roadways remain open, unrestricted, and available for public, including putting an end to temporary access permits for use of public roads located on United States' lands, preventing foreseeable re-barricading of the Roadways, and deconstructing all objects on the Roadways that now or will prevent or restrict the public from using public roads on United States' land;

H.      An order requiring the United States to remove the cement blocks from the Roadways and to ensure the cement blocks are not replaced with the same or similar tangible objects;

I.      A declaration that the Homeowners have easements by necessity for the benefit of their respective properties;

J.      A declaration that the Homeowners have implied easements for the benefit of their respective properties; and

K.      Awarding Intervening Defendants such other and further relief as this Court deems just and appropriate.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Homeowners request a jury trial on all issues so triable.

Dated this 24th day of October, 2023.

REINHART BOERNER VAN DEUREN S.C.
N16 W23250 Stone Ridge Drive
Suite 1
Waukesha, WI 53188

P.O. Box 2265
Waukesha, WI 53187-2265

Telephone:  262-951-4527
Facsimile:  262-951-4690

Signed electronically by:

*/s/ David G. Peterson*
David G. Peterson
WI State Bar ID No. 1001047
dgpeterson@reinhartlaw.com
Bridget M. Hubing
WI State Bar ID No. 1029356
bhubing@reinhartlaw.com
Olivia J. Schwartz
WI State Bar ID No. 1115787
oschwartz@reinhartlaw.com
Samuel C. Sylvan
WI State Bar ID No. 1131339
ssylvan@reinhartlaw.com

*Attorneys for Intervening Defendants*