UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff and
        Counter Defendant,

    v.

TOWN OF LAC DU FLAMBEAU,

        Defendant and
        Counter Claimant,

    and

GORDON ANDERSON et al.,

        Intervenor Defendants and
        Intervenor Counter Claimants.

Case No. 3:23-cv-00355-wmc

---

**INTERVENOR DEFENDANT AND COUNTER CLAIMANT HOMEOWNERS' BRIEF
IN SUPPORT OF HOMEOWNERS' MOTION FOR PRELIMINARY INJUNCTION**

---

Reinhart Boerner Van Deuren s.c.
N16 W23250 Stone Ridge Drive
Suite 1
Waukesha, WI 53188
Telephone:  262-951-4527
Facsimile:  262-951-4690

David G. Peterson
WI State Bar ID No. 1001047
dgpeterson@reinhartlaw.com
Bridget M. Hubing
WI State Bar ID No. 1029356
bhubing@reinhartlaw.com
Samuel C. Sylvan
WI State Bar ID No. 1131339
ssylvan@reinhartlaw.com
Olivia J. Brooks
WI State Bar ID No. 1115787
obrooks@reinhartlaw.com

*Attorneys for Intervenor
Defendant Homeowners*

1

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 4

FACTS .................................................................................................................................. 8

I.     THE HOMEOWNERS' FEE SIMPLE LANDS IN THE CHECKERBOARD
RESERVATION................................................................................................................8

II.    HISTORY OF THE RESERVATION AND CONGRESSIONAL
ALLOTMENT ACTS .......................................................................................................9

III.   THE BAND'S REFUSAL TO CONSENT TO BIA-ISSUED RIGHTS-OF-
WAY RENDERED THE RIGHT OF WAY APPLICATION PROCESS
UNDER THE ROW ACT FUTILE AND UNAVAILABLE TO THE
HOMEOWNERS..........................................................................................................16

IV.   THE ROADWAYS' HISTORY, THE BAND'S TEMPORARY ACCESS
PERMITS THAT THE TOWN CAN NO LONGER AFFORD, AND THE
IMMINENT BARRICADING AND CLOSURE OF THE ROADWAYS ....................18

LEGAL STANDARD......................................................................................................... 25

ARGUMENT ..................................................................................................................... 27

I.     THE HOMEOWNERS ARE LIKELY TO SUCCEED ON THE MERITS OF
THEIR EASEMENT CLAIMS .....................................................................................28

    a)  The Homeowners Are Likely to Succeed on the Merits of Their Implied
Easements Claims ....................................................................................... 28

    b)  The Homeowners Are Likely to Succeed on the Merits of Their Easements
by Necessity Claims.................................................................................... 33

    c)  The Homeowners' Easements Implied at Law Are Unaffected by Other
Congressional Acts like the Indian ROW Act ............................................ 39

II.    THE HOMEOWNERS WILL BE IRREPARABLY HARMED BY THE
BARRICADED ROADWAYS UNLESS THE COURT ENTERS A
PRELIMINARY INJUNCTION. ..................................................................................44

III.   THE EQUITIES WEIGH IN FAVOR OF THE HOMEOWNERS ...............................59

IV.   A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST............................60

V.      AN ORDER IN THIS SUIT ENTERED AGAINST THE USA WILL BIND
        THE BAND ...........................................................................................................62

REQUEST FOR WAIVER OF BOND ........................................................................ 63

CONCLUSION............................................................................................................. 64

## INTRODUCTION

The Homeowners all own parcels of property within the Reservation of the Lac du Flambeau Band of Lake Superior Chippewa Indians (the "Band"). The Band has again threatened to place barricades across four public roads on the Reservation and in the Town of Lac du Flambeau (the "Town"), to unlawfully prevent the Homeowners from accessing their homes. The four roads at issue are Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane, and Elsie Lake Lane (each, "Roadway," and collectively, the "Roadways"). The Roadways are on land that the USA holds in trust for the Band and in restricted-fee status for seventy-six individual Indian landowners ("Allottees").

As explained below, the Homeowners all have easements over the Roadways, both implied and by necessity, to freely access their homes. But in early 2023, disregarding the Homeowners' rights, the Band barricaded the Roadways. After six weeks of the Roadways being closed and causing irreparable harm to the Homeowners, the Band removed the barricades and enacted a temporary access "Permit" scheme where the Band charged the Town monthly fees to keep the Roadways open. Between March 2023 and today, the Town has paid $600,000 for the permits, but now the Town has run out of money. The last set of temporary access permits will expire on September 12, 2024. The Band has threatened that, if the Town fails to pay the next monthly permit fee (which it cannot afford), the Band will again impose "restricted access" over (i.e., barricade) the Roadways, similar to how the Band stated in early 2023 that it "reserve[d] the right to limit access" to the Roadways, just days before it barricaded them. When that again happens, as evidenced by what happened when the Roadways were unlawfully closed in 2023,

the Homeowners will be irreparably harmed and will continue to be harmed in the absence of court relief.

One way the barricaded Roadways cause irreparable harm is that they violate and deprive the Homeowners of the Homeowners' property rights to use their easements implied at law to access their homes. While the easements are not recorded, there is a substantial likelihood that the Homeowners will prevail on their implied easement and easement by necessity claims in this litigation. Thus, the Court should enter a preliminary injunction against the USA (as trustee) and the Band (as beneficiary of the USA's litigation) to keep the Roadways open for the Homeowners and their invitees, guests, and emergency services during the litigation's pendency. The Homeowners have a substantial likelihood of succeeding on the merits because implied easements and easements by necessity very likely exist as a matter of law and equity due to the manner in which the Reservation was allotted into parcels by Congress and sold in fee simple to non-tribal members. In 1989, the United States Supreme Court acknowledged this conclusion for a reservation in Washington that is checkerboarded similarly to the Reservation here.[1]

When the Band barricaded the Roadways in 2023, a group of plaintiffs (many of whom are Homeowners here) sued members of the Tribal Council, seeking to have the barricades removed. *See Pollard v. Johnson*., 23-cv-135-wmc (W.D. Wis. Feb. 28, 2023) ("*Pollard*"). This Court ultimately dismissed *Pollard*, finding that the Cout lacked subject matter jurisdiction. *Pollard*, 2023 WL 5221533 (W.D. Wis. Aug. 15, 2023). The USA was not a party in *Pollard* but filed an amicus brief urging dismissal. *Pollard*, ECF No. 53. In its *Pollard* amicus brief, the USA revealed that it was contemplating filing this lawsuit to provide a proper vehicle to bring before the Court all interested stakeholders so that the Homeowners' easement issues, as well as all

---

[1] *See Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408 (1989), discussed in detail below.

other issues regarding the public nature of the Roadways, could be fully litigated in the event a negotiated resolution was not reached. *Pollard*, ECF No. 53, at 10-11 ("Such an action would allow all stakeholders to seek to intervene and litigate the full panoply of their claims and defenses.").

As explained below, the USA admits in this lawsuit, through its discovery responses, that its sole defensive contention to the Homeowners' easement claims is that (according to the USA) Congress "lack[ed] … intent" for such easements to be created through the General Allotment Act (also known as the Dawes Act), or other statutes. (8/30/2024 Hubing Decl., Ex. 2, pp. 17-19, 7/12/2024 USA's Resp. to Homeowners' Interrog. Nos. 10 & 11.) But the Supreme Court already explicitly decided that question in the Homeowners' favor, concluding that Congress *did* have such intent, impliedly granting easements for fee lands deriving from Dawes Act allotments:

> As we recognized in *Montana v. United States*, "treaty rights with respect to reservation lands must be read in light of the subsequent alienation of those lands." 450 U.S. [544], at 561, 101 S. Ct. [1245], at 1256. **A statute [i.e., the Dawes Act] that authorizes the sale of a parcel of land in a reservation *must implicitly grant the purchaser access* to that property**.
>
> * * *
>
> **Congress could not possibly have intended in enacting the Dawes Act that tribes would maintain the power to exclude bona fide purchasers of reservation land from that property**….

*Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408, 436-41 (1989) (Stevens, J., concurring, joined by Justice O'Connor) (emphasis added). As the *Brendale* plurality stated, six Supreme Court Justices agreed on this issue:

> Justice STEVENS acknowledges that **the Act eliminated tribal authority to exclude nonmembers from fee lands they owned**.
>
> * * *

> [T]he Yakima Nation no longer has the power to exclude fee owners from its land within the boundaries of the [Yakima "checkerboard"] reservation, as Justice STEVENS concedes. . . . **Once [non-Yakima member] Brendale obtained title to his land that land was no longer off limits to him; the tribal authority to exclude was necessarily overcome by, as Justice STEVENS puts it,** *an "implici[t] grant" of access to the land*.

*Brendale*, 492 U.S. at 423-24 (White, J., plurality, joined by Chief Justice Rehnquist and Justices Scalia and Kennedy).

By relying solely on an argument that the Supreme Court expressly rejected, and by not asserting that the Homeowners fail to satisfy any other elements of their easement claims,[2] the USA effectively admits that the Homeowners have a substantial likelihood of success on the merits of their easement claims. The easements are on land that the USA owns and holds in trust for the Band — lands that the USA is charged with administering. The United States has waived sovereign immunity by filing this lawsuit for the benefit of the Band, seeking resolution of all interests and claims regarding the Roadways. The Court should therefore enter a preliminary injunction against the USA requiring that the barricades be removed and/or[3] the Roadways

---

[2] Congressional intent is an element of the Homeowners' implied easement claims but not an element of the easement by necessity claims, so the USA effectively concedes the Homeowners are entitled to an easement by necessity. *See Brendale v. Olney*, No. C-78-145, at 1-8 (E.D. Wash. Mar. 3, 1981) (Mem. Decision & Judgment), attached as Ex. 3 to 8/30/2024 Hubing Decl., (finding easement by necessity across the Yakima Reservation for non-member's allotted parcel located within the Reservation and accessible only by closed Bureau of Indian Affairs' ("BIA") roads within the reservation; citing 3 POWELL ON REAL PROPERTY ¶ 410 (1979) for three elements of easement by necessity, none of which is the conveyor's intent). *See also Leo Sheep Co. v. United States*, 440 U.S. 668, 679 n.14 (1979) (citing with affirmation 3 POWELL ON REAL PROPERTY ¶ 410 (1978) for elements of easement by necessity).

[3] The Homeowners have good reason to believe that by the time the Court hears this Motion, the Band will have barricaded and closed the Roadways. While the filing of this Motion might cause the Band to delay barricading and closing the Roadways, even if the Band has not done so by the time that the Court hears this Motion, the Court should not give the Band's delay any deference and should enter an Order preventing the Roadways' closure until final resolution of the Homeowners' easement claims. The status quo is open Roadways, and the Court should sit in equity to preserve the status quo and to prevent imminent irreparable harm to the Homeowners. If the Roadways being open at the exact time the Court hears this Motion were dispositive to the Court's analysis and the imminent threat of irreparable harm were ignored, the Band could simply wait to barricade and close the Roadways until immediately after the Motion hearing. That is an outcome the Court should seek to avoid.

remain clear of any roadway impediments during this litigation's pendency so that no persons or entities interfere with the Homeowners' rights to use the Roadways to access their properties.

**FACTS**

I.   THE HOMEOWNERS' FEE SIMPLE LANDS IN THE CHECKERBOARD RESERVATION

The Homeowners own lands in fee simple, where their homes are located, within the boundaries of the Band's Reservation. (Aug. 2024 Homeowner Declarations of James Baird ("8/27/2024 Baird Decl.") ¶¶ 1-4, Julie Kilger ("8/27/2024 Kilger Decl.") ¶¶ 1-4, Dennis Pearson ("8/27/2024 D. Pearson Decl.") ¶¶ 1-4, Sally Fermanich ("8/28/2024 Fermanich Decl.") ¶¶ 1-4, Donald Pollard ("8/28/2024 D. Pollard Decl.") ¶¶ 1-4, Mary Possin ("8/28/2024 M. Possin Decl.") ¶¶ 1-4, John Spanton ("8/28/2024 J. Spanton Decl.") ¶¶ 1-4, Julie Walsh ("8/28/2024 Walsh Decl.") ¶¶ 1-4, Pamela Kester ("8/30/2024 Kester Decl.") ¶¶ 1-4, Martha Hunt ("8/31/2024 M. Hunt Decl.") ¶¶ 1-4, Joseph Hunt ("8/31/2024 J. Hunt Decl.") ¶¶ 1-4; 8/30/2024 Hubing Decl., ¶¶ 3, 6, Exs. 1 & 4; USA's Answer to Homeowners' Am. Countercl., ECF No. 67, ("Answer"), ¶ 57.)

The Reservation was established in 1854. Treaty with the Chippewas, 10 Stat. 1109 (Sept. 30, 1854); (Answer ¶ 59.) The Reservation is a checkerboard reservation, meaning that there are many parcels of land owned in fee simple by non-tribal members, including the Homeowners and their fee lands, within the outer boundaries of the Reservation. (Answer ¶ 66; 8/27/2024 Baird Decl. ¶¶ 1-4; 8/27/2024 Kilger Decl. ¶¶ 1-4; 8/27/2024 D. Pearson Decl. ¶¶ 1-4; 8/28/2024 Fermanich Decl. ¶¶ 1-4; 8/28/2024 D. Pollard Decl. ¶¶ 1-4; 8/28/2024 M. Possin Decl. ¶¶ 1-4; 8/28/2024 J. Spanton Decl. ¶¶ 1-4; 8/28/2024 Walsh Decl. ¶¶ 1-4; 8/30/2024 Kester Decl. ¶¶ 1-4; 8/31/2024 M. Hunt Decl. ¶¶ 1-4, 8/31/2024 J. Hunt Decl. ¶¶ 1-4; 8/30/2024 Hubing Decl., ¶¶ 3, 6, Exs. 1 & 4); *Lac du Flambeau Band of Lake Superior Chippewa*, Wis. Dep't of

Pub. Instruction, https://dpi.wi.gov/amind/tribalnationswi/ldf (last accessed Aug. 30, 2024) ("[The Reservation] is a checkerboard reservation.").

The Roadways provide the only roadway access to and from the Homeowners' homes. (8/27/2024 Baird Decl. ¶ 5; 8/27/2024 Kilger Decl. ¶ 5; 8/27/2024 D. Pearson Decl. ¶ 5; 8/28/2024 Fermanich Decl. ¶ 5; 8/28/2024 D. Pollard Decl. ¶ 5; 8/28/2024 M. Possin Decl. ¶ 5; 8/28/2024 J. Spanton Decl. ¶ 5; 8/28/2024 Walsh Decl. ¶ 5; 8/30/2024 Kester Decl. ¶ 5; 8/31/2024 M. Hunt Decl. ¶ 5; 8/31/2024 J. Hunt Decl. ¶ 5.)

When the Homeowners took title to their respective properties, they did so without notice of the rights-of-way issue for their respective Roadway about which USA has sued the Town. (8/27/2024 Baird Decl. ¶ 6; 8/27/2024 Kilger Decl. ¶ 6; 8/27/2024 D. Pearson Decl. ¶ 6; 8/28/2024 Fermanich Decl. ¶ 6; 8/28/2024 D. Pollard Decl. ¶ 6; 8/28/2024 M. Possin Decl. ¶ 6; 8/28/2024 J. Spanton Decl. ¶ 6; 8/28/2024 Walsh Decl. ¶ 6; 8/30/2024 Kester Decl. ¶ 6; 8/31/2024 M. Hunt Decl. ¶ 6; 8/31/2024 J. Hunt Decl. ¶ 6.) The express rights-of-way that USA points to in its trespass and ejectment claims against the Town were never recorded in the Register of Deeds office for Vilas County or any other searchable recording system available to the public that would have provided notice to the Homeowners of the express rights-of-way's existence or alleged expiration. (*See* 8/27/2024 Baird Decl. ¶ 6; 8/27/2024 Kilger Decl. ¶ 6; 8/27/2024 D. Pearson Decl. ¶ 6; 8/28/2024 Fermanich Decl. ¶ 6; 8/28/2024 D. Pollard Decl. ¶ 6; 8/28/2024 M. Possin Decl. ¶ 6; 8/28/2024 J. Spanton Decl. ¶ 6; 8/28/2024 Walsh Decl. ¶ 6; 8/30/2024 Kester Decl. ¶ 6; 8/31/2024 M. Hunt Decl. ¶ 6; 8/31/2024 J. Hunt Decl. ¶ 6.)

## II.  HISTORY OF THE RESERVATION AND CONGRESSIONAL ALLOTMENT ACTS

The Reservation is a checkerboard reservation as a result of the 1887 General Allotment Act (also known as the Dawes Act) and various successor allotment acts, including the Burke

9

Act, 34 Stat. 182 (1906) (allotment acts collectively, "Dawes Act") enacted by Congress. (Answer ¶¶ 60-62); 24 Stat. 388, as amended, 25 U.S.C. § 331 *et seq.,* (1887); *see Brendale*, 492 U.S. at 436 (describing the Dawes Act).

The avowed purpose of the Dawes Act was to destroy tribal governments, to integrate reservations in the United States with Indians and non-Indians alike, and thereby generally assimilate Indians into non-Indian culture.[4] *See Montana v. United States*, 450 U.S. 544, 559 n.9 (1981). As stated in *Montana*:

> The policy of the [Allotment] Acts was the eventual assimilation of the Indian population, *Organized Village of Kake v. Egan*, 369 U.S. 60, 72, and the "gradual extinction of Indian reservations and Indian titles." *Draper v. United States*, 164 U.S. 240, 246. The Secretary of the Interior and the Commissioner of Indian Affairs repeatedly emphasized that the allotment policy was designed to eventually eliminate tribal relations. See, *e.g.,* Secretary of the Interior Ann. Rep., vol. 1, pp. 25-28 (1885); Secretary of the Interior Ann. Rep., vol. 1, p. 4 (1886); Commissioner of Indian Affairs Ann. Rep., vol. 1, pp. IV-X (1887); Secretary of the Interior Ann. Rep., vol. 1, pp. XXIX-XXXII (1888); Commissioner of Indian Affairs Ann. Rep. 3-4 (1889); Commissioner of Indian Affairs Ann. Rep. VI, XXXIX (1890); Commissioner of Indian Affairs Ann. Rep., vol. 1, pp. 3-9, 26 (1891); Commissioner of Indian Affairs Ann. Rep. 5 (1892); Secretary of the Interior Ann. Rep., vol. 1, p. IV (1894). And throughout the congressional debates on the subject of allotment, it was assumed that the "civilization" of the Indian population was to be accomplished, in part, by the dissolution of tribal relations. See, *e.g.,* 11 Cong. Rec. 779 (Sen. Vest), 782 (Sen. Coke), 783-784 (Sen. Saunders), 875 (Sens. Morgan and Hoar), 881 (Sen. Brown), 905 (Sen. Butler), 939 (Sen. Teller), 1003 (Sen. Morgan), 1028 (Sen. Hoar), 1064, 1065 (Sen. Plumb), 1067 (Sen. Williams) (1881).

> There is simply no suggestion in the legislative history that Congress intended that the non-Indians who would settle upon

---

[4] The Homeowners are certainly sympathetic to arguments that the policy decision of Congress that underlies and resulted in the Dawes Act and similar congressional allotment acts was unwise from a multicultural and political standpoint. But the present issue is one of law — not policy wisdom — that requires acknowledging Congress's intent of the Dawes Act and its implicit grants of land access necessarily deriving therefrom.

> alienated allotted lands would be subject to tribal regulatory authority. Indeed, throughout the congressional debates, allotment of Indian land was consistently equated with the dissolution of tribal affairs and jurisdiction. See, *e.g., id.,* at 785 (Sen. Morgan), 875 (Sen. Hoar), 876 (Sen. Morgan), 878 (Sens. Hoar and Coke), 881 (Sen. Brown), 908 (Sen. Call), 939 (Sen. Teller), 1028 (Sen. Hoar), 1067 (Sens. Edmunds and Williams). It defies common sense to suppose that Congress would intend that non-Indians purchasing allotted lands would become subject to tribal jurisdiction when an avowed purpose of the allotment policy was the ultimate destruction of tribal government. And it is hardly likely that Congress could have imagined that the purpose of peaceful assimilation could be advanced if feeholders could be excluded from fishing or hunting on their acquired property.
>
> The policy of allotment and sale of surplus reservation land was, of course, repudiated in 1934 by the Indian Reorganization Act, 48 Stat. 984, 25 U. S. C. § 461 *et seq.* But what is relevant in this case is the effect of the land alienation occasioned by that policy on Indian treaty rights tied to Indian use and occupation of reservation land.

*Id.* at 559 n.9.

And as further stated in *Brendale*:

> The Yakima Nation argues that we should not consider the Allotment Act because it was repudiated in 1934 by the Indian Reorganization Act. But the Court in *Montana* was well aware of the change in Indian policy engendered by the Indian Reorganization Act and concluded that this fact was *irrelevant*.

492 U.S. at 423 (emphasis added). The Court continued, "Although the Indian Reorganization Act may have ended the allotment of further lands, it did not restore to the Indians the exclusive use of those lands that had already passed to non-Indians or prevent already allotted lands for which fee patents were subsequently issued from thereafter passing to non-Indians." *Id.* Accordingly, "the Allotment Act eliminated tribal authority to exclude nonmembers from fee lands they owned" within reservations' boundaries. *Id.*

Per the Dawes Act, Indians were allotted parcels of land, and after a period of time, restrictions on those parcels were lifted and the land was able to be freely sold in fee to non-

Indians. *Brendale*, 492 U.S. at 436. After allotment of parcels to all eligible tribal members, leftover "surplus" reservation land was available to be allotted to non-tribal members. *History of Indian Land Consolidation*, U.S. Dep't of the Interior ("DOI"), BIA, https://www.bia.gov/bia/history/history-indian-land-consolidation (last accessed Aug. 21, 2024).

In 1887, the Lac du Flambeau Tribe was recognized as being particularly ready for allotment and generally favorable to the idea:

> The President has wisely ordered that allotments be made only on reservations where the Indians are known to be generally favorable to the idea, and the following have thus far been selected: Papago and Pima (Salt river), Arizona; L'Anse and Vieux de Sert, Michigan; Lac Court d'Oreilles, Bad River, Red Cliff, and Lac du Flambeau, Wisconsin; ….

Report of the Secretary of Interior for Fiscal Year Ending June 30, 1887, vol. II, at 4-5, https://babel.hathitrust.org/cgi/pt?id=uc1.l0063764468&seq=7 (last accessed Aug. 20, 2024). By 1904, there were already 115 allotments made on the Lac du Flambeau Reservation. Ann. Rep. of the Commissioner of Indian Affairs, for the year 1904, Part I, at 57, available at https://search.library.wisc.edu/digital/A4NNDRS3POJH3X8G (last accessed Aug. 20, 2024).

In 1906, Congress passed the Burke Act which, in part, amended the Dawes Act of 1887. The Burke Act allowed the Secretary of the Interior "at any time" to issue fee patents to tribal member allottees resulting in the "remov[al]" of "all restrictions as to sale, incumbrance, or taxation of said land." 34 Stat. 182, ch. 2348 (1906), codified at 25 U.S.C. § 349.

By such Acts of Congress, 600 allotments had been made on the Reservation by 1935, totaling 42,532 acres of land, with 15,345 acres alienated to non-Indians. *See Allotment Information for Midwest BIA Region*, Indian Land Tenure Foundation, https://iltf.org/wp-content/uploads/2017/01/midwest_Page_3.jpg (last accessed Aug. 20, 2024).

In the 1930s (after the creation and sale of allotments on the Reservation similar to the Yakima Reservation in *Brendale*), the allotment policy of the Dawes Act was recognized as a failure, and its purpose was disclaimed by the 1934 Indian Reorganization Act. *Brendale*, 492 U.S. at 436. Today it is widely acknowledged that bands and tribes across the country had their land improperly taken from them by the USA as a result of the Dawes Act and Congressional allotment acts in general.

But neither the Indian Reorganization Act of 1934 nor any other congressional acts, such as the Indian Nonintercourse Act[5] and the Indian Right-of-Way Act (1948), took back the alienated lands that became owned in fee simple by non-tribal members in reservations, whether through tribal members' sales of the lands allotted to them or by fee patents passed down through inheritance from a tribal member parent to their non-tribal member child such as Philip Brendale. *See Brendale*, 492 U.S. at 423; *id*. at 436-37 & n.1 ("About 90 million acres of tribal land were alienated through allotment and sale of surplus lands by 1934, amounting to approximately two-thirds of the total land held by Indian tribes in 1887."). Ownership of fee simple lands within reservations continued unabated. *Brendale*, 492 U.S. at 423. The *Brendale* Court did not even find the Indian Nonintercourse Act of 1834 or the Indian Rights-of-Way Act of 1948 relevant enough to discuss in its historical analysis relating to Congress's "impli[ed] grant" of access to non-members' fee simple lands within reservations' boundaries. *Brendale*, 492 U.S. at 423-24; *id*. at 436-37.

According to the Wisconsin Department of Public Instruction, the Lac du Flambeau Reservation is 86,600 acres (or 135 square miles) comprising 57,935 acres of Tribal or Allottees

---

[5] The "Indian Nonintercourse Act" is a collective term for six statutes passed in 1790, 1793, 1796, 1799, 1802, and 1834. USA appears to rely on the 1834 law, codified at 25 U.S.C. § 177, for the USA's incorrect assertion of congressional intent partly at issue in this Motion. (*See* 8/30/2024 Hubing Decl., Ex. 2, pp. 17-19, 7/12/2024 USA's Resp. to Homeowners' Interrog. Nos. 10 & 11.)

land (66.9%) and 28,665 acres of alienated fee land (33.1%). *Lac du Flambeau Band of Lake Superior Chippewa*, Wis. Dep't of Pub. Instruction, *supra*. Given the current ownership status of the lands that were once parceled out and sold under the Dawes Act and related allotment acts, the Reservation is now characterized as a checkerboard reservation, similar to the Yakima Reservation involved in *Brendale*. (Answer ¶ 66); *Brendale*, 492 U.S. at 415 ("Most of the fee land is found in Toppenish, Wapato, and Harrah, the three incorporated towns located in the northeastern part of the reservation. The remaining fee land is scattered throughout the reservation in a 'checkerboard' pattern."). The image below depicts the checkerboarding of the Lac du Flambeau Reservation as of 2007, with land parcels owned in fee simple being shown in red, Indian allottees land in white, and tribal land in green:



*See Lake Fairs Engaging the Public: A Look at the Lac du Flambeau Tribe's Annual Lakefest*,
U.W. Extension Stevens Point, https://www3.uwsp.edu/cnr-ap/UWEXLakes/Documents/
programs/convention/2010/gauthier_brian_lake_fairs.pdf, at 5 (last accessed Aug. 20, 2024).

Discovery in this litigation is still ongoing (*see* ECF No. 81). However, it is not genuinely disputed that the Homeowners' lands are all owned in fee simple, derive from the Dawes Act and/or various successor allotment acts of Congress, and are situated in the checkerboard Reservation, with the only roadway access to their homes via the (soon-to-be closed and barricaded) Roadways which partly lie on USA trust or restricted fee lands. (Answer, ECF No. 67, ¶ 75; 8/30/2024 Hubing Decl. ¶¶ 3, 6, Exs. 1 & 4; 8/27/2024 Baird Decl. ¶¶ 1-5; 8/27/2024 Kilger Decl. ¶¶ 1-5; 8/27/2024 D. Pearson Decl. ¶¶ 1-5; 8/28/2024 Fermanich Decl. ¶¶ 1-5; 8/28/2024 D. Pollard Decl. ¶¶ 1-5; 8/28/2024 M. Possin Decl. ¶¶ 1-5; 8/28/2024 J. Spanton Decl. ¶¶ 1-5; 8/28/2024 Walsh Decl. ¶¶ 1-5; 8/30/2024 Kester Decl. ¶¶ 1-5; 8/31/2024 M. Hunt Decl. ¶¶ 1-5; 8/31/2024 J. Hunt Decl. ¶¶ 1-5; Homeowners' Answer to USA's Am. Compl. ("Homeowners' Answer"), ECF No. 66, ¶ 2; 8/29/2024 Declaration of M. Gaulke ("8/29/2024 Gaulke Decl."), ¶¶ 14-16, Ex. D (8/13/2024 letter from the Band to the Town) & Ex. E (final set of Temporary Access Permits, which expire September 12, 2024).)

### III. THE BAND'S REFUSAL TO CONSENT TO BIA-ISSUED RIGHTS-OF-WAY RENDERED THE RIGHT OF WAY APPLICATION PROCESS UNDER THE ROW ACT FUTILE AND UNAVAILABLE TO THE HOMEOWNERS

Around 2013, the issue regarding the alleged expiration of the express Right of Ways ("ROW") for the Roadways started to become known to non-tribal members when the Band delivered letters to certain landowners. (*Pollard*, ECF Nos. 46-1 to 46-4.) The Town Board told residents that the Town would take care of communicating with the BIA regarding the ROWs and asked that no one individually pursue renewed ROWs. (8/30/2024 Hubing Decl. ¶ 18, Ex. 19 (1/2/2014 Letter from Town Board to Residents.)) The Town and the Band began negotiating, and the Band reassured residents that "the Tribe will not deny any resident of Lac du Flambeau access to their home, nor will any 'fee' be imposed on residents." (8/30/2024 Hubing Decl. ¶ 7,

Ex. 5 (Tribal Roads Announcement press release from Tribal Council).) After negotiations between the Town and the Band broke down, the Homeowners applied for new rights of way, pursuant to the procedures set forth in the ROW Act[6] and implementing regulations. (8/30/2024 Hubing Decl. Ex. 14, Town's Resp. to USA's Interrog. No. 6.) The Band was initially cooperative in these efforts by the Homeowners.

The ROW applications under the ROW Act and its regulations proceeded slowly, and eventually came to a halt due to the Band withholding its consent for the rights-of-way under the ROW Act and its regulations. (Homeowners' Am. Countercl., ECF No. 62, ¶¶ 158-185; 8/30/2024 Hubing Decl. Ex. 6.) The BIA Appraisals determined that the fair market value to renew all of the Roadways' ROWs for 50-year terms was $79,000. (ECF Nos. 51, 52, 53, 54, 55, 56, 57.) But the Band demanded $10,000,000.00 for renewals, and then increased it to $20,000,000.00, as described below. The Band in late 2023 expressly stated that it will never approve new ROWs for the Roadways under the ROW Act. (8/30/2024 Hubing Decl. ¶ 8, Ex. 6 (12/1/2023 Letter from Band President John Johnson, Sr., to Chairman of the Town Matt Gaulke ("[The Band] will not approve any new long-term easements over Access Roads.").) The ROW Application process under the ROW Act and its implementing regulations is therefore futile and unavailable to the Homeowners. The USA now seeks ejection in this lawsuit if the Town and the Band do not negotiate a resolution (USA Am. Compl., ECF No. 61, ¶¶ 67-76), which appears increasingly unlikely. The Homeowners have no other viable option than to pursue permanent access through judicial recognition of their easement rights.[7]

---

[6] 25 U.S.C. §§ 323-328 (the "ROW Act").

[7] As discussed in more detail below, by and through the Dawes Act, Congress "implicitly granted" access rights to the Homeowners' lands, which rights are appurtenant to, and accompanied the allotment of, the Homeowners' lands. *Brendale*, 492 U.S. at 436-41 (Stevens, J., concurring); *id.*, 492 U.S. at 423-24 (White, J., plurality). Those access rights have run with the Homeowners' lands since the time of their allotment under the Dawes Act. Because such rights are unaffected by other statutes, including later-

## IV. THE ROADWAYS' HISTORY, THE BAND'S TEMPORARY ACCESS PERMITS THAT THE TOWN CAN NO LONGER AFFORD, AND THE IMMINENT BARRICADING AND CLOSURE OF THE ROADWAYS

The Roadways were built more than fifty years ago. (*See* 8/28/2024 D. Pollard Decl., Ex. A, 3/6/2023 D. Pollard Decl. ("3/6/2023 D. Pollard Decl.") ¶ 17.) The total length of roadway at issue regarding the four Roadways is just over 1.3 miles. (8/30/2024 Hubing Decl. ¶ 9, Exs. 7, 8, 9, & 10, K. Roy, BLM Indian Land Surveyor, BIA Midwest Region, maps of Roadways and surrounding lands at issue.) The portions of Annie Sunn Lane that cross over trust or restricted fee land is a section running east-west of about 1900 feet (approximately .36 miles) and a second section running north-south of roughly one-half mile. (8/30/2024 Hubing Decl. ¶ 9, Ex. 7, 6/14/2024 K. Roy, BLM Indian Land Surveyor, BIA Midwest Region, Map of Annie Sunn Lane and surrounding land.) The portion of Center Sugarbush Lane that crosses over trust or restricted fee land is about 1326 feet (approximately .25 miles). (8/30/2024 Hubing Decl. ¶ 9, Ex. 8, 6/14/2024 K. Roy, BLM Indian Land Surveyor, BIA Midwest Region, Map of Center Sugarbush Lane and surrounding land.) The portion of East Ross Allen Lake Lane that crosses over trust or restricted fee land is about 146 feet (approximately .03 miles). (8/30/2024 Hubing Decl. ¶ 9, Ex. 9, 6/14/2024 K. Roy, BLM Indian Land Surveyor, BIA Midwest Region, Map of East Ross Allen Lake Lane and surrounding land.) The portions of Elsie Lake Lane that cross over trust or restricted fee land is a section running east-west of about 445 feet (approximately .08 miles) and a second section running north-south of 1039 feet (approximately .2 miles). (8/30/2024 Hubing Decl. ¶ 9, Ex. 10, 6/14/2024 K. Roy, BLM Indian Land Surveyor, BIA Midwest Region, Map of Elsie Lake Lane and surrounding land.)

---

enacted ones like the ROW Act, the Homeowners do not need rights-of-way under the ROW Act or its implementing regulations. *See Brendale*, 492 U.S. at 436-41 (Stevens, J., concurring); *id.* at 423-24 (White, J., plurality).

Each Roadway is a public road and, until last year when the Roadways were barricaded, each has been used in such a manner, including the portion of each that will soon be barricaded in the absence of a preliminary injunction. (8/29/2024 Gaulke Decl., Ex. D, 8/13/2024 letter from the Band to the Town; 3/6/2023 D. Pollard Decl. ¶ 17; 8/28/2024 J. Spanton Decl., Ex. A, 3/6/2023 J. Spanton Decl. ("3/6/2023 J. Spanton Decl.") ¶ 17; 8/27/2024 D. Pearson Decl., Ex. A, 3/6/2023 R. Pearson Decl. ("3/6/2023 R. Pearson Decl.") ¶ 25; 8/27/2024 Kilger Decl., Ex. A, 3/6/2023 J. Kilger Decl. ("3/6/2023 J. Kilger Decl.") ¶ 18; *Pollard*, ECF No. 32, 3/17/2023 M. Hunt Decl. ("3/17/2023 M. Hunt Decl.") ¶ 36; 8/28/2024 J. Walsh Decl., Ex. A, 3/24/2024 J. Walsh Decl. ("3/24/2024 J. Walsh Decl.") ¶ 12; 8/28/2024 Fermanich Decl., Ex. A, 3/14/2023 S. Fermanich Decl. ("3/14/2023 S. Fermanich Decl.") ¶ 25.) For decades the Band has intentionally availed itself of millions of dollars in federal funds by intentionally listing the Roadways (including the mileage) along with other roads on the NTTFI[8]; since 2013, the Band has received around $10,000,000 in federal funds by availing itself of the TTP.[9] (8/30/2024 Hubing Decl. Ex. 11, p.7, 7/26/2024 USA Suppl. Resp. to Town's Interrog. No. 12; 8/30/2024 Hubing Decl. Ex.

---

[8] The federal Tribal Transportation Program ("TTP"), formerly known as the Indian Reservation Roads Program ("IRR"), was established to help provide safe and adequate transportation and public road access to and within Indian reservations and lands. The Band voluntarily elects to participate in the TTP. The Band has identified roads that are part of its "Tribal Transportation System." Such roads are listed in an inventory of tribal transportation facilities maintained by the Secretary of the Interior in cooperation with the Secretary of the Federal Highway Administration. 23 U.S.C. § 202(b)(1)(A). The inventory is referred to as the National Tribal Transportation Facilities Inventory ("NTTFI."). Roads listed in the NTTFI are "public roads," i.e., roads that are under the jurisdiction of and maintained by a "public authority" (a federal, state, county, town or township, Indian Tribe, municipal or instrumentality with authority to maintain the road) (23 U.S.C. §101(a)(22), (23), (33); 25 C.F.R. § 170.5; 25 C.F.R. § 170.114(a)) and that are open for public travel. All roads listed in the NTTFI must be open and available for public use as required by 23 U.S.C. § 101(a)(22), (23), (33); 25 C.F.R. § 170.5; and 25 C.F.R. § 170.114(a).

[9] Related litigation pending in this Court challenges the legality, effectiveness and finality of the BIA's purported removal of the Roadways from the NTTFI, after the Band requested such removal during the *Pollard* case, based on APA and constitutional grounds. *See Anderson v. Newland*, 23-cv-00777 (W.D. Wis. Nov. 8, 2023). While the Homeowners maintain that the Roadways remain listed on the NTTFI, that issue is not immediately relevant to this Motion.

12, US_0000228 (total of amounts in Column B, excluding "HIP Funding - COVID-19").[10])

Consequently, under federal law, the Roadways "must be open and available for public use …."

25 C.F.R. § 170.114(a).[11]

      The Roadways provide the only road access to the Homeowners' homes, and the Homeowners and their invitees and visitors used them for ingress and egress without issue and in a public manner until January 2023, when the Band or tribal members barricaded the Roadways, depriving the Homeowners of access to their homes and irreparably harming them. (*Pollard*, Declarations of eleven Homeowners, ECF Nos. 13, 14, 15, 16, 17, 31, 32, 33, 34, 35, 36.) Specifically, on January 31, 2023, the Band or those acting in concert with it placed or caused to be placed barricades on each of the Roadways, consisting of large concrete blocks with chains between the blocks as well as wooden barricades in front of the chains. (3/6/2023 D. Pollard Decl. ¶ 8, 3/6/2023 R. Pearson Decl. ¶ 6; 3/6/2023 J. Kilger Decl. ¶ 5; 3/6/2023 J. Spanton Decl. ¶ 6; 8/30/2024 Kester Decl., Ex. A, 3/4/2023 P. Kester Decl. ("3/4/2023 P. Kester Decl.") ¶ 6; *Pollard,* 3/6/2023 Decl. of B. Hubing, Exs. E-H, ECF Nos. 12-5 through 12-8 (photos of barricaded Roadways).) Cameras were installed to monitor the Homeowners' use of the Roadways. (*Pollard*, ECF No. 12-9, Ex. I, 3/6/2023 Decl. of B. Hubing (camera installed to monitor  East Ross Allen Lake Lane).)  President  of the  Band, John Johnson, Sr., announced in February 2023 that any non-tribal members who went around the barricades to travel on the

---

[10] "HIP" is the BIA's Housing Improvement Program. "HIP funds allow tribes to provide housing assistance to individuals who cannot access other forms of housing resources. These often include emergency home repairs that would otherwise go unaddressed." *National American Indian Housing Council's Briefing Paper Recommended Fiscal Year 2023 & 2024 Funding Levels for Tribal Housing Programs*, National American Indian Housing Council, https://naihc.net/wp-content/uploads/2022/10/NAIHC-Budget-Recommendations-FY23-24_finaltosharepost.pdf (last accessed Aug. 28, 2024).

[11] *See Brendale*, 492 U.S. at 439 ("[I]n 1988 the BIA ultimately decided to allow the public to use BIA roads because they had been constructed with public funds. See Letter from James S. Bergmann, Acting Assistant Secretary, Indian Affairs, of April 8, 1988, reprinted in App. to Brief for Petitioner in No. 87-1622, p. 1a.").

closed portions of the Roadways would be in "trespass." (8/30/2024 Hubing Decl., Ex. 13, 2/6/2023 Letter from J. Johnson, Sr., to the Town.)

In March 2023, the Band removed the barricades, reopening the Roadways, upon the Town's agreement to enter a temporary access permitting regime with the Band that will end on September 12, 2024. (8/29/2024 Gaulke Decl. ¶¶ 4-8, 12, 15, Exs. A, B, & E.) According to the Band, the Temporary Access Permits were issued to the Town so that Homeowners and others similarly situated could "traverse [t]ribal [l]and" to "lawfully access" their homes in exchange for substantial compensation to the Band. (8/29/2024 Gaulke Decl. ¶¶ 4-8, Ex. A (Band Resolution No. 67(23)), Ex. B (Band Resolution No. 143(23)), & Ex. E (8/22/2024 to 9/12/2024 Temporary Access Permits).)

Between March 2023 and August 2024, the Town paid the Band a total of $600,000 for the Temporary Access Permits so that Homeowners could traverse the 1.3 miles to access their homes for the last seventeen months. (*See* 8/29/2024 Gaulke Decl. ¶ 9; 8/30/2024 Hubing Decl. ¶ 9, Exs. 7, 8, 9, & 10, K. Roy, BLM Indian Land Surveyor, BIA Midwest Region, maps of Roadways and surrounding lands at issue.) The Town's entire road budget for 2024 has been completely depleted due to the monthly payments for the Temporary Access Permits. (8/29/2024 Gaulke Decl. ¶ 11.) The Town cannot draw from its other budgets without loss of other essential services. (8/29/2024 Gaulke Decl. ¶ 11.) The Town's current annual road budget is $47,619 in the red. (8/29/2024 Gaulke Decl. ¶ 11.) Thus, the Town cannot afford to renew the Temporary Access Permits after the current permits expire on September 12, 2024. (8/29/2024 Gaulke Decl. ¶¶ 12, 15-16, Ex. E.) The Town Board recently decided to stop making payments to the Band for future Temporary Access Permits for the Roadways because of the Town's financial inability to pay the Band for Temporary Access Permits renewals. (8/29/2024 Gaulke Decl. ¶ 16; 8/30/2024

Hubing Decl., Ex. 14, pp. 7-10, 6/17/2024 Town's Resp. to USA's Interrog. No. 4 (temporary access permits renewed monthly through the date of discovery responses).)

On August 9, 2024, the Town sent a letter to the Band and others, stating in part that to resolve the Roadways dispute, the Band was seeking land from local, state and federal governments, but such property exchanges are outside the Town's power and statutory authority and the Town has not yet received such assistance from state or federal politicians. (8/29/2024 Gaulke Decl. ¶ 13, Ex. C, 8/9/2024 Letter from the Town to the Band, et al.) The Town concluded: "**the Town is unable, not unwilling, to pay the [temporary access] permit fees for 08/12/24-09/12/24.** This serves as notice of the current situation and a plea for some form of assistance." (*Id.* (emphasis added).)

In response, on August 13, 2024, the Band sent a letter to the Town, stating: "the Tribal Council has not amended Resolution No. 143(23) to accommodate the Town's current position. Thus, the Tribe considers the Town to be in default of Resolution No. 143(23). Please take notice that the Town has until Friday August 23, 2024 to pay all outstanding Temporary Access Permit fees to the Tribe, and **failure to pay will result in restricted access over the Four Roads**." (8/29/2024 Gaulke Decl. ¶ 14, Ex. D, 8/13/2024 Letter from the Band to the Town (emphasis added).) On August 22, 2024, a final $50,000 payment was made, and the final set of Permits will expire on September 12, 2024. (8/29/2024 Gaulke Decl. ¶ 15.) The Town made this final payment with financial assistance from a third party but does not anticipate receiving any such help again in the near-term. (8/29/2024 Gaulke Decl. ¶ 15.)

Based on the Band's response letter, the Band will direct tribal members to close off the Roadways by placing barricades or causing the placement of barricades on the Roadways, depriving the Homeowners of roadway access to their homes, on or around September 12, 2024,

when the Temporary Access Permits expire and the Town will not pay for renewal of the permits. (8/29/2024 Gaulke Decl. ¶¶ 14-16, Ex. D (8/13/2024 Letter from the Band to the Town) & Ex. E; 8/28/2024 D. Pollard Decl. ¶¶ 5, 7-9; 8/27/2024 Baird Decl. ¶¶ 5, 7-12; 8/28/2024 M. Possin Decl. ¶¶ 5, 7-9; 8/28/2024 Walsh Decl. ¶¶ 5, 7-9; 8/28/2024 Fermanich Decl. ¶¶ 5, 7-9; 8/27/2024 Kilger Decl. ¶¶ 5, 7-8; 8/27/2024 D. Pearson Decl. ¶¶ 5, 7-9; 8/28/2024 J. Spanton Decl. ¶¶ 5, 7-8; 8/30/2024 Kester Decl. ¶¶ 5, 7-8; 3/6/2023 D. Pollard Decl. ¶¶ 6-7; 3/6/2023 R. Pearson Decl. ¶¶ 4-5; 3/6/2023 J. Kilger Decl. ¶¶ 3-4; 3/6/2023 J. Spanton Decl. ¶¶ 4-5; *Pollard*, ECF No. 31, 3/27/2023 M. Hornbostel Decl. ("3/27/2023 M. Hornbostel Decl.") ¶ 11; *Pollard*, ECF No. 32, 3/17/2023 M. Hunt Decl. ("3/17/2023 M. Hunt. Decl.") ¶ 13; *Pollard*, ECF No. 33, 3/26/2023 J. Hunt Decl. ("3/26/2023 J. Hunt Decl.") ¶¶ 12-13; 8/28/2024 M. Possin Decl., Ex. A, 3/14/2023 M. Possin Decl. ("3/14/2023 M. Possin Decl.") ¶ 7; 3/14/2023 S. Fermanich Decl. ¶ 19; 3/24/2024 J. Walsh Decl. ¶ 7).

Each of the Homeowners (except for one family, whose residence is north of Elsie Lake Lane) only have road access to their properties via one of the four Roadways, which access was and will again soon be wholly blocked by the barricades the Band, or those acting on its behalf, will place or cause to be placed across each of the Roadways. (8/29/2024 Gaulke Decl. ¶¶ 14-16, Ex. D (8/13/2024 Letter from the Band to the Town) & Ex. E; 8/28/2024 D. Pollard Decl. ¶¶ 5, 7-9; 8/27/2024 Baird Decl. ¶¶ 5, 7-12; 8/28/2024 M. Possin Decl. ¶¶ 5, 7-9; 8/28/2024 Walsh Decl. ¶¶ 5, 7-9; 8/28/2024 Fermanich Decl. ¶¶ 5, 7-9; 8/30/2024 Kester Decl. ¶¶ 5, 7-8; 8/27/2024 Kilger Decl. ¶¶ 5, 7-8; 8/27/2024 D. Pearson Decl. ¶¶ 5, 7-9; 8/28/2024 J. Spanton Decl. ¶¶ 5, 7-8; 3/6/2023 D. Pollard Decl. ¶¶ 6-7; 3/6/2023 R. Pearson Decl. ¶¶ 4-5; 3/6/2023 J. Kilger Decl. ¶¶ 3-4; 3/6/2023 J. Spanton Decl. ¶¶ 4-5; 3/27/2023 M. Hornbostel Decl. ¶ 11; 3/26/2023 J. Hunt Decl. ¶¶ 12-13; 3/17/2023 M. Hunt Decl. ¶ 13; 3/14/2023 M. Possin Decl. ¶ 7;

3/14/2023 S. Fermanich Decl. ¶ 19; 3/24/2024 J. Walsh Decl. ¶ 7.) Due to the terrain, vehicles cannot bypass the Band's barricades on the Roadways. (*Pollard,* 3/6/2023 Decl. of B. Hubing, Exs. E-H, ECF Nos. 12-5 to 12-8 (photos of barricaded Roadways).)

When the barricades are in place, like they soon will be in the absence of a preliminary injunction, the Homeowners cannot use the Roadways to freely come and go from their homes, even to obtain basic necessities such as food, pet supplies and home repair materials. (*See, e.g.*, 3/6/2023 R. Pearson Decl. ¶¶ 14-16; 3/6/2023 J. Kilger Decl. ¶ 8; 3/6/2023 J. Spanton Decl. ¶ 9.) The Homeowners are only permitted to leave via the Roadways for medical appointments; if they leave their home for any reason other than a medical appointment, they are not allowed back through the barricades to return home. (8/30/2024 Hubing Decl., Ex. 15, "LDF Emergency Service Aid in Action for Home Owners" (sic), at 1 ("At no time will the LDF Tribal Council deny anyone who wants to leave but currently will not approve re-entry at this time.").) Even to attend medical appointments, the Homeowners need to call tribal police to unlock the chains on the barricades. (8/30/2024 Hubing Decl., Ex. 15, "LDF Emergency Service Aid in Action for Home Owners (sic)," & Ex. 16, "LDF Emergency Service Aid in Action for Homeowners (TEMPORARY (sic) SUSPENDED as of March 13, 2023).")

Last year, President Johnson publicly stated that the barricades on the Roadways would not be removed until compensation and damages are paid. (8/30/2024 Hubing Decl., Ex. 13, 2/6/2023 Letter from J. Johnson, Sr., to the Town).) The Band's January 2023 demand to keep the four Roadways open was a total of $20,000,000, after previously demanding $10,000,000 in October 2022 ($7,000,000 for East Ross Allen Lake Lane (146 feet) and a million for each of the other Roadways). (8/30/2024 Hubing Decl., Ex. 17, Emails between the Band's counsel and the Homeowners' counsel.) Now the Band will again soon re-barricade the Roadways and likely will

frame the reason for doing so as the Town's (imminent) failure to pay for the Temporary Access Permits upon the current ones' expiration on September 12, 2024. (8/29/2024 Gaulke Decl. ¶¶ 14-16, Ex. D (8/13/2024 Letter from the Band to the Town) & Ex. E.)

## LEGAL STANDARD

The Homeowners are seeking a preliminary injunction pending resolution of this case on the merits. When faced with a motion for injunctive relief, the gist of the court's undertaking is to "balance the competing claims of injury and … consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Injunctive relief is intended to maintain the status quo (or restore the status quo) until the merits of the case are resolved. *Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 770 (7th Cir. 2001). Until January 2023, the status quo for the last 60-plus years had been open Roadways with unimpeded access to the Homeowners for unrestricted ingress into and egress from their homes. (*See* 3/6/2023 D. Pollard Decl. ¶ 17.) The status quo of open Roadways returned when the barricades were unchained in March 2023. (8/29/2024 Gaulke Decl. ¶¶ 4-8, 12, Exs. A & B.) But when the Court hears this Motion or soon thereafter, that status quo will need to be restored when the Band barricades the Roadways again after the expiration of the final Temporary Access Permits on September 12, 2024, with the Town unable to pay for additional permits. (8/29/2024 Gaulke Decl. ¶¶ 14-16, Ex. D (8/13/2024 Letter from the Band to the Town) & Ex. E.)

Specifically, injunctive relief must be granted if:

(1) The moving party is likely to succeed on the merits;

(2) The moving party is likely to suffer irreparable harm in the absence of injunctive relief;

(3) The balance of equities tips in the moving party's favor; and

(4) An injunction is in the public interest.

*Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022) (quoting *Winter*, 555 U.S. at 20).

Likelihood of success on the merits and likelihood of irreparable harm in the absence of preliminary relief are interdependent: "the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins.*, 582 F.3d 721, 725 (7th Cir. 2009). Also, irreparable harm and inadequate remedy at law are oftentimes addressed together because the concept of irreparable harm generally accounts for or subsumes the concept of inadequate remedies at law. *See Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) ("Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages."). *See, e.g.*, *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 946 (W.D. Wis. 2018) (addressing irreparable harm and inadequate remedy at law together; finding that plaintiffs established that they are at risk of irreparable harm because of "serious, ongoing impact[s] on plaintiffs' [mental and physical] health," which strongly weighs in favor of injunctive relief, and such impacts on plaintiffs show that money damages "would be seriously deficient as compared to the harm suffered."); *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003) (addressing irreparable harm and inadequate remedy at law together; holding that inability to maintain a business relationship and loss of the relationship constitute irreparable harm and, "[b]ecause it is not practicable to calculate damages to remedy this kind of harm, no remedy at law can adequately compensate [plaintiff] for its injury.").

## ARGUMENT

The Court should grant the Motions because each requirement for a preliminary injunction is satisfied here.

First, the Homeowners will likely succeed on the merits of their easement claims. The United States Supreme Court has held that Congress intended to impliedly grant rights of access (i.e., implied easements) to the parcels that were allotted and sold under the Dawes Act, which include the parcels now owned by the Homeowners. Further, the Homeowners clearly satisfy the three elements of easement by necessity that apply to such claims over tribal trust lands.

Second, the Homeowners will soon be irreparably harmed when the Roadways are imminently barricaded and closed unless the Court enters a preliminary injunction to keep the Roadways open and unrestricted.

Third, the equities weigh heavily in favor of a preliminary injunction because the origin of this problem are the Acts of Congress enacted more than one hundred years ago creating checkerboard reservations with non-Indian fee simple lands in the middle of reservations. The Homeowners are bona fide purchasers for value who took title without knowledge of any Rights-of-Way expiration dispute, and now they are pawns in a larger political debate for which they have received no real political help.

Finally, an injunction is in the public's interest because the Roadways have been public roads for decades without any issues until last year, and the Homeowners' friends, families, guests, invitees, visitors, and emergency services need unfettered access to the Homeowners' properties in order for the Homeowners to enjoy the full bundle of their property rights and minimize risks that exist with barricaded and closed Roadways that permeate beyond the Homeowners themselves.

I.   THE HOMEOWNERS ARE LIKELY TO SUCCEED ON THE MERITS OF
     THEIR EASEMENT CLAIMS

To establish a likelihood of success on the merits, movants must "demonstrate that [their]

claim has some likelihood of success on the merits." *Doe,* 43 F.4th at 791. "The likelihood of

success on the merits is an early measurement of the quality of the underlying [causes of

action]." *Id.* at 788.

The Homeowners have three claims in their Amended Counterclaims (ECF No. 62):

Easement by Necessity; Implied Easement; and Declaratory Judgment. As set forth in more

detail below, the Homeowners are likely to succeed on the merits of their easement claims.[12]

Thus, this element of the preliminary injunction analysis strongly favors the entry of a

preliminary injunction.

> a)   *The Homeowners Are Likely to Succeed on the Merits of Their*
>      *Implied Easements Claims*

The Homeowners' parcels all are included in the land set aside by the Treaty with the

Chippewas in 1854.[13] Subsequently, the Dawes Act and successor allotment acts split up the

Reservation land into smaller parcels that were restricted for a number of years but then freely

alienated and sold off in fee simple to non-Band members. (Answer ¶¶ 61, 333.) Over sixty years

ago, the relevant lands (now owned by the Homeowners) were sold to a developer, who later

conveyed title to the vacant lots to the Homeowners or their predecessors-in-interest. All of the

parcels sold to the Homeowners are situated within the boundaries of the Reservation and

---

[12] The Homeowners rely on their easement claims for this Motion to demonstrate the likelihood of
success on the merits. By doing so, the Homeowners do not intend to waive their Declaratory Judgment
claim, and instead preserve that claim for trial.

[13] Treaty with the Chippewas, 10 Stat. 1109 (1854); Answer ¶¶ 61, 333; 8/27/2024 Baird Decl. ¶¶ 1-4;
8/27/2024 Kilger Decl. ¶¶ 1-4; 8/27/2024 D. Pearson Decl. ¶¶ 1-4; 8/28/2024 Fermanich Decl. ¶¶ 1-4;
8/28/2024 D. Pollard Decl. ¶¶ 1-4; 8/28/2024 M. Possin Decl. ¶¶ 1-4; 8/28/2024 J. Spanton Decl. ¶¶ 1-4;
8/28/2024 Walsh Decl. ¶¶ 1-4; 8/30/2024 Hubing Decl., ¶¶ 3, 6, Exs. 1 & 4.

accessible by road only via the Roadways which partly lie upon tribal trust or restricted fee lands.[14]

When Congress passed the Dawes Act, Congress "authorize[d] the sale of a parcel of land in a reservation," which the Supreme Court has expressly noted "must" mean that Congress ***"implicitly grant[ed] the purchaser access to that property*.*" *Brendale*, 492 U.S. at 437 (Stevens, J., concurring) (emphasis added); *id.* at 424 (White, J., plurality). The reason: "Congress could not possibly have intended in enacting the Dawes Act that tribes would maintain the power to exclude bona fide purchasers of reservation land from that property . . . ." *Brendale*, 492 U.S. at 441 (Stevens, J., concurring); *id.* at 423 (White, J., plurality). Because the Homeowners are bona fide purchasers of Dawes Act lands just like that which the Supreme Court analyzed in *Brendale*, Congress "implicitly grant[ed]" access rights (i.e., easements) to the Homeowners and their properties across tribal land via the Roadways. *Brendale*, 492 U.S. at 437 (Stevens, J., concurring); *Id.* at 424 (White, J., plurality); *Evans v. Shoshone-Bannock Land Use Policy Comm'n*, 736 F.3d 1298, 1304 n.6 (9th Cir. 2013) ("[T]he transfer of tribal land to nonmembers 'must implicitly grant the purchaser access to that property.'") (quoting *Brendale,* 492 U.S. at 437 (Stevens, J.).

Accordingly, as explained below, the Homeowners are likely to succeed on establishing implied easements to use the Roadways freely. Because the Dawes Act "eliminated [the Band's] tribal authority to exclude nonmembers from fee lands they own," the Band lacks a lawful basis to exclude the Homeowners from their fee lands by use of barricades to close or restrict the

---

[14] Homeowners' Answer to USA's Am. Compl. ("Homeowners' Answer"), ECF No. 66, ¶ 2; Answer ¶¶ 61, 333; 8/27/2024 Baird Decl. ¶¶ 1-5; 8/27/2024 Kilger Decl. ¶¶ 1-5; 8/27/2024 D. Pearson Decl. ¶¶ 1-5; 8/28/2024 Fermanich Decl. ¶¶ 1-5; 8/28/2024 D. Pollard Decl. ¶¶ 1-5; 8/28/2024 M. Possin Decl. ¶¶ 1-5; 8/28/2024 J. Spanton Decl. ¶¶ 1-5; 8/28/2024 Walsh Decl. ¶¶ 1-5; 8/30/2024 Kester Decl. ¶¶ 1-5; 8/31/2024 M. Hunt Decl. ¶¶ 1-4; 8/31/2024 J. Hunt Decl. ¶¶ 1-4; 8/30/2024 Hubing Decl., ¶¶ 3, 6, Exs. 1 & 4.

Roadways. Closing or restricting the Roadways directly interferes with the Homeowners' property rights regarding their implied easements that run with their fee lands created under the Dawes Act. *See Brendale*, 492 U.S. at 423-24.

Federal common law applies to easement claims over tribal trust or restricted fee land. *Confederated Salish & Kootenai Tribes v. Namen*, 380 F. Supp. 452, 466 (D. Mont. 1974) ("Where the United States holds title in trust for Indian Tribes, federal common law is applicable …."); *Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 965 (10th Cir. 2019) ("When a dispute arises over possessory rights in Indian allotted land, federal law governs."); *Fitzgerald v. United States,* 932 F. Supp. 1195, 1203 (D. Ariz. 1996).[15]

---

[15] *See also*:
- *Brendale*, 492 U.S. at 436-37 (Stevens, J., concurring); *Id.* at 423-24 (White, J., plurality) (property rights to access fee land in a reservation by use of roadways that lie on reservation land is determined based on Congress's "implicit" intent)
- *Swinomish Indian Tribal Community v. BNSF Railway Co.*, 951 F.3d 1142, 1153 (9th Cir. 2020) (federal common law applies to interpret easement agreement with tribe)
- *Superior Oil Co. v. United States*, 353 F.2d 34, 37 n.4 (9th Cir. 1965) ("[S]ince the Constitution gives Congress general power over lands of the United States, and since the lands through which the claimed easement passes are owned by the United States, the extent of the easement is governed by federal law unless there is a federal statute which makes state or local law applicable." (citation omitted));
- *Brendale v. Olney*, No. C-78-145, at 6 (E.D. Wash. Mar. 3, 1981) (Mem. Decision & Judgment), attached as Ex. 3 to 8/30/2024 Hubing Decl. ("[T]he courts have recognized an implied right of access to the extent it can be gleaned from the congressional intent underlying the land grant.... [T]he patent issued in the instant case [for fee land in the Yakima Reservation] contained no restrictions or limitations on the scope of the grant. Indeed, the Ninth Circuit has held that Congress intended grants of allotted lands to include conveyance of customary common law rights of access. Therefore, plaintiff would be entitled to a right of access even under [an implied easement] approach [as opposed to an easement by necessity approach]." (citing *Kinscherff v. United States*, 586 F.2d 159, 161 (10th Cir. 1978); *Superior Oil*, 353 F.2d at 36; *Namen*, 380 F. Supp. at 461);
- *Kinscherff*, 586 F.2d at 161;
- *United States v. Okla. Gas & Elec. Co.*, 318 U.S. 206, 209-10 (1943) (state law applies to determine issues relating to the scope of an easement over tribal property *after* such an easement has been granted in the first place)
- *Utah v. Andrus*, 486 F. Supp. 995, 1002 (D. Utah 1979);
- *United States v. Balliet*, 133 F. Supp. 2d 1120, 1128 (W.D. Ark. 2001).

An implied easement exists "if Congress intended to grant an easement for access when it granted title." *Fitzgerald*, 932 F. Supp. at 1203; *see* 8/30/2024 Hubing Decl., Ex. 2, pp. 17-19, 7/12/2024 USA's Resp. to Homeowners' Interrog. No. 10 (contending that Homeowners lack implied easement because (according to USA) Congress did not intend to imply access rights). In other words, courts "recognize[] an implied right of access to the extent it can be gleaned from the congressional intent underlying the land grant." *Olney*, No. C-78-145, at 6 (citing *Kinscherff v. United States*, 586 F.2d 159, 161 (10th Cir. 1978); *Superior Oil Co. v. United States*, 353 F.2d 34, 36 (9th Cir. 1965)).[16] Such congressional intent exists here, just as it did in *Brendale*.

When examining the checkerboard reservation in *Brendale*, the Supreme Court recognized that Congress's intent was clear with respect to the Dawes Act and accompanying "implicitly granted" access rights (i.e., implied easements). For all lands that were alienated and sold in fee simple to non-Indians following the Dawes Act, such landowners "must" have "impli[ed] grant[s]" to access their lands in checkerboard reservations where their properties are accessible only by crossing Indian land. *Brendale*, 492 U.S. at 437; *id.* at 424 ("Once Brendale obtained title to his land that land was no longer off limits to him; the tribal authority to exclude was necessarily overcome by, as Justice STEVENS puts it, an 'implici[t] grant' of access to the land."). Six United States Supreme Court Justices all agreed on this point. *Brendale* held that it is inconceivable Congress did not impliedly grant access rights to non-Indians, like the

---

[16] The Seventh Circuit has applied Wisconsin law to easement claims regarding U.S. Forest land. *Ronkowski v. United States,* 911 F.3d 887, 890 (7th Cir. 2018) (applying Wisconsin easement law to easement claims over U.S. Forest land). To the extent that an implied easement exists under federal common law but not Wisconsin law, the former applies. *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (federal law is the supreme law of the land and thus any conflict between federal and state law must be resolved in favor of federal law); *North Dakota v. United States*, 460 U.S. 300, 318 (1983) (when dealing with federal land, "the choice of applicable law presents a federal question. Although state law may be borrowed if appropriate, specific aberrant or hostile state rules do not provide appropriate standards for federal law."). Thus, given the clear congressional intent behind the Dawes Act as described in *Brendale* and *Evans*, applying Wisconsin law is unnecessary at this stage.

Homeowners here, who possess plots surrounded entirely by trust or restricted fee Indian lands. *Id.* To hold otherwise would be to render useless Congress's intent of the assimilation of Indians with non-Indians behind the Dawes Act and successor allotment acts. *See Kinscherff*, 586 F.2d at 161 ("The scope and extent of the right of access depends upon what must, under the circumstances, be attributable to the grantor either by implication of intent or by operation of law founded in a public policy favoring land utilization.").

In enacting the Dawes Act, Congress's intent to provide easements (i.e., implied easements) over tribal lands for free access to the parcels that were created and sold to non-tribal members under the Dawes Act was clear to the Supreme Court. The Court also recognized that that congressional intent has never been overridden or rescinded. "Although the Indian Reorganization Act may have ended the allotment of further lands, it did not restore to the Indians the exclusive use of those lands that had already passed to non-Indians or prevent already allotted lands for which fee patents were subsequently issued from thereafter passing to non-Indians." *Brendale*, 492 U.S. at 423 ("Justice STEVENS acknowledges that the Allotment Act eliminated tribal authority to exclude nonmembers from fee lands they owned.").[17]

Recently, in *Evans*, 736 F.3d 1298, the Ninth Circuit reiterated the *Brendale* Court's finding that "**the transfer of tribal land to nonmembers 'must implicitly grant the purchaser access to that property.'**" *Id.* at 1304 n.6 (emphasis added) (citing *Brendale,* 492 U.S. at 437 (Stevens, J.)). The Homeowners (and their predecessors) are such purchasers, whose land was accompanied by an implicit grant of access. *See Brendale*, 492 U.S. at 439 (referring to Brendale's easement, which the Eastern District of Washington found to exist by implication or

---

[17] Similarly, the *Montana* Court concluded the Indian Reorganization Act of 1934 was not "relevant" when examining the effect of land alienation occasioned by the policy of allotment and sale of surplus reservation land. *Montana*, 450 U.S. at 559 n.9; *see Brendale*, 492 U.S. at 423.

necessity, as "a right of access to his own property over BIA roads."). Thus, the Homeowners have implied easements for access over the Roadways.

In its discovery responses, the USA stated that the only element of the Homeowners' implied easement claim that is disputed by the USA is the element of congressional intent. (*See* 8/30/2024 Hubing Decl., Ex. 2, pp. 17-19, 7/12/2024 USA's Resp. to Homeowners' Interrog. No. 10.) The USA asserts that there are various other acts such as the Indian Nonintercourse or Indian Right-of-Way Acts that suggest a "lack" of intent to impliedly grant access rights to non-Indians for lands owned in fee in checkerboard reservations. (*See id.*) But the USA ignores *Brendale* and *Evans*. Furthermore, the *Brendale* Court did not even consider the Indian Nonintercourse or Indian Rights-of-Way Acts relevant in gauging Congress's "impli[ed] grant" of access to non-members' fee simple lands within reservations. *Brendale*, 492 U.S. at 423-24; *id*. at 436-37.[18] As held in *Brendale*, because the intent behind the Dawes Act and the various other Allotment Acts, and the ability of non-Indian fee landowners in a reservation to access their lands, are only fulfilled with an implicit grant of access to their properties, the Homeowners will likely succeed on the merits of their implied easement claim.

> b)   *The Homeowners Are Likely to Succeed on the Merits of Their Easements by Necessity Claims*

An easement by necessity over trust or restricted fee land is found to exist when the following three elements are demonstrated: "First, there must originally have been unity of title in the dominant and servient tenements. Next, title must be severed by conveyance of one of the

---

[18] Additional support for the existence of implied easements to use the Roadways derives from language in the 1854 Treaty with the Chippewas. Article 3 states, in relevant part, "All necessary roads [and] highways … shall have the right of way through ["any of the reserved tracts"], compensation being made therefor as in other cases." Treaty with the Chippewas, art. 3, 10 Stat. 1109. While the Dawes Act cast aside the "compensation" aspect (i.e., the implicit grant of unrestricted access for ingress and egress), *see Brendale*, 492 U.S. at 423-24, the fact that the 1854 Treaty allowed for "all necessary roads" across Reservation land further supports the Homeowners' implied easement claim and illustrates Congress's intent that the Reservation shall be subject to having public roads through it.

parcels. Third, the easement must be necessary, both at the time of conveyance and at present, in order for the conveyor of the dominant tenement to use his land." *See Olney*, No. C-78-145, at 5-6 (citing 3 POWELL ON REAL PROPERTY ¶ 410 (1979)). There is no element of the conveyor's intent for an easement by necessity. *Id.*[19]

The Homeowners are likely to succeed on the merits of their easement by necessity claim because the three elements are undisputedly satisfied here: there was originally unity of title in the dominant and servient tenements; title was severed by conveyance of the Homeowners' parcels; the easement is necessary now and was necessary at the time of conveyance.

First, the land composing the Reservation was originally held in its entirety in trust by the USA for the benefit of the Band. Treaty with the Chippewas, art. 2, 10 Stat. 1109; (USA's Answer to Homeowners' Am. Countercl., ECF No. 67, ¶ 333 ("The United States admits that, prior to allotment, all of the lands comprising the Reservation were under common ownership.").)

Second, the Homeowners' parcels were severed from the Reservation as a result of the Dawes Act and subsequent Allotment Acts, in like manner to the land at issue in *Olney* and *Brendale*. (USA's Answer to Homeowners' Am. Countercl., ECF No. 67, ¶¶ 333, 61 ("The United States admits that portions of the Reservation were allotted pursuant to the [Dawes] Act.").) "In accordance with the allotment policy of the Federal Government commencing in 1887 by enactment of the Dawes Act, 25 U.S.C. § 331 *et seq.*, parcels of land on the [Band's]

---

[19] The elements of easement by necessity under Wisconsin law are essentially the same as those under federal common law. *Compare Schwab v. Timmons*, 224 Wis. 2d 27, 37-38, 589 N.W.2d 1 (1999) ("To establish an easement by necessity, a party must show common ownership of the two parcels prior to severance of the landlocked parcel, and that the owner of the now landlocked parcel cannot access a public roadway from his or her own property." (internal citations omitted)), *with Olney*, No. C-78-145, at 5-6. There is no element of intent under either federal or Wisconsin law. Thus, the analysis and conclusion would be the same regardless of which law is applied to the Homeowners' easement by necessity claim.

reservation were appropriated to individual tribe members," with so-called surplus land available to be allotted to non-tribal members. *See Olney*, No. C-78-145, at 5.[20] With the caveat of the Burke Act, which does not affect this analysis, "[l]ands allotted to tribal members under the Dawes Act remained in trust for a period of 25 years, after which a fee patent could issue to the individual allottee in fee simple and without restriction as to use or alienability." *Olney*, No. C-78-145, at 5-6; 25 U.S.C. § 348; *Brendale*, 492 U.S. at 436.

Finally, here, just like in Philip Brendale's 1981 case in the Eastern District of Washington: "There is no dispute between the parties that the only means of access to the allotted land has been [and continues to be] by use of the roads within the unallotted portion of the reservation. This land is still held in trust by the United States Government and is regulated by the BIA." *Olney*, No. C-78-145, at 6.[21] In the absence of an easement, the Homeowners cannot access a public roadway from their homes. (*See* 8/27/2024 Baird Decl. ¶ 5; 8/27/2024 Kilger Decl. ¶ 5; 8/27/2024 D. Pearson Decl. ¶ 5; 8/28/2024 Fermanich Decl. ¶ 5; 8/28/2024 D. Pollard Decl. ¶ 5; 8/28/2024 M. Possin Decl. ¶ 5; 8/28/2024 J. Spanton Decl. ¶ 5; 8/28/2024 Walsh Decl. ¶ 5; 8/30/2024 Kester Decl. ¶ 5.) The Homeowners have no other alternative available to them for access to their properties, and easements therefore are necessary.

The district court's conclusion in *Olney* that Mr. Brendale was entitled to an easement by necessity was noted several years later by the Supreme Court in *Brendale*.[22] The Supreme Court

---

[20] *See* Report of the Secretary of Interior for Fiscal Year Ending June 30, 1887, vol. II, at 4-5, *supra*; Ann. Rep. of the Commissioner of Indian Affairs, for the year 1904, Part I, at 57, *supra*; History of Indian Land Consolidation, *supra*; *Allotment Information for Midwest BIA Region*, *supra*.

[21] *See* Homeowners' Answer, ECF No. 66, ¶ 2; Answer, ECF No. 67, ¶ 75; 8/27/2024 Baird Decl. ¶¶ 1-5; 8/27/2024 Kilger Decl. ¶¶ 1-5; 8/27/2024 D. Pearson Decl. ¶¶ 1-5; 8/28/2024 Fermanich Decl. ¶¶ 1-5; 8/28/2024 D. Pollard Decl. ¶¶ 1-5; 8/28/2024 M. Possin Decl. ¶¶ 1-5; 8/28/2024 J. Spanton Decl. ¶¶ 1-5; 8/28/2024 Walsh Decl. ¶¶ 1-5; 8/30/2024 Kester Decl. ¶¶ 1-5.

[22] "Until recently the BIA supported the Tribe's policy of denying entry into the closed area by restricting use of BIA roads to members of the Tribe and a narrowly defined class of permittees. In litigation with

did not cast any doubt on the district court's conclusion in *Olney*; on the contrary, the plurality and concurrence both concluded that Brendale has the property right of free access to his fee land within the boundaries of the Yakima Reservation, as the *Olney* court established. *See Brendale*, 492 U.S. at 422-37. Here, in like manner to *Olney*, the Homeowners satisfy the three elements of easement by necessity to use the Roadways to access their homes free of barricades and free of any requirement that the Town or Homeowners have express rights-of-way under the ROW Act or access permits from the Band in order for the Homeowners to "lawfully access their [homes]." (*See* 8/29/2024 Gaulke Decl. Ex. B, Tribal Resolution No. 143(23), at 2).

The USA does not contest that the Homeowners satisfy all three elements of the easement by necessity claim; instead, the USA's sole defensive contention to the claim is that Congress "lack[ed] … intent" for an easement by necessity to be created through the Dawes Act or other statutes. (8/30/2024 Hubing Decl., Ex. 2, pp. 18-19, 7/12/2024 USA's Resp. to Homeowners' Interrog. No. 11.) But that contention is irrelevant because intent is not one of the three elements of easement by necessity. Thus, the USA effectively concedes that the Homeowners satisfy the elements of their easement by necessity claim.

Not only is the USA's assertion about the "lack of" congressional intent incorrect as a historical and legal matter (*see Brendale* and *Evans*), but just as important is the fact that the USA's argument is wholly beside the point. The *Olney* court found congressional intent to be irrelevant insofar as applying common law to Brendale's claim of easement by necessity over Yakima trust land. "[T]he doctrine of easement by necessity applies to lands held by the federal government." No. C-78-145, at 6 (citing *United States v. Dunn*, 478 F.2d 443, 444 n.2 (9th Cir.

---

the Government, petitioner Brendale eventually succeeded in establishing a right of access to his own property over BIA roads. See *Brendale v. Olney*, No. C-78-145 (E.D. Wash., Mar. 3, 1981).

1973)).[23] In other words, "Congress intended grants of allotted lands to include conveyance of customary common law rights of access." *Id.* at 6 (citing *Namen*, 380 F. Supp. at 461 (federal common law applies to Indian trust land and thus easements by necessity can exist over tribal land irrespective of Congress's intent)).

The district court's decision in *Olney* is particularly instructive. In *Olney*, non-Yakima member Philip Brendale owned in fee simple a 160-acre parcel of allotted land entirely within the checkerboard Yakima reservation. *Olney*, C-78-145, at 1-2. His property was originally allotted to his great aunt (a Yakima member) and later inherited by his mother who received a fee patent in 1963. He inherited the fee patent upon his mother's death in June 1972. *Olney*, C-78-145, at 1-2.

Brendale's parcel was accessible only by road via closed roads in the Yakima Reservation. *Olney*, C-78-145, at 1-2. Only enrolled Yakima members were allowed to access the roads. *Id.* at 1. After his inheriting the fee land in June 1972, Brendale continued to use the BIA-owned roads within the reservation without a permit. *Id.* at 2. The USA then sued him to stop him from doing so. *Id.* Brendale in turn then sued the USA, seeking in part a declaration that he has "common law easement rights appurtenant to [his] land" which is impaired by the roads' closure and the USA's assertion that he needs a permit to access his land. *Id.* at 2-3.

The court held that Brendale had an easement "over the closed BIA roads of the Yakima Reservation … which are reasonably necessary for access to his land." *Id.* at 6-7. "The right of access in issue … is a property interest in the form of an easement appurtenant to and accompanying the allotment of the land now owned by plaintiff." *Id.* at 3. Brendale's suit sought

---

[23] "[E]ven where a true easement by necessity has not been applied on government land, the courts have recognized an implied right of access to the extent it can be gleaned from the congressional intent underlying the land grant." *Olney*, No. C-78-145, at 6. Here, Congress did imply a right of access, per the *Brendale* Court's conclusion on the matter. *Supra* § I.A.

to establish and "preserve and protect this easement." *Id.*[24] In like manner here, the Court should determine that the Homeowners are likely to succeed on the merits of their claim that they have a right of access to their parcels which is, to quote *Olney*, a "property interest in the form of an easement appurtenant to and accompanying the allotment of the land now owned by" the Homeowners.

*Namen* also is instructive and further supports that congressional intent is not an element for easement by necessity claims across Indian trust land. In *Namen*, tribes sought an injunction and declaration against the Namens, who owned land in Montana on the south half of Flathead Lake, which is a part of the Flathead Indian Reservation. *Namen*, 380 F. Supp. at 455. The tribes were organized under the Indian Reorganization Act of 1934. *Id.* at 456. The reservation was created pursuant to a treaty that reserved for the tribes the land embraced by set boundaries, which include the south half of Flathead Lake. *Id.* The Namens obtained ownership of their land through successive conveyances stemming from an allotment under the Flathead Allotment Act (the Act of April 23, 1904, 33 Stat. 302). *Id.* The allotment system from the Dawes Act "was specifically applied to the Flathead Reservation" by the Flathead Allotment Act. *Id.* at 459.

The tribes wanted a declaration that the Namens "are in trespass upon [the tribes'] land to the extent that [the Namens] maintain and have erected buildings and structures beyond the high water mark of Flathead Lake and encroach on the bed and banks of said Lake." *Id.* at 455. The court rejected the tribes' contention. *Id.* at 466-67. In doing so, the court found that "express Congressional language is not … a prerequisite to the application of federal common law

---

[24] The *Olney* court assuaged concerns about the easement's scope by noting that the easement was not an "absolute right." Rather, the easement's scope is subject to "well recognized restrictions," including a scope measured by "such uses as the parties might reasonably have expected from future uses of the dominant tenement. What the parties might reasonably have expected is to be ascertained from the circumstances existing at the time of the conveyance. It is to be assumed that they anticipated such uses as might reasonably be required by a normal development of the dominant tenement" *Id.* at 6-7.

principles to federal grants of tribal lands," and "the fact that Indian land is involved does not necessitate the application of different principles in determining the extent of a federal grant." *Id.* at 466. That is, "[w]here the United States holds title in trust for Indian Tribes, federal common law is applicable to a determination of the extent of a federal grant despite the lack of any express Congressional language to that effect." *Id.* "The fact that Congress did not expressly delineate these rights does not negate their existence. It was not necessary for Congress to specify every incident of ownership which accompanies a patent to lands on an Indian Reservation." *Id.*

Here, just as in *Namen*, the Court need not find an express statement by Congress that the Homeowners should have easement rights in order for the Court to establish those rights. The fact that Congress did not expressly delineate the access rights for allotment parcels created in checkerboard reservations does not negate their existence. The Court should find that the Homeowners are likely to succeed on the merits of their easement by necessity claim. A contrary conclusion, resulting in the Homeowners having no access to their properties, would render the Homeowners' properties worthless and be antagonistic to the purpose of the common law easements by necessity at issue in this case which, as several courts have recognized, accompanied the allotments under the Dawes Act, irrespective of whether there was an express statement by Congress.

### c) The Homeowners' Easements Implied at Law Are Unaffected by Other Congressional Acts like the Indian ROW Act

Not only is the Indian Reorganization Act of 1934 irrelevant to the Homeowners' easement rights, also irrelevant are the Indian Reorganization Act as well as other Acts of Congress—specifically, the Indian Rights of Way Act of 1948 (25 U.S.C. § 323-328) ("ROW

Act") and the Indian Nonintercourse Act, 25 U.S.C. § 177. None of those Acts affect the Homeowners' property rights providing them free access to their homes.

The ROW Act had no and has no effect on the Homeowners' property rights to access their homes via the Roadways, which rights the Homeowners pursue in this action. Specifically, the Homeowners do not need express rights-of-ways from the BIA under the ROW Act, which require the Band's consent, and to which the Band has "repeatedly" said it will never consent. (8/30/2024 Hubing Decl. Ex. 6.) This is because Congress "implicitly granted" the Homeowners access rights to their homes by the Dawes Act in the late 1800s and early 1900s and, in so doing, "necessarily overc[a]me" the Band's authority to exclude the Homeowners from their fee lands such as by barricading the sole Roadways servicing the Homeowners' lands. *Brendale*, 492 U.S. at 423-24; *id.* at 436-37 (Stevens, J., concurring). This implicit grant by Congress also necessarily overcomes any assertion that the Homeowners need to get express rights-of-way under the ROW Act regulations in order for the Homeowners to lawfully access their homes.

The USA's position that the Homeowners need to comply with the ROW Act to lawfully access their homes, and the Band's position that it can barricade the Roadways, are contrary to the plain language of *Brendale*, which was decided in 1989, more than 40 years *after* the ROW Act was enacted: "Once Brendale obtained title to his land, that land was no longer off limits to him; **the tribal authority to exclude was necessarily overcome by … an 'implici[t] grant' of access** to the land." *Brendale*, 492 U.S. at 423-24 (emphasis added); *id.* at 436-37 (Stevens, J., concurring). As such, the Band lacks the authority to use the ROW Act or barricades as a basis to exclude the Homeowners from their fee lands. The Homeowners did not need, and still do not need, ROWs under the ROW Act and its implementing regulations to lawfully exercise their rights of free access to their properties, which rights have been "appurtenant" to their lands since

the Dawes Act, and which therefore predate and are unaffected by the ROW Act. *Olney*, No. C-78-145, at 3, 5-7 ("The right of access in issue … is a property interest in the form of an easement appurtenant to and accompanying the allotment of the land now owned by plaintiff…. [Plaintiff has an] easement appurtenant over those BIA roads on the Yakima Reservation which are reasonably necessary for access to his land."). The fact that the developer may have complied with ROW Act provisions when building the Roadways in the 1960s does not negate the earlier-created easement rights that exist by reason of the Dawes Act allotments to the Homeowners' predecessors in title. Once the allotments were parceled off from the Reservation and sold in fee through the Dawes Act allotment process, those parcels had access rights across Reservation land. *Brendale*, 492 U.S. at 423-24 (emphasis added); *id.* at 436-37 (Stevens, J., concurring). Those access rights continue unabated through today for the Homeowners' parcels.

If the Supreme Court in 1989 thought that the ROW Act of 1948 (or Indian Nonintercourse Act statute enacted in 1834, 25 U.S.C. § 177) was relevant to its analysis of access rights to fee lands within a checkerboard reservation, and whether such rights were affected or repudiated by later Congressional acts (e.g., its discussion of the irrelevance of the Indian Reorganization Act of 1934), the Court would have mentioned it. But tellingly, the Court did not. *See Brendale*, 492 U.S. at 423-441.[25]

---

[25] The ROW Act's language supports the conclusion that the ROW Act is irrelevant to the Homeowners' "implicitly granted" access rights to their homes. For example, 25 U.S.C. §§ 324 and 325 are forward looking, addressing express rights-of-way that *will* "be made," meaning they do not address or affect prior Congressional allotment acts and the property rights that necessarily accompanied such acts per Congress's intent, including those granted to the Homeowners years before. *Id.* § 324 ("No grant of a right-of-way over and across any lands belonging to a tribe … *shall be made* without the consent of the proper tribal officials." (emphasis added)); *id.* § 325 ("No grant of a right-of-way *shall be made* without the payment of such compensation as the Secretary of the Interior shall determine to be just." (emphasis added)). The Homeowners' "implied grants" were already given by Congress by and through the Dawes Act and already began running with their fee lands by the time of the ROW Act in 1948.

Additionally, the Supreme Court held that Indian statutes must be construed "in light of the intent of the Congress that enacted them." *Cent. Mach. Co. v. Ariz. State Tax Comm'n.*, 448 U.S. 160, 166 (1980). Thus, assuming that the USA contends that the ROW Act or the Indian Reorganization Act somehow repealed the Homeowners' property rights of free access to their homes granted by and through the Dawes Act, the USA then has the burden to demonstrate that either Act of later Congresses "affect[] the broad coverage" of the Dawes Act and the Dawes Act's "**application to the facts of this case**." *Wis. Winnebago Bus. Comm. v. Koberstein*, 762 F.2d 613, 619 (7th Cir. 1985) (emphasis added). In other words, the USA would need to prove that the later Acts "cover the entire subject matter" of the Dawes Act as it "applies to the facts of this case." *Id.* According to *Brendale*, however, the USA cannot make such a showing because neither the Indian Reorganization Act nor the ROW Act swept so broadly:

> "The Yakima Nation argues that we should not consider the Allotment Act because it was repudiated in 1934 by the Indian Reorganization Act, 48 Stat. 984. But the Court in *Montana* was well aware of the change in Indian policy engendered by the Indian Reorganization Act and concluded that this fact was irrelevant. 450 U.S., at 560, n. 9, 101 S. Ct., at 1256, n.9. **Although the Indian Reorganization Act may have ended the allotment of further lands, it did not restore to the Indians the exclusive use of those lands that had already passed to non-Indians or prevent already allotted lands for which fee patents were subsequently issued from thereafter passing to non-Indians**."

*Brendale*, 492 U.S. at 423 (emphasis added); *id.* at 436-437 (discussing the still-existing effects that the Dawes Act has on tribal authority through the present, notwithstanding the Indian Reorganization Act).

Accordingly, as recognized by the *Olney* and *Namen* courts, the "customary common law rights of access" granted by Congress to the Homeowners and their predecessors and successors under the Dawes Act continue unabated, unaffected by the Indian Reorganization Act and ROW Act. Nothing in the ROW Act indicates it affected or affects the Homeowners' preexisting

"property interest in the form of an easement appurtenant to and accompanying the allotment of the land now owned by [them]." *Olney*, No. C-78-145, at 3.

Further, the Indian Reorganization or ROW Acts would need to be "irreconcilable" with the property rights granted by Congress under the Dawes Act to non-Indian landowners of already-alienated fee lands in a reservation for those rights to be repealed by implication. *United States v. Santee Sioux Tribe of Neb.*, 324 F.3d 607, 611 (8th Cir. 2003). Yet, as the above-*Brendale* excerpt shows, the *Brendale* Court easily reconciled the Dawes Act to the Indian Reorganization Act such that the legal rights of land access granted to the Homeowners by Congress under the Dawes Act live on. *See id.* ("The two statutes here are not irreconcilable."). The same reconciliation is easily achieved by a plain reading of the forward-looking ROW Act, which is *silent* as to preexisting property rights that were already granted by Congress. *See supra* note 25.

Finally, the 1834 Indian Nonintercourse Act's requirement for tribal consent and Congressional approval for sale of Indian land was abrogated for the allotment process established by the 1887 Dawes Act, which required no tribal consent for allotments. The Homeowners' access rights here were granted by Congress through the Dawes Act, which is a situation far different from a person who obtains a tribal grant of easement that expires, such as for a pipeline or similar incursion on Indian land. The easement rights for a pipeline are subject to the Nonintercourse Act, *Bad River Band of Lake Superior Tribe of Chippewa Indians of Bad River Rsrv. v. Enbridge Energy Co.*, 626 F. Supp. 3d 1030, 1056 (W.D. Wis. 2022), whereas the Homeowners' access rights granted by Congress through the Dawes Acts are not. *Brendale*, 492 U.S. at 423-24; *id.* at 436-37.

For all these reasons, the Homeowners' easements implied at law were and remain unaffected by other congressional acts like the ROW Act, Indian Reorganization Act, and Indian Nonintercourse Act; thus, providing additional bases upon which the Homeowners will likely succeed on the merits of their easement claims.

## II. THE HOMEOWNERS WILL BE IRREPARABLY HARMED BY THE BARRICADED ROADWAYS UNLESS THE COURT ENTERS A PRELIMINARY INJUNCTION.

To satisfy the "irreparable harm" prong, movants "must establish that irreparable harm is likely without an injunction…. That is, there must be more than a mere possibility that the harm will come to pass, but the alleged harm need not be occurring or be certain to occur before a court may grant relief." *Michigan v. U.S. Army Corps of Engrs.*, 667 F.3d 765, 787–88 (7th Cir. 2011) (citing *Winter*, 555 U.S. at 21–23) ("A presently existing actual threat must be shown."). "[T]he likelihood of irreparable harm takes into account how urgent the need for equitable relief really is." *Doe,* 43 F.4th at 788. Here, the Homeowners have demonstrated imminent irreparable harm, and their need for equitable relief from the Court really is urgent.

Closure of the Roadways causes irreparable harm to the Homeowners. When the Band closed the Roadways for six weeks in 2023, the Homeowners suffered irreparable harm, which harm will be incurred again if the Roadways are closed again. (8/28/2024 D. Pollard Decl. ¶¶ 7-9; 8/27/2024 Baird Decl. ¶¶ 7-12; 8/28/2024 M. Possin Decl. ¶¶ 7-9; 8/28/2024 Walsh Decl. ¶¶ 7-9; 8/28/2024 Fermanich Decl. ¶¶ 7-9; 8/27/2024 Kilger Decl. ¶¶ 7-8; 8/27/2024 D. Pearson Decl. ¶¶ 7-9; 8/28/2024 J. Spanton Decl. ¶¶ 7-8; 8/30/2024 Kester Decl. ¶¶ 7-8.) The Declarations submitted in 2023 by numerous Homeowners, as well as the additional Declarations submitted herewith, describe how the unlawful barricades—and the continued threat of their replacement and very likely, imminent reconstruction of them—personally affected the

Homeowners, and caused, continue to cause, and will further cause irreparable harm to the Homeowners in the absence of a preliminary injunction.

Due to the barricades, many Homeowners, such as the Pollards and other residents on the Roadways, were forced to flee their homes (in minus 20-degree weather), which delayed medical care, including for life-threatening illnesses for an elderly man, as well as prohibited a special needs child from access to school and therapy. (3/6/2023 D. Pollard Decl. ¶¶ 10, 14; 3/4/2023 P. Kester Decl. ¶ 8.) Those who could stay in their homes endured the physical strains of having to trek long distances across frozen lakes, which are now melted and frequently impassable, and delays in receiving their prescription medications. (3/6/2023 Spanton Decl. ¶¶ 9-11; 3/6/2023 R. Pearson Decl. ¶¶ 14-16; 3/26/2023 J. Hunt Decl. ¶ 21 (describing unreasonable logistics in and untimely manner of obtaining prescription medications because of the barricades on the Roadway and the tribal police not getting Mr. Hunt's medications for him in a timely manner).) Some residents could not risk staying in their homes. (3/6/2023 D. Pollard Decl. ¶ 11.) Other Homeowners have serious health conditions that made it very hard and risky to their safety to leave their property by means of anything other than a vehicle. (8/27/2024 Baird Decl. ¶¶ 2-12; 3/26/2023 J. Hunt Decl. ¶¶ 12-16; 3/17/2023 M. Hunt Decl. ¶¶ 16-17.)

In addition, the barricades—and now their imminent reconstruction come mid-September 2024 or soon thereafter—took and continue to take a major toll on the mental health of Homeowners and the other residents on the Roadways regardless of whether they were barricaded in or out. (*See, e.g.*, 8/28/2024 Walsh Decl. ¶¶ 7-9; 3/24/2024 J. Walsh Decl. ¶¶ 7-11.) One child affected by the barricaded Roadway had to be hospitalized due to a panic attack because she was unable to return to her home and school. (3/4/2023 P. Kester Decl. ¶¶ 8, 25-26.) Other residents on the Roadways experienced and continue to experience mental health

conditions, such as severe anxiety and stress (8/28/2024 J. Walsh Decl. ¶ 9), due to a variety of things like worsening insomnia, the mere knowledge of losing access to their homes due to the frequent impassability of nearby lakes, fear of retaliation from tribal members or the Band, significant concerns about delayed response times for emergency vehicles to pass through the barricades, and about prevention to quickly drive to a hospital in the case of emergency, particularly among older Homeowners.[26]

Still others are falling into deep depression to the point of needing mental health services. (3/6/2023 R. Pearson Decl. ¶¶ 22-23; 3/4/2023 P. Kester Decl. ¶¶ 17, 29-30; 3/24/2024 J. Walsh Decl. ¶¶ 7-11; 8/28/2024 Walsh Decl. ¶ 9.)

Some Homeowners and other residents have also been irreparably harmed, continue to be irreparably harmed, and will be further irreparably harmed in the likely event the barricades are fully reconstructed, e.g., by being forced to leave a school in which the student thrives (3/4/2023 P. Kester Decl. ¶¶ 8-10, 28-30), being unable to go to work and the likelihood of job loss (3/6/2023 J. Kilger Decl. ¶¶ 11-16; 8/27/2024 D. Pearson Decl. ¶ 9; 3/6/2023 R. Pearson Decl. ¶¶ 10-14, 16-17), and feeling unsafe in the workplace (3/27/2023 M. Hornbostel Decl. ¶¶ 14, 28 (noting that tribal members travel to Mr. Hornbostel and Ms. Panfil's restaurant to intimidate Mr. Hornbostel).).

---

[26] *See* 8/28/2024 M. Possin Decl. ¶ 9; 3/27/2023 M. Hornbostel Decl. ¶¶ 9-11; 3/6/2023 D. Pollard Decl. ¶¶ 12-13, 15-16; 3/6/2023 J. Spanton Decl. ¶¶ 12-16; 3/6/2023 J. Kilger Decl. ¶¶ 9-10, 17; 3/6/2023 R. Pearson Decl. ¶¶ 18-24; *Pollard*, 3/6/2023 B. Hubing Decl., ECF No. 12, ¶ 10; 8/31/2024 J. Hunt Decl. ¶¶ 7-10; 3/26/2023 J. Hunt Decl. ¶¶ 15-19 (describing Mr. Hunt's medical emergency in October 2022 and how, if the incident had occurred while the barricades were up, Mr. Hunt would not have survived, and Mr. and Ms. Hunt's fear that if the barricade is reconstructed, Mr. Hunt will not survive another medical emergency); 3/17/2023 M. Hunt Decl. ¶¶ 18-19 (same); 8/31/2024 M. Hunt Decl. ¶¶ 7-10; 3/14/2024 M. Possin Decl. ¶¶ 9-11 (diagnosed with anxiety disorder as a direct consequence of the barricades, and describing ongoing insomnia); 3/14/2023 S. Fermanich Decl. ¶¶ 11-18, 24 (describing underlying atrial fibrillation condition and episodes that have worsened in frequency and length due to the barricades construction and fear that the barricades will again be erected at any time); 8/28/2024 Fermanich Decl. ¶ 9; 3/17/2023 M. Hunt Decl. ¶¶ 33-34 (tripling usual dose of insomnia medication to sleep through the night).

Moreover, Homeowners were cut off from the outside world and face the imminent threat of that happening again in the form of the barricades preventing the United States Postal Service from delivering mail to Homeowners' homes. (*See, e.g.*, 3/26/2023 J. Hunt Decl. ¶ 23; 3/17/2023 M. Hunt Decl. ¶ 24; 3/14/2023 M. Possin Decl. ¶ 12.) The Hunts went 21 days without receiving mail because of the barricades (3/26/2023 J. Hunt Decl. ¶ 23; 3/17/2023 M. Hunt Decl. ¶ 24), and the likely threat of a lengthy postal service interruption occurring again further adds to the imminent irreparable harm Homeowners face in the absence of expeditious court relief.[27]

Homeowners were irreparably harmed and continue to be irreparably harmed by the anxiety and emotional stress from knowing that they will likely soon be again barricaded from or into their homes in the absence of a preliminary injunction. (8/27/2024 Baird Decl. ¶¶ 7-12; 8/27/2024 Kilger Decl. ¶¶ 7-8; 8/27/2024 D. Pearson Decl. ¶¶ 7-8; 8/28/2024 Fermanich Decl. ¶¶ 7-9; 8/28/2024 D. Pollard Decl. ¶¶ 7-9; 8/28/2024 M. Possin Decl. ¶¶ 7-9; 8/28/2024 J. Spanton Decl. ¶¶ 7-8; 8/28/2024 Walsh Decl. ¶¶ 7-9; 8/30/2024 Kester Decl. ¶¶ 7-8; 3/27/2023 M. Hornbostel Decl. ¶¶ 9, 11; 3/26/2023 J. Hunt Decl. ¶¶ 11, 29; 3/17/2023 M. Hunt Decl. ¶¶ 12, 30; 3/14/2023 M. Possin Decl. ¶ 15; 3/14/2023 S. Fermanich Decl. ¶ 24.) The sheer likelihood of the reconstruction of the barricades irreparably harms Homeowners. Homeowners fear the barricades will be put back up at any time, which causes extreme anxiety and emotional distress knowing Homeowners may soon once again be barricaded in or out. (8/28/2024 J. Walsh Decl. ¶ 9; 3/27/2023 M. Hornbostel Decl. ¶¶ 9, 11; 3/26/2023 J. Hunt Decl. ¶¶ 11, 29; 3/17/2023 M. Hunt Decl. ¶¶ 12, 30; 3/14/2023 M. Possin Decl. ¶ 15; 3/14/2023 S. Fermanich Decl. ¶ 24.)

The uncertainty surrounding negotiations involving the Roadways, extreme passion underlying this roadways access dispute, and threats from tribal members, combined with the

---

[27] Congress takes this harm seriously. It is a federal crime to knowingly and willfully obstruct USPS mail carriers carrying the mail. 18 U.S.C. § 1701.

irreparable harm that Homeowners and other residents have faced, continue to experience, and will experience upon the reconstruction of the barricades, has caused yet another serious manifestation of ongoing and future irreparable harm: fear of violence and even homicide. (3/27/2023 M. Hornbostel Decl. ¶¶ 15-26 & Exs. A (ECF No. 31-1) & C (ECF No. 31-3) (describing Ms. Panfil's experience of receiving threats from tribal members and having her face plastered on a tribal "wanted poster," Ms. Panfil believing her life is jeopardy and feeling unsafe, Ms. Panfil's severe emotional reaction to the circumstances and threats, and Ms. Panfil fleeing Wisconsin); *see also* 3/17/2023 M. Hunt Decl. ¶¶ 37-39 (describing that a tribe member stated, "We know our complaint is with the federal government, but we can't barricade their homes," and describing seeing social media posts from a tribe member saying that they need to leave Lac du Flambeau and not come back).)

As U.S. Representative Thomas Tiffany stated in a February 23, 2023 letter to Band President John Johnson, Sr., the barricades put at risk the health and safety of the Homeowners and other residents who rely solely on the Roadways. (*Pollard*, 3/6/2023 B. Hubing Decl., Ex. O, ECF No. 12-15.) Representative Tiffany notes that the "decision to take this unprecedented action is putting the health, safety, and well-being of dozens of town residents at risk" and the barricades "cut[] off access to … vital roads …." (*Id*.)

When the barricades were on the Roadways, emergency services, such as EMTs, fire departments, etc., needed to carry keys (that were never provided to them) to specific barricade locks (and a heating device if a lock is frozen) and stop to unlock the barricade before providing emergency services to potentially save lives. (*Pollard*, ECF No. 45, Decl. of T. Bill, ¶¶ 13-16.) This will happen again without court relief. Terrain prevented vehicles from driving around the barricades when they were in place, even in an emergency. (*Pollard,* 3/6/2023 B. Hubing Decl.,

Exs. E-H, ECF Nos. 12-5 through 12-8 (photos of barricaded Roadways).) This too will happen again without a preliminary injunction.

Further, the Homeowners were threatened that, if they left for any reason other than medical appointments or receiving prescription medications, they would not be allowed back through the barricades to return to their homes. (8/30/2024 Hubing Decl. Exs. 15 & 16; 3/6/2023 R. Pearson Decl. ¶ 19.) The Homeowners were not only unable to drive vehicles past the barricades, but also they could not go around the barricades on foot or by any other means because the Band considered them in "trespass." (8/30/2024 Hubing Decl. Ex. 13; 3/6/2023 D. Pollard Decl. ¶¶ 6-16; 3/6/2023 R. Pearson Decl. ¶¶ 4-24; 3/6/2023 J. Kilger Decl. ¶¶ 3-17; 3/6/2023 J. Spanton Decl. ¶¶ 4-16; 3/4/2023 P. Kester Decl. ¶¶ 4-30; 3/14/2023 S. Fermanich Decl. ¶¶ 3-5, 11-24; 3/17/2023 M. Hunt Decl. ¶¶ 7-17, 30, 32-35; 3/27/2023 M. Hornbostel Decl. ¶¶ 4-12; 3/14/2023 M. Possin Decl. ¶¶ 3-15; 3/24/2024 J. Walsh Decl. ¶¶ 3-11.)

Although some Homeowners had some limited ability to access basic necessities when the barricades were fully constructed, such as food and pet supplies, by boating, walking or snowmobiling across lakes in the area depending on the weather and seasons, those Homeowners' ability to do so quite literally came and went with the weather and seasonal changes. (*See, e.g.*, 3/6/2023 R. Pearson Decl. ¶¶ 14-16; 3/6/2023 J. Kilger Decl. ¶ 8; 3/6/2023 J. Spanton Decl. ¶ 9.) This too will happen again. (8/27/2024 Baird Decl. ¶¶ 7-12; 8/28/2024 J. Spanton Decl. ¶¶ 7-8; 8/27/2024 D. Pearson Decl. ¶¶ 7-8; 8/27/2024 Kilger Decl. ¶¶ 7-8.) And like before, as the weather continues to cool down and ice builds in the coming months, it will be too dangerous to pass through or over a lake; then as the weather warms up and the icy lakes melt, it will be too dangerous to attempt to walk or snowmobile across them. (3/6/2023 J. Spanton Decl. ¶¶ 9-10; 3/6/2023 R. Pearson Decl. ¶ 16.) The result will again be total isolation

with no realistic way to leave landlocked parcels. (8/27/2024 Baird Decl. ¶¶ 7-12; 8/28/2024 J. Spanton Decl. ¶¶ 7-8; 8/27/2024 D. Pearson Decl. ¶¶ 7-8.) As demonstrated in 2023, the risk of tragedies and threats to the Homeowners' health, safety and well-being will soon increase manyfold in the absence of a preliminary injunction. (8/28/2024 M. Possin Decl. ¶¶ 7-9; 8/27/2024 Baird Decl. ¶¶ 1-12; 8/28/2024 D. Pollard Decl. ¶ 9; 8/28/2024 Fermanich Decl. ¶¶ 7-9; 8/30/2024 Kester Decl. ¶¶ 7-8.)

The reality is that in the likely event that the barricades are reconstructed soon, the same exact irreparable harm that the Homeowners and others experienced for six weeks in 2023 (described above in detail) will undoubtedly be replicated and that harm will be compounded by the previous and continuing irreparable harm that the Homeowners face through the present. There is a high likelihood of further imminent irreparable harm that is ominously on the immediate horizon that can be avoided only by court relief. (8/28/2024 D. Pollard Decl. ¶¶ 7-9; 8/27/2024 Baird Decl. ¶¶ 7-12; 8/28/2024 M. Possin Decl. ¶¶ 7-9; 8/28/2024 Walsh Decl. ¶¶ 7-9; 8/28/2024 Fermanich Decl. ¶¶ 7-9; 8/27/2024 Kilger Decl. ¶¶ 7-8; 8/27/2024 D. Pearson Decl. ¶¶ 7-9; 8/28/2024 J. Spanton Decl. ¶¶ 7-8; 8/30/2024 Kester Decl. ¶¶ 7-8; 8/31/2024 J. Hunt Decl. ¶¶ 7-10; 8/31/2024 M. Hunt Decl. ¶¶ 7-10; *see* 8/29/2024 Gaulke Decl. Exs. D & E.)

The Court, sitting in equity, may enter a preliminary injunction to provide relief to the Homeowners, because they currently are being irreparably harmed due to the imminent threat of the Roadways being re-barricaded, and because of the threat of the Homeowners again facing further irreparable harm in like manner to the trauma and mental anguish they suffered for six weeks in 2023 when the Roadways were barricaded. *See Winter*, 555 U.S. at 22. The Homeowners are currently being irreparably harmed by the mere threat of the reconstruction of the barricades on the Roadways. When the barricades are in place, they caused irreparable harm

to the Homeowners, including preventing the Homeowners from maintaining anything close to a normal livelihood by preventing fundamental human rights like the freedom from isolation, freedom of movement, and freedom to receive visitors at one's home. On these grounds alone, the Court has authority to issue preliminary injunctive relief here. *See Winter*, 555 U.S. at 22.

Even so, the imminent irreparable harm that the Homeowners will soon face when the Roadways are re-barricaded suffices to afford the Homeowners with preliminary injunctive relief. The Revocable Temporary Access Permits are precisely what they are named: not only revocable, but also temporary. (8/29/2024 Gaulke Decl. Exs. A, B, & E.) The Town paid the Band $600,000 through an escalating monthly payment scheme to keep the Roadways open via the Temporary Access Permits. (8/29/2024 Gaulke Decl. ¶ 9.) The final payment was $50,000. (*Id.* ¶ 15.) But now the money has run out, no resolution has been reached, and the Band will again close the Roadways — there is no reason to think the Band won't follow through on its threat that it will do so, as it publicly stated its intention. (8/29/2024 Gaulke Decl. ¶¶ 9-16, Exs. C, D, & E; *see* 8/30/2024 Hubing Decl. Exs. 13, 15, & 16.) The Band will soon replace the barricades after the final set of Temporary Access Permits expires on September 12, 2024. (8/29/2024 Gaulke Decl. ¶¶ 14-16, Exs. D & E.) Although at the time of this filing the Homeowners are not presently physically restrained by the barricades, the Homeowners seek preliminary injunctive relief to prevent imminent irreparable harm that will indisputably result when the barricades are placed on the Roadways. The Homeowners' request is very specific and narrow as it relates to preventing imminent irreparable harm: the Homeowners only seek injunctive relief for what will cause them further irreparable harm in the absence of an injunction when the barricades are fully reconstructed upon the expiration of the revocable Temporary Access Permits.

Even if the Homeowners' current ongoing harm at the time of this filing or the Court's hearing on this Motion does not rise to the level of "irreparable" (we posit that it does), the Homeowners respectfully submit that a court should not require a group of people who already experienced specific irreparable harm to again experience the same or similar irreparable harm in order to obtain court relief. This is especially true if that group meets their burden to show likely and imminent irreparable harm for an injunction to issue, as the Homeowners do through the Motion, Brief, and supporting documents. *Michigan*, 667 F.3d at 787-88; *Walling v. T. Buettner & Co.*, 133 F.2d 306, 308 (7th Cir. 1943); *Burlington N. Santa Fe Ry. Co. v. 50-Foot Wide Easement Consisting of 6.99 Acres More or Less*, 346 F. App'x 297, 301 (10th Cir. 2009) ("[P]revention of impending future injury is a recognized function of a court of equity"); *see also SEC v. Gentile*, 939 F.3d 549, 556 (3rd Cir. 2019) ("[T]he most basic rule of preventive injunctive relief [is] that the plaintiff must show a cognizable risk of future harm." (citing *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952))).[28]

Here, there is more than a "mere possibility" that the Band will replace the barricades on the Roadways. Rather, it is very likely, if not certain, that the Band will do so upon expiration of the final temporary access permits in mid-September 2024. (8/29/2024 Gaulke Decl. ¶¶ 14-16, Exs. D & E.) The Band's recent statements only point to the conclusion that it will soon

---

[28] "It is well-settled that the voluntary cessation of allegedly unlawful conduct does not moot a case in which the legality of that conduct has been placed in issue. The rational for this rule is straightforward: 'mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave [t]he defendant . . . free to return to his old ways.'" *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 74–75 (1983) (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)). "Whenever there is a risk that the defendant will return to his old ways, the plaintiff continues to have a stake in the outcome—its interest in not continuing to be subjected to that risk." *Heckler*, 464 U.S. at 75. This rationale applies squarely to this case with the permits set to expire on September 12, 2024, which will result in the Roadways' closure at that time or soon thereafter. (8/29/2024 Gaulke Decl. ¶¶ 14-16, Ex. D (8/13/2024 Band's letter to the Town) & Ex. E); *Lewis v. Tully*, 99 F.R.D. 632, 636 (N.D. Ill. 1983) ("[T]he existence of past harm is relevant in showing the likelihood of future harm." (citing *Kolender v. Lawson*, 461 U.S. 352, 355, n.3 (1983))).

reconstruct the barricades on the Roadways. (8/29/2024 Gaulke Decl. ¶¶ 14-16, Ex. D (8/13/2024 Band's letter to the Town) & Ex. E.) The harm incurred in 2023 was significant, and "the existence of past harm is relevant in showing the likelihood of future harm." *Lewis v. Tully*, 99 F.R.D. 632, 636 (N.D. Ill. 1983) (citing *Kolender v. Lawson*, 461 U.S. 352, 355 n.3 (1983)). Thus, while the barricades may not currently be on the Roadways at the time of this filing or when the Court holds its hearing on the Motion, the Homeowners have demonstrated a high likelihood of imminent irreparable harm and lack of an adequate remedy at law.

Courts consistently hold that harm affecting physical and mental health, safety, and wellbeing (or acts or omissions that threaten health, safety, and wellbeing) constitutes irreparable harm for which there is no adequate remedy at law. *E.g.*, *Am. Med. Ass'n v. Weinberger*, 522 F.2d 921, 925 (7th Cir. 1975) (noting that the implementation of a Medicare and Medicaid program that "directly interfere[es]" with the ability to receive proper medical care threatens the health of the programs' members such that plaintiffs showed a likelihood of irreparable harm to plaintiffs if an injunction does not issue); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 946 (W.D. Wis. 2018) (finding that plaintiffs established that they are at risk of irreparable harm because of "serious, ongoing impact[s] on plaintiffs' [mental and physical] health," which strongly weighs in favor of injunctive relief).[29]

---

[29] *Jones v. Wolf*, 467 F. Supp. 3d 74, 93 (E.D.N.Y. 2020) ("irreparable harm exists where, as here, the moving individuals face imminent risk to their health, safety, and lives" (internal quotation marks omitted)); *Henrietta D. v. Giuliani*, 119 F. Supp. 2d 181, 214 (E.D.N.Y. 2000), *aff'd sub nom. Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003) (plaintiffs who "face imminent risk to their health, safety, and lives" "have suffered and continue to suffer grave and irreparable harm"); *Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 613–14 (D.D.C. 1980) (finding that regulations that would expose children farmworkers to toxic or potentially toxic pesticides create hazards that constitute irreparable harm necessitating interlocutory relief in the form of reversing denial of injunctive relief and remanding to district court for immediate entry of injunction); *NAACP v. Town of East Haven*, 70 F.3d 219, 224 (2d Cir. 1995) (noting that public safety is an aspect of irreparable harm).

Moreover, courts have held that, under certain circumstances, loss of employment opportunities can also constitute irreparable harm. *See, e.g.*, *Brewer*, 757 F.3d at 1068 (plaintiffs demonstrated irreparable harm by a policy that prohibits a class of people from getting a driver's license on the basis of citizenship status that, in turn, prevents a class of people from being able to drive to work and ultimately to maintain their chosen professions). Here, the Pearsons will likely lose their jobs if the Roadway is barricaded again. (8/27/2024 D. Pearson Decl. ¶ 9.) Further, it is not as though the Homeowners would be wrongfully terminated but could find a job elsewhere. Rather, many Homeowners were barricaded into their homes and will likely be re-barricaded into their homes soon in the absence of court relief; this wholly prevents almost *all* employment opportunities if the very real threat of losing their current jobs comes to fruition because of the unlawful closure of the Roadways.

Further, even if all the above-mentioned forms of irreparable harm do not suffice (which, we posit, they do), surely the inability to maintain interpersonal relationships with family and spouses, or to engage in other everyday activities (like normally attending to needed medical procedures), because of being barricaded into or out of one's home constitute irreparable harm for which there are no calculable damages. (*E.g.*, 3/6/2023 R. Pearson Decl. ¶¶ 10-13; 3/6/2023 D. Pollard Decl. ¶ 14); *see Brewer*, 757 F.3d at 1068 ("Defendants' policy hinders Plaintiffs' ability to drive, and … this (in turn) hinders Plaintiffs' ability to work and engage in other everyday activities. No award of damages can compensate Plaintiffs for the myriad personal and professional harms caused by their inability to obtain driver's licenses. Thus, Plaintiffs are likely to suffer irreparable harm in the absence of an injunction."). This is especially clear where courts have held that even the deprivation of business relationships, which is an undoubtedly monetary-

driven affair unlike family, marriage, and friendship, constitutes irreparable harm for which there is no adequate remedy at law. *Foodcomm*, 328 F.3d at 304.[30]

Compare the deprivation of business or franchisee-franchisor relationships that courts have held constitutes irreparable harm, with the severe consequences of not being able to go about one's normal day, like attending to needed medical procedures without disruption (*see* 8/28/2024 D. Pollard Decl. ¶¶ 7-9; 3/6/2023 D. Pollard Decl. ¶ 14) *or* the severe consequences of forcibly depriving humans of normal and complete companionship-driven relationships and intertwined livelihoods like spouses and family (e.g., the Pearsons, who had to wake up 1.5 hours earlier than usual every morning to make it to work in time and who were getting home 2 hours after they otherwise normally would while the barricades were in place (*see* 3/6/2023 R. Pearson Decl. ¶¶ 10-13)), and it immediately becomes clear that the harm the Homeowners face is precisely the unique type of harm for which injunctive relief has long been intended. *See Gause v. Perkins*, 56 N.C. 177 (1857) (irreparable harm is harm "which cannot be repaired, retrieved, put back again, atoned for … the injury must be of a peculiar nature, so that compensation in money cannot atone for it" (emphasis omitted)).

The barricades prevented and will again prevent the Homeowners from freely going to and from their properties. (8/28/2024 D. Pollard Decl. ¶¶ 5, 7-9; 8/27/2024 Baird Decl. ¶¶ 5, 7-12; 8/28/2024 M. Possin Decl. ¶¶ 5, 7-9; 8/28/2024 Walsh Decl. ¶¶ 5, 7-9; 8/28/2024 Fermanich Decl. ¶¶ 5, 7-9; 8/27/2024 Kilger Decl. ¶¶ 5, 7-8; 8/27/2024 D. Pearson Decl. ¶¶ 5, 7-9; 8/28/2024 J. Spanton Decl. ¶¶ 5, 7-8; 8/30/2024 Kester Decl. ¶¶ 5, 7-8; 3/6/2023 D. Pollard

---

[30] *See also Stuller*, *Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 678–79 (7th Cir. 2012) (agreeing with the district court's conclusion that "because [the franchisee-plaintiff's] franchises would be terminated by Steak N Shake if [franchisee-plaintiff] did not implement Steak N Shake's pricing policy, [franchisee-plaintiff] had demonstrated that it had no adequate legal remedy and would suffer irreparable harm in the absence of an injunction" enjoining Steak N Shake "from taking any adverse action against [franchisee-plaintiff] for its refusal to implement the policy during the pendency of the case.").

Decl. ¶¶ 6-7; 3/6/2023 R. Pearson Decl. ¶¶ 4-5; 3/6/2023 J. Kilger Decl. ¶¶ 3-4; 3/6/2023 J. Spanton Decl. ¶¶ 4-5; 3/27/2023 M. Hornbostel Decl. ¶ 11; 3/26/2023 J. Hunt Decl. ¶¶ 12-13; 3/17/2023 M. Hunt Decl. ¶ 13; 8/31/2024 J. Hunt Decl. ¶¶ 7-10; 8/31/2024 M. Hunt Decl. ¶¶ 7-10; 3/14/2023 M. Possin Decl. ¶ 7; 3/14/2023 S. Fermanich Decl. ¶ 19; 3/24/2024 J. Walsh Decl. ¶ 7.) The barricaded Roadways therefore restrained and will again restrain the Homeowners' physical liberty. Many Homeowners were prevented from leaving their properties in any realistic or safe manner. (3/27/2023 M. Hornbostel Decl. ¶ 10; 3/26/2023 J. Hunt Decl. ¶¶ 12-13; 3/17/2023 M. Hunt Decl. ¶ 13.) Yet others fled their homes and were prevented from returning because of the barricades, being designated as "trespass[ers]," and not being allowed back into their properties if they fled. (8/30/2024 Hubing Decl. Exs. 13, 15 at 1, & 16 at 1; 3/6/2023 R. Pearson Decl. ¶¶ 1-10; 3/14/2023 S. Fermanich Decl. ¶¶ 1-19; 3/17/2023 M. Hunt Decl. ¶¶ 1-15; 3/27/2023 M. Hornbostel Decl. ¶¶ 1-12; 3/14/2023 M. Possin Decl. ¶¶ 1-7; 3/24/2024 J. Walsh Decl. ¶¶ 1-7; 3/26/2023 J. Hunt Decl. ¶¶ 1-16; 3/6/2023 J. Spanton Decl. ¶ 14; 3/6/2023 J. Kilger Decl. ¶ 9; 3/6/2023 D. Pollard Decl. ¶ 10; 3/4/2023 P. Kester Decl. ¶ 8.) This harm will happen again when the Band or tribal members soon barricade the Roadways again. *Tully*, 99 F.R.D. at 636 ("[T]he existence of past harm is relevant in showing the likelihood of future harm.").

When the Roadways are closed, Homeowners, like the Pollards, were forced to flee and take with them only what they could fit in their car. (3/6/2023 D. Pollard Decl. ¶ 10.) Thus, the barricades wholly restricted the Homeowners' fundamental freedom of movement. (8/27/2024 Baird Decl. ¶¶ 1-5; 8/27/2024 Kilger Decl. ¶¶ 1-5; 8/27/2024 D. Pearson Decl. ¶¶ 1-5; 8/28/2024 Fermanich Decl. ¶¶ 1-5; 8/28/2024 D. Pollard Decl. ¶¶ 1-5; 8/28/2024 M. Possin Decl. ¶¶ 1-5; 8/28/2024 J. Spanton Decl. ¶¶ 1-5; 8/28/2024 Walsh Decl. ¶¶ 1-5; 8/30/2024 Kester Decl. ¶¶ 1-5; 8/31/2024 J. Hunt Decl. ¶¶ 1-5; 8/31/2024 M. Hunt Decl. ¶¶ 1-5); *see Kent v. Dulles*, 357 U.S.

116, 126 (1958) ("Freedom of movement across frontiers in either direction, and inside frontiers as well, was a part of our heritage. Travel abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values…. [E]very American is left to shape his own life as he thinks best, do what he pleases, go where he pleases." (internal citations omitted)).[31] This is yet another form of irreparable harm that the Homeowners will experience again soon when the Roadways are re-barricaded.

Moreover, the barricades completely denied the Homeowners the long-recognized right to access and enjoy property free from unlawful or tortious interference; and the same harm will result again soon in the absence of court relief. (8/28/2024 M. Possin Decl. ¶¶ 5, 8; 8/27/2024 J. Baird Decl. ¶¶ 5, 7-8; 8/27/2024 J. Kilger Decl. ¶¶ 5, 8; 8/27/2024 D. Pearson Decl. ¶¶ 5, 8; 8/28/2024 J. Spanton Decl. ¶¶ 5, 8; 8/28/2024 Walsh Decl. ¶ 8; 8/28/2024 Fermanich Decl. ¶¶ 5, 8; 8/28/2024 D. Pollard Decl. ¶¶ 5, 8; 8/30/2024 Kester Decl. ¶¶ 5, 8; 8/31/2024 J. Hunt Decl. ¶¶ 1-5; 8/31/2024 M. Hunt Decl. ¶¶ 1-5.) Courts, including the Seventh Circuit, have consistently recognized that denying homeowners the right to access and enjoy their property— even segments that do not contain the dwelling itself—is irreparable harm sufficient for injunctive relief. *United Church of the Med. Ctr. v. Med. Ctr. Comm'n*, 689 F.2d 693, 701 (7th Cir. 1982) ("It is settled beyond the need for citation … that a given piece of property is considered to be unique, and **its loss is always an irreparable injury**." (emphasis added));

---

[31] *Schleifer v. City of Charlottesville*, 963 F. Supp. 534, 542 (W.D. Va. 1997) (similar; citing *Kent v. Dulles*); *Aziz v. Trump*, 234 F. Supp. 3d 724, 737 (E.D. Va. 2017) (a travel ban irreparably harms hundreds of university students and faculty by "significantly straining freedom of movement").

*Johnson v. USDA*, 734 F.2d 774, 789 (11th Cir. 1984) ("[I]rreparable injury is suffered when one is wrongfully ejected from his home. Real property and especially a home is unique.").[32]

There is an immediate need to issue an injunction requiring that the Roadways remain open during the pendency of this lawsuit. Without this guarantee from the Court, it is highly likely, if not certain, that the Band or tribal members will again barricade the Roadways after the final access permits expire on September 12. When that happens, the Homeowners and other impacted residents will immediately once again be stripped of their right to freely travel to and from their respective properties, which, as many courts have concluded, constitutes irreparable harm. These innocent landowners should not be forced to live in limbo.

Further, the Homeowners do not have an adequate remedy at law. It is impossible to put a value on the loss of freedom and fundamental liberties that have been suffered by the Homeowners and will again be suffered by them when the Roadways are re-barricaded soon in the absence of immediate court relief pending the outcome of the litigation. *See Alvarez*, 679 F.3d at 589; *Flack*, 328 F. Supp. 3d at 946. There is an immeasurable difficulty in quantifying the unique injuries to the Homeowners. *Cf. Pro's Sports Bar & Grill, Inc. v. City of Country Club Hills*, 589 F.3d 865, 872–73 (7th Cir. 2009) (affirming the district court's grant of preliminary injunction and conclusion that harm to plaintiff was irreparable because it was

---

[32] *E.g.*, *Classic Country Land, LLC v. Eversole*, No. 6:17-cv-00113-GFVT-HAI, 2018 WL 4219195, at *4 (E.D. Ky. Sept. 5, 2018) (after finding in favor of the plaintiff on the merits of the dispute, that is, that the land at issue was plaintiff's as established by a land survey, inviting plaintiff "to file additional motions for injunctive relief to protect their property rights" if the defendant "further interferes" with the plaintiff's land); *Stickler v. Halevy*, 794 F. Supp. 2d 385, 405 (E.D.N.Y. 2011) (inviting plaintiffs to move for a preliminary injunction that would require the fence installed by defendants on a disputed area of property between the parties' properties "to be removed forthwith, with free access restored to occupants of both homes to the entire space," and noting that "[t]he Disputed Area can be restored during the litigation with access to all parties without appreciably harming any of them"); *Koepp v. Holland*, 688 F. Supp. 2d 65, 94 (N.D.N.Y. 2010) (entering preliminary injunction that enjoins defendant from "erecting, installing or constructing any fencing along the property line separating plaintiffs' property and the 40-foot strip [of disputed land] which would interfere with plaintiffs' [property right] during the pendency of this action").

difficult to ascertain the specific amount of money damages and because money damages might come too late to adequately compensate plaintiff). The Court should therefore find that the Homeowners have suffered, will continue to suffer, and face likely, imminent irreparable harm in the absence of injunctive relief and have no adequate remedy at law.

### III. THE EQUITIES WEIGH IN FAVOR OF THE HOMEOWNERS

If the moving party makes the preliminary showing of likelihood of success on the merits and the threshold showing of likelihood of suffering irreparable harm in the absence of injunctive relief, the court then turns to balancing the harms and assessing the public's and non-parties' interest, if any, in granting or denying the requested relief. *DM Trans, LLC v. Scott,* 38 F.4th 608, 622 (7th Cir. 2022).

The balancing of equities needing to tip in the Homeowners' favor is another way of saying that the Homeowners must show the harm they would suffer without the injunction is greater than the harm that preliminary relief would inflict on the USA and Band. *See Michigan*, 667 F.3d at 769–70; *DM Trans*, 38 F.4th at 622 ("[T]he court weighs the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted."). Also, "[t]he more likely [the movant] is to win, the less the balance of harms must weigh in his favor…." *DM Trans*, 38 F.4th at 622.

Balancing of harms is often referred to as a "sliding scale analysis." *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012). It is not mathematical in nature, but rather is intuitive, allows the court to craft appropriate relief, and accounts for competing considerations. *Id.* In other words, "the district court sits as would a chancellor in equity and weighs all the factors . . . ." *Id.*

Here, the balance of harms strongly favors granting the Homeowners' request for injunctive relief pending the outcome of this case. *DM Trans,* 38 F.4th at 622. In this case, the harm that the Homeowners will suffer if the USA or Band are permitted to barricade the Roadways substantially outweighs the harm the USA or Band will incur if they are prohibited from barricading the Roadways. The Roadways have been open to the Homeowners for many decades. (3/6/2023 D. Pollard Decl. ¶ 17; 3/6/2023 J. Spanton Decl. ¶ 17; 3/6/2023 R. Pearson Decl. ¶ 25; 3/6/2023 J. Kilger Decl. ¶ 18; 3/17/2023 M. Hunt Decl. ¶ 36; 3/24/2024 J. Walsh Decl. ¶ 12; 3/14/2023 S. Fermanich Decl. ¶ 25.) Their character and use will not change in that respect insofar as providing the Homeowners, their families, friends, guests, invitees and visitors, emergency services, USPS workers, delivery people, etc., with free access.

Keeping the Roadways open to the Homeowners, at least during the pendency of this suit, will not harm the USA. If the USA prevails in this case, the Roadways will be removed and the land restored to its original condition, and therefore, there is no harm in the Homeowners continuing to use the Roadways during the pendency of the lawsuit.

On the other hand, if the USA or Band remain free to unlawfully barricade the Roadways again, the Homeowners will suffer tremendous harm, as discussed above. Therefore, the balance of harms analysis overwhelmingly favors the Homeowners and heavily weighs in favor of granting injunctive relief prohibiting the barricades from being erected and requiring them to be removed if already erected.

## IV. A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST

Entry of a preliminary injunction requiring the USA and Band to keep the Roadways open will serve the public interest in many ways, including protecting the public's right to use the Roadways and ensuring that emergency vehicles, police and other first responders can access

homes, persons, and properties that are blocked by the barricades. (*See* 3/6/2023 R. Pearson Decl. ¶ 21.) This factor unquestionably weighs in favor of the entry of injunctive relief.

The Roadways have been used as public roads for over six decades and the Band has acknowledged that fact. The Band has signed various agreements with the Town over the years, such as the Acknowledgement of Public Authority Responsibility (APAR) in 2007, whereby the Band agreed that the Roadways "will continue to be owned by the Town and opened to the public for travel." (*Pollard*, 3/6/2023 B. Hubing Decl., Ex. M, ECF No. 12-13.) In addition, in a letter to the Town, dated March 8, 2011, the BIA opined that the Roadways are public and must remain open. (*Pollard*, 3/6/2023 B. Hubing Decl., Ex. N, ECF No. 12-14.)

Moreover, despite the Band getting approximately $10,000,000 in federal funds since 2013 for listing the Roadways and other roads on the NTTFI (8/30/2024 B. Hubing Decl. ¶ 11, Ex. 12), until January 2023 the Town maintained Center Sugarbush Lane, East Ross Allen Lake Lane, Elsie Lake Lane and the north-south portion of Annie Sunn Lane. (3/6/2023 D. Pollard Decl. ¶ 17; 3/6/2023 J. Spanton Decl. ¶ 17; 3/6/2023 R. Pearson Decl. ¶ 25; 3/6/2023 J. Kilger Decl. ¶ 18). Individual landowners who use Annie Sunn Lane for access to their homes maintained the east-west portion.  (3/6/2023 D. Pollard Decl. ¶ 17.)

In fact, there is no public interest served at all by allowing the Roadways to be barricaded or closed. To the contrary, nonparties have a strong interest in the Court entering an order requiring the Roadways remain open to allow access for the corollaries of the Roadways' decades-long public nature: Homeowners' families and friends who wish or need to visit the Homeowners for any number of reasons; police, firefighters, and ambulances; USPS; delivery drivers; construction workers and contractors. Plus, the public and nonparties, including Homeowners' families and friends, are harmed by the deteriorating wellbeing and health of the

Homeowners directly caused by the Roadways being barricaded. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009) ("The general public has an interest in the health of state residents." (internal quotation marks omitted)).

### V.  AN ORDER IN THIS SUIT ENTERED AGAINST THE USA WILL BIND THE BAND

As trustee suing on behalf of its beneficiary the Band, an injunction entered against the USA in this suit will bind the Band. The USA appears to have acknowledged as much in response to a related interrogatory from the Town. (8/30/2024 Hubing Decl. ¶ 17, Ex. 18, p.72, 7/12/2024 USA's Resp. to Town's Request for Admission No. 13 ("[T]he United States admits that, pursuant to *Heckman v. United States*, 224 U.S. 413 (1912) and its progeny, the Band will be bound by any judgment the United States obtains against the Town in this action.").)

A basic tenet of fiduciary litigation is that a beneficiary is bound as a matter of law by the orders of a court resolving matters where the beneficiary's trustee is a party in the case. *In re Sharif*, 457 B.R. 702, 731 (Bankr. N.D. Ill. 2011). This principle applies equally to the USA-Band relationship in this case such that an order by the Court binds both entities. *Nevada v. United States*, 463 U.S. 110, 135 (1983) ("[T]he Tribe, whose interests were represented in *Orr Ditch* by the United States, can be bound by the *Orr Ditch* decree." (citing Restatement (Second) of Judgments § 41(1)(d) (1982) (entity is bound by court order or judgment "as though [it was] a party" when that entity "is represented by a party who is … "[a]n official or agency invested by law with authority to represent the [entity's] interest.")))).

Here, the USA is admittedly "acting … as trustee for the [Band] and [Allottees]." (USA First Am. Compl., ECF No. 61, at 1.) Accordingly, an injunction here, particularly one that is expressly entered against the USA, should bind both the USA and its beneficiary the Band. The interests of the Band and the Allottees are fully represented by the USA in this suit, and there is

no need for either the Band or any of the Allottees to be present as parties. *Heckman*, 224 U.S. at 445-46 ("But if the United States, representing the owners of restricted lands, is entitled to bring a suit of this character, it must follow that the decree will bind not only the United States, but the Indians whom it represents in the litigation."). Pursuant to *Heckman*, the Court's judgment would be binding on the Band and Allottees, and the same holds true for an Order entering preliminary injunctive relief.

If the Band could avoid being legally and equitably bound in this "action [that] allow[s] all stakeholders to seek to intervene and litigate the full panoply of their claims and defenses" (*Pollard*, USA Amicus Br., ECF No. 53 at 10) merely because the Band's trustee, the USA, filed this lawsuit (rather than the Band on its own behalf), "tribal immunity might be transformed into a rule that tribes may never lose a lawsuit." *United States v. Oregon*, 657 F.2d 1009, 1014-15 & n.13 (9th Cir. 1981) ("Indeed, the same court that issued the injunction at issue here has held that non-parties may be enjoined from interfering with the res in the court's constructive possession. If non-parties may be enjoined from interference, then intervenors, over whom the court has personal jurisdiction, may certainly be enjoined from similar acts."). Ultimately, it would defy common sense, let alone the notions of agency and finality, to conclude that the Band would be bound by an order in this case if the USA wins but not if the USA loses. (*See* 8/30/2024 Hubing Decl. ¶ 17, Ex. 18, p.72, 7/12/2024 USA's Resp. to Town's Request for Admission No. 13.) Thus, an injunction that expressly enjoins USA as trustee should also be entered against and bind the Band as beneficiary and their respective officials, representatives, and agents.

## <u>REQUEST FOR WAIVER OF BOND</u>

Once a court has determined that injunctive relief is warranted, Federal Rule of Civil Procedure 65(c) requires consideration of an appropriate bond. Under appropriate circumstances,

such a bond may be excused, notwithstanding the literal language of Rule 65(c). *Allen v. Bartholomew Cnty. Ct. Servs. Dep't*, 185 F. Supp. 3d 1075, 1087 (S.D. Ind. 2016) (citing *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010)); *see also Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, No. 16–CV–943–PP, 2016 WL 5239829, at * 7 (E.D. Wis. Sept. 22, 2016).

In the instant case, the Homeowners have demonstrated a high likelihood of success on their Motion. The facts here, including the complete lack of harm to anyone if the Court orders the Roadways remain open, all weigh against a substantial bond or any bond at all. Accordingly, the Homeowners respectfully request that the Court waive the requirement for a bond or, in the alternative, that it impose a bond of not more than $1,000.

## CONCLUSION

As set forth above, the Homeowners have demonstrated a need for the immediate issuance of a preliminary injunction prohibiting the USA and its beneficiary the Band from allowing or erecting any barricading of the Roadways and enjoining them from allowing anyone to put up barricades on the Roadways, including the Band or tribal members. Accordingly, the Homeowners respectfully request that this Court enter an Order, effective during the pendency of this litigation and until final resolution of the Homeowners' easement claims:

1.     Requiring the USA and the Band, as beneficiary of this litigation and bound by any judgment or order in this action, to remove or cause the removal of, within 8 hours of notice of entry of the Order, any barricades and other impediments to ingress and egress over Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane, and Elsie Lake Lane (the "Roadways"), so that the Roadways are immediately open, and kept open, for use by the Homeowners, their families, friends, invitees, guests, and visitors, and requiring the USA and

Band to remove, within 8 hours of notice of entry of an Order, any and all recording devices, such as cameras, monitoring the Homeowners' use of the Roadways;

     2.    Enjoining the USA, their employees, agents and representatives, and all persons acting in concert or in participation with them, and the Band as beneficiary of this litigation and bound by any judgment or order in this action, from maintaining or erecting, or causing to be maintained or erected, or allowing any other person to maintain or erect, any barricade or other means of blocking the Homeowners' access over the Roadways so that the Homeowners and the other property owners or possessors with homes served by the Roadways, as well as their respective families, friends, guests, visitors and invitees, may freely travel to and from their properties, and enjoining the USA, their employees, agents and representatives, and all persons acting in concert or in participation with them, and the Band as beneficiary of this litigation and bound by any judgment or order in this action, from installing recording devices, such as cameras, monitoring the use of the Roadways;

     3.    Enjoining the USA, their employees, agents and representatives, and all persons acting in concert or in participation with them, and the Band as beneficiary of this litigation and bound by any judgment or order in this action, from restricting or limiting the use of or access to the Roadways, including (but not limited to) by blocking or closing the Roadways and/or by requiring permits of any sort to access, use, or travel over, the Roadways, such that the Roadways remain open, and kept open, for use by the Homeowners, their families, friends, guests, invitees and visitors, and the other property owners or possessors with homes served by the Roadways, as well as their respective families, friends, guests, visitors and invitees.

Dated this 3rd day of September, 2024.

Reinhart Boerner Van Deuren s.c.
N16 W23250 Stone Ridge Drive
Suite 1
Waukesha, WI 53188
Telephone:  262-951-4527
Facsimile:  262-951-4690

Signed electronically by:

/s/ *David G. Peterson*
David G. Peterson
WI State Bar ID No. 1001047
dgpeterson@reinhartlaw.com
Bridget M. Hubing
WI State Bar ID No. 1029356
bhubing@reinhartlaw.com
Samuel C. Sylvan
WI State Bar ID No. 1131339
ssylvan@reinhartlaw.com
Olivia J. Brooks
WI State Bar ID No. 1115787
obrooks@reinhartlaw.com

*Attorneys for Intervenor*
*Defendant Homeowners*