IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

                Plaintiff,

v.

TOWN OF LAC DU FLAMBEAU,

                Defendant and
                counterclaimant,    OPINION and ORDER

And                                          23-cv-355-wmc

GORDON ANDERSON, *et al.*,

                Intervenor defendants and
                Intervenor counterclaimants.

---

This case arises out of an earlier decision by the Lac du Flambeau Band of the Lake Superior Chippewa Indians ("Tribe) to place blockades on four roads ("Roads") within the Lac du Flambeau Indian Reservation that provide access to property and homes on the Reservation owned by non-tribal members. Although the Town of Lac du Flambeau ("Town") had been maintaining the roads for decades, neither the Town nor individual, non-Indian homeowners can point to a valid, enforceable right-of-way easement on those roads since the expiration of a little known 50-year easement some ten years ago, at least according to the Tribe. After a homeowners' lawsuit attempting to challenge the blockade was dismissed for lack of jurisdiction over the tribal defendants in August 2023, *Pollard, et al. v. Johnson, et al.*, 23-cv-135-wmc (W.D. Wis.), the United States filed this trespass and ejectment action on its own behalf and as trustee for the Tribe, as well as 76 individual, Indian landowners ("Allotees") against

the Town, essentially seeking to establish the Tribe's right to prevent non-Indian owners access to their property on the Reservation. More than 70 homeowners who rely on the Roads to reach their property ("Homeowners") have also intervened as defendants, and both the Town and Homeowners filed several counterclaims against the United States seeking to establish their respective rights to access.

The Homeowners have now filed a motion for a preliminary injunction (dkt. #88), in which the Town has joined (dkt. #107), seeking an order prohibiting the United States and Tribe from restricting access to the four Roads during the pendency of this lawsuit. The United States opposes that motion. The court held oral argument on the motion on September 20, 2024, and now grants the Homeowners' motion in part and denies it in part.[1] Specifically, the court will enjoin the United States and its employees, agents and representatives from restricting or limiting access to the Roads to the Town for maintenance or the Homeowners for access to their properties during the pendency of this lawsuit. As owner of the Roads in trust for the Tribe, the court will likewise require the United States to communicate this injunction to the Tribe and encourage its compliance. However, as discussed below, the court will not expressly enter an injunction against the Bureau of Indian Affairs ("BIA") or the Tribe at this time, but will consider expanding the injunction to expressly include them or Tribal members if they take steps to frustrate the intent or thrust of the court's preliminary injunction pending final judgment in this case.

---

[1] The United States has also filed a motion to dismiss one of the Town's counterclaims on various grounds. (Dkt. #68.) That motion will be addressed by separate order.

BACKGROUND[2]

**A. Lac du Flambeau Indian Reservation**

The Lac du Flambeau Indian Reservation was established in 1854 via the Treaty with the Chippewas. It is now one of a number referred to as "checkerboard" reservations in this country, meaning that there are multiple parcels of land on the Reservation owned in fee simple by non-tribal members, including the Homeowners involved in this case. At least in part, the Reservation's checkerboard nature is the result of the allotment provision in Article 3 of the Treaty with the Chippewa, 10 Stat. 1109 (Sept. 30, 1854), which permitted the United States to assign tracts of Reservation land to individual tribal members.[3]

As part of a larger, troubling history in our country, allotment on the Reservation coincided with congressional efforts nationwide to dissolve reservations and extinguish tribal sovereignty. Such efforts increased with the passage of the General Allotment Act in 1887 ("Dawes Act"), 25 U.S.C. § 331, *et seq.*, which adopted a nationwide version of the allotment provisions found in treaties like the 1854 Treaty with the Chippewa. Both the Treaty and Dawes Act started the process by which tribal lands could be allotted, then by later enactments sold or assigned to non-tribal members, effectively removing them from tribal control. By 1904, there were already 115 allotments made on the Lac du Flambeau Reservation, and by 1935, 600 allotments had been made.

---

[2] These background facts are based on the Homeowners' proposed findings of fact in support of their motion for preliminary injunction (dkt. #90), the United States' responses to those proposed findings (dkt. #109), and the evidence in the record.

[3] *See Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin v. Evers*, 46 F.4th 552, 560 (7th Cir. 2022) (describing history of allotment on Ojibwe lands in Wisconsin).

The allotment process ended with the Indian Reorganization Act in 1934. However, lands that had already passed to non-Indians did not return to tribal control, and Congress enacted the Indian Right-of-Way Act, 25 U.S.C. §§ 323–28 ("ROW Act"), in 1948 to ensure a process was in place to control access to within and across Indian trust lands. Today, the Lac du Flambeau Reservation is 86,600 acres in total (or 135 square miles), comprising 57,935 acres of Tribal or Allottee land (66.9%) and 28,665 acres of alienated fee land (33.1%). All of the Homeowners involved in this case own their land in fee simple, which previous owners obtained under Congress's now-repealed allotment policies

### B. Four Roads at Issue

The Town of La du Flambeau is located in the center of Reservation. For more than 50 years, the Town has maintained certain roads on Reservation land that provide access to non-tribal members' fee property within the boundaries of the Reservation, including the four Roads at issue in this case. These Roads were built more than 60 years ago and, with a single exception, provide the only access to the Homeowner's homes and fee property.[4] The approximately 1.3 miles of the Roads at issue are located on land owned by the United States in trust for the Tribe and administered by the BIA.

In the 1960s, for reasons that are not entirely clear nor disclosed, the BIA apparently granted a formal 50-year, right-of-way easements on the Roads to various private land developers under the ROW Act. The developers later assigned these easements to the Town, and the roads were treated as public roads for the next 50 years or more. Although the Town

---

[4] One family has alternative access to their home.

maintained the roads for the public for decades after, however, its right-of-way easements on all four Roads expired between 2011 and 2018, and no formal easements have been renewed.

From the limited evidence in the record, it appears that the Homeowners acquired their properties between the 1970s and 2010s. When they took title to their respective properties, they did so without notice of the rights-of-way issue on the Roads, including the Town's 50-year rights-of-way under the ROW Act, which were never recorded in the Register of Deeds office for Vilas County or any other searchable recording system available to the public. Instead, according to the United States, the rights-of-way were recorded in a BIA management system, but the United States does not state whether this system was publicly-searchable, which seems unlikely.

In 2013, the BIA sent letters to some Homeowners, notifying them that the easement across a portion of the Roads would be expiring. (Dkt. #46-1–46-4, in *Pollard, et al.*, 23-cv-135-wmc.) In January 2014, the Town also sent a letter to some of the Homeowners (dkt. #91-19), stating that it would take care of communicating with the BIA regarding rights-of-way and asking that no Homeowners individually pursue an individual right-of-way. The Town and the Tribe then began negotiating, and the Tribe issued a statement that "it will not deny any resident of Lac du Flambeau access to their home, nor will any 'fee' be imposed on residents." (Dkt. #91-5.)

In 2017, however, after negotiations between the Town and the Tribe broke down, and the Town failed to pursue a renewal of the rights-of-way on any of the Roads, some of the Homeowners proceeded to apply for individual rights-of-way under the procedures afforded by the ROW Act. The BIA then sought formal appraisals the Roads and determined that the fair market value to renew all of the rights-of-way for another 50-year term was $79,000. However,

5

the Tribe demanded significantly more money -- ranging at various times from $10 to $20 million.  By early 2023, further negotiations over the appropriate value of new rights-of-way had stalled completely, and the Tribe has since stated that it would not approve any new long-term easements over the Roads under the ROW Act.

### C. Blockage of Roads

As a result, in January 2023, the Tribal Council sent letters to the Town, Homeowners and title insurance companies stating that:  any rights-of-way on the Roads had expired five to more than 10 years ago; the Town and Homeowners were considered in trespass; and the Tribe reserved the right to limit access to the roads, including by posting signs, road checkpoints and physical barriers.  Then, on January 31, the Tribal Council erected barriers across the four Roads, consisting of large concrete blocks with chains between the blocks, as well as wooden barricades in front of the chains.  At least one camera was also installed to monitor the use of the Roads by Homeowners or others.

These barriers remained in place between January 31 and March 13, 2023.  During this time, the Homeowners could not use the Roads to come and go from their homes freely, even to obtain necessities such food, pet supplies and home repair materials.  The Homeowners were permitted to leave via the Roads for medical appointments by calling tribal police to unlock the chains on the barricades.  If they were to leave their home for any other reason than a medical appointment, however, Homeowners were not always allowed back through the barricades to return home.  As a result, the Homeowners aver to having suffered from anxiety and distress from not being allowed back through the barricades to return home, with one child

6

reportedly hospitalized due to a panic attack after she was unable to return to her home from school.  Other Homeowners reported not receiving mail for weeks.

### D. Litigation History

In February 2023, a group of Homeowners that rely on the Roads to access their homes filed a lawsuit, naming as defendants the 12 individual members of the Tribe making up the Lac du Flambeau Tribal Council.  *See Pollard, et al. v. Johnson, et al.*, 23-cv-135-wmc (W.D. Wis.).  In particular, the Homeowners claimed that the Tribe's interference with access to the four roads violated the Federal-Aid Highway Act, 23 U.S.C. § 101 *et seq.*, the Tribal Transportation Program, 23 U.S.C. §§ 201–202, and implementing regulations at 25 C.F.R. Part 170.  They also brought state-law nuisance and implied easement claims.  Ultimately, the case was dismissed for lack of subject matter jurisdiction and the Tribe's sovereign immunity.

On March 13, 2023, while that lawsuit was pending, the Tribe opened the Roads under temporary access permits issued by the Tribe to the Town, which cost the Town $600,000 to continue.  After the Town's entire road budget for 2024 has been completely depleted due to the monthly payments for this temporary access, the Town claimed it could no longer pay to keep the Roads open.  Thus, the last temporary access permits expired on September 12, 2024, and the Tribe has threatened to but the barricades back up if the Town fails to pay the next monthly permit fee.

Meanwhile, the United States filed this trespass and ejectment action against the Town under the ROW Act.  The Town filed counterclaims, and the Homeowners intervened as defendants, filing their own counterclaims for implied and necessary easements.  There are two other, related cases pending in this court: (1) *Town of Lac du Flambeau v. Newland, et al.*, 23-cv-

541-wmc, in which the Town sued federal agencies alleging violations of the Administrative Procedures Act, stemming from the BIA's decision to remove the Roads from the Tribal Transportation Program's National Tribal Transportation Facilities Inventory and arguably authorizing the Tribe to exercise what rights it has to reclaim the Roads for use solely by the Tribe and its members; and (2) *Anderson, et al. v. Newland*, et al., 23-cv-777-wmc, in which several individual property owners sued federal agencies and officials alleging similar violations of the Administrative Procedures Act and the Constitution. Those cases have motions pending that will be addressed by separate order as well.

OPINION

Preliminary injunctive relief is an "extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015); *see also Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022) ("A preliminary injunction is an extraordinary remedy never awarded as of right.") (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008)). To obtain a preliminary injunction, the Town and Homeowners must show that: (1) they have "some likelihood of prevailing on the merits"; (2) traditional legal remedies would be inadequate; and (3) they will suffer irreparable harm without the relief. *Finch v. Treto*, 82 F.4th 572, 578 (7th Cir. 2023); *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020). If they pass these thresholds, the court proceeds to a balancing analysis, weighing the harm that the Homeowners and Town would suffer absent a preliminary injunction against the harm the United States would suffer were a preliminary injunction issued, as well as considering whether an injunction is in the public interest. *Planned*

8

*Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018); *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018).

Here, the Homeowners request a preliminary injunction to prohibit the United States and Tribe from reinstituting barriers and restricting their access to the Roads. The Homeowners' motion is based on their easement claim, and in particular, their claim that they do not need rights-of-way under the ROW Act because they already enjoy a common law easement over the Roads for purposes of accessing their properties. They also contend that a right-of-way easement was implicitly included in the original allotments of the lands purchased by non-Tribal members and those easements have run with those allotted lands since their purchase.

I. **Likelihood of Success on the Merits**

The first, and in this case the principal, question is whether the Homeowners have shown that they are likely to succeed on the merits on their easement claim. "Some likelihood of success" is more than "a mere possibility of success," but "the applicant need not show that it definitely will win the case." *Grubhub Inc. v. Relish Labs LLC*, 80 F.4th 835, 844 (7th Cir. 2023). As the court discussed with the parties at the preliminary injunction hearing, the Homeowners have certainly shown some likelihood of success on their claim that they have a long-standing common law right of access across the Roads to their property.[5]

---

[5] The parties appear to agree that federal law applies to the Homeowners' easement claims. *See McFarland v. Kempthorne*, 545 F.3d 1106, 1110 (9th Cir. 2008) (federal law governs claim of easement over lands owned by the United States).

In particular, the Homeowners have shown that in *Brendale v. Confederated Tribes & Bands of Yakima Nation*, 492 U.S. 408 (1989), the United States Supreme Court recognized a common law right of access to allotment lands within a Reservation. The *Brendale* case involved a dispute about the authority of the Yakima Nation to zone land owned by non-tribal members located within the boundaries of the reservation. By a six to three margin, the Supreme Court held that the Tribe lacked authority to zone non-tribal member land within the reservation if the land was open to the general public. By a five to four margin, the Court also held that the Tribe retained authority to zone non-tribal land in an area of the reservation that was closed to the general public. No single opinion garnered a majority: four Justices concluded that the Yakima Tribe lacked any authority to zone non-Indian fee land, and three Justices determined that the Tribe could zone fee land in all areas of the reservation. Declining to join either of these opinions, Justice Stevens, joined by Justice O'Connor, concluded that the Tribe retained zoning authority over non-Indian land only in areas closed to the public. *Id.* at 443–44 (opinion of Stevens, J.)). And because he provided the crucial fifth (and by concurrence, sixth vote), Justice Stevens' opinion is actually controlling.

As part of his reasoning, Stevens explained that a Tribe's "virtually absolute power to exclude" can be "diminished by federal statute or voluntarily surrendered by the Tribe itself." *Id.* at 433. Thus, he held for the majority that the Tribe's ability to exert control had been diminished in the open area of the Yakima Reservation as a result of allotment policies that had alienated land within the Reservation to non-Indians. Justice Stevens further stated that "treaty rights with respect to reservation lands must be read in light of the subsequent alienation of those lands," and that alienation includes a right to access the land. Specifically, he explained, "[a] statute that authorizes the sale of a parcel of land in a reservation must

10

implicitly grant the purchaser access to that property. . . Congress could not possibly have intended in enacting the Dawes Act that tribes would maintain the power to exclude bona fide purchasers of reservation land from that property." *Id.* at 437; *see also Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 141 (1982) ("When a tribe grants a non-Indian the right to be on Indian land, the tribe agrees not to exercise its ultimate power to oust the non-Indian as long as the non-Indian complies with the initial conditions of entry.").

As the United States correctly points out, the *Brendale* case was about Tribal zoning authority and did not actually resolve the question at issue before this court as to whether a Tribe can preclude non-tribal members' long-standing access to their fee property via Tribal land without compensation. The United States further argues, correctly, that easements, or encumbrances generally, should not be *implied* on Tribal trust land due to the Tribe's sovereign authority; rather, Congress has designated the ROW Act as the proper mechanism for obtaining rights-of-way on Tribal land. *See Fitzgerald Living Tr. v. United States*, 460 F.3d 1259, 1267 (9th Cir. 2006) ("The intent to grant an easement must be so manifest on the face of the instrument that no other construction can be placed on it."); *Imperial Granite Co. v. Pala Band of Mission Indians*, 940 F.2d 1269, 1272 (9th Cir. 1991) (no easement by implication or necessity over tribal land); *Confederated Salish and Kootenai Tribes v. Lake Cnty. Bd. of Commissioners*, 454 F. Supp. 3d 957 (D. Mont. 2020) (same).

Although not directly on all fours, Justice Stevens' observations dictating the outcome in *Brendale* as to Congress's intent in permitting the sale of allotments of Tribal lands to non-tribal members are persuasive, not just in terms of practical reasoning, but also in light of other persuasive authority concerning federal common law access rights and Congressional intent. In particular, the Ninth Circuit Court of Appeals relied on *Brendale* for the proposition that

11

"the transfer of tribal land to nonmembers 'must implicitly grant the purchaser access to that property.'" *Evans v. Shoshone-Bannock Land Use Pol'y Comm'n*, 736 F.3d 1298, 1305 (9th Cir. 2013). In addition, two district courts have already relied on Congressional intent in implying access rights for non-Indian landowners on Tribal trust land. In *Brendale v. Olney*, c-78-145 (E.D. Wash. 1981), the United States had barred a non-Indian who owned fee land within the boundaries of the Yakima Reservation from using BIA roads without a permit to access his property. (Dkt. #91-3.)[6] In response, the landowner argued that he had a common law easement to access his land via the BIA road, and the district court agreed, holding that a right-of-access easement accompanied the original allotment of the land now owned by the plaintiff. *Id.* at 3, 5–7. And in *Confederated Salish & Kootenai Tribes v. Namen*, 380 F. Supp. 452, 459 (D. Mont. 1974), *aff'd*, 534 F.2d 1376 (9th Cir. 1976), which concerned a dispute over non-Indian landowner riparian rights, the district court held that through allotment policies, Congress "must have intended that the [allotments] would include the customary riparian rights of access and wharfage." *Id.* at 466. As that court further held, "[t]he fact that Congress did not expressly delineate these rights does not negate their existence. It was not necessary for Congress to specify every incident of ownership which accompanies a patent to lands on an Indian Reservation." *Id.*

Court decisions involving the Homestead Act, 43 U.S.C. § 161 (repealed 1976), likewise provide persuasive authority to support the Homeowners' claim for rights of access. In particular, at least two courts have found that the Homestead Act implied a right of access across public lands to reach an otherwise landlocked homestead property. *See Fitzgerald Living*

---

[6] This *Brendale* case involved the same non-Indian landowner who was involved in the *Brendale* case before the Supreme Court, but was a separate case that was not appealed.

12

*Tr. v. United States*, 460 F.3d 1259, 1265 (9th Cir. 2006) ("[W]e accept the Fitzgeralds' argument that the Homestead Act contemplated an inholder's access to his property over public lands."). In fairness, neither the *Fitzgerald* court nor the *Jenks* court implied an "easement." The *Fitzgerald* court held that the Homestead Act "sanctioned the longstanding customary use of public lands by a settler," and that the Forest Service could require an inholder to apply for a permit with "reasonable" conditions, *id.* at 1265, 1268; and the *Jenks* court held that the Homestead Act created an implied "right of access" in the form of an "implied license" to use public lands to access their property. 129 F.3d at 1354. In so holding, the *Jenks* court appears to distinguish between an "easement" and a "license" based on the extent to which the government could regulate access. Specifically, the court described easements as access "free from reasonable government regulation," whereas a license would permit the government to impose requirements so long as they were not arbitrary and capricious. *Id.* at 1354.

Regardless, in light of the extensive persuasive authority cited by the Homeowners and discussed above -- and arguably importantly, the admitted inability by the United States to cite *any* authority holding to the contrary -- the court has little trouble holding that the Homeowners have a likelihood of succeeding on the merits of their claim to *some* right of access to their properties located within the Lac du Flambeau Reservation and consistent with those rights, the Town may at least continue to maintain those access Roads. The court need not determine at this stage the precise nature of that right, nor whether the United States or Tribe could place reasonable restrictions on it or claim a right to some form of compensation for its continuation. Although the *Jenks* and *Fitzgerald* courts found it necessary to distinguish between a license, easement or historical public access, it is unnecessary to do so at this early stage of this lawsuit as the United States Supreme Court itself has explained, "[a] right-of-way is a type

13

of easement." *United States Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 613 (2020). "Specifically, a right-of-way grants the limited 'right to pass ... through the estate of another.'" *Id.* Moreover, even if the United States or Tribe could impose *reasonable* restrictions on the Homeowners' or Town's access, they have not attempted to so here. Rather, to date, the Tribe has blocked access altogether or demanded $20 million for access. Both are unreasonable restrictions: the former because it would deny virtually all access and the latter because it has no bearing to the fair market value of the isolated, approximately 1.3 miles of roadway accepted by BIA. Thus, the Homeowners have shown a likelihood of success on their easement/right-of-access claims.

## II. Lack of Legal Remedies and Irreparable Harm

The Homeowners likewise have shown that they have "no adequate remedy at law" and "that without [injunctive] relief [they] will [liley] suffer irreparable harm. *See Planned Parenthood of Ind.*, 896 F.3d at 816 (citation omitted). For preliminary relief to be granted, irreparable harm must be "likely." *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 788 (7th Cir. 2011). Although the United States argues that it remains uncertain whether the Tribe will again block the roads, the evidence in the record suggests otherwise. Just last month, the Tribe sent a letter to the Town stating that it would not accommodate the Town's budget concerns and that failure to pay for temporary access permit fees "*will* result in restricted access over the Four Roads." (Dkt. #92-4 (emphasis added).) Given that the Tribe already restricted access for a significant period of time last year, and then demanded the Town pay an exorbitant, monthly fee to keep them open, the Homeowners have shown a substantial likelihood that it will do so again.

Moreover, the harm the Homeowners will suffer if Roads are again blocked would be significant and irreparable. The numerous declarations from Homeowners regarding the mental and emotional distress, in addition to practical impacts compounded by restricted access to school, work, medical care, police and other first responders, are more than sufficient to establish irreparable harm. In contrast, the Tribe has allowed access to these obscure, tiny access roads for decades without the United States showing any harm, save for the indignities long ago inflicted by Congress in passing the Dawes Act and allowing the sale of allotted land to non-tribal members. However painful that may be (and the court does not discount it), surely the United States and the Tribe can wait a short, additional time for the parties' rights here to be fully adjudicated.

### III. Balance of Harm and the Public Interest

The remaining factors –the balance of harm and the public interest—also favor the Homeowners. Again, aside from a brief interference with the Tribe's sovereign rights, the United States has identified no risk of harm to itself, the Tribe or the public that would flow from a temporary injunction. Nor can the court think of any. The Roads have been open to the public for more than 50 years, and there is no evidence in the record suggesting that public use has caused any problems. Nor does the United States suggest that it or the Tribe seeks to use the land for some other purpose. In contrast, the Homeowners' potential harm is indisputable, as is the harm to their guests and the public's interest in having the Roads open for access by the Town for maintenance, mail and package delivery, police, and other first responders, and essential commerce. Accordingly, the court is persuaded that entry of a preliminary injunction is appropriate here.

**IV.     Enforceability of the Preliminary Injunction**

The final question is whether entry of an injunction would be futile. The United States argued both in its opposition brief and at the injunction hearing that any preliminary injunction would be meaningless because it could not be enforced against the Tribe, which is the entity that actually blocked the Roads and is threatening to do so again. In particular, the United States argues that the Tribe's sovereign immunity would bar enforcement of the injunction order against it, and that any effort to include the Tribe in the injunction order would exceed the bounds of Federal Rule of Civil Procedure 65.

In contrast, all parties agree that the Tribe *will* be bound by any final judgment in this case due to the United States' appearing as trustee for the Tribe. *See Heckman v. United States*, 224 U.S. 413 (1912). While none of the parties nor the court were able to find any legal authority addressing why a Tribe would not be similarly bound under *Heckman* by an interim order issued in a case filed by the United States on the Tribe's behalf, the court is hard-pressed to think of a reason, especially since the Tribe is being afforded the luxury of using the government, and by extension this court, as both sword to do its bidding *and* a shield from any, at least interim, accountability.

That being said, the court is not convinced that the Tribe could simply flout an interim order against the United States in this case, nor will it assume the Tribe will do so out of the gate. As the Supreme Court explained in *Heckman*, when the United States sues on behalf of a Tribe, the "efficacy" of the litigation "does not depend upon the Indians' acquiescence" in the litigation. *Id.* at 444–45. Rather, the result "bind[s] not only the United States, but the Indians whom it represents in the litigation." *Id.* at 445–46. *See also id.* at 445–46 ("[I]t could not, consistently with any principle, be tolerated that, after the United States on behalf of its wards

16

had invoked the jurisdiction of its courts ... these wards should themselves be permitted to relitigate the question.")  Several other cases in which the United States sued on behalf of a Tribe -- particularly involving water and other resource rights -- have held that Tribes are bound by consent decrees or other court decisions.  *E.g. Arizona v. California*, 460 U.S. 605, 627 (1984) (water litigation) (United States has "full authority" to litigate claims for tribes *and* "bind them in litigation").  Although these cases involve final judgments, the court again sees no persuasive reason why a Tribe would not also be bound by a federal court's preliminary injunction.

At this time, however, the court will not include the Tribe in the injunction order.[7]  Instead, the court will direct the United States to notify the Tribe of this decision and of the court's expectation that Roads will remain open during the pendency of this lawsuit for access by the Homeowners and their guests, as well as the Town to continue to maintain the Roads and first responders, mail and package delivery, other essential services like busing children and continued pickups and deliveries.  If the Tribe chooses to disregard the court's order, the Homeowners or Town should notify the court immediately and seek any relief that they deem necessary.

ORDER

IT IS ORDERED that:

(1) The Homeowners' motion for a preliminary injunction (dkt. #88) is GRANTED IN PART and DENIED IN PART.  The motion is GRANTED as follows:

---

[7] The court likewise will not require the Homeowners or Town to post a bond under Federal Rule of Civil Procedure 65(c), given that the United States did not object to the Homeowners' request for waiver of a bond.

> The United States is preliminarily enjoined from using any means to restrict access to the four Roads at issue in this case during the pendency of this litigation.

The motion is DENIED in all other respects.

(2) The United States is further directed to provide a copy of this order and the separate injunction order to the Tribe, as well as encourage the Tribe to eliminate any barriers or other restrictions impending Road access, and refrain from imposing any additional restrictions, on the Homeowners' access to the Roads during the pendency of this litigation.

Entered this 26th day of September, 2024.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge