UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff and
        Counter Defendant,

   v.

TOWN OF LAC DU FLAMBEAU,

        Defendant and
        Counter Claimant,

    and

GORDON ANDERSON et al.,

        Intervenor Defendants and
        Intervenor Counter Claimants.

Case No. 3:23-cv-00355-wmc

---

**INTERVENOR DEFENDANT AND COUNTER CLAIMANT HOMEOWNERS' BRIEF IN SUPPORT OF HOMEOWNERS' MOTION FOR SUMMARY JUDGMENT**

---

Reinhart Boerner Van Deuren s.c.
N16 W23250 Stone Ridge Drive, Suite 1
Waukesha, WI 53188
Telephone:  262-951-4527
Facsimile:  262-951-4690

David G. Peterson
WI State Bar ID No. 1001047
dgpeterson@reinhartlaw.com
Bridget M. Hubing
WI State Bar ID No. 1029356
bhubing@reinhartlaw.com
Samuel C. Sylvan
WI State Bar ID No. 1131339
ssylvan@reinhartlaw.com

*Attorneys for Intervenor
Defendant Homeowners*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. 3

INTRODUCTION .............................................................................................................. 7

FACTS ............................................................................................................................ 9

A.  THE CREATION OF A CHECKBOARD RESERVATION UNDER THE
    CONGRESSIONAL ALLOTMENT ACTS ........................................................... 9

B.  HISTORY OF LANDS ALLOTTED AND SOLD TO THE HOMEOWNERS ............. 14

C.  THE BAND'S REFUSAL TO CONSENT TO BIA-ISSUED RIGHTS-OF-
    WAY RENDERED THE RIGHT OF WAY APPLICATION PROCESS
    UNDER THE ROW ACT FUTILE AND UNAVAILABLE TO THE
    HOMEOWNERS ............................................................................................... 16

LEGAL STANDARD ....................................................................................................... 18

ARGUMENT .................................................................................................................. 19

I.   THE COURT SHOULD DECLARE THAT THE HOMEOWNERS HAVE
     IMPLIED EASEMENTS ..................................................................................... 19

II.  THE COURT SHOULD DECLARE THAT THE HOMEOWNERS HAVE
     EASEMENTS BY NECESSITY ......................................................................... 25

III. SOME HOMEOWNERS MAY ALSO HOLD EXPRESS EASEMENTS
     BECAUSE THE ALOTTEES AGREED TO "NECESSARY ROADWAYS"
     TO BE BUILT, PURSUANT TO THE 1933 UNEMPLOYMENT ACT ...................... 32

IV.  THE HOMEOWNERS' EASEMENTS ARE UNAFFECTED BY OTHER
     CONGRESSIONAL ACTS LIKE THE INDIAN ROW ACT .................................... 38

CONCLUSION ............................................................................................................... 45

## TABLE OF AUTHORITIES

**Cases**

*Adams v. United States*, 3 F.3d 1254 (9th Cir. 1993) ................................................... 30

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................. 18

*Anderson v. Newland*, No. 23-cv-777-wmc (W.D. Wis.) ............................................... 19

*Bad River Band of Lake Superior Tribe of Chippewa Indians v. Enbridge Energy Co.*,
    626 F. Supp. 3d 1030 (W.D. Wis. 2022) ................................................................ 44

*Banks v. Yokemick*, 214 F. Supp. 2d 401 (S.D.N.Y. 2002) ........................................... 26

*Brendale v. Confederated Tribes & Bands of the Yakima Indian Nation*,
    492 U.S. 408 (1989) .......................................................................................... *passim*

*Brendale v. Olney*, No. C-78-145 (E.D. Wash. Mar. 3, 1981) ............................... *passim*

*Burdess v. United States*, 553 F. Supp. 646 (E.D. Ark. 1982) ..................................... 37

*Byrnes v. Douglass*, 83 F. 45 (9th Cir. 1897) ............................................................... 37

*Carroll v. Lynch*, 698 F.3d 561 (7th Cir. 2012) ........................................................... 18

*Central Mach. Co. v. Ariz. State Tax Comm'n.*, 448 U.S. 160 (1980) ......................... 41

*Choctaw Nation of Indians v. United States*, 318 U.S. 423 (1943) ............................. 33

*Confederated Bands of Ute Indians v. United States*, 330 U.S. 169 (1947) ................ 33

*Confederated Salish & Kootenai Tribes v. Lake Cnty. Bd. of Commissioners*,
    454 F. Supp. 3d 957 (D. Mont. 2020) ............................................................. 31, 32

*Confederated Salish & Kootenai Tribes v. Namen*, 380 F. Supp. 452
    (D. Mont. 1974) ...................................................................... 19, 28, 30, 44

*Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959 (10th Cir. 2019) ............... 19

*Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451 (7th Cir. 2020) ...................... 18

*Draper v. United States*, 164 U.S. 240 ......................................................................... 10

*Dunn v. Menard, Inc.*, 880 F.3d 899 (7th Cir. 2018) ................................................... 18

*Evans v. Shoshone-Bannock Land Use Policy Comm'n*, 736 F.3d 1298 (9th Cir. 2013) ....... 21, 23

*Feliberty v. Kemper Corp.*, 98 F.3d 274 (7th Cir. 1996) .............................................. 18

*Fitzgerald Living Tr. v. United States*, 460 F.3d 1259 (9th Cir. 2006) ............. 28, 30, 31, 34

*Fitzgerald v. United States,* 932 F. Supp. 1195 (D. Ariz. 1996) .................................. 19

*Flexible Steel Lacing Co. v. Conveyor Accessories, Inc.*, 955 F.3d 632 (7th Cir. 2020) ............. 18

*Hart v. Schering-Plough Corp.*, 253 F.3d 272 (7th Cir. 2001) .................................... 24

*Imperial Granite Co. v. Pala Band of Mission Indians*, 940 F.2d 1269 (9th Cir. 1991) ........ 31, 32

*Jogi v. Voges*, 480 F.3d 822 (7th Cir. 2007) ................................................................... 33

*Kingdomware Tech., Inc. v. United States*, 579 U.S. 162 (2016) ................................... 34

*Kinscherff v. United States*, 586 F.2d 159 (10th Cir. 1978) ..................................... 20, 22

*Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1 (1984) ..................................... 37

*Koclanakis v. Merrimack Mut. Fire Ins.*, 899 F.2d 673 (7th Cir. 1990) ...................... 18

*Leo Sheep Co. v. United States*, 440 U.S. 668 (1979) ................................................ 28

*Lyon v. Gila River Indian Cmty.*, 626 F.3d 1059 (9th Cir. 2010) .............................. 22, 30, 31, 42

*Marx v. Gen. Revenue Corp.*, 568 U.S. 371 (2013) .................................................... 38

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ................... 18

*McFarland v. Kempthorne*, 545 F.3d 1106 (9th Cir. 2008) ........................................ 19

*Me. Cmty. Health Options v. United States*, 590 U.S. 296 (2020) ............................ 34

*Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982) ......................................... 21

*Montana v. United States*, 450 U.S. 544 (1981) .................................................. 10, 13, 23, 42

*Oregon Dep't of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. 753 (1985) ........ 33

*Organized Village of Kake v. Egan*, 369 U.S. 60 ..................................................... 10

*Pollard v. Johnson*, No. 23-cv-135-wmc, ECF Nos. 46-1 to 46-4 ......................... 16, 17

*Pulsifer v. United States*, 601 U.S. 124 (2024) ........................................................ 38

*Sarnoff v. Am. Home Prods. Corp.*, 798 F.2d 1075 (7th Cir. 1986) ........................... 24

*Solem v. Bartlett*, 465 U.S. 463 (1984) .................................................................. 32

*Stein v. Kaiser Found. Health Plan, Inc.*, 115 F.4th 1244 (4th Cir. 2024) .................. 24

*Superior Oil Co. v. United States*, 353 F.2d 34 (9th Cir. 1965) .............................. 19, 20

*United States v. Dunn*, 478 F.2d 443 (9th Cir. 1973) ....................................... 22, 28, 31

*United States v. Jenks*, 129 F.3d 1348 (10th Cir. 1997) ........................................ 31

*United States v. Miller*, 317 U.S. 369 (1943) .......................................................... 37

*United States v. Montana*, 604 F.2d 1162 (9th Cir. 1979) ...................................... 25

*United States v. Reader's Digest Ass'n*, 662 F.2d 955 (3d Cir. 1981) ........................ 18

*United States v. Santa Fe Pac. R.R.*, 314 U.S. 339 (1941) ...................................... 25

*United States v. Santee Sioux Tribe of Neb.*, 324 F.3d 607 (8th Cir. 2003) .............. 44

*United States v. Segura*, 747 F.3d 323 (5th Cir. 2014) ............................................ 24

*United States v. Stuart*, 489 U.S. 353 (1989) ........................................................... 33

*United States v. Town of Lac du Flambeau*, No. 23-cv-355-wmc,
2024 WL 4297671 (W.D. Wis. Sept. 26, 2024) .................................................. 7, 15, 23, 30, 31

*Utah v. Andrus*, 486 F. Supp. 995 (D. Utah 1979) ....................................................... 22

*Wimberly v. Lake Weir Yacht Club Ass'n*, 480 So.2d 224 (Fla. Ct. App. 1985) ......................... 32

*Wis. Winnebago Bus. Comm. v. Koberstein*, 762 F.2d 613 (7th Cir. 1985) ................................ 41

**Statutes**

1933 Unemployment Relief Act ........................................................................ 8, 33, 35, 36

24 Stat. 388, as amended, 25 U.S.C. § 331 *et seq.,* (1887) ........................................... 9

34 Stat. 182, ch. 2348 (1906), codified at 25 U.S.C. § 349 ........................................ 10

Act of Feb. 3, 1903, ch. 399, 32 Stat. 795 .......................................................... *passim*

Act of July 27, 1866, 14 Stat. 294 ..................................................................... 25

Burke Act ........................................................................................... 10

General Allotment Act (also known as the Dawes Act) in 1887 ............... 9, 10, 13, 14, 20, 26, 30

Homestead Act ...................................................................................... 30

Indian Nonintercourse Act ................................................................ 14, 38, 40, 44, 45

Indian Reorganization Act, 48 Stat. 984, at 25 U.S.C. § 461 *et seq.* .................................... *passim*

Indian Right-of-Way Act (1948) ..................................................................... *passim*

**Other Authorities**

*Allotment Information for Midwest BIA Region*, Indian Land Tenure Foundation,
https://iltf.org/wp-content/uploads/2017/01/midwest_Page_3.jpg
(last accessed Aug. 20, 2024) ................................................................. 13

Ann. Rep. of the Commissioner of Indian Affairs, for the year 1904, Part I, at 57, available at
https://search.library.wisc.edu/digital/A4NNDRS3POJH3X8G
(last accessed Aug. 20, 2024) ................................................................. 12

Cohen's Handbook of Federal Indian Law ................................................................ 24

*History of Indian Land Consolidation*, U.S. Dep't of the Interior ("DOI"), BIA,
https://www.bia.gov/bia/history/history-indian-land-consolidation
(last accessed Aug. 21, 2024) ................................................................. 11

*Lac du Flambeau Band of Lake Superior Chippewa*, Wis. Dep't of Pub. Instruction,
https://dpi.wi.gov/amind/tribalnationswi/ldf (last accessed Aug. 30, 2024) ...................... 9, 14

*Message from the President of the United States Transmitting Letter of the Secretary of the
Interior Relative to the Right of Way for Railroads Through Indian Lands*,
Exec. Doc. No. 40, at 3 (1888) .............................................................. 37

POWELL ON REAL PROPERTY ¶ 410 (1979) .......................................................... 26, 28

Report of the Secretary of Interior for Fiscal Year Ending June 30, 1887, vol. II, at 4-5,
    https://babel.hathitrust.org/cgi/pt?id=uc1.l0063764468&seq=7
    (last accessed Aug. 20, 2024) ................................................................................... 11

**Rules**

Fed. R. Civ. P. 56 .................................................................................................... 18

**Treatises**

Treaty with the Chippewas, 10 Stat. 1109 (Sept. 30, 1854) ................................................... *passim*

Treaty with the Seminoles, 14 Stat. 755 (1866) .......................................................... 40

## INTRODUCTION

The Intervenor Defendant Homeowners (the "Homeowners")[1] submit this Brief in support of their Motion for Summary Judgment on their easement counterclaims brought against the United States of America ("USA" or "government"). The Homeowners all own parcels of property, located within the Lac du Flambeau Reservation (the "Reservation"), in fee simple pursuant to valid federal patents.[2] The Homeowners can access their property only by traveling on public and private roads that partly traverse Reservation lands within the Town of Lac du Flambeau (the "Town"). The four roads at issue are Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane, and Elsie Lake Lane (each, "Roadway," and collectively, the "Roadways"). The Roadways are partly on land that the USA holds in trust for the Band and in restricted-fee status for seventy-six individual Indian landowners ("Allottees").

As the Court has recognized, this case is about the Lac du Flambeau Band of Lake Superior Chippewa Indians (the "Band" or "Tribe") attempting to exercise power "to prevent non-Indian owners access to their property on the Reservation." *United States v. Town of Lac du Flambeau*, No. 23-cv-355-wmc, 2024 WL 4297671, at *1 (W.D. Wis. Sept. 26, 2024). As explained more fully below, the U.S. Supreme Court has held that tribes, which includes the Band, lack such power because of countervailing property rights of access to non-Indian fee lands in a reservation that resulted from allotment. *See Brendale v. Confederated Tribes & Bands of the Yakima Indian Nation*, 492 U.S. 408, 421-41 (1989).

---

[1] A list of Homeowners, who are the Intervenor Defendants and Counter Claimants, along with the parcels of property they own, is Exhibit 1 (ECF No. 91-1) to the Aug. 30, 2024 Declaration of B. Hubing (ECF No. 91).

[2] *See* Decl. of Knight Barry Title Re: Annie Sunn Lane Properties, ¶¶ 1-7, Exs. 1 through 3; Decl. of Knight Barry Title Re: Center Sugarbush Lane Properties, ¶¶ 1-7, Exs. 1 through 5; Decl. of Knight Barry Title Re: East Ross Allen Lake Lane Properties, ¶¶ 1-7, Exs. 1 through 7; Decl. of Knight Barry Title Re: Elsie Lake Lane Properties, ¶¶ 1-7, Exs. 1 through 5; Declaration of David G. Peterson, ¶¶ 1-3, Exs. 1 & 2 (hereinafter, collectively as the "Patents").

The Homeowners in this case possess one of the most important property rights in the bundle of rights afforded property owners under American jurisprudence, that is, the right to freely access their homes and properties. The Homeowners have easements both by implication and by necessity to use the portions of the Roadways lying on trust or restricted fee lands that are the subject matter of this litigation for ingress and egress to their respective homes and properties. As explained below, the Homeowners' rights to use the Roadways further exist because the allottees here expressly agreed with the USA, pursuant to the 1933 Unemployment Relief Act, to the opening and establishment of all "necessary roadways" in exchange for the creation of such roadways and "the benefits to accrue therefrom to [the] Reservation and lands … without any further compensation therefor."

For these reasons, the Homeowners respectfully request that the Court enter an order, in recordable form, declaring that the Homeowners hold valid and enforceable easements for ingress and egress between their respective parcels and a public road, including over the Roadways that run with the land, and that the Roadways shall accordingly be kept permanently open for use by the Homeowners, their families, friends, invitees, guests and visitors, and allowing the Town to maintain the Roadways for travel in a manner consistent with town roads. In addition, although the USA's trespass and ejectment claims in its Amended Complaint (ECF No. 61) are pleaded only against the Town, those two claims fail as a matter of law as against the Homeowners if the Court grants summary judgment to the Homeowners; thus, the Homeowners further respectfully request that the Court enter summary judgment dismissing the USA's ejectment claim and declaring the Homeowners have not trespassed on the land at issue in this case.

## FACTS

A.   THE CREATION OF A CHECKBOARD RESERVATION UNDER THE CONGRESSIONAL ALLOTMENT ACTS

The Reservation was established in 1854. (Treaty with the Chippewas, 10 Stat. 1109 (Sept. 30, 1854) (the "Treaty of 1854" or "1854 Treaty"); *see* USA Answer to Homeowners' Am. Countercl. ¶ 59, ECF No. 67.) The Reservation became what is known as a "checkerboard" reservation as a result of the Treaty of 1854 as well as the Act of Feb. 3, 1903, ch. 399, 32 Stat. 795 (the "1903 Allotment Act"). (Answer ¶¶ 60-62.) This is because there are many parcels of land owned in fee simple by non-tribal members, including the Homeowners and their fee lands, within the outer boundaries of the Reservation, resembling a checkerboard. (*Lac du Flambeau Band of Lake Superior Chippewa*, Wis. Dep't of Pub. Instruction, https://dpi.wi.gov/amind/tribalnationswi/ldf (last accessed Aug. 30, 2024) ("[The Reservation] is a checkerboard reservation.").)

Similar to the Treaty of 1854 and 1903 Allotment Act, various other allotment acts created other "checkerboard" reservations across the country. *See* 24 Stat. 388, as amended, 25 U.S.C. § 331 *et seq.,* (1887); *Brendale*, 492 U.S. at 415, 436-37 (describing allotment and its effects). Most notably, Congress passed the General Allotment Act (also known as the Dawes Act) in 1887. "Under the Dawes Act, the President was authorized to allot reservation lands in severalty to resident Indians. Allotted lands were held in trust for members of the Tribe for a period of at least 25 years, after which the members received fee patents and could freely transfer the land to nonmembers." *Brendale*, 492 U.S. at 436. The purpose of allotment was clear: "When all the lands had been allotted and the trusts expired, the reservation could be abolished. . . . the Dawes Act was designed ultimately to abolish Indian reservations" *Id.* (quotation marks and citation omitted).

In 1906, Congress passed the Burke Act which, in part, amended the Dawes Act of 1887. The Burke Act allowed the Secretary of the Interior "at any time" to issue fee patents to tribal member allottees resulting in the "remov[al]" of "all restrictions as to sale, incumbance, or taxation of said land." 34 Stat. 182, ch. 2348 (1906), codified at 25 U.S.C. § 349.

The avowed purpose of these various allotment acts of Congress was to destroy tribal governments, to integrate reservations in the United States with Indians and non-Indians alike, and thereby generally assimilate Indians into non-Indian culture.[3] *See Montana v. United States*, 450 U.S. 544, 559 n.9 (1981). As stated in *Montana*:

> The policy of the [Allotment] Acts was the eventual assimilation of the Indian population, *Organized Village of Kake v. Egan*, 369 U.S. 60, 72, and the "gradual extinction of Indian reservations and Indian titles." *Draper v. United States*, 164 U.S. 240, 246. The Secretary of the Interior and the Commissioner of Indian Affairs repeatedly emphasized that the allotment policy was designed to eventually eliminate tribal relations. And throughout the congressional debates on the subject of allotment, it was assumed that the "civilization" of the Indian population was to be accomplished, in part, by the dissolution of tribal relations.
>
> There is simply no suggestion in the legislative history that Congress intended that the non-Indians who would settle upon alienated allotted lands would be subject to tribal regulatory authority. Indeed, throughout the congressional debates, allotment of Indian land was consistently equated with the dissolution of tribal affairs and jurisdiction. *It defies common sense to suppose that Congress would intend that non-Indians purchasing allotted lands would become subject to tribal jurisdiction when an avowed purpose of the allotment policy was the ultimate destruction of tribal government. And it is hardly likely that Congress could have imagined that the purpose of peaceful assimilation could be advanced if fee-holders could be excluded from fishing or hunting on their acquired property.*

---

[3] The Homeowners are certainly sympathetic to arguments that the policy decision of Congress that underlies and resulted in the Dawes Act, Article 3 of the 1854 Treaty, 1903 Allotment Act, and similar congressional allotment acts was unwise from a multicultural and political standpoint. But the present issue is one of law — not policy wisdom in retrospect — that requires acknowledging Congress's intent of the various allotment acts and the implicit and necessary grants of access to former reserved lands that were ultimately alienated, divided and sold as a result of such congressional acts.

*Id.* (emphasis added) (citations omitted).

Per the allotment acts, Indians were allotted parcels of land, and after a period of time or at the President's discretion, restrictions on those parcels were lifted and the land was able to be freely sold in fee to non-Indians. *See Brendale*, 492 U.S. at 436; Treaty of 1854, art. 3; 1903 Allotment Act. After allotment of parcels to all eligible tribal members, leftover "surplus" reservation land was available for sale to non-tribal members. *History of Indian Land Consolidation*, U.S. Dep't of the Interior ("DOI"), BIA, https://www.bia.gov/bia/history/history-indian-land-consolidation (last accessed Aug. 21, 2024).

In 1887, the Lac du Flambeau Tribe was recognized as being particularly ready for allotment and generally favorable to the idea:

> The President has wisely ordered that allotments be made only on reservations where the Indians are known to be generally favorable to the idea, and the following have thus far been selected: Papago and Pima (Salt river), Arizona; L'Anse and Vieux de Sert, Michigan; Lac Court d'Oreilles, Bad River, Red Cliff, and Lac du Flambeau, Wisconsin; ….

Report of the Secretary of Interior for Fiscal Year Ending June 30, 1887, vol. II, at 4-5, https://babel.hathitrust.org/cgi/pt?id=uc1.l0063764468&seq=7 (last accessed Aug. 20, 2024).

In fact, the Treaty of 1854 specifically allowed allotment of the Band's land on the Reservation, and further expressly required that "all necessary roads" "shall have the right of way" across any reserved tracts:

> ARTICLE 3. The United States will define the boundaries of the reserved tracts, whenever it may be necessary, by actual survey, and the President may, from time to time, at his discretion, cause the whole to be surveyed, *and may assign to each head of a family or single person over twenty-one years of age, eighty acres of land for his or their separate use: and he may, at his discretion, as fast as the occupants become capable of transacting their own affairs, issue patents therefor to such occupants, with such restrictions of the power of alienation as he may see fit to impose.* And he may also, at his discretion, make rules and regulations, respecting the

> disposition of the lands in case of the death of the head of a family, or single person occupying the same, or in case of its abandonment by them. And he may also assign other lands in exchange for mineral lands, if any such are found in the tracts herein set apart. And he may also make such changes in the boundaries of such reserved tracts or otherwise, as shall be necessary to prevent interference with any vested rights. *All necessary roads*, highways, and railroads, *the lines of which may run through any of the reserved tracts, shall have the right of way through the same,* compensation being made therefor as in other cases.

Treaty of 1854, art. 3 (emphasis added).

In 1903, Congress passed an allotment act specifically addressing allotment of the Band's land on the Reservation, making such additional allotments thereunder subject to the Treaty of 1854 and its express requirement of rights of way being reserved for "all necessary roads":

> SECTION 1. That with the consent of the Chippewa Indians of Lake Superior, located on the Lac Courte Oreille Reservation in the State of Wisconsin, to be obtained in such manner as the Secretary of the Interior may direct, the President may allot to each Indian now living and residing on said reservation and entitled to so reside, and who has not heretofore received an allotment not exceeding eighty acres of land, such allotments to be subject in all respects, except as to the age and condition of the allottee, to the provisions of the. third article of the treaty with the Chippewas of Lake Superior and the Mississippi, concluded September thirtieth, eighteen hundred and fifty-four.

> SEC. 2. That the provisions of section one of this Act shall also under same terms and conditions apply to the Chippewa Indians of Lake Superior located on the Lac du Flambeau Reservation in the State of Wisconsin.

1903 Allotment Act.

By 1904, there were already 115 allotments made on the Lac du Flambeau Reservation. Ann. Rep. of the Commissioner of Indian Affairs, for the year 1904, Part I, at 57, available at https://search.library.wisc.edu/digital/A4NNDRS3POJH3X8G (last accessed Aug. 20, 2024).

By the congressional allotment acts, and in accordance with the Treaty of 1854 and 1903 Allotment Act, 600 allotments had been made on the Reservation by 1935, totaling 42,532 acres

of land, with 15,345 acres alienated (i.e. sold in fee simple) to non-Indians. *See Allotment*

*Information for Midwest BIA Region*, Indian Land Tenure Foundation, https://iltf.org/wp-

content/uploads/2017/01/midwest_Page_3.jpg (last accessed Aug. 20, 2024).

In the 1930s, the allotment policy was recognized as a failure, and its purpose was

disclaimed by the 1934 Indian Reorganization Act:

> The policy of allotment and sale of surplus reservation land was, of course, repudiated in 1934 by the Indian Reorganization Act, 48 Stat. 984, at 25 U.S.C. § 461 *et seq. But what is relevant in this case is the effect of the land alienation occasioned by that policy on Indian treaty rights* tied to Indian use and occupation of reservation land.

*Montana* 450 U.S. at 559 n.9 (emphasis added). As further stated in *Brendale* by Justice White

and Justice Stevens, respectively:

> The Yakima Nation argues that we should not consider the Allotment Act because it was repudiated in 1934 by the Indian Reorganization Act. But the Court in *Montana* was well aware of the change in Indian policy engendered by the Indian Reorganization Act and concluded that this fact was *irrelevant*. . . .
>
> * * * *
>
> [I]n 1934, the Indian Reorganization Act, 48 Stat. 984, repudiated the allotment policy. In the interim, however, large portions of reservation lands were conveyed to nonmembers such as petitioners Wilkinson and Brendale. [FN 1:] About 90 million acres of tribal land were alienated through allotment and sale of surplus lands by 1934, amounting to approximately two-thirds of the total land held by Indian tribes in 1887.

492 U.S. at 423, 436 (emphasis added) (citation omitted). Today it is widely acknowledged that

bands and tribes across the country had their land improperly taken from them by the USA as a

result of the Dawes Act and Congressional allotment acts in general.

But neither the Indian Reorganization Act of 1934 nor any other congressional acts, such as the Indian Nonintercourse Act[4] and the Indian Right-of-Way Act (1948), took back title to the alienated lands that became owned in fee simple by non-tribal members in reservations. *See Brendale*, 492 U.S. at 423; *id*. at 436-37 & n.1. Accordingly, ownership of fee simple lands within reservations stemming from the Dawes Act or Article 3 of the 1854 Treaty and 1903 Allotment Act continued unabated. *See id*.

According to the Wisconsin Department of Public Instruction, the Lac du Flambeau Reservation is 86,600 acres (or 135 square miles) comprising 57,935 acres of Tribal or Allottees land (66.9%) and 28,665 acres of alienated fee land (33.1%). *Lac du Flambeau Band of Lake Superior Chippewa*, Wis. Dep't of Pub. Instruction, *supra*.

B.   HISTORY OF LANDS ALLOTTED AND SOLD TO THE HOMEOWNERS

The Homeowners own lands in fee simple, where their homes are located, within the boundaries of the Band's Reservation.[5] The Roadways provide the only roadway access to and from all the Homeowners' homes and properties. (*See* Decl. of K. Wyse, Exs. 1 through 7; 8/27/2024 Baird Decl. ¶ 5; 8/27/2024 Kilger Decl. ¶ 5; 8/27/2024 D. Pearson Decl. ¶ 5;

---

[4] The "Indian Nonintercourse Act" is a collective term for six statutes passed in 1790, 1793, 1796, 1799, 1802, and 1834. USA appears to rely on the 1834 law, codified at 25 U.S.C. § 177, for the USA's incorrect assertion of congressional intent partly at issue in this Motion. (*See* 8/30/2024 Hubing Decl., Ex. 2, pp. 17-19, 7/12/2024 USA's Resp. to Homeowners' Interrog. Nos. 10 & 11.)

[5] Decl. of Knight Barry Title Re: Annie Sunn Lane Properties, ¶¶ 1-7, Exs. 1 through 3; Decl. of Knight Barry Title Re: Center Sugarbush Lane Properties, ¶¶ 1-7, Exs. 1 through 5; Decl. of Knight Barry Title Re: East Ross Allen Lake Lane Properties, ¶¶ 1-7, Exs. 1 through 7; Decl. of Knight Barry Title Re: Elsie Lake Lane Properties, ¶¶ 1-7, Exs. 1 through 5; Aug. 2024 Homeowner Declarations of James Baird ("8/27/2024 Baird Decl." (ECF No. 93)) ¶¶ 1-4, Julie Kilger ("8/27/2024 Kilger Decl." (ECF No. 94)) ¶¶ 1-4, Dennis Pearson ("8/27/2024 D. Pearson Decl." (ECF No. 95)) ¶¶ 1-4, Sally Fermanich ("8/28/2024 Fermanich Decl." (ECF No. 96)) ¶¶ 1-4, Donald Pollard ("8/28/2024 D. Pollard Decl." (ECF No. 97)) ¶¶ 1-4, Mary Possin ("8/28/2024 M. Possin Decl." (ECF No. 98)) ¶¶ 1-4, John Spanton ("8/28/2024 J. Spanton Decl." (ECF No. 99)) ¶¶ 1-4, Julie Walsh ("8/28/2024 Walsh Decl." (ECF No. 106)) ¶¶ 1-4, Pamela Kester ("8/30/2024 Kester Decl." (ECF No. 101)) ¶¶ 1-4, Martha Hunt ("8/31/2024 M. Hunt Decl." (ECF No. 102)) ¶¶ 1-4, Joseph Hunt ("8/31/2024 J. Hunt Decl." (ECF No. 103)) ¶¶ 1-4; 8/30/2024 Hubing Decl., ¶¶ 3, 6, Exs. 1 & 4; USA's Answer to Homeowners' Am. Countercl., ECF No. 67, ("Answer"), ¶ 57.

8/28/2024 Fermanich Decl. ¶ 5; 8/28/2024 D. Pollard Decl. ¶ 5; 8/28/2024 M. Possin Decl. ¶ 5; 8/28/2024 J. Spanton Decl. ¶ 5; 8/28/2024 Walsh Decl. ¶ 5; 8/30/2024 Kester Decl. ¶ 5; 8/31/2024 M. Hunt Decl. ¶ 5; 8/31/2024 J. Hunt Decl. ¶ 5.)[6]

When the Homeowners took title to their respective properties, they did so without notice of the rights-of-way issue for their respective Roadway about which the USA has sued the Town.[7] The express rights-of-way that the USA points to in its trespass and ejectment claims against the Town were never recorded in the Register of Deeds office for Vilas County or any other searchable recording system available to the public that would have provided notice to the Homeowners of the express rights-of-way's existence or alleged expiration.[8]   Therefore, the Homeowners are also bona fide purchasers for value.

The Roadways were built more than fifty years ago. (ECF No. 109 ¶ 102; *see* ECF No. 97-1, 8/28/2024 D. Pollard Decl., Ex. A, 3/6/2023 D. Pollard Decl. ("3/6/2023 D. Pollard Decl.") ¶ 17.) The total length of the roadways at issue regarding the four Roadways is just over 1.3 miles. (ECF Nos. 91-7 through 91-10, 8/30/2024 Hubing Decl. Exs. 7, 8, 9, & 10, K. Roy, BLM Indian Land Surveyor, BIA Midwest Region, maps of Roadways and surrounding lands at issue.) Details regarding the history of each of the Roadways is provided in the Homeowners' Proposed Findings of Fact, filed herewith.

---

[6] The Homeowners previously indicated that one of their properties had access without the need to cross trust or restricted fee land. *See* ECF No. 89 at 23; *Town of Lac du Flambeau*, 2024 WL 4297671, at *2 n.4. But since then, the Homeowners have discovered that the family cannot access their property without use of Elsie Lake Lane. (Suppl. B. Hubing Decl., ¶ 3, Exs. A & B.)

[7] Decl. of Knight Barry Title Re: Annie Sunn Lane Properties ¶ 8; Decl. of Knight Barry Title Re: Center Sugarbush Lane Properties ¶ 8; Decl. of Knight Barry Title Re: East Ross Allen Lake Lane Properties ¶ 8; Decl. of Knight Barry Title Re: Elsie Lake Lane Properties ¶ 8; 8/27/2024 Baird Decl. ¶ 6; 8/27/2024 Kilger Decl. ¶ 6; 8/27/2024 D. Pearson Decl. ¶ 6; 8/28/2024 Fermanich Decl. ¶ 6; 8/28/2024 D. Pollard Decl. ¶ 6; 8/28/2024 M. Possin Decl. ¶ 6; 8/28/2024 J. Spanton Decl. ¶ 6; 8/28/2024 Walsh Decl. ¶ 6; 8/30/2024 Kester Decl. ¶ 6; 8/31/2024 M. Hunt Decl. ¶ 6; 8/31/2024 J. Hunt Decl. ¶ 6.

[8] Decl. of Knight Barry Title Re: Annie Sunn Lane Properties ¶ 8; Decl. of Knight Barry Title Re: Center Sugarbush Lane Properties ¶ 8; Decl. of Knight Barry Title Re: East Ross Allen Lake Lane Properties ¶ 8; Decl. of Knight Barry Title Re: Elsie Lake Lane Properties ¶ 8.

C.      THE BAND'S REFUSAL TO CONSENT TO BIA-ISSUED RIGHTS-OF-WAY
        RENDERED THE RIGHT OF WAY APPLICATION PROCESS UNDER THE
        ROW ACT FUTILE AND UNAVAILABLE TO THE HOMEOWNERS

Around 2013, the issue regarding the alleged expiration of the express Right of Ways

("ROW") for the Roadways started to become known to non-tribal members when the Band

delivered letters to certain landowners. (*See Pollard v. Johnson*, No. 23-cv-135-wmc, ECF Nos.

46-1 to 46-4.) The Town Board told residents that the Town would take care of communicating

with the BIA regarding the Six ROWs and asked that no one individually pursue renewed

ROWs. (8/30/2024 Hubing Decl. ¶ 18, Ex. 19 (1/2/2014 Letter from Town Board to Residents).)

The Town and the Band began negotiating, and the Band reassured residents that "the Tribe will

not deny any resident of Lac du Flambeau access to their home, nor will any 'fee' be imposed on

residents." (8/30/2024 Hubing Decl. ¶ 7, Ex. 5 (Tribal Roads Announcement press release from

Tribal Council).) After negotiations between the Town and the Band broke down, the

Homeowners applied for new rights of way, pursuant to the procedures set forth in the ROW

Act[9] and implementing regulations. (ECF No. 91-14, 8/30/2024 Hubing Decl. Ex. 14, Town's

Resp. to USA's Interrog. No. 6.) The Band was initially cooperative in these efforts by the

Homeowners.

The ROW applications under the ROW Act and its regulations proceeded slowly, and

eventually came to a halt due to the Band withholding its consent for the rights-of-way under the

ROW Act and its regulations. (Homeowners' Am. Countercl., ECF No. 62, ¶¶ 158-185;

8/30/2024 Hubing Decl. Ex. 6.) The BIA Appraisals in 2022 determined that the fair market

value to renew all of the Roadways' ROWs for 50-year terms was $79,000. (ECF Nos. 51, 52,

---

[9] Indian Rights-of-Way Act of 1948, 25 U.S.C. §§ 323-28 (the "ROW Act").

53, 54, 55, 56, 57.)[10] But the Band demanded $10,000,000 for renewals, and then increased it to $20,000,000. (ECF No. 91-17, 8/30/2024 Hubing Decl. Ex. 17.) The Band in late 2023 stated that it will never approve new long-term ROWs for the Roadways under *any* statutory or regulatory scheme, including the ROW Act. (*See* ECF No. 91-6, 8/30/2024 Hubing Decl. ¶ 8, Ex. 6 (12/1/2023 Letter from Band President John Johnson, Sr., to Chairman of the Town Matt Gaulke ("[The Band] will not approve any new long-term easements over Access Roads.").) The ROW application process under the ROW Act and its implementing regulations is therefore futile and unavailable to the Homeowners.

Soon after the Band admitted it will never approve any new long-term easements over the Roadways, the Band excluded many of the Homeowners from their fee lands by barricading the Roadways for approximately six-weeks, from the end of January 2023 through mid-March 2023.[11] (*See, e.g.*, ECF No. 105-1, 3/6/2023 D. Pollard Decl. ¶¶ 10-11; ECF No. 101-1, 3/4/2023 P. Kester Decl. ¶ 8; ECF Nos. 91-15 & 91-16, 8/30/2024 Hubing Decl. Exs. 15 & 16.) In 2025, the Band will very likely again attempt to exclude the Homeowners from their fee lands within the exterior boundaries of the Reservation. (*See* ECF No. 122-1.) The USA's ejectment claim on behalf of the Tribe is intended to "obliterate" the Roadways in order to exclude the Homeowners from their homes and properties. (*See* Suppl. B. Hubing Decl., ¶ 8, Ex. G.)

The Homeowners thus have no other viable option than to pursue permanent access through judicial recognition of their easement rights to access their homes and properties.

---

[10] BIA appraisals in 2014 concluded that a new 50-year right-of-way over East Ross Allen Lane was valued at $500 and renewals for 50-year rights-of-way for Center Sugarbush Lane and Annie Sunn Lane were valued at $3,300 and $4,400, respectively. (Suppl. B. Hubing Decl., ¶¶ 4-7, Exs. C through F.)

[11] (3/6/2023 D. Pollard Decl. ¶ 8, 3/6/2023 R. Pearson Decl. ¶ 6; 3/6/2023 J. Kilger Decl. ¶ 5; 3/6/2023 J. Spanton Decl. ¶ 6; 8/30/2024 Kester Decl., Ex. A, 3/4/2023 P. Kester Decl. ("3/4/2023 P. Kester Decl.") ¶ 6; *Pollard v. Johnson,* No. 23-cv-135-wmc, 3/6/2023 Decl. of B. Hubing, Exs. E-H, ECF Nos. 12-5 through 12-8 (photos of barricaded Roadways).)

**LEGAL STANDARD**

"Summary judgment is appropriate when [the movant shows] 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Flexible Steel Lacing Co. v. Conveyor Accessories, Inc.*, 955 F.3d 632, 643 (7th Cir. 2020) (quoting Fed. R. Civ. P. 56 (a)). "A genuine dispute of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,'" and a court must "consider all of the evidence in the record in the light most favorable to the non-moving party," and "draw all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018) (first quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); and then quoting *Feliberty v. Kemper Corp.*, 98 F.3d 274, 276-77 (7th Cir. 1996)); *see also Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 457 (7th Cir. 2020). "Mere 'metaphysical doubt as to the material facts' is not enough," *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)), and the defendants "cannot rest on mere unsupported denials" to stave off summary judgment. *Koclanakis v. Merrimack Mut. Fire Ins.*, 899 F.2d 673, 675 (7th Cir. 1990).

The Homeowners asserted three claims in their Amended Counterclaims (ECF No. 62): Easement by Necessity; Implied Easement; and Declaratory Judgment. As set forth in more detail below, the Court should enter summary judgment for the Homeowners. The material facts are not genuinely disputed regarding the Homeowners. Because the issues here are legal in nature and there is no genuine evidentiary dispute between the USA and Homeowners, the Court should render a decision on summary judgment as to the Homeowners' counterclaims. Fed. R. Civ. P 56 (a); *see United States v. Reader's Digest Ass'n*, 662 F.2d 955, 960-61 (3d Cir. 1981).

**ARGUMENT**

As explained below, the Homeowners all have easements over the Roadways, both implied and by necessity, to freely access their homes. Neither the USA nor the Tribe genuinely dispute the Tribe's intention and efforts to exclude the Homeowners from their homes and properties and take back their land.[12] But the Homeowners have longstanding property rights in the form of rights-of-way to access their homes, irrespective of the Tribe's refusal to consent to express new rights-of-way under the inapplicable ROW Act and its implementing regulations. The United States has waived sovereign immunity by filing this lawsuit for the benefit of the Band, seeking resolution of all interests and claims regarding the Roadways. The Court should grant summary judgment for the Homeowners for the reasons set forth below.

## I.   THE COURT SHOULD DECLARE THAT THE HOMEOWNERS HAVE IMPLIED EASEMENTS

The Homeowners have implied easements to use the Roadways to access their homes and properties under federal common law.[13] An implied easement exists "if Congress intended to grant an easement for access." *Fitzgerald v. United States,* 932 F. Supp. 1195, 1203 (D. Ariz. 1996). In other words, courts "recognize[] an implied right of access to the extent it can be gleaned from the congressional intent underlying the land grant." *Brendale v. Olney*, No. C-78-145, at 6 (E.D. Wash. Mar. 3, 1981) (Mem. Decision & Judgment), ECF No. 91-3, Ex. 3 to

---

[12] Indeed, the Tribe's President has testified before the State of Wisconsin Division of Hearings and Appeals indisputably indicating that the Tribe's strategy to exclude the Homeowners from their fee lands here is part of an effort to take back former reservation lands. (ECF No. 15-1, Ex. A to Decl. of D. Peterson, *Anderson v. Newland*, No. 23-cv-777-wmc (W.D. Wis.), President John Johnson Sr.'s testimony in DHA Case No. DNR-23-0001 & DNR Case No. 22-045, at 51:17-52:1; 52:5-53:17.)

[13] Federal common law applies to easement claims over tribal trust or restricted fee land. *McFarland v. Kempthorne*, 545 F.3d 1106, 1110 (9th Cir. 2008) (citing *Superior Oil Co. v. United States*, 353 F.2d 34, 37 n.4 (9th Cir. 1965)); *Confederated Salish & Kootenai Tribes v. Namen*, 380 F. Supp. 452, 466 (D. Mont. 1974) ("Where the United States holds title in trust for Indian Tribes, federal common law is applicable …."); *Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 965 (10th Cir. 2019) ("When a dispute arises over possessory rights in Indian allotted land, federal law governs."); *Fitzgerald v. United States,* 932 F. Supp. 1195, 1203 (D. Ariz. 1996).

8/30/2024 Hubing Decl. (citing *Kinscherff v. United States*, 586 F.2d 159, 161 (10th Cir. 1978); *Superior Oil Co. v. United States*, 353 F.2d 34, 36 (9th Cir. 1965)). Such congressional intent exists here for the Homeowners' land, just as the Court found it existed in *Brendale*.

The Homeowners' parcels all are included in the land set aside by the Treaty of 1854.[14] Subsequently, under the Treaty of 1854 and 1903 Allotment Act, Reservation land was split up into hundreds of allotments and conveyed to tribal members by way of federal patents, allowing allottees to freely alienate their lands by selling parcels in fee simple to non-Band members. (*See* Answer ¶¶ 61, 333; *supra*, Patents, n.2.) Eventually, the relevant lands (now owned by the Homeowners) were sold to a developer, who further divided the allotted land and conveyed title to the vacant lots to the Homeowners or their predecessors-in-interest. All the parcels sold to the Homeowners are situated within the boundaries of the Reservation and accessible by road only via the Roadways which partly lie upon tribal trust or restricted fee lands.[15]

When the Senate ratified the 1854 Treaty and Congress enacted the 1903 Allotment Act, like the Dawes Act, Congress "authorize[d] the sale of a parcel of land in a reservation," which the Supreme Court has expressly concluded "must" mean that Congress ***implicitly grant[ed] the purchaser access to that property***." *Brendale*, 492 U.S. at 437 (Stevens, J., concurring) (emphasis added); *id.* at 424 (White, J., plurality). The reason: "Congress could not possibly have intended in enacting [a statute that authorizes the sale of a parcel of land in a reservation] that tribes would maintain the power to exclude bona fide purchasers of reservation land from

---

[14] Treaty with the Chippewas, 10 Stat. 1109 (1854); USA's Answer, ECF No. 67, ¶¶ 61, 333; *supra*, Patents, n.2.

[15] Homeowners' Answer to USA's Am. Compl. ("Homeowners' Answer"), ECF No. 66, ¶ 2; Answer ¶¶ 61, 333; 8/27/2024 Baird Decl. ¶¶ 1-5; 8/27/2024 Kilger Decl. ¶¶ 1-5; 8/27/2024 D. Pearson Decl. ¶¶ 1-5; 8/28/2024 Fermanich Decl. ¶¶ 1-5; 8/28/2024 D. Pollard Decl. ¶¶ 1-5; 8/28/2024 M. Possin Decl. ¶¶ 1-5; 8/28/2024 J. Spanton Decl. ¶¶ 1-5; 8/28/2024 Walsh Decl. ¶¶ 1-5; 8/30/2024 Kester Decl. ¶¶ 1-5; 8/31/2024 M. Hunt Decl. ¶¶ 1-4; 8/31/2024 J. Hunt Decl. ¶¶ 1-4; 8/30/2024 Hubing Decl., ¶¶ 3, 6, Exs. 1 & 4.

that property. . . ." *See Brendale*, 492 U.S. at 437, 441 (Stevens, J., concurring); *id.* at 423 (White, J., plurality); *see also Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 144 (1982) ("When a tribe grants a non-Indian the right to be on Indian land, the tribe agrees not to exercise its ultimate power to oust the non-Indian as long as the non-Indian complies with the initial conditions of entry.").

As stated by Justice Stevens: "***a statute* that authorizes the sale of a parcel of land in a reservation *must implicitly grant* the purchaser access to that property**." *Brendale*, 492 U.S. at 437 (Stevens, J., concurring) (emphasis added). Both the 1854 Treaty with the Chippewas and the 1903 Allotment Act "authorize[d] the sale of a parcel of land in a reservation." *See Brendale*, 492 U.S. at 437 (Stevens, J., concurring). Thus, the 1854 Treaty and 1903 Allotment Act "**must implicitly grant** the purchaser[s] [i.e., the Homeowners] access to th[eir] propert[ies]." *See Brendale*, 492 U.S. at 437 (Stevens, J., concurring); *see also Evans v. Shoshone-Bannock Land Use Policy Comm'n*, 736 F.3d 1298, 1304 n.6 (9th Cir. 2013) ("[T]he transfer of tribal land to nonmembers '**must implicitly grant the purchaser access to that property**.'" (emphasis added) (quoting *Brendale,* 492 U.S. at 437 (Stevens, J.))). And, as discussed in more depth further below, Article 3 of the 1854 Treaty only supports Justice Stevens' declaration that the Homeowners have a legal right to access their properties.

When examining the checkerboard reservation in *Brendale*, the Supreme Court recognized that Congress's intent was clear with respect to congressional allotment acts and accompanying "implicitly granted" access rights (i.e., implied easements). Six United States Supreme Court Justices all agreed on this point. *Brendale* held that it is inconceivable Congress did not impliedly grant access rights to non-Indians, like the Homeowners here, who possess plots surrounded entirely by trust or restricted fee Indian lands. *Brendale*, 492 U.S. at 436-37; *id.*

at 423-24. To hold otherwise would be to render useless not only Congress's intent of the assimilation of Indians with non-Indians, but also render useless all the Homeowners' parcels that derive from the 1854 Treaty and allotment acts. *See Kinscherff*, 586 F.2d at 161 ("The scope and extent of the right of access depends … upon what must, under the circumstances, be attributed to the grantor either by implication of intent or by operation of law founded in a public policy favoring land utilization."); *Lyon v. Gila River Indian Cmty.*, 626 F.3d 1059, 1073 (9th Cir. 2010) ("[T]he federal government must have intended some right of access to the land or the purpose of the land grants would fail."). As the District of Utah held in *Utah v. Andrus*, 486 F. Supp. 995, 1002 (D. Utah 1979):

> [T]he court must conclude that Congress intended that Utah (or its lessees) have access to the school lands [by crossing federal lands]. Unless a right of access is inferred, the very purpose of the school trust lands would fail. Without access [across federal land] the state could not develop the [school] trust lands in any fashion and they would become economically worthless. This Congress did not intend. Further, traditional property law concepts support Utah's claimed right of access. Under the common law it was assumed that a grantor intended to include in the conveyance whatever was necessary for the use and enjoyment of the land in question. When a grantor conveys only a portion of his land, and the land received by the grantee is surrounded by what the grantor has retained, it is generally held that the grantee has an easement of access, either by implication or necessity, across the grantor's land.

*Id.* (citing *United States v. Dunn*, 478 F.2d 443, 444 & n.2 (9th Cir. 1973)).

The congressional intent to provide access has never been overridden or rescinded. "Although the Indian Reorganization Act may have ended the allotment of further lands, **it did not restore to the Indians the exclusive use of those lands that had already passed to non-Indians or prevent already allotted lands for which fee patents were subsequently issued from thereafter passing to non-Indians**." *Brendale*, 492 U.S. at 423 (emphasis added) ("Justice STEVENS acknowledges that **the Allotment Act eliminated tribal authority to exclude**

**nonmembers from fee lands they owned** [within the exterior boundaries of the reservation]." (emphasis added)).[16]

Recently, in *Evans*, 736 F.3d 1298, the Ninth Circuit reiterated the *Brendale* Court's finding that "**the transfer of tribal land to nonmembers 'must implicitly grant the purchaser access to that property.'**" *Id.* at 1304 n.6 (emphasis added) (citing *Brendale,* 492 U.S. at 437 (Stevens, J.)). The Homeowners (and their predecessors) are such purchasers, whose land was accompanied by an implicit grant of access intended by Congress. *See Brendale*, 492 U.S. at 439. In fact, Justice Stevens in 1989 referred to Brendale's easement, which the Eastern District of Washington found to exist by implication or necessity, as "a right of access to his own property over BIA roads," and took no issue with the Eastern District of Washington's holding eight years earlier in *Brendale v. Olney*. *See id*. Thus, the Homeowners have implied easements for access over the Roadways.

The USA has admitted here that *Brendale*'s "**legal context is the Tribe's power to exclude**." (ECF No. 108 at 21 (emphasis added)). That is exactly what the Tribe seeks to do to the Homeowners here. (*Town of Lac du Flambeau*, 2024 WL 4297671, at *1 (the Tribe is "essentially seeking to establish the Tribe's right to prevent non-Indian owners access to their property on the Reservation")). But the Tribe cannot exclude the Homeowners, because as Justice Stevens stated: "As we recognized in *Montana v. United States,* '**treaty rights with respect to reservation lands must be read in light of the subsequent alienation of those lands.**' **A statute that authorizes the sale of a parcel of land in a reservation must implicitly**

---

[16] Similarly, the *Montana* Court concluded the Indian Reorganization Act of 1934 was not "relevant" when examining the effect of land alienation occasioned by the policy of allotment and sale of surplus reservation land. *Montana*, 450 U.S. at 559 n.9; *see Brendale*, 492 U.S. at 423.

**grant the purchaser access to that property**." *Brendale*, 492 U.S. at 436-37 (emphasis added) (citation omitted).

Second, the portions of *Brendale* that the Homeowners rely on are not dicta. Dicta "is a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding." *Sarnoff v. Am. Home Prods. Corp.*, 798 F.2d 1075, 1084 (7th Cir. 1986), *abrogated on other grounds by Hart v. Schering-Plough Corp.*, 253 F.3d 272 (7th Cir. 2001). "A statement is not dictum if it is necessary to the results or constitutes an explication of the governing rules of law." *United States v. Segura*, 747 F.3d 323, 328 (5th Cir. 2014). "Across the board, federal courts define dicta as aspects of an opinion not necessary to the determination of the legal questions presented." *Stein v. Kaiser Found. Health Plan, Inc.*, 115 F.4th 1244, 1250 (4th Cir. 2024) (Forrest, J., concurring).

In Justice Stevens' and Justice White's opinions (as shown, in part, by their back-and-forth in their opinions), establishing countervailing property rights possessed by non-Indian fee owners in a reservation was "necessary to the determination of the legal question[] presented," i.e., to what extent can tribes assert power or authority against non-Indian fee lands, and thus was foundational and not dicta. *See Stein*, 115 F.4th at 1250 (Forrest, J., concurring). Because the determination of landowners' implied grants of access to their fee lands in a reservation was a necessary foundation for the Court's analysis of that legal question and because "deleting" these judicial statements would thereby "seriously impair[] the analytical foundations of the holding," neither Justice Stevens' nor Justice White's statements are dicta. *See Sarnoff*, 798 F.2d at 1084.

A leading treatise on Indian law does not view Justice White's or Justice Steven's statements as "dicta." 1 Cohen's Handbook of Federal Indian Law § 4.01[2][e] (2023) states: "A tribe [is] not … permitted to exclude from fee lands within its reservation persons who hold valid

federal patents to such lands." *Id.* (citing *Brendale*, 492 U.S. at 424 (White, J., plurality); *United States v. Montana*, 604 F.2d 1162, 1167-169 (9th Cir. 1979), *rev'd on other grounds*, 450 U.S. 544 (1981)). Such "persons" *are the Homeowners*. *See supra*, Patents, n.2.

In addition, to the extent the USA cites *United States v. Santa Fe Pac. R.R.*, 314 U.S. 339, 354 (1941), such reliance is misguided. *Santa Fe* is inapplicable because the Homeowners do not seek or claim title to the lands on which the portions of the Roadways at issue lie; they do not seek to extinguish or claim to extinguish title; they seek only a right to cross such lands merely to access their landlocked fee lands in a reservation. Moreover, the historical context of the Hualapai and their ancestral lands at issue in *Santa Fe* is starkly contrasted by the Treaty of 1854, which expressly provided for allotments under Article 3. As the *Santa Fe* Court noted, "the Walapais did not accept the offer which Congress had tendered." 314 U.S. at 354. The forced abandonment of their ancestral home was not a 'voluntary cession' within the meaning of" section 2 of the Act of July 27, 1866, 14 Stat. 294, An Act granting Lands to aid in the Construction of a Railroad and Telegraph Lane from the States of Missouri and Arkansas to the Pacific Coast. *See* 314 U.S. at 355-56 (footnote omitted). *Santa Fe* is therefore inapplicable here, because under Article 3 of the Treaty of 1854, the Tribe expressly agreed to allotment.

Consistent with *Brendale* and the other applicable authorities cited herein, the Court should grant summary judgment to the Homeowners declaring their implied easements to freely access their homes and properties via the Roadways.

## II.   THE COURT SHOULD DECLARE THAT THE HOMEOWNERS HAVE EASEMENTS BY NECESSITY

An easement by necessity over trust or restricted fee land is found to exist when the following three elements are demonstrated: "First, there must originally have been unity of title in the dominant and servient tenements. Next, title must be severed by conveyance of one of the

parcels. Third, the easement must be necessary, both at the time of conveyance and at present, in order for the conveyor of the dominant tenement to use his land." *See Olney*, No. C-78-145, at 5-6 (citing 3 POWELL ON REAL PROPERTY ¶ 410 (1979); *see Brendale*, 492 U.S. at 439 (Justice Stevens referring to Brendale's easement established in *Olney* as "a right of access to his own property" and taking no issue with *Olney*'s holding)). There is no element of the conveyor's intent for an easement by necessity. *Id.*

The Court should enter summary judgment for the Homeowners on their easement by necessity claims because the three elements indisputably are satisfied here: there was originally unity of title in the dominant and servient tenements; title was severed by conveyance of the Homeowners' parcels; the easement is necessary now and was necessary at the time of conveyance.

First, the land composing the Reservation was originally held in its entirety in trust by the USA for the benefit of the Band. Treaty of 1854, art. 2; ECF No. 67, ¶ 333 ("The United States admits that, prior to allotment, all of the lands comprising the Reservation were under common ownership.").

Second, the Homeowners' parcels were severed from the original reservation land area set aside by the Treaty of 1854 as a result of allotments pursuant to Article 3 of the Treaty of 1854 and 1903 Allotment Act,[17] in similar manner to the land at issue in *Olney* and *Brendale*. (ECF No. 67, ¶ 333; *supra*, Patents, n.2.) When those allotments occurred here to the

---

[17] The USA affirmatively alleged that "[t]he Reservation was subject to allotment *under the Indian General Allotment Act, also known as the Dawes Act*." Town's Answer, ECF No. 64, ¶ 12 (emphasis added), and the USA admitted in its Amended Answer to the Homeowners' counterclaims that "that portions of the Reservation were allotted pursuant to the General Allotment Act," ECF No. 67, ¶ 61. But the USA seemed to try to walk back that admission. *See* ECF No. 108 at 12 n.2. While admissions in answers are formal judicial admissions, *see Banks v. Yokemick*, 214 F. Supp. 2d 401, 405 (S.D.N.Y. 2002), it is the fact that the Homeowners' parcels were severed from the Reservation by allotment and conveyance, not so much the source of that severance, that is relevant insofar as the Court's easement by necessity analysis.

Homeowners' predecessors in title, they were accompanied by a necessary right of access, per *Brendale*, to prevent the parcels from being landlocked and inaccessible.

Finally, here, just like in Philip Brendale's 1981 case in the Eastern District of Washington, there is no dispute that the only means of access to the allotted land has been and continues to be by use of the roads within the Reservation. This land is held in trust or restricted status by the United States Government and is regulated by the BIA. *Olney*, No. C-78-145, at 6.[18] Without use of the existing Roadways, the Homeowners cannot access a public roadway from their homes. (*See* 8/27/2024 Baird Decl. ¶ 5; 8/27/2024 Kilger Decl. ¶ 5; 8/27/2024 D. Pearson Decl. ¶ 5; 8/28/2024 Fermanich Decl. ¶ 5; 8/28/2024 D. Pollard Decl. ¶ 5; 8/28/2024 M. Possin Decl. ¶ 5; 8/28/2024 J. Spanton Decl. ¶ 5; 8/28/2024 Walsh Decl. ¶ 5; 8/30/2024 Kester Decl. ¶ 5.) The Homeowners have no other alternative available to them for access to their properties, and easements therefore are necessary.

The district court's conclusion in *Olney* that Mr. Brendale was entitled to an easement by necessity was noted several years later by the Supreme Court in *Brendale*. The Supreme Court did not cast any doubt on the district court's conclusion in *Olney*; on the contrary, the plurality and concurrence both concluded that Brendale has the property right of free access to his fee land within the boundaries of the Yakima Reservation, as the *Olney* district court decision established. *See Brendale*, 492 U.S. at 422-37. Here, in like manner to *Olney*, the Homeowners satisfy the three elements of easement by necessity to use the Roadways to access their homes free of barricades and free of any requirement that the Town or Homeowners have express rights-of-way under the ROW Act, or access permits from the Band, in order for the Homeowners to

---

[18] *See* Homeowners' Answer, ECF No. 66, ¶ 2; USA's Answer, ECF No. 67, ¶ 75.

"lawfully access their [homes]." (*See* 8/29/2024 Gaulke Decl. Ex. B, Tribal Resolution No. 143(23), at 2.)

The USA does not contest that the Homeowners satisfy all three elements of the easement by necessity claim; instead, the USA's sole defensive contention to the claim is that Congress "lack[ed] … intent" for an easement by necessity to be created through any authorities. (8/30/2024 Hubing Decl., Ex. 2, pp. 18-19, 7/12/2024 USA's Resp. to Homeowners' Interrog. No. 11.) But that contention is irrelevant because intent is not one of the three elements of a claim for an easement by necessity applied by federal courts under federal common law. *See Fitzgerald Living Tr. v. United States*, 460 F.3d 1259, 1266 (9th Cir. 2006) (analyzing the three elements of easement by necessity under 4 *Powell on Real Property* § 34.07 (2006), none of which is Congressional intent). *See also Leo Sheep Co. v. United States*, 440 U.S. 668, 679 n.14 (1979) (citing with affirmation 3 POWELL ON REAL PROPERTY ¶ 410 (1978) for elements of easement by necessity).

Thus, the USA effectively concedes that the Homeowners satisfy the elements of their easement by necessity claim. The *Olney* court found congressional intent to be irrelevant insofar as applying common law to Brendale's claim of easement by necessity over Yakima trust land. "[T]he doctrine of easement by necessity applies to lands held by the federal government." No. C-78-145, at 6 (citing *United States v. Dunn*, 478 F.2d 443, 444 n.2 (9th Cir. 1973)).[19] In other words, "Congress intended grants of allotted lands to include conveyance of customary common law rights of access." *Olney*, No. C-78-145, at 6 (citing *Namen*, 380 F. Supp. at 461, 466 ("federal common law principles" apply to Indian trust land and thus easements by necessity can

---

[19] "[E]ven where a true easement by necessity has not been applied on government land, the courts have recognized an implied right of access to the extent it can be gleaned from the congressional intent underlying the land grant." *Olney*, No. C-78-145, at 6. Here, Congress did imply a right of access, per the *Brendale* Court's conclusion on the matter. *Supra* § I.

exist over tribal land irrespective of Congress's intent because "[i]t was not necessary for Congress to specify every incident of ownership which accompanies a patent to lands on an Indian Reservation.")).

The district court's decision in *Olney* is particularly instructive. In *Olney*, non-Yakima member Philip Brendale owned in fee simple a 160-acre parcel of allotted land entirely within the checkerboard Yakima reservation. *Olney*, C-78-145, at 1-2. His property was originally allotted to his great aunt (a Yakima member) and later inherited by his mother who received a fee patent in 1963. He inherited the fee patent upon his mother's death in June 1972. *Id.* at 1-2.

Brendale's parcel was accessible only by road via closed roads in the Yakima Reservation. *Id.* Only enrolled Yakima members were allowed to access the roads. *Id.* at 1. After his inheriting the fee land in June 1972, Brendale continued to use the BIA-owned roads within the reservation without a permit. *Id.* at 2. The USA then sued him to stop him from doing so. *Id.* Brendale in turn then sued the USA, seeking in part a declaration that he has "common law easement rights appurtenant to [his] land" which is impaired by the roads' closure and the USA's assertion that he needs a permit to access his land. *Id.* at 2-3.

The court held that Brendale had an easement "over the closed BIA roads of the Yakima Reservation … which are reasonably necessary for access to his land." *Id.* at 6-7. "The right of access in issue … is a property interest in the form of an easement appurtenant to and accompanying the allotment of the land now owned by plaintiff." *Id.* at 3. Brendale's suit sought to establish and "preserve and protect this easement." *Id.*[20] In like manner here, the Court should

---

[20] The *Olney* court assuaged concerns about the easement's scope by noting that the easement was not an "absolute right." Rather, the easement's scope is subject to "well recognized restrictions," including a scope measured by "such uses as the parties might reasonably have expected from future uses of the dominant tenement. What the parties might reasonably have expected is to be ascertained from the circumstances existing at the time of the conveyance. It is to be assumed that they anticipated such uses as might reasonably be required by a normal development of the dominant tenement" No. C-78-145, at 6-7.

conclude that the Homeowners have a right of access to their parcels which is, to quote *Olney*, a "property interest in the form of an easement appurtenant to and accompanying the allotment of the land now owned by" the Homeowners. This right to access exists regardless of whether the allotments derive from the Dawes Act (as was Brendale's in *Olney*) or from the Treaty of 1854 and 1903 Allotment Act. This is true because the Treaty of 1854 and 1903 Allotment Act were statutes "that authorize[] the sale of a parcel of land in a reservation," (per *Brendale*) and also because the allotments necessarily carried with them a right to access, as recognized in the final sentence of Article 3 of the Treaty.

Here, just as in *Olney* and *Namen*, the Court need not find an express statement by Congress that the Homeowners should have easement rights in order for the Court to establish those rights. The fact that "Congress did not expressly delineate" the access rights for allotment parcels created in checkerboard reservations "does not negate their existence." *See Namen*, 380 F. Supp. at 466. The Court should find that the Homeowners have easements by necessity providing access to their properties over the Roadways. A contrary conclusion, resulting in the Homeowners having no access to their properties, would render the Homeowners' properties worthless.

Further supporting the conclusion that the Homeowners possess easements by necessity to access their properties are cases addressing a statutory scheme "under which landowners whose property was surrounded by national forests were *guaranteed reasonable* access over federal land and therefore did not need a common-law easement to cross it." *See Lyon*, 626 F.3d at 1072 (second emphasis added) (citing *Fitzgerald*, 460 F.3d 1259); *Adams v. United States*, 3 F.3d 1254, 1259 (9th Cir. 1993); *Town of Lac du Flambeau*, 2024 WL 4297671, at *6 ("[A]t least two courts have found that the Homestead Act implied a right of access across public lands

to reach an otherwise landlocked homestead property."). Here, the Homeowners effectively have *no* mechanism to obtain access to their homes, let alone "*guaranteed* reasonable access," where the ROW Act allows the Band to demand 100 times (or more) fair market value for new rights of way (25 C.F.R. § 169.110(a)), or to outright refuse consent for access (25 C.F.R. § 169.107(a)). And if that is the case, then the Homeowners *must* have a common law easement to cross the Roadways because of their "need." *See Lyon*, 626 F.3d at 1072; *United States v. Jenks*, 129 F.3d 1348, 1353 (10th Cir. 1997); *Fitzgerald*, 460 F.3d at 1266-67; *Dunn*, 478 F.2d 443.

In this Court's Preliminary Injunction Order, it noted two cases that it thought potentially cut against the Homeowners' easement claims, but the Homeowners respectfully posit that both cases are distinguishable from the Homeowners' case. First, the Court cited *Imperial Granite Co. v. Pala Band of Mission Indians*, 940 F.2d 1269, 1272 (9th Cir. 1991), for the proposition that the court concluded there was "no easement by implication or necessity over tribal land." *Town of Lac du Flambeau*, 2024 WL 4297671, at *6. But *Imperial Granite* is inapposite because it casts no doubt on the legal principle that an easement by necessity can be possessed over trust and restricted land; instead, it merely sets forth a factual distinction upon which Imperial Granite could not establish that it acquired an easement there. *See* 940 F.2d at 1272.

Next, the Court cited *Confederated Salish & Kootenai Tribes v. Lake Cnty. Bd. of Commissioners*, 454 F. Supp. 3d 957 (D. Mont. 2020) for the conclusion that there was "no easement by implication or necessity over tribal land" in that case. *See Town of Lac du Flambeau*, 2024 WL 4297671, at *6. But the analysis in *Lake Cnty*. was whether title to the underlying land was transferred to the defendants, not whether the defendants had an easement by necessity or easement by implication.

The *Lake Cnty.* court stated, "The whole purpose of trust land is the protection of land from *unauthorized alienation*," quoting *Imperial Granite*, 940 F.2d at 1272. *Lake Cnty.*, 454 F. Supp. 3d at 967 (emphasis added). But that quote of *Imperial Granite* is the portion concerning property rights *by prescription*. 940 F.2d at 1272 (emphasis added) ("the Indians' property may not be lost *through adverse possession*" (emphasis added)); *see Wimberly v. Lake Weir Yacht Club Ass'n*, 480 So.2d 224, 225 (Fla. Ct. App. 1985) (noting that an easement by necessity "is a different legal entity from a prescriptive easement"). Here, the Homeowners do not seek *prescriptive* easements, nor do they seek or assert title to the lands on which the portions of the Roadways at issue lie, let alone through adverse possession.

Also, the *Lake Cnty.* court's statement, invoking *Solem v. Bartlett*, 465 U.S. 463, 470 (1984), about "divest[ing] a reservation of its land" and "diminish[ing] [a reservation's] boundaries" is inapplicable here, because those statements relate to the court's analysis of whether there was *transfer of title to the land* on which the roads there lied, not a distinct issue about an easement claim. *See* 454 F. Supp. 3d at 967-68 (concluding that "*title* is retained by the United States, in trust for the Tribes" (emphasis added)). Here, the Homeowners do not seek or assert title to the lands on which the portions of the Roadways at issue lie; instead, the Homeowners claim easements by implication and by necessity.

Because the applicable authorities demonstrate that the Homeowners have easements by necessity to use the Roadways to access their properties and homes, the Court should reach that conclusion.

### III. SOME HOMEOWNERS MAY ALSO HOLD EXPRESS EASEMENTS BECAUSE THE ALOTTEES AGREED TO "NECESSARY ROADWAYS" TO BE BUILT, PURSUANT TO THE 1933 UNEMPLOYMENT ACT

Nearly 90 years ago, the allottees, who owned the parcels of land over which the Roadways traverse, gave permission to the USA to build all "necessary roadways" over their

land, pursuant to the 1933 Unemployment Relief Act. The compensation to the allottees in exchange for the grants of permission was the benefits provided by the roads, "without any further compensation therefor." (Suppl. B. Hubing Decl., ¶¶ 9-11, Exs. H through J.) Here, the Roadways are "necessary roadways" under those express grants of permanent rights of way by the allottees. Thus, to the extent "compensation" was required under Article 3 of the 1854 Treaty, such compensation was made and agreed to by the predecessors in interest long ago.

"[A] treaty should generally be construe[d] ... liberally to give effect to the purpose which animates it[,] and … [e]ven where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred." *United States v. Stuart*, 489 U.S. 353, 368 (1989); *accord Jogi v. Voges*, 480 F.3d 822, 834 (7th Cir. 2007). Specific to Indian treaties, "even though legal ambiguities are resolved to the benefit of the Indians, courts cannot ignore plain language [in a treaty] that, viewed in historical context and given a fair appraisal, clearly runs counter to a tribe's later claims." *Oregon Dep't of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 774 (1985). That is, courts "cannot, under the guise of [liberal] interpretation ... rewrite congressional acts [e.g., treaties] so as to make them mean something they obviously were not intended to mean." *Confederated Bands of Ute Indians v. United States*, 330 U.S. 169, 179 (1947). "[E]ven Indian treaties cannot be re-written or expanded beyond their clear terms to remedy a[n] injustice. . . ." *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432 (1943).

Article 3 of the 1854 Treaty empowers the President to allot tracts of land in the Reservation and, at [the President's] discretion, … issue patents … with such restrictions of the power of alienation as he may see fit to impose." *See* Treaty with the Chippewas, art. 3, 10 Stat.

1109 (1854). Yet Article 3 does more than just enable the alienation of fee lands inside the Reservation. It also provides additional support to the conclusion that the Homeowners have a right of access to their properties, which right is appurtenant to their allotted parcels within the Reservation's outer boundaries, for "[a]ll necessary roads" that "run through any of the reserved tracts." *Id.* Specifically, Article 3 provides: "All necessary roads … *shall have the right of way* through [any of the reserved tracts], compensation being made therefor as in other cases." Treaty with the Chippewas, art. 3, 10 Stat. 1109 (1854) (emphasis added). The right thus supported by this Treaty provision is a mandatory right-of-way for "all necessary roads" through any of the Reservation, "compensation being made therefor as in other cases." *See id.*

"Shall have the right of way" is "*mandatory*" language that is trigged and effectuated by a threshold determination that a given "road" is "necessary." *See Kingdomware Tech., Inc. v. United States*, 579 U.S. 162, 171-72 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement"); *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 310 (2020); *see also Fitzgerald*, 460 F.3d at 1267 ("The intent to grant an easement must be so manifest on the face of the instrument … that no other construction can be placed on it.").

Underscoring the manifestly "mandatory" right-of-way possessed by the Homeowners for "all necessary roads" is the express and repeated inclusion of the permissive or discretionary "may" (indeed, the literal use of the phrase "at his discretion") throughout other parts of the 1854 Treaty and specifically Article 3. *See Me. Cmty.*, 590 U.S. at 310-11 (noting when Congress differentiates between "shall" and "may" in the same law); *cf.* Treaty with the Chippewas, art. 3, 10 Stat. 1109 (1854) ("[T]he President *may*, from time to time, *at his discretion*, cause the whole to be surveyed, and *may* assign to each head of a family or single person over twenty-one years

of age, eighty acres of land for his or their separate use; and he *may*, *at his discretion*, as fast as the occupants become capable …." (emphasis added)).

Here, there is no dispute that the Roadways are "necessary roads," because without the Roadways, the Homeowners cannot access, use or in any way enjoy their homes and properties.[21] Accordingly, they "shall have the right of way through" the portions of trust and restricted fee lands on which the necessary Roadways lie, "compensation being made therefor" – and here, compensation was made in the 1930s to the then-allottees.

In the 1930s, the then-allottees of all five parcels containing Annie Sunn Lane, then-allottees of the parcel containing Center Sugarbush Lane, and then-allottees of the parcel containing the East-West Segment of Elsie Lake Lane, granted permission to use their lands to build transportation routes for vehicular access by signing forms entitled, "Permission of the Allottee or Owner to Place Improvements On and Across His (Their) Land for the Performance of Useful Public Work for the Relief of Unemployment Pursuant to Executive Order of May 12, 1933."[22] (Suppl. B. Hubing Decl., ¶¶ 9-11, Exs. H through J.) These grants provided that the allottees, "for and on behalf of [themselves], successors and assigns," "grant[ed] to the United States right of ways on and across said allotments and tracts of land on the said Reservation of the opening and establishing of necessary roadways, trails, and all other uses" to carry out the public purposes of the Unemployment Relief Act of 1933. (Suppl. B. Hubing Decl., ¶¶ 9-11, Exs. H through J.) The allottees further accepted compensation in exchange for the grants and

---

[21] (*See* Decl. of K. Wyse, Exs. 1 through 7; 8/27/2024 Baird Decl. ¶ 5; 8/27/2024 Kilger Decl. ¶ 5; 8/27/2024 D. Pearson Decl. ¶ 5; 8/28/2024 Fermanich Decl. ¶ 5; 8/28/2024 D. Pollard Decl. ¶ 5; 8/28/2024 M. Possin Decl. ¶ 5; 8/28/2024 J. Spanton Decl. ¶ 5; 8/28/2024 Walsh Decl. ¶ 5; 8/30/2024 Kester Decl. ¶ 5; 8/31/2024 M. Hunt Decl. ¶ 5; 8/31/2024 J. Hunt Decl. ¶ 5.)

[22] The Homeowners were unable to locate Permissions to Build Roadways Forms for the North-South Segment of Elsie Lake Lane or East Ross Allen Lake Lane amongst the 73,588 documents produced by the USA.

waived any additional compensation: "[T]he consideration for the grants herein made being the performance of such work [i.e., the creation of the roadways and trails for economic and employment purposes] and the benefits to accrue therefrom to the said Reservation and lands. . . . we hereby freely consent and agree to the granting of such right of ways for the carrying out of the work program as contemplated without any further compensation therefor." (Suppl. B. Hubing Decl., ¶¶ 9-11, Exs. H through J.)

The USA acknowledged in 1933 that "it is reasonable to expect that all right of ways needed on or across Indian allotments to permit carrying out the purposes of the Executive order [of May 12, 1933] should be given by the Indian allottees without additional compensation, as the benefit accruing to the Indians undoubtedly will greatly over-shadow any possible damages to the allotments." (Suppl. B. Hubing Decl., ¶ 12, Ex. K, May 20, 1933 Letter from Commissioner J. Collier re: Easement for Improvements under Emergency Conservation Work, at 1.)

Further, the USA concluded that the grants under the 1933 Unemployment Relief Act by the then-allottees are permanent and valid, even if the roadway location has moved within the respective parcel. (*See* Suppl. B. Hubing Decl., ¶¶ 13-14, Ex. L ("no further easements are required"), & Ex. M.) Department of the Interior Field Solicitor Elmer Nitzschke opined in 1979 on the permanent nature of the rights-of-way under the 1933 Unemployment Relief Act and executive action thereunder: "[W]here the United States Government obtains a permanent easement by grant for a specific purpose, there can be no abandonment without an Act of Congress." (Suppl. B. Hubing Decl., ¶ 15, Ex. N, Jan. 31, 1979 Letter from E. Nitzschke, Field Solicitor, at US_0034063.)

Because the then-allottees expressly agreed to the "granting of such right of ways …
without any further compensation therefor," satisfying any potential requirement for
compensation under Article 3 of the 1854 Treaty, and the rights of way are permanent, the Court
need not delve into interpretation of "compensation being made therefor as in other cases" under
that provision.[23]

The USA seemed to argue at the preliminary injunction hearing that the second clause of
Article 3's last sentence ("compensation being made therefor as in other cases") means the
Homeowners have no right to access their homes because (according to the USA) such clause
allows the Band to withhold consent or demand tens of millions of dollars under the
(inapplicable) ROW Act and its regulations. Not so, for several reasons. First, the ROW Act does
not apply for the reasons discussed below. Second, compensation has already been made to the
extent it is required under Article 3 of the 1854 Treaty, so no further compensation is required.

---

[23] If the Court were to find that some of the Homeowners lack easements by implication and necessity but
have the right-of-way on the condition that the Tribe or current Allottees must accept compensation under
Article 3, the Court should in such event order the USA, on behalf of the Tribe, to accept market value for
those Homeowners. *See Burdess v. United States*, 553 F. Supp. 646, 653 (E.D. Ark. 1982) (ordering the
USA to grant plaintiff an express right-of-way across federal land).

Various federal and state actors have suggested or interpreted "compensation being made therefor as in
other cases" as meaning just compensation or a price equal to that yielded by eminent domain, i.e., market
value. *See, e.g.*, Br. for State of Minn., 1938 WL 63939, at *33-34 (8th Cir. 1939); *Message from the
President of the United States Transmitting Letter of the Secretary of the Interior Relative to the Right of
Way for Railroads Through Indian Lands*, Exec. Doc. No. 40, at 3 (1888), available at
https://www.govinfo.gov/content/pkg/SERIALSET-02504_00_00-041-0040-0000/pdf/SERIALSET-
02504_00_00-041-0040-0000.pdf ("as in other cases" may mean "proceedings by 'condemnation'");
Suppl. B. Hubing Decl., ¶ 16, Ex. O, *Morris Sun*, Condensed News: Annual Report of Indian
Commissioner Atkins, Vol. III, No. 51 (Nov. 4, 1886) ("[A] [r]ailway company has completed its
[railroad] through the Bad river reservation in Wisconsin, and has paid the Indians in their tribal and
individual capacity what is deemed to be a just compensation for the right of way as provided for under
the terms of the treaty under which they hold their lands."); *see also Byrnes v. Douglass*, 83 F. 45, 48 (9th
Cir. 1897) ("[W]e cannot say that the fair and actual value of the property taken was not awarded, or that
just compensation was not made."); *United States v. Miller*, 317 U.S. 369, 374 (1943) ("[T]he courts early
adopted, and have retained, the concept of market value" as the standard for "just compensation"); *Kirby
Forest Indus., Inc. v. United States*, 467 U.S. 1 (1984) (just compensation means the fair market value of
the property on the date it is appropriated).

Third, the second clause of the last sentence of Article 3 of the 1854 Treaty does not turn "shall" into "may" or otherwise eliminate common law access rights or the right to an express right-of-way over necessary roads to the Homeowners' allotment parcels. It would be erroneous to read the last sentence of Article 3 of the 1854 Treaty as lawfully allowing the USA or Band to exclude the Homeowners from their fee lands, because such an interpretation "would render superfluous" the first clause of the last sentence of Article 3 (i.e., "All necessary roads … shall have the right of way through [any of the reserved tracts]"). *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386-87 (2013). In other words, the interpretation that the USA asserts regarding Article 3's last sentence would erroneously vitiate a treaty provision that speaks in mandatory terms and plays a crucial role in the Treaty. *See Pulsifer v. United States*, 601 U.S. 124, 143 (2024) (canon against surplusage applies with more force when the provision is "designed to serve a concrete function").

For all these reasons, in addition to the Homeowners' right of access by implication and by necessity, certain allottees in the 1930s expressly agreed to the establishment of all "necessary roadways" in exchange for the creation of such roadways and "the benefits to accrue therefrom to [the] Reservation and lands . . . without any further compensation therefor." Because the Roadways are "necessary roadways" and compensation was made, the Homeowners possess this additional right to access their homes via the Roadways.

## IV.   THE HOMEOWNERS' EASEMENTS ARE UNAFFECTED BY OTHER CONGRESSIONAL ACTS LIKE THE INDIAN ROW ACT

Not only is the Indian Reorganization Act of 1934 irrelevant to the Homeowners' easement rights, also irrelevant are other Acts of Congress – specifically, the ROW Act and the Indian Nonintercourse Act, 25 U.S.C. § 177. None of those Acts affect the Homeowners' property rights providing them free access to their homes.

The ROW Act had no and has no effect on the Homeowners' property rights to access their homes via the Roadways, which rights the Homeowners pursue in this action. Specifically, the Homeowners do not need express rights-of-ways from the BIA under the ROW Act, which require the Band's consent, and to which the Band has "repeatedly" said it will never consent, including under *any* regulatory or statutory scheme or treaty provision. (*See* ECF No. 91-6, 8/30/2024 Hubing Decl. Ex. 6.) This is because Congress "implicitly granted" the Homeowners access rights to their homes. *Brendale*, 492 U.S. at 423-24; *id.* at 436-37 (Stevens, J., concurring). This implicit grant by Congress also necessarily overcomes any assertion that the Homeowners need to get express rights-of-way under the ROW Act regulations in order for the Homeowners to lawfully access their homes.

The USA's position that the Homeowners need to comply with the ROW Act to lawfully access their homes, and the Band's position that it can barricade the Roadways, are contrary to the plain language of *Brendale*, which was decided in 1989, more than 40 years *after* the ROW Act was enacted: "Once Brendale obtained title to his land, that land was no longer off limits to him; **the tribal authority to exclude was necessarily overcome by … an 'implici[t] grant' of access** to the land." *Brendale*, 492 U.S. at 423-24 (emphasis added); *id.* at 436-37 (Stevens, J., concurring). As such, the Band lacks the authority to use the ROW Act or barricades as a basis to exclude the Homeowners from their fee lands. The Homeowners did not need, and still do not need, ROWs under the ROW Act and its implementing regulations to lawfully exercise their rights of free access to their properties, which rights have been "appurtenant" to their lands since allotment, and which therefore predate and are unaffected by the ROW Act. *Olney*, No. C-78-145, at 3, 5-7 ("The right of access in issue … is a property interest in the form of an easement appurtenant to and accompanying the allotment of the land now owned by plaintiff…. [Plaintiff

has an] easement appurtenant over those BIA roads on the Yakima Reservation which are reasonably necessary for access to his land."). The fact that the developer may have complied with ROW Act provisions when building the Roadways in the 1960s does not negate the earlier-created easement rights that exist by reason of the allotments to the Homeowners' predecessors in title. Once the allotments were parceled off from the original Reservation and sold in fee because of the allotment process, those parcels had access rights across Reservation land necessary to access the fee land. *Brendale*, 492 U.S. at 423-24; *id.* at 436-37 (Stevens, J., concurring). Those access rights continue unabated through today for the Homeowners' parcels.

If the Supreme Court in 1989 thought that the ROW Act of 1948 (or Indian Nonintercourse Act statute enacted in 1834, 25 U.S.C. § 177) was relevant to its analysis of access rights to fee lands within a checkerboard reservation, and whether such rights were affected or repudiated by later Congressional acts (e.g., its discussion of the irrelevance of the Indian Reorganization Act of 1934), the Court would have mentioned it. But tellingly, the Court did not. *See Brendale*, 492 U.S. at 423-41.[24]

Similarly, contrasting Article 3 of the 1854 Treaty with other Indian treaties of the same era further illuminates the Homeowners' right to access their properties. For example, Article V of the Treaty with the Seminoles, 14 Stat. 755 (1866), discusses rights-of-way for railroads granted through the lands of the Seminoles. *See* Treaty with the Seminoles, art. V. There, the

---

[24] The ROW Act's language supports the conclusion that the ROW Act is irrelevant to the Homeowners' "implicitly granted" access rights to their homes. For example, 25 U.S.C. §§ 324 and 325 are forward looking, addressing express rights-of-way that *will* "be made," meaning they do not address or affect prior Congressional allotment acts and the property rights that necessarily accompanied such acts per Congress's intent, including those granted to the Homeowners years before. *Id.* § 324 ("No grant of a right-of-way over and across any lands belonging to a tribe … *shall be made* without the consent of the proper tribal officials." (emphasis added)); *id.* § 325 ("No grant of a right-of-way *shall be made* without the payment of such compensation as the Secretary of the Interior shall determine to be just." (emphasis added)). The Homeowners' "implied grants" were already given by Congress by and through the 1903 Allotment Act and the Treaty of 1854, and already began running with their fee lands by the time of the ROW Act in 1948.

USA and Seminole Nation ratified that the railroad companies "shall be subject to the laws of the United States relating to the intercourse with Indian tribes, and also to such rules and regulations as may be prescribed by the Secretary of the Interior, for that purpose." *Id.* It further included agreement on compensation relating to lands lying alongside contemplated railroads, i.e., "at such price per acre as may be eventually agreed upon between said Seminole nation and the party … building said road—subject to the approval of the President of the United States." *Id.* This contrasts sharply with Article 3 of the 1854 Treaty, which lacks any reference to rights-of-way "subject to" later enacted "laws of the United States" or "to such rules and regulations as may be prescribed by the Secretary of the Interior." *See id.* Likewise, similarly missing from Article 3 of the 1854 Treaty is any language indicating that compensation relating to rights-of-way must "be eventually agreed upon" between the Nation and the grantee. *See id.* These types of exclusions from Article 3 of the 1854 Treaty support the conclusion that the Tribe cannot exclude the Homeowners from their fee simple lands on the basis of the later enacted ROW Act.

Additionally, the Supreme Court held that Indian statutes must be construed "in light of the intent of the Congress that enacted them." *Central Mach. Co. v. Ariz. State Tax Comm'n.*, 448 U.S. 160, 166 (1980). Thus, assuming that the USA contends that the ROW Act or the Indian Reorganization Act somehow repealed or precluded the Homeowners' access rights, the USA then has the burden to demonstrate that either Act of later Congresses "affect[] the broad coverage" of these authorities and their "**application to the facts of this case**." *Wis. Winnebago Bus. Comm. v. Koberstein*, 762 F.2d 613, 619 (7th Cir. 1985) (emphasis added). In other words, the USA would need to prove that the later Acts "cover the entire subject matter" of the allotment authorities as they "appl[y] to the facts of this case." *Id.* According to *Brendale*,

however, the USA cannot make such a showing because neither the Indian Reorganization Act nor the ROW Act swept so broadly:

> "The Yakima Nation argues that we should not consider the Allotment Act because it was repudiated in 1934 by the Indian Reorganization Act, 48 Stat. 984. But the Court in *Montana* was well aware of the change in Indian policy engendered by the Indian Reorganization Act and concluded that this fact was irrelevant. 450 U.S., at 560, n. 9, 101 S. Ct., at 1256, n.9. **Although the Indian Reorganization Act may have ended the allotment of further lands, it did not restore to the Indians the exclusive use of those lands that had already passed to non-Indians or prevent already allotted lands for which fee patents were subsequently issued from thereafter passing to non-Indians**."

*Brendale*, 492 U.S. at 423 (emphasis added); *id.* at 436-437 (discussing the still-existing effects that allotment has on tribal authority through the present, notwithstanding the Indian Reorganization Act).

The USA cannot meet that burden without asking this court to disregard *Lyon v. Gila River Indian Community*, a Ninth Circuit decision directly refuting the United States's position that all prior easement claims were voided in 1948 upon the passage of the ROW Act.

In *Lyon*, a bankruptcy trustee who acquired a 657-acre parcel of land that was completely surrounded by reservation land, sued an Indian tribe, seeking a declaratory judgment that the estate held legal title to the 657-acre parcel of land and could access the parcel over Indian lands. 626 F.3 at 1065. Congress created the reservation in 1859 and was later expanded in 1883 and 1913 to include all of the land surrounding the parcel. *Id.* at 1066. In 1929, the State of Arizona sold the 657-acre parcel to an individual, pursuant to a patent conveying the land "together with all the rights, privileges, immunities and appurtenances of whatsoever nature" and "subject to any and all easements or rights of way heretofore legally obtained." *Id.* Since then, the parcel was conveyed to several new owners by deeds using similar language and eventually sold to a developer for construction of a higher-density housing development. *Id.* The 657-acre parcel was

serviced by two town roads that traversed tribal lands. *Id*. The developer later declared bankruptcy and listed the parcel as its largest asset. *Id*.

The Gila River Indian Community (the "Community") filed a proof of claim asserting that it held aboriginal title to the 657-acre parcel because it was located within the boundaries of the reservation. *Id*. In response, the bankruptcy trustee filed an adversary proceeding in which the Community asserted ownership rights in the 657-acre parcel and sought trespass damages because non-members of the Community had no right to cross reservation lands for access to the parcel. *Id*. at 1067. The district court held that the Community did not hold aboriginal title to the 657-acre parcel, because the land was sold by the State of Arizona in fee simple and that the bankruptcy trustee, as a successor in interest, held an implied easement to access the parcel, which ran with the land for over 80 years. *Id*. The Ninth Circuit Court of Appeals affirmed that the Community's claim for aboriginal title failed based on the history of the property. *Id*. at 1068. Moreover, the Court of Appeals affirmed that the Community could not cut off access to the 657-acre parcel after an implied easement for ingress and egress to the parcel had already accrued and ran with the land for decades. *Id*. at 1071.

The Circuit Court specifically addressed the federal procedures for obtaining access over reservation lands and quickly rejected the notion that such procedures could preempt a common law implied easement:

> The Community first argues that the Trustee's claim to a common law easement is preempted by federal procedures for obtaining rights of way over Indian lands. Although these procedures were not created until after conveyance of the alleged easement in 1877, the Community urges that preemption applies to the claim of the easement now asserted. But nothing in the scheme indicates that Congress, in creating procedures for obtaining **new** rights of way, intended to preempt all claims to **previously acquired** rights of way, such that holders of pre-existing easements would have to go through the new procedures.

* * *

> We hold that the Trustee's claim of a pre-existing easement to access Section 16 is **not preempted** by the existence of a regulatory scheme for obtaining new easements over Indian lands.

*Id*. at 1071-72 (emphasis added).

Accordingly, as also recognized by the *Olney* and *Namen* courts, the "customary common law rights of access" granted by Congress to the Homeowners and their predecessors and successors under the Treaty of 1854 and 1903 Allotment Act continue unabated, unaffected by the Indian Reorganization Act and ROW Act. *Olney*, No. C-78-145, at 3; *Namen*, 380 F. Supp at 465-67. Further, the Indian Reorganization or ROW Acts would need to be "irreconcilable" with the property rights granted by Congress, under the 1854 Treaty and 1903 Allotment Act to non-Indian landowners of already-alienated fee lands in a reservation, for those rights to be repealed by implication. *United States v. Santee Sioux Tribe of Neb.*, 324 F.3d 607, 611 (8th Cir. 2003). Yet, the forward-looking ROW Act is *silent* as to preexisting property rights of access.

Finally, the 1834 Indian Nonintercourse Act's requirement for tribal consent and Congressional approval for the sale of Indian land was satisfied, if not abrogated, by the Treaty of 1854 and 1903 Allotment Act providing for allotments and alienation of lands in the Reservation. The Homeowners' access rights here were granted by Congress through the 1854 Treaty and 1903 Allotment Act, which is a situation far different from a company that obtains a tribal grant of easement that expires, such as for a pipeline or similar incursion on Indian land. The easement rights for a pipeline are subject to the Nonintercourse Act, *Bad River Band of Lake Superior Tribe of Chippewa Indians v. Enbridge Energy Co*., 626 F. Supp. 3d 1030, 1047, 1056 (W.D. Wis. 2022), whereas the Homeowners' access rights granted by Congress through the 1854 Treaty and 1903 Allotment Act are not. *See Brendale*, 492 U.S. at 423-24; *id*. at 436-37.

For all these reasons, the Homeowners' easements implied at law and by necessity were and remain unaffected by other congressional acts, including the ROW Act, Indian Reorganization Act, and Indian Nonintercourse Act.

## CONCLUSION

As set forth above, the Homeowners have the right to freely access their properties. The Court should enter summary judgment in favor of the Homeowners, declaring that the Homeowners hold valid and enforceable easements for ingress and egress between their respective parcels and a public road, including over the Roadways that run with the land, and that the Roadways shall accordingly be kept permanently open for use by the Homeowners, their families, friends, invitees, guests and visitors, and allowing the Town to maintain the Roadways for travel in a manner consistent with town roads. Also, although the USA's trespass and ejectment claims are pleaded only against the Town, those two claims fail as a matter of law as against the Homeowners if the Court grants summary judgment to the Homeowners; accordingly, the Court should also enter summary judgment dismissing the USA's ejectment claim and declaring the Homeowners have not trespassed on the land at issue in this case.

Dated this 13th day of December, 2024.

Reinhart Boerner Van Deuren s.c.
N16 W23250 Stone Ridge Drive
Suite 1
Waukesha, WI 53188
Telephone:  262-951-4527
Facsimile:  262-951-4690

Signed electronically by:

/s/ *David G. Peterson*
David G. Peterson
WI State Bar ID No. 1001047
dgpeterson@reinhartlaw.com
Bridget M. Hubing
WI State Bar ID No. 1029356
bhubing@reinhartlaw.com
Samuel C. Sylvan
WI State Bar ID No. 1131339
ssylvan@reinhartlaw.com

*Attorneys for Intervenor*
*Defendant Homeowners*