IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff and                 Case No. 3:23-cv-00355-wmc
        Counter Defendant,

v.

TOWN OF LAC DU FLAMBEAU,

        Defendant and
        Counter Claimant,

and

GORDON ANDERSON et al.,

        Intervenor Defendants and
        Intervenor Counterclaimants.

---

**UNITED STATES OF AMERICA'S MEMORANDUM OF LAW IN SUPPORT OF PARTIAL MOTION FOR SUMMARY JUDGMENT AND FOR SUMMARY JUDGMENT ON THE TOWN OF LAC DU FLAMBEAU'S AND GORDON ANDERSON ET AL.'S COUNTERCLAIMS AND AFFIRMATIVE DEFENSES**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND ........................................ 4

I.    Indian Nonintercourse Act ............................................................................ 4

II.   Indian Right-of-Way Act .............................................................................. 5

III.  Tribal Transportation Program ...................................................................... 6

STANDARD OF REVIEW ................................................................................... 10

ARGUMENT ......................................................................................................... 11

I.    THE TOWN IS IN TRESPASS ON THE TRUST AND RESTRICTED-FEE LANDS ON WHICH THE ROADS ARE LOCATED ................................................................ 11

    A.    Federal Common Law Governs The United States' Trespass Claim. ................ 12

    B.    The Definition Of Trespass. ...................................................................... 13

    C.    The United States Holds Fee Title To The Lands In Trust For The Benefit Of The Band And Holds Restrictions Against Alienation And Encumbrance For The Lands The Allottees Own In Fee. .................................................... 15

        1.    *Annie Sunn Lane* .......................................................................... 16

        2.    *Center Sugarbush Lane* ................................................................. 17

        3.    *East Ross Allen Lake Lane* ............................................................ 18

        4.    *Elsie Lake Lane* ........................................................................... 18

    D.    Each Of The ROWs Was For A Term Of Fifty Years Pursuant To The Express Terms Of The Grant Or By Operation Of Law .................................... 19

        1.    *The First Annie Sunn Lane ROW* ................................................. 20

        2.    *The Second Annie Sunn Lane ROW* .............................................. 20

        3.    *The Center Sugarbush Lane ROW* ................................................. 22

        4.    *The East Ross Allen Lake Lane ROW* ........................................... 22

        5.    *The Elsie Lake Lane ROW* ........................................................... 23

E.    Since The Expiration Of The ROWs, The Town Has Continued To Use And Occupy The Band's And The Allottees' Trust And Restricted-Fee Lands Without The Authorization Of The United States And Without The Consent Of The Band And The Allottees. ............................................................ 23

II.    THE TOWN IS SUBJECT TO EJECTMENT FOR ITS TRESPASS............................ 25

A.    The Court Should Issue An Order Ejecting The Town From The Band's And The Allottees' Lands As A Matter Of Law. .......................................... 25

B.    Even If The Court Applies Equitable Principles, The United States Is Entitled To An Order Of Ejectment. .................................................. 28

1.    *Irreparable Harm And Inadequate Remedies At Law* ......................... 29

2.    *Balance of Hardships* ................................................. 31

3.    *Public Interest*....................................................... 33

III.    THE TOWN AND HOMEOWNERS HAVE NO IMPLIED EASEMENTS OR EASEMENTS BY NECESSITY ON THE INDIAN TRUST OR RESTRICTED-FEE LANDS UNDERLYING THE ROADS .......................................... 34

A.    The Property Rights Of The United States, The Band, And The Allottees To The Trust And Restricted-Fee Lands Cannot Be Divested Or Diminished Without A Clear Statement Of Congress. ........................................ 36

B.    Congress Has Not Clearly Stated Its Intent To Grant Implied, Perpetual Easements For The Roads Over The Trust and Restricted-Fee Lands.............. 41

C.    The ROW Act And Related Statutes Provide The Exclusive Means Under Federal Law By Which Defendants Can Obtain Easements Over The Trust and Restricted-Fee Lands. ............................................. 48

IV.    25 C.F.R. § 170.114(a) IS NOT A LEGAL SUBSTITUTE FOR THE TOWN'S AND HOMEOWNERS' COMPLIANCE WITH THE ROW ACT........................................ 50

A.    The TTP Is A Funding Program For Tribes' Surface Transportation Needs; It Does Not Convey Rights To The Defendants Or The Public. ............................. 52

B.    The TTP Did Not Expressly Or Impliedly Repeal The ROW Act; The TTP And The ROW Act Must Be Read Together.................................. 55

V.    THE 1933 UNEMPLOYMENT RELIEF ACT DOES NOT PROVIDE USE AND ACCESS RIGHTS TO THE TOWN OR HOMEOWNERS. .......................................... 60

VI.   THE UNITED STATES IS ENTITLED TO SUMMARY JUDGMENT ON THE TOWN'S FOURTH COUNTERCLAIM ......................................................................... 66

VII.  NONE OF THE REMAINING AFFIRMATIVE DEFENSES SHIELDS THE TOWN FROM TRESPASS LIABILITY ................................................................................. 67

    A.   Failure To State A Claim Is Not A Proper Affirmative Defense ........................ 68

    B.   Equitable Defenses Do Not Apply To The United States. ................................... 68

    C.   Adverse Possession Does Not Apply To The United States. ............................... 70

    D.   The United States' Trespass Case Is Not Barred By The Statute Of Limitations ................................................................................................................ 71

    E.   Failure To Join Indispensable Parties. .................................................................... 72

    F.   Failure to Identify And Obtain The Consent Of The Allottees ......................... 74

    G.   Defenses Based On The Tenth Amendment ......................................................... 75

CONCLUSION ................................................................................................................... 76

# TABLE OF AUTHORITIES

<u>Federal Cases</u>

*American Invs-Co Countryside, Inc. v. Riverdale Bank*,
  596 F.2d 211 (7th Cir. 1979) ................................................................ 28

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................... 11

*Ariz. State Dep't of Pub. Welfare v. HEW*,
  449 F.2d 456 (9th Cir. 1971) ................................................................ 75

*Bad River Band of Lake Superior Tribe of Bad River Reservation v. Enbridge Energy Co., Inc.*,
  626 F. Supp. 3d 1030 (W.D. Wis. 2022) .................................................... passim

*Bad River Band of Lake Superior Tribe of Chippewa Indians of the Bad River Reservation v. Enbridge Energy Co., Inc.*,
  No. 19-cv-602-wmc, 2023 WL 4043961 (W.D. Wis. June 16, 2023) ........................ 28, 30

*Bd. of Comm'rs of Jackson Cnty. v. United States*,
  308 U.S. 343 (1939) ........................................................................... 69

*Bellaver v. Quanex, Corp.*,
  200 F.3d 485 (7th Cir. 2000) ................................................................ 10

*Branch v. Smith*,
  538 U.S. 254 (2003) ........................................................................... 55

*Brendale v. Confederated Tribes & Bands of Yakima Nation*,
  492 U.S. 408 (1989) ........................................................................... 42

*Cap. Indem. Corp. v. St. Paul Fire & Marine Ins. Co.*,
  357 F. Supp. 399 (W.D. Wis. 1972) ....................................................... 15, 67

*Chemehuevi Indian Tribe v. Jewell*,
  767 F.3d 900 (9th Cir. 2014) ................................................................ 38

*Cnty. of Oneida v. Oneida Indian Nation*,
  470 U.S. 226 (1985) ....................................................................... 12, 70

*Cohens v. Virginia*,
  19 U.S. (6 Wheat.) 264 (1821) .............................................................. 42

*Computing Scale Co. v. Toledo Computing Scale Co.,*
279 F. 648 (7th Cir. 1921) ................................................................ 30

*Confederated Salish & Kootenai Tribes v. Lake Cnty. Bd. of Comm'rs,*
454 F. Supp. 3d 957 (D. Mont. 2020) .............................................. 36, 49

*Cramer v. United States,*
261 U.S. 219 (1923) ......................................................................... 38

*Dace v. Chicago Pub. Schs.,*
No. 19 C 6819, 2020 WL 1861671 (N.D. Ill. Mar. 18, 2020) ............... 68

*Davilla v. Enable Midstream Partners L.P.,*
913 F.3d 959 (10th Cir. 2019) ...................................................... passim

*Dick v. United States,*
208 U.S. 340 (1908) ......................................................................... 76

*Evans v. Shoshone-Bannock Land Use Policy Comm'n,*
736 F.3d 1298 (9th Cir. 2013) .......................................................... 42

*Fed. Power Comm'n v. Tuscarora Indian Nation,*
362 U.S. 99 (1960) .............................................................. 5, 38, 49

*Fitzgerald Living Trust v. United States,*
460 F.3d 1259 (9th Cir. 2006) .......................................................... 43

*Haaland v. Brackeen,*
599 U.S. 255 (2023) ......................................................................... 36

*Heckman v. United States,*
224 U.S. 413 (1912) .................................................................. 72, 73

*Helene Curtis Indus., Inc. v. Church & Dwight Co.,*
560 F.2d 1325 (7th Cir. 1977) .......................................................... 32

*Imperial Granite Co. v. Pala Band of Mission Indians,*
940 F.2d 1269 (9th Cir. 1991) ...................................................... passim

*In re Thulis,*
474 B.R. 668 (W.D. Wis. 2012) ........................................................ 42

*Israel v. U.S. Dep't of Ag.,*
135 F. Supp. 2d 945 (W.D. Wis. 2001) ............................................. 69

*J.E.M. AG Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.,*
   534 U.S. 124 (2001) ........................................................................... 56

*Johnson v. M'Intosh,*
   21 U.S. 543 (1823) ........................................................................... 39

*Kochan v. Kowalski,*
   478 F. Supp. 3d 440 (W.D.N.Y. 2020) ........................................... 72

*Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Evers,*
   46 F.4th 552 (7th Cir. 2022) ...................................................... passim

*Lake Berryessa Tenants' Council v. United States,*
   588 F.2d 267 (9th Cir. 1978) ........................................................... 69

*Liebhart v. SPX Corp.,*
   998 F.3d 772 (7th Cir. 2021) ........................................................... 28

*Life Spine, Inc. v. Aegis Spine, Inc.,*
   8 F.4th 531 (7th Cir. 2021) ............................................................. 29

*Luster v. Ill. Dep't of Corrs.,*
   652 F.3d 726 (7th Cir. 2011) ........................................................... 11

*Lyon v. Gila River Indian Cmty.,*
   626 F.3d 1059 (9th Cir. 2010) ......................................................... 43

*Marsh v. Brooks,*
   49 U.S. 223 (1850) ...................................................................... 25, 26

*Martin v. Consultants & Adm'rs, Inc.,*
   966 F.2d 1078 (7th Cir. 1992) ......................................................... 69

*McGirt v. Oklahoma,*
   591 U.S. 894 (2020) ................................................................... passim

*Merrion v. Jicarilla Apache Tribe,*
   455 U.S. 130 (1982) .............................................................. 30, 33, 49

*Michigan v. Bay Mills Indian Cmty.,*
   572 U.S. 782 (2014) ......................................................................... 36

*Minnesota v. United States,*
   305 U.S. 382 (1939) ......................................................................... 40

*Montana v. Blackfeet Tribe of Indians,*
   471 U.S. 759 (1985) .................................................................................... 43

*Morton v. Mancari,*
   417 U.S. 535 (1974) ......................................................................... 56, 57, 58

*Murr v. Wisconsin,*
   582 U.S. 383 (2017) .................................................................................... 31

*Nebraska v. Pub. Power Dist. v. 100.95 Acres of Land,*
   719 F.2d 956 (8th Cir. 1983) ................................................................... 5, 45

*New Mexico v. Mescalero Apache Tribe,*
   462 U.S. 324 (1983) .................................................................................... 42

*Oneida Indian Nation of N.Y. v. Cnty. of Oneida,*
   414 U.S. 661 (1974) ................................................................................. 4, 39

*Oneida Nation v. Vill. of Hobart,*
   968 F.3d 664 (7th Cir. 2020) ....................................................................... 65

*Oneida Tribe of Indians of Wis. v. Vill. of Hobart,*
   732 F.3d 837 (7th Cir. 2013) ....................................................................... 40

*Oregon Potato Co. v. Kerry, Inc.,*
   No. 20-cv-92-jdp, 2020 WL 4586401 (W.D. Wis. Aug 10, 2020) ................... 68

*Oscar Gruss & Son v. First State Bank,*
   582 F.2d 424 (7th Cir 1978) ........................................................................ 42

*Payne v. Pauley,*
   337 F.3d 767 (7th Cir. 2003) ....................................................................... 10

*Pelfresne v. Vill. of Williams Bay,*
   865 F.2d 877 (7th Cir. 1989) ....................................................................... 29

*PFS Investments Inc. v. Thompson,*
   No. 23-cv-50-wmc, 2023 WL 2327903 (W.D. Wis. Mar. 2, 2023) ................. 29

*Pipitone v. United States,*
   180 F.3d 859 (7th Cir. 1999) ....................................................................... 10

*Plains Commerce Bank v. Long Fam. Land & Cattle Co.,*
   554 U.S. 316 (2008) .................................................................................... 39

*Plains Elec. Generation & Transmission Coop., Inc.*,
    542 F.2d 1375 (10th Cir. 1976) ................................................................................ 50

*Pollard v. Johnson*,
    694 F. Supp. 3d 1080 (W.D. Wis. 2023) ................................................. 7, 54, 58

*Posadas v. Nat'l City Bank*,
    296 U.S. 497 (1936) .................................................................................................. 56

*Pueblo of Jemez v. United States*,
    483 F. Supp. 3d 1024 (D.N.M. 2020) *aff'd in part, vacated in part, and rev'd in part
    on other grounds*, 64 F.4th 881 (10th Cir. 2023)............................................ 29, 30

*Randolph v. IMBS, Inc.*,
    368 F.3d 726 (7th Cir. 2004) ............................................................................ 55, 59

*Ray v. Spirit Airlines, Inc.*,
    767 F.3d 1220 (11th Cir. 2014) ............................................................................. 56

*Ronkowski v. United States*,
    No. 17-cv-226-bbc, 2018 WL 2376298 (W.D. Wis. May 23, 2018) ................... 47

*San Xavier Dev. Auth. v. Charles*,
    237 F.3d 1149 (9th Cir. 2001) ................................................................................ 38

*Santa Rosa Band of Indians v. Kings Cnty.*,
    532 F.2d 655 (9th Cir. 1975) .................................................................................. 40

*S.C. Johnson & Son, Inc. v. Minigrip, LLC*,
    No. 16-cv-244-jdp, 2017 WL 8727853 (W.D. Wis. Oct. 16, 2017) ................... 32

*Seneca Nation of Indians v. New York*,
    213 F.R.D. 131 (W.D.N.Y.2003) .......................................................................... 73

*Shoshone Tribe of Indians of Wind River Rsrv. v. United States*,
    299 U.S. 476 (1937) .................................................................................................. 33

*Sierra Club v. Franklin Ctny. Power of Ill., LLC*,
    546 F.3d 918 (7th Cir. 2008) .................................................................................. 32

*Smith v. Severn*,
    129 F.3d 419 (7th Cir. 1997) .................................................................................. 10

*Superior Oil Co. v. United States*,
    353 F.2d 34 (9th Cir. 1965) .................................................................................... 49

*Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.,*
    951 F.3d 1142 (9th Cir. 2020) ................................................................ 56, 57, 59

*Tober v. Graco Children's Prods., Inc.,*
    431 F.3d 572 (7th Cir. 2005) ................................................................ 68

*U.S. Commodity Futures Trading Comm'n v. Kraft Foods Group, Inc.,*
    195 F. Supp. 3d 996 (N.D. Ill. 2016) .................................................... 69

*Ultratec, Inc. v. Sorenson Commc'ns, Inc.,*
    323 F. Supp. 3d 1071 (W.D. Wis. 2018) ............................................... 29

*United States v. 7,405.3 Acres of Land,*
    97 F.2d 417 (4th Cir. 1938) .............................................................. 40, 71

*United States v. Ahtanum Irr. Dist.,*
    236 F.2d 321 (9th Cir. 1956) ............................................................. 71

*United States v. Borden Co.,*
    308 U.S. 188 (1939) ........................................................................... 57

*United States v. California,*
    332 U.S. 19 (1947) ............................................................................. 69

*United States v. City of Tacoma,*
    332 F.3d 574 (9th Cir. 2003) ............................................................. 70

*United States v. Cooley,*
    593 U.S. 345 (2021) ........................................................................... 36

*United States v. Imperial Irr. Dist.,*
    799 F. Supp. 1052 (S.D. Cal. 1992) ............................................... 13, 24, 25

*United States v. Lara,*
    541 U.S. 193 (2004) ........................................................................... 36

*United States v. Milner,*
    583 F.3d 1174 (9th Cir. 2009) ...................................................... passim

*United States v. Oakland Cannabis Buyers' Co-op.,*
    532 U.S. 483 (2001) ....................................................................... 32, 34

*United States v. Osage Wind, LLC,*
    710 F. Supp. 3d 1018 (N.D. Okla. 2023) ........................................ 31, 33

*United States v. Osterlund*,
  505 F. Supp. 165 (D. Colo. 1981) .................................................................................. 26, 27

*United States v. Osterlund*,
  671 F.2d 1267 (10th Cir. 1982) ...................................................................................passim

*United States v. Pend Oreille Util. Dist. No.*,
  1, 28 F.3d 1544 (9th Cir. 1994) ............................................................................................. 25

*United States v. S. Pac. Transp. Co.*,
  543 F.2d 676 (9th Cir. 1976) ................................................................................................. 38

*United States v. Schwartz*,
  460 F.2d 1365 (7th Cir. 1972) ......................................................................................... 35, 71

*United States v. Shaver*,
  No. 5:23-cv-02276-SB-SP, 2024 WL 4468026 (C.D. Cal. May 15, 2024) ........................... 25

*United States v. Torlaw Realty, Inc.*,
  348 F. App'x 213 (9th Cir. 2009) ......................................................................................... 73

*United States v. Union Pac. R.R. Co.*,
  353 U.S. 112 (1957) ............................................................................................................... 43

*United States v. White Mountain Apache Tribe*,
  537 U.S. 465 (2003) ............................................................................................................... 36

*Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Utah*,
  790 F.3d 1000 (10th Cir. 2015) ...................................................................................... 30, 33

*Virginian R. Co. v. Ry. Employees*,
  300 U.S. 515 (1937) ............................................................................................................... 32

**State Cases**

*Beduhn v. Kolar*,
  39 Wis. 2d 148, 158 N.W.2d 346 (1968) .............................................................................. 28

*Ebert v. Vill. of Gresham*,
  2020 WI App 76, 394 Wis. 2d 840, 953 N.W.2d 106 ......................................................... 26

*Grygiel v. Monches Fish & Game Club, Inc.*,
  2010 WI 93, 328 Wis. 2d 436, 787 N.W.2d 6 ...................................................................... 12

*Manor Enters., Inc. v. Vivid, Inc.*,
   228 Wis. 2d 382, 596 N.W.2d 828 (Ct. App. 1999) ........................................................ 12, 13

*Munger v. Seehafer*,
   2016 WI App 89, 372 Wis. 2d 749, 890 N.W.2d 22 ........................................................ 26

Statutes and Public Laws

23 U.S.C. § 101 ...............................................................................................................passim

23 U.S.C. § 116 ........................................................................................................................ 8

23 U.S.C. § 201 ...............................................................................................................passim

23 U.S.C. § 202 ...............................................................................................................passim

25 U.S.C. § 177 ...............................................................................................................passim

25 U.S.C. § 311 ................................................................................................................ 49, 65

25 U.S.C. § 318a ...................................................................................................................... 7

25 U.S.C. § 321 ...................................................................................................................... 49

25 U.S.C. § 324 ...............................................................................................................passim

25 U.S.C. § 325 .................................................................................................................. 6, 59

25 U.S.C. § 396a .................................................................................................................... 39

25 U.S.C. § 415 ...................................................................................................................... 39

25 U.S.C. § 2701 .................................................................................................................... 39

25 U.S.C. § 5101 .................................................................................................................... 65

25 U.S.C. §§ 323-328 .......................................................................................................... 1, 39

28 U.S.C. § 2409a .................................................................................................................. 38

28 U.S.C. § 2415 .................................................................................................................... 71

Act of July 22, 1790, ch.33, 1 Stat. 137 ........................................................................... 4, 37

Act of March 1, 1793, ch. 19, 1 Stat. 329 ......................................................................... 4, 37

Act of May 19, 1796, ch. 30, 1 Stat. 469 ................................................................ 5, 37

Act of March 3, 1799, ch. 46, 1 Stat. 743 ............................................................... 5, 37

Act of March 30, 1802, ch. 13, 2 Stat. 139 ............................................................. 5, 38

Act of June 30, 1834, ch. 161, 4 Stat. 729 .............................................................. 5, 37

Act of June 4, 1888, ch. 345, 25 Stat. 169 ................................................................. 46

Act of Feb. 3, 1903, ch. 399, 32 Stat. 795 ................................................................. 43

Act of May 26, 1928, ch. 756, 45 Stat. 750 ................................................................. 7

Act of Sept. 16, 1966, Pub. L. No. 89-554, 80 Stat. 378 ............................................ 63

Indian Reorganization Act, ch. 576, 48 Stat. 984 (1934) ........................................... 65

General Allotment Act, ch. 119, 24 Stat. 388 (1887) ............................................... 3, 44

Labor-Federal Security Appropriations Act, Pub. L. No. 77-647, 56 Stat. 562 (1943) ....... 63

Labor-Federal Security Appropriations Act, Pub.. L. No. 78-135, 57 Stat. 498 (1944) ...... 63

Unemployment Relief Act, Pub. L. No. 73-5, 48 Stat. 22 (1933) ........................... 3, 60, 61, 63


## Federal Rules

Fed. R. Civ. P. 8 ....................................................................................................... 68

Fed. R. Civ. P. 12 ................................................................................................ 66, 68

Fed. R. Civ. P. 56 ............................................................................................ 2, 10, 66


## Federal Regulations

25 C.F.R. Part 169 ............................................................................................. passim

25 C.F.R. Part 170 .............................................................................................. 6, 57

25 C.F.R. § 170.114 ........................................................................................... passim

25 C.F.R. § 170.2 ........................................................................................... 6, 7, 52

25 C.F.R. §§ 170.443 ..................................................................................... 53, 57

25 C.F.R. §§ 170.444-447 ............................................................................. 7, 8, 66

25 C.F.R § 170.460 .......................................................................................... 9, 53, 57

25 C.F.R. § 170.473 .......................................................................................... 53, 57

25 C.F.R. § 170.5 ............................................................................................passim

Tribal Transporation Program, 81 Fed. Reg. 78,456 (Nov. 7, 2016) ...........passim

## Publications and Other Authorities

Bureau of Indian Affairs, *Rights-of-Way on Indian Lands Handbook*,
   52 IAM 9-H (Office of Trust Services Jan. 10, 2022) ............................................... 9, 52, 54

FELIX S. COHEN, COHEN'S HANDBOOK OF FEDERAL INDIAN LAW
   (Nell Jessup Newton ed. 2012) ......................................................................passim

*Lac Du Flambeau Indians*,
   9 Pub. Lands Dec. 392 (D.O.I.), 1889 WL 734 (Sept. 23, 1899) .................................... 43, 44

Restatement (Second) of Torts (Am. Law Inst. 1965) ................................................. 12, 13, 14

Treaty with the Chippewa, 10 Stat. 1109 (Sept. 30, 1854) ............................................passim

W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* (5th ed. 1984) ...................... 13

## INTRODUCTION

Plaintiff United States of America brought this trespass action on its own behalf and in its capacity as trustee for the Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin (the "Band") and seventy-six individual Indian landowners (the "Allottees") against Defendant Town of Lac du Flambeau (the "Town") to remedy the Town's continuous and ongoing trespass on lands that the United States holds in trust or restricted-fee status for the Band and the Allottees. Specifically, the United States alleges that the Town continues to use and occupy segments of four roads within the exterior boundaries of the Lac du Flambeau Indian Reservation (the "Reservation")—Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane, and Elsie Lake Lane (the "Roads")—despite having no valid rights-of-way ("ROW") under the Indian Right-of-Way Act, 25 U.S.C. §§ 323-328, and its implementing regulations, 25 C.F.R. Part 169 (together, the "ROW Act"), entitling the Town to use the trust and restricted-fee lands underlying the segments of the Roads, which the Town asserts are part of its road system. *See generally* Dkts. 1 and 61 (Compl. and First Am. Compl.). The Town held valid ROWs for the segments of Roads for terms of fifty years, but those ROWs undisputedly expired at various times between 2011 and 2018. The ROWs were not renewed. *Id.*

Intervenor Defendants Gordon Anderson et al., a group of non-Indian residents of the Reservation who own properties accessed by the Roads (the "Homeowners"), intervened in the case in support of the Town. *See generally* Dkts. 10, 19, 25. Because of the location of the Homeowners' properties, the Homeowners are regular users of the

segments of the Roads crossing the Bands' and the Allottees' trust and restricted-fee lands. Like the Town, the Homeowners do not currently hold valid ROWs entitling them to use the trust and restricted-fee lands underlying the Roads.

Pursuant to Fed. R. Civ. P. 56, the Court's *Summary Judgment Procedures*, and the dispositive-motion briefing schedule set in this case, *see* Dkt. 124, the United States now respectfully moves for partial summary judgment on the liability components of its trespass and ejectment claims against the Town, and for an order ejecting the Town from the Band's and Allottees' lands. *See* Dkt. 61, Prayer for Relief ¶¶ (a), (d), and (e). The United States also requests summary judgment on the Town's and Homeowners' counterclaims and affirmative defenses.

The United States' trespass and ejectment claims and the Town's and the Homeowners' counterclaims and affirmative defenses all present legal issues appropriate for decision by summary judgment. As demonstrated in the United States' Statement of Proposed Findings of Fact in Support of its Motion for Partial Summary Judgment ("US PFF") and other supporting materials, filed concurrently herewith or already of record in this case, the material facts pertaining to the United States' trespass and ejectment claims are not subject to any genuine dispute.

If the Court finds that the Town is in trespass on the trust and restricted-fee lands constituting the Band's, the Allottees', and the United States' real property, the United States is entitled under settled law to an order promptly ejecting the Town from those trust and restricted-fee lands. Such an order follows as a matter of law because of the Town's trespass—its unauthorized alienation—of lands to which the United States

either holds legal title for the benefit of the Band or holds restrictions against alienation and encumbrance for the lands the Allottees jointly own in restricted fee. And this outcome holds true even if the Court were to consider the equities of granting such relief.

Nor are there any disputed material factual issues regarding the Town's and Homeowners' counterclaims and affirmative defenses. The United States' entitlement to summary judgment on those counterclaims and affirmative defenses is equally clear. First, the Town does not possess easements in the trust and restricted-fee lands underlying the Roads by implication or necessity. The United States' 1854 Treaty with the Chippewa, 10 Stat. 1109 (Sept. 30, 1854) ("1854 Treaty"), granted future non-Indian settlers on the Reservation no such rights. Nor do the Town or Homeowners point to any clear statement from Congress in the General Allotment Act, ch. 119, 24 Stat. 388 (1887), or any other statute granting such rights in trust or restricted-fee lands on the Reservation. Second, the Town is not excused from compliance with the ROW Act by virtue of the regulation found at 25 C.F.R. § 170.114(a). To interpret that regulation as a grant of legal rights to use and occupy the trust and restricted-fee lands at issue here would contravene Congress' clear directive in the ROW Act and would result in the de facto repeal of that Act, a legally untenable outcome. Third, the Town's and Homeowners' reliance on the Unemployment Relief Act, 48 Stat. 22 (Mar. 31, 1933), is misplaced. That Depression-Era statute granting rights to access the Reservation to relieve unemployment did not grant the Town the right, in perpetuity, to use the trust and restricted-fee lands underlying the Roads. The Act granted no such rights and, in

any event, most, if not all, of the segments of the Roads crossing the trust and restricted-fee lands at issue in this case were not constructed at the time of the statute's enactment. In short, the Town is in trespass, has no valid defense to its trespass, and should accordingly be found in violation of the applicable federal law.

## STATUTORY AND REGULATORY BACKGROUND

### I.     Indian Nonintercourse Act

In 1790, Congress passed the Indian Nonintercourse Act, the first of a series of laws that prohibited—and still prohibit—the sale or alienation of Indian lands without the express consent of the United States. Act of July 22, 1790, ch. 33, § 4, 1 stat. 137, 138. The Act

> *declared*, [t]hat no sale of lands made by any Indians, or any nation or tribe of Indians within the United States, shall be valid to any person or persons, or to any state, whether having the right of pre-emption to such lands or not, *unless the same shall be made and duly executed at some public treaty, held under the authority of the United States.*

*Id.* (emphasis added); *see also Oneida Indian Nation of N.Y. v. Cnty. of Oneida* ("*Oneida I*"), 414 U.S. 661, 667–670 (1974) ("Unquestionably it has been the policy of the federal government from the beginning to respect the Indian right of occupancy, which could only be interfered with or determined by the United States."). That law passed by the First Congress also made it a federal offense for a non-Indian to "trespass against" an Indian or their property in Indian territory that would otherwise be punishable under state law if committed within the jurisdiction of any state. 1 Stat. 138, § 5. Since then, Congress has passed numerous iterations of that law, using substantially the same language as § 4 of the 1790 version. Act of March 1, 1793, ch. 19, § 8, 1 Stat. 329, 330; Act

of May 19, 1796, ch. 30, § 12, 1 Stat. 469, 472; Act of March 3, 1799, ch. 46, § 12, 1 Stat. 743, 746; Act of March 30, 1802, ch. 13, § 12, 2 Stat. 139, 143; Act of June 30, 1834, ch. 161, § 12, 4 Stat. 729, 730. The current version of the Indian Nonintercourse Act is codified at 25 U.S.C. § 177 (the "INA") and makes clear that title and any other interests in Indian lands—including rights-of-way—can only be validly conveyed pursuant to unambiguous congressional authorization:

> No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

*Id.; see also Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 119 (1960) ("The obvious purpose of that statute is to prevent unfair, improvident or improper disposition by Indians of lands owned or possessed by them to other parties, except the United States, without the consent of Congress . . . .").

## II.   Indian Right-of-Way Act

The ROW Act, since its enactment in 1948, has authorized the Secretary to grant rights-of-way across trust and restricted-fee lands of both Tribes and individual Indians. 25 U.S.C. § 324. *See Nebraska v. Pub. Power Dist. v. 100.95 Acres of Land,* 719 F.2d 956, 958-59 (8th Cir. 1983) (explaining that the purpose of the ROW Act was to simplify the "amalgam of special purpose access statutes dating back as far as 1875"). With respect to trust and restricted-fee land, the ROW Act contains two requirements for granting a right-of-way. First, "[n]o grant of a right-of-way . . . shall be made without the consent of the proper tribal officials." 25 U.S.C. § 324. Second, "[n]o grant of right-

of-way shall be made without the payment of such compensation as the Secretary of the Interior shall determine to be just." *Id.* § 325. Grants of right-of-way must be for a term of years, and to renew a right-of-way the applicant must apply for a renewal before that right-of-way expires. 25 C.F.R. § 169.201-202. Absent compliance with the ROW Act, "the user of a right-of-way over Indian lands obtains no interest in those lands and may be held to be a trespasser." FELIX S. COHEN, COHEN'S HANDBOOK OF FEDERAL INDIAN LAW ("COHEN'S HANDBOOK") § 15.09[4], at 1064 (Nell Jessup Newton ed. 2012).

### III.   Tribal Transportation Program

The Tribal Transportation Program, authorized at 23 U.S.C. §§ 201-202 and implemented through Department of the Interior regulations in 25 C.F.R. Part 170 (together, the "TTP"), is a funding program that was established for the "benefit of Tribes." 25 C.F.R. § 170.2(h). It was designed to provide "safe and adequate transportation and public roads" within or providing access to Tribal lands, through the allocation of Federal funds. 81 Fed. Reg. 78,456, 78,456-57 (Nov. 7, 2016). Federally recognized Tribes receiving funding through the TTP can expend those funds on surface transportation needs, including transportation planning and construction, roadway and facility maintenance, environmental mitigation as it relates to transportation facilities, and other critical transportation infrastructure. 23 U.S.C. § 202(a)(1) (use of Federal funds); *see also* 23 U.S.C. § 101(a)(33) (defining a "tribal transportation facility").

For almost a century[1] the TTP has contributed to the "economic development, self-determination, and employment of Indians and Alaska Natives" through the funding of surface transportation needs of Tribes. 81 Fed. Reg. at 78,457. The TTP is administered "for the benefit of Tribes" and is tribally driven in accordance with the federal policy of "self-determination and self-governance" of Tribal governments. 25 C.F.R. § 170.2(h); *see also Pollard v. Johnson*, 694 F. Supp. 3d 1080, 1086 (W.D. Wis. 2023) (Congress's intent in passing the TTP was "to assist tribes in providing safe and adequate transportation and public road access to and within Indian lands, 23 U.S.C. § 202, while at the same time respecting Tribal self-determination and self-governance.").

For a road or transportation facility to be eligible for the expenditure of TTP funds, it must be listed on the National Tribal Transportation Facility Inventory ("NTTFI"). 23 U.S.C. § 202(b)(1)(B); *see also* 25 C.F.R. § 170.5 (further defining the NTTFI). The Secretary of the Interior ("Secretary") maintains the NTTFI, but Tribes determine what existing roads or other transportation facilities located within their jurisdictions are listed. 25 C.F.R. §§ 170.444-447 (detailing documentation required to have an existing road or facility listed or to update a listing). Once a roadway or facility is listed on the NTTFI, a Tribe is authorized to expend its TTP funds on that road or facility in accordance with the Tribe's Federal Highway Administration ("FHWA")-approved "tribal transportation improvement program," or "TTIP." *See* 23 U.S.C.

---

[1] The TTP's predecessor—the Indian Reservation Roads Program—was established on May 26, 1928. See Act of May 26, 1928, ch. 756, 45 Stat. 750 (codified at 25 U.S.C. § 318a).

§ 202(b)(4)(B).

If a Tribe wants to "updat[e] the data on a facility currently listed in the NTTFI"—which includes the removal of a road or facility from the NTTFI—the Tribe submits its update request to the United States Department of the Interior, Bureau of Indian Affairs ("BIA") pursuant to 25 C.F.R. § 170.444(b). The BIA then undertakes the ministerial act of removing the roadway or facility from the NTTFI after the BIA verifies that the Tribe has not expended federal transportation funds on that roadway or facility.[2]

The NTTFI identifies the "public authority," or "owner" in transportation-funding shorthand, that is responsible for maintaining each road or facility listed on the NTTFI. *See* 23 U.S.C. § 101(a)(22) (definition of "public authority"); *see also* 25 C.F.R. § 170.5 (same). As the definition makes plain, a public authority or owner for a road or other transportation facility located on trust or restricted-fee land within an Indian reservation need not be the Tribe itself; rather, it can be a Federal or State agency, or a

---

[2] Federal lands, including trust and restricted-fee lands, and Tribal transportation facilities are to be "treated under uniform policies similar to the policies that apply to Federal-aid highways" at Chapter 1 of Title 23. 23 U.S.C. § 201(a). Chapter 1 of Title 23 provides that "it shall be the duty of the State transportation department or other direct recipient to maintain, or cause to be maintained, any project constructed under the provisions of this chapter or constructed under the provisions of prior [Highway] Acts." *Id.* § 116(b). While the BIA jointly administers the TTP with the FHWA, Tribes are the direct recipients of TTP funds authorized by 23 U.S.C. § 202(b)(3). The TTP allows Tribes to use a limited portion of their available Tribal funds for maintenance activities. *Id.* at § 202(a)(8). Read in harmony, these provisions mean that roads constructed with funds authorized by the TTP must be maintained by Tribes until the Government has received a reasonable return on its investment. Here, the Town is the "public authority" responsible for maintaining the Roads, *see* US PFF ¶¶ 44, 46, 51, and the BIA confirmed that the Band had spent no TTP funds on the Roads, *id.* at ¶ 58.

subdivision of a State, as is the case here. *Id.* A Tribe may list such roads or other facilities because they are "public roads . . . within the exterior boundary of Indian reservations" or are "public roads within or providing access to an Indian reservation or Indian trust land or restricted Indian land that is not subject to fee title alienation without the approval of the Federal Government." 23 U.S.C. § 202(b)(1)(B)(v) & (vi); *see also* 25 C.F.R. § 170.5 (definition of NTTFI). The purpose of the NTTFI, however, is "limited to establishing eligibility for assistance using TTP funds." Bureau of Indian Affairs, *Rights-of-Way on Indian Lands Handbook*, 52 IAM 9-H at 8 (Office of Trust Services Jan. 10, 2022) ("ROW Handbook").[3]

Tribes are always the direct recipients of the TTP funds authorized by 23 U.S.C. § 202(b)(3)(A)(i). For this reason, the NTTFI  "should not be used for determining real property ownership, nor whether a ROW is needed or if it exists. In all instances, the Trust Asset and Accounting Management System (TAAMS) should be used to verify realty data, including real property ownership and the existence of a ROW."[4] ROW Handbook at 8. Simply put, listing a road or other transportation facility on the NTTFI serves a single function: to establish a list of roads and other transportation facilities for

---

[3] The ROW Handbook is publicly accessible at: https://www.bia.gov/sites/default/files/dup/assets/public/raca/handbook/pdf/52%20IAM%209-H%20ROW%20HB%20_FINAL_signed_w.footer_Jan%202022_minor%20corrections_508.pdf, last visited Dec. 12, 2024.

[4] The ROW Handbook, the purpose of which "is to provide guidance to BIA staff on processing ROWs on trust or restricted land," states further: "Accordingly, the TTP regulations defer to 25 CFR 169 to determine whether a ROW is needed for a construction project (25 CFR 170.460). If a ROW is needed, the TTP regulations require that it be in place before commencement of construction activities (25 CFR 170.460)." ROW Handbook at 1, 8.

which a Tribe, in its sole discretion pursuant to an approved TTIP, may expend its share of TTP funding for transportation infrastructure, maintenance, and other TTP-eligible activities on or about Indian lands. *See id.* § 202(b)(1). Only public roads, as defined at 23 U.S.C. § 101(a)(22) and meeting the requirements of 23 U.S.C. § 202(b)(1)(B) and the TTP regulations, are eligible to be listed in the NTTFI. And to remain on the NTTFI, the public authority or owner of the roads must keep them open for public use. 25 C.F.R. § 170.114(a).

## STANDARD OF REVIEW

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For summary-judgment purposes, material facts are those that are outcome determinative under the applicable law. *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). In determining whether a genuine issue of material fact exists, the Court must "construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Bellaver v. Quanex, Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000). The Court must avoid "the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A genuine issue of fact "exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." *Bellaver,* 200 F.3d at 492 (quoting *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir. 1999) (citation omitted)).

A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011). A party opposing summary judgment "may not rest upon the mere allegations or denials of [their] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citations omitted).

## ARGUMENT

### I.   THE TOWN IS IN TRESPASS ON THE TRUST AND RESTRICTED-FEE LANDS ON WHICH THE ROADS ARE LOCATED

This action presents a paradigmatic case of trespass on Indian lands and violation of the property rights of the Band, the Allottees, and the United States. The BIA granted the ROWs for the Roads at various times in the 1960s. US PFF ¶¶ 35-39. Each ROW was for a term of fifty years. *Id.* The ROWs expired by their terms in 2011, 2014, and 2018. *Id.* The Town treated the Roads, including those segments crossing the trust and restricted-fee lands owned by the Band and the Allottees, as part of the Town's road system during the ROW terms—that is, the Town was the "public authority" responsible for operation and maintenance of those road segments. *Id.* ¶ 45. Since the expiration of each of the ROWs, the Town has continued to hold itself out as the public authority that "owns" the segments of the Roads crossing the trust and restricted-fee lands. *Id.* ¶¶ 46-47. And the Town has continued to use and occupy those lands, and perform maintenance on those segments of the Roads, as part of the Town's

road system. *Id.* ¶ 52. The Town lacks any valid legal right under Federal law to do so and is thus committing a continuing trespass.

A.    **Federal Common Law Governs The United States' Trespass Claim.**

"Federal common law governs an action for trespass on Indian lands." *United States v. Milner*, 583 F.3d 1174, 1182 (9th Cir. 2009); *see also Cnty. of Oneida v. Oneida Indian Nation ("Oneida II")*, 470 U.S. 226, 234-36 (1985) (citing and discussing the foundational cases); *Bad River Band of Lake Superior Tribe of Bad River Reservation v. Enbridge Energy Co., Inc.*, 626 F. Supp. 3d 1030, 1040-41 & n.3 (W.D. Wis. 2022) ("*Bad River Band I*") (same), *on appeal*, Nos. 23-2309, 23-2467 (7th Cir.). The federal common law of trespass "generally comports with the Restatement of Torts." *Milner*, 583 F.3d at 1182-83 (footnote omitted); *Bad River Band I*, 626 F. Supp. 3d at 1041 (citing the Restatement (Second) of Torts for the elements of trespass). Federal courts may look to state law for guidance in crafting federal common law. *See Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 965 (10th Cir. 2019) (Federal common law applies to trespass claims on allotted land and court would look to state trespass law as providing governing principles "to the extent [state law] comports with federal policy"); *Bad River Band I*, 626 F. Supp. 3d at 1041 n.3 (citing *Davilla*). Wisconsin law also generally conforms to the Restatement's definition of trespass. *Grygiel v. Monches Fish & Game Club, Inc.*, 2010 WI 93, ¶ 40, 328 Wis. 2d 436, 461, 787 N.W.2d 6, 18; *Manor Enters., Inc. v. Vivid, Inc.*, 228 Wis. 2d 382, 396-97, 596 N.W.2d 828, 835 (Ct. App. 1999).

## B.    The Definition Of Trespass.

The Restatement provides that a person is liable for trespass "if he intentionally (a) enters land in the possession of [another], or causes a thing or a third person to do so, or (b) remains on the land, or (c) fails to remove from the land a thing which he is under a duty to remove." Restatement (Second) of Torts § 158 (Am. Law Inst. 1965). In an action brought by the United States for trespass on the lands of the Torres-Martinez Band of Mission Indians, the federal district court in southern California defined the contours of the tort as follows:

> Trespass is the intentional use of the property of another without authorization and without privilege. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 13 at 70 (5th ed. 1984). Any physical entry upon the surface of the land is a trespass . . . . The intent required is simply an intent to be on the land.

*United States v. Imperial Irr. Dist.*, 799 F. Supp. 1052, 1059 (S.D. Cal. 1992). *Accord Manor Enters., Inc.*, 228 Wis. 2d at 391, 596 N.W.2d at 832 (citing Restatement (Second) of Torts to define trespass).

*United States v. Milner* is instructive. In that case, the United States sued a group of waterfront homeowners for trespass because "shore defense structures" they had erected to protect their properties encroached on tidelands held in trust for the Lummi Nation. *Milner*, 583 F.3d at 1180-81. The homeowners initially leased the tidelands from the Lummi. When the lease expired, the homeowners declined to renew it. *Id.* When the homeowners failed to respond to requests from the United States "demanding removal of the structures or alternatively that the Homeowners enter into agreements to lease the tidelands," the United States sued. *Id.*

The homeowners argued "that because their structures were lawfully built . . . they cannot be liable for trespass . . . ." *Id.* at 1183. In other words, they claimed "that the elements of intent and causation were not satisfied" given the initial legal placement of the structures. *Id.* The Ninth Circuit disagreed, concluding that "[a]lthough the shore defense structures may have been legal as they were initially erected, this is not a defense against the trespass action . . . ." *Id.* at 1190. The court found that "to be liable for trespass, the Homeowners need not have intended the actual trespass. Rather, the intent requirement is satisfied because the government requested that the encroaching parts of the structures be removed, but the Homeowners failed to do so." *Id.* at 1190-91; *see also* Restatement (Second) of Torts § 160(a) ("A trespass . . . may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor . . . has placed [on the land] . . . with the consent of the person then in possession of the land, if the actor fails to remove it after the consent has been effectively terminated."). The same is true here—the Town cannot claim that the expired ROWs authorize the continued use of the Roads crossing the Band's and Allottees' lands, even if the Roads were "lawfully built."

*Davilla* puts a fine point on the intent issue where, like here, the expired ROWs were expressly term limited. In *Davilla*, a group of allottee landowners sued Enable, the owner of a natural gas pipeline crossing the allottees' lands. Enable "failed to renew the easement but also failed to remove the pipeline," 913 F.3d at 962, following expiration of a 20-year easement. The court readily disposed of Enable's argument that it lacked the requisite intent necessary to commit a trespass because, at the time Enable initially

constructed the pipeline, it was legally authorized to do so. "As we have explained, Enable acquired the pipeline *already knowing* the right-of-way would eventually expire. It therefore cannot . . . claim it lacked notice of its duty to remove or intent to maintain the trespass." *Id.* at 970 (emphasis in original). Similarly, at the time it accepted responsibility for each of the Roads as a public authority, the Town was aware the ROWs would expire, *see* US PFF ¶¶ 47-48, and, more than five years after the last of the ROWs expired, the Town continues to use and occupy the Band's and Allottees' trust and restricted-fee lands without a valid legal right.[5]

**C.    The United States Holds Fee Title To The Lands In Trust For The Benefit Of The Band And Holds Restrictions Against Alienation And Encumbrance For The Lands The Allottees Own In Fee.**

Based on the relevant BIA records, it is also undisputed that the segments of the Roads at issue are located on lands either owned by the United States in trust for the

---

[5] The Town had a valid legal right under federal law to use, occupy, and maintain the segments of the Roads crossing the Band's and the Allottees' lands during the terms of the ROWs. The Town did not seek to renew the ROWs or obtain new ROWs, and does not now possess valid ROWs granted by the United States and consented to by the Band and the Allottees. This is undisputed. US PFF ¶¶ 49-50. Considering the definition of trespass, and given these undisputed facts, the Town's and the Homeowners' affirmative defenses that the United States and the Band "contributed to or were the sole cause" of the trespass, Dkt. 64 at 26 ¶ 7 (Town's Seventh Aff. Def.); Dkt. 66 at 39 ¶ 13 (Homeowners' Thirteenth Aff. Def.); and that the United States and the Band "implicitly and expressly consented" to the use of the Band's and the Allottees' lands in the operation of the Roads, Dkt. 64 at 27 ¶ 19 (Town's Nineteenth Aff. Def.); Dkt. 66 at 38 ¶ 6 (Homeowners' Sixth Aff. Def.), wholly lack merit. *See Cap. Indem. Corp. v. St. Paul Fire & Marine Ins. Co.*, 357 F. Supp. 399, 410 (W.D. Wis. 1972) (the burden of establishing all the elements of an affirmative defense rests squarely upon the defendant).

Band or owned by the Allottees in restricted-fee status, with the United States holding restrictions against alienation and encumbrance of those allotted lands.[6]

### 1.   Annie Sunn Lane

Three discrete segments of Annie Sunn Lane are located on trust and restricted-fee lands owned by the Band and some of the Allottees. Two of the segments are relevant to this case. US PFF ¶ 18. The first relevant segment—referred to in the Complaint as the "First Annie Sunn Lane ROW," Dkt. 61 ¶ 18—is located within three separate tracts of land. US PFF ¶ 19. The first tract consists of the SE¼ of the SE¼ in Section 9, Township T41N, R5E, 4th P.M., totaling 40.000 acres of land designated by the BIA as Tract No. 432 7A51. *Id.* ¶ 19.a. The Band owns a ninety-six percent (96%) interest in Tract No. 432 7A51, which the United States holds in trust. *Id.* The remaining four percent (4%) is jointly held in restricted-fee status by sixteen of the Allottees. *Id.* The second tract consists of the E½, the S½ of the NW¼, and Government Lots 1, 2, and 3 in Section 16, T41N, R5E, 4th P.M., totaling 507.050 acres of land designated by the BIA as Tract No. T 2047. *Id.* ¶ 19.b. The Band owns a one-hundred percent (100%) interest in Tract No. 432 T 2047, which the United States holds in trust. *Id.* The third tract on which the First Annie Sunn Lane ROW is located consists of the SW¼ of the SW¼ in Section 10, T41N, R5E, 4th P.M., and the NW¼ of the NW¼ in Section 15, T41N, R5E, 4th P.M., totaling 80.000 acres of land designated by the BIA as Tract No. 432 7G16. *Id.* ¶ 19.c. The

---

[6] This section addresses and disposes of the Town's affirmative defense alleging that the United States "has not shown or is unable to meet its burden of demonstrating the legal ownership status of the Roads, including but not limited to the fact that certain portions of Elise [sic] Lake Lane are held in fee status." Dkt. 64 at 26 ¶ 13 (Town's Thirteenth Aff. Def.).

Band owns a ninety-three percent (93%) interest in Tract No. 432 7G16, which the United States holds in trust. *Id.* The remaining seven percent (7%) is jointly held in restricted-fee status by forty of the Allottees. *Id.*

The First Annie Sunn ROW, denominated ROW 432-2575964 by the BIA, details this east-west road right-of-way over Tract Nos. 432 7A51, 432 T 2047, and 432 7G16. *Id.* ¶ 35. The ROW consisted of a segment of the road currently known as Annie Sunn Lane. The First Annie Sunn ROW segment was 1,867 feet in length and 66 feet in width, for a total area of 2.86 acres of encumbered trust and restricted-fee land. *Id.*

The second relevant segment of Annie Sunn Lane—referred to in the Complaint as the "Second Annie Sunn Lane ROW," Dkt. 61 ¶ 25—is located entirely within Tract No. 432 T 2047, described above, in which the Band owns the entire interest. US PFF ¶ 19.b. The Second Annie Sunn ROW, denominated ROW 432-1521 by the BIA, details this north-south road right-of-way over Tract No. 432 T 2047. *Id.* ¶ 36. The ROW consisted of a segment of the road currently known as Annie Sunn Lane. The Second Annie Sunn ROW segment was 2,478.7 feet in length and 66 feet in width, for a total area of 3.60 acres of encumbered trust land. *Id.*

## 2. *Center Sugarbush Lane*

A single segment of Center Sugarbush Lane—referred to in the Complaint as the "Center Sugarbush Lane ROW," Dkt. 61 ¶ 30—is located entirely within a tract of land consisting of the NE¼ of the SW¼ and the SE¼ of the NW¼ in Section 20, T41N, R5E, 4th P.M., totaling 80.000 acres of land designated by the BIA as Tract No. 432 7D13. US PFF ¶¶ 22-23. The Band owns a seventy-five percent (75%) interest in Tract No. 432

7D13, which the United States holds in trust. *Id.* ¶ 23. The remaining twenty-five

percent (25%) is jointly held in restricted-fee status by fifteen of the Allottees. *Id.*

The Center Sugarbush Lane ROW, denominated ROW 432-4391964 by the BIA,

details this road right-of-way over Tract No. 432 7D13. *Id.* ¶ 37. The ROW consisted of a

segment of the road currently known as Center Sugarbush Lane, 1,362.5 feet in length

and 66 feet in width, for a total area of 2.0 acres of encumbered trust and restricted-fee

land. *Id.*

### 3.   *East Ross Allen Lake Lane*

A single segment of East Ross Allen Lake Lane—referred to in the Complaint as

the "East Ross Allen Lake Lane ROW," Dkt. 61 ¶ 37—is located entirely within a tract of

land consisting of Government Lots 1, 5, 6, and 7, and the SW¼ of the SW¼ in Section 2,

Township 40 North, Range 4 East, 4th P.M., totaling 219.100 acres of land designated by

the BIA as Tract No. 432 T 2056. *Id.* ¶¶ 26-27. The Band owns a one hundred percent

(100%) interest in Tract No. 432 T 2056, which the United States holds in trust. *Id.*

The East Ross Allen Lake Lane ROW, denominated ROW 432-1869964 by the

BIA, details this road right-of-way over Tract No. 432 T 2056. *Id.* ¶ 38. The ROW

consisted of a segment of the road currently known East Ross Allen Lake Lane, 537 feet

in length and 66 feet in width, for a total area of 0.81 acres of encumbered trust land. *Id.*

### 4.   *Elsie Lake Lane*

A single segment of Elsie Lake Lane—referred to in the Complaint as the "Elsie

Lake Lane ROW," Dkt. 61 ¶ 44—is located entirely within a tract of land consisting of

Government Lot 2 in Section 30, Township 41 North, Range 6 East, 4th P.M., totaling

38.300 acres of land designated by the BIA as Tract No. 432 7H60. US PFF ¶¶ 30-31. The

Band owns a forty-eight percent (48%) interest in Tract No. 432 7H60, which the United

States holds in trust. *Id.* ¶ 31. Seven of the Allottees jointly hold fifty percent (50%) of

the remaining interest in restricted-fee status, and the remaining two percent (2%) is

owned in fee. *Id.*

The Elsie Lake Lane ROW, denominated ROW 432-11462961 by the BIA, details

this road right-of-way over Tract No. 432 7H60. *Id.* ¶ 39. The ROW consisted of a

segment of the road currently known as Elsie Lake Lane, 1,039.3 feet in length and 32

feet in width, for a total area of 0.76 acres of encumbered trust and restricted-fee land.

*Id.*

### D.     Each Of The ROWs Was For A Term Of Fifty Years Pursuant To The Express Terms Of The Grants Or By Operation Of Law.

Also based on the relevant BIA records, it is undisputed that each of the ROWs

was granted for a term of fifty years. As explained below, the fifty-year term of each

ROW either was plain on the face of each grant, was clear from terms of the application

for each ROW, was clear from the terms of the Band's consent for each, or was an

express limitation imposed by the BIA regulations in force at the time of each grant. [7]

---

[7] This section addresses and disposes of the Town's and the Homeowners' affirmative
defenses alleging that "certain ROWs did not contain expiration provisions, and others
provided that they were subject to renewal upon compliance with applicable regulations."
Dkt. 64 at 28 ¶ 28 (Town's Twenty-Eighth Aff. Def.); Dkt. 66 at 38 ¶ 7 (Homeowners'
Seventh Aff. Def.). As explained below, only the Second Annie Sunn Lane ROW did not
specify the term of the grant, which was limited to fifty years by the regulations in effect at
the time. *See* Section D.2., *infra.*

### 1.     The First Annie Sunn Lane ROW

E. J. Riley, Superintendent of the BIA-Great Lakes Agency at the time, approved the First Annie Sunn Lane ROW (ROW  432-2575964) on April 28, 1964, "for a period of fifty years from that date," until April 27, 2014. *Id.* ¶ 35; Declaration of Melissa O'Connor, Dkt. 110 ("O'Connor PI Decl."), ¶¶ 4-5, 6.A, 7.A & Dkt. 110-7, at 6. The First Annie Sunn Lane ROW was issued to Ronald P. Niske, President, Northwoods Land Office, Inc., *id.*, with the understanding that it would be assigned to the Town. US PFF ¶ 41. Prior to approving the grant, the BIA obtained the consent of the allottee owners of Tract Nos. 432 7A51 and 432 7G16, *id.* ¶ 34, as well as the consent of the Band. *Id.* Since its expiration, the First Annie Sunn Lane ROW has not been renewed. *Id.* ¶¶ 35, 50.

### 2.     The Second Annie Sunn Lane ROW

Four years later, Superintendent Riley approved the Second Annie Sunn Lane ROW (ROW 432-1521), on February 19, 1968, for a "Public road right-of-way." *Id.* ¶ 36; O'Connor PI Decl., ¶¶ 4-5, 6.B, 7.B & Dkt. 110-8, at 5. The Second Annie Sunn Lane ROW was issued to Mr. Niske and Northwoods. *Id.* Prior to approving the grant, the BIA obtained the consent of the Band. US PFF ¶ 36. On September 22, 1971, Niske assigned the easement to the Town. *Id.* ¶ 40.

The Second Annie Sunn Lane ROW is silent with respect to the term of the grant. O'Connor PI Decl., ¶¶ 4-5, 6.B, 7.B & Dkt. 110-8, at 5. There is no indication on the face of the document whether the grant was for a limited term of years or without term. *Id.* The Lac du Flambeau Tribal Council Resolutions consenting to the Second Annie Sunn

Lane ROW also are silent as to term. *Id.*, Dkt. 110-8, at 2-3. The BIA approval states in full:

> Public road right-of-way approved pursuant to the provisions of the Act of Feb. 5, 1948 (62 Stat. 17) and 25 CFR 161, and subject to any prior, valid, existing right or adverse claims, and with the right in the applicant, its successors and assigns, to transfer this right-of-way by assignment, grant, or otherwise.

*Id.*, Dkt. 110-8, at 5.

The BIA regulations implementing the ROW Act in force at the time that the BIA approved the Second Annie Sunn Lane ROW in February 1968 limited the term of right-of-way grants for roads to private, non-governmental entities like Mr. Niske and Northwoods to no more than fifty years. US PFF ¶ 42 (25 C.F.R. Subchapter O, Part 161 (Rights-of-Way Over Indian Lands), § 161.19 (Dec. 6, 1957)). Notwithstanding the Second Annie Sunn Lane ROW's silence as to term, the BIA both at the time of the grant and subsequently understood this regulatory limitation to apply to the grant. *See id.* ¶ 44; Declaration of Hillary Hoffman in Support of United States' Motion for Partial Summary Judgment ("Hoffman Decl."), ¶¶ 19-20 & Atts. P (BIA Memorandum dated Feb. 23, 1968) (US_0034626) ("Private individuals and corporations should only receive private grants of easement for the limited term specified in 25 C.F.R. 161"), and Q (BIA Letter to Richard Caspari dated Sept. 16, 1977) (US_0034632) ("Right-of-way was granted to Northwoods Land Office, Inc. on February 19, 1968 and was assigned to the Town of Lac du Flambeau on September 22, 1971. Right-of-way is for a 50-year tenure.").

3.      *The Center Sugarbush Lane ROW*

Superintendent Riley approved the Center Sugarbush Lane ROW (ROW  432-4391964) on July 28, 1964, "for a period of fifty years from the date hereof," until July 27, 2014. US PFF ¶ 37; O'Connor PI Decl., ¶¶ 4-5, 6.C, 7.C & Dkt. 110-9, at 2. The Center Sugarbush Lane ROW was issued to Mr. Niske and Northwoods, *id.*, with the understanding that it would be assigned to the Town. US PFF ¶ 43. Prior to approving the grant, the BIA obtained the consent of the allottee owners of Tract No. 432 7D13. *Id.* ¶ 37. Since its expiration, the Center Sugarbush Lane ROW has not been renewed. *Id.* ¶¶ 37, 50.

4.      *The East Ross Allen Lake Lane ROW*

Superintendent Riley approved the East Ross Allen Lake Lane ROW (ROW 432-1869964) on March 17, 1964, "for a period of fifty years from the date hereof," until March 16, 2014. *Id.* ¶ 38; O'Connor PI Decl., ¶¶ 4-5, 6.D, 7.D & Dkt. 110-10, at 3. The East Ross Allen Lake Lane ROW was issued to Mr. Niske and Northwoods, *id.*, with the understanding that it would be assigned to the Town. US PFF ¶ 43. Prior to approving the grant, the BIA obtained the consent of the Band. *Id.* ¶ 38. The Lac du Flambeau Tribal Council expressly authorized Mr. Niske "to transfer the right-of-way by assignment, grant, or otherwise . . . ." O'Connor PI Decl., ¶ 6.D and Dkt. 110-10, at 1. Since its expiration, the East Ross Allen Lake Lane ROW has not been renewed. US PFF ¶¶ 38, 50.

5.     *The Elsie Lake Lane ROW*

Superintendent Riley approved the Elsie Lake Lane ROW (ROW 432-11462961) on October 23, 1961, expressly stating that "[t]his right-of-way is limited to a period of 50 years from date of approval," until October 22, 2011. *Id.* ¶ 39; O'Connor PI Decl., ¶¶ 4-5, 6.E, 7.E & Dkt. 110-11, at 1. The grant was "subject to renewal for a like term upon compliance with applicable regulations." *Id.* The Elsie Lake Lane ROW was issued to Patterson Bros., Inc., *id.*, with the understanding that it would be assigned to the Town. US PFF ¶ 43. Prior to approving the grant, the BIA obtained the consent of the allottee owners of Tract No. 432 7H60. *Id.* ¶ 39. Since its expiration, the Elsie Lake Lane ROW has not been renewed. *Id.* ¶¶ 39, 50.

**E.     Since The Expiration Of The ROWs, The Town Has Continued To Use And Occupy The Band's And The Allottees' Trust And Restricted-Fee Lands Without The Authorization Of The United States And Without The Consent Of The Band And The Allottees.**

Finally, it is undisputed that the Town, without any valid right under the ROW Act or other federal law, has continued, since the respective expirations of the ROWs, to use and occupy the Band's and the Allottees' trust and restricted-fee lands to operate and maintain the segments of the Roads located on those lands as part of the Town's road system. *Id.* ¶¶ 47, 52. The Town, as it must, acknowledges its continuing use of the trust and restricted-fee lands on which segments of the Roads are located despite the Town's lack of valid legal tenure. *See id.* ¶ 52; Hoffman Decl. ¶ 21 & Att. R (Town's

Interrog. Answers), Town's Answer to Interrog. No. 5; Dkt. 66 (Homeowners' Answer),
¶ 58.[8]

By its own admission, the Town has continued to actively operate and maintain
the segments of the Roads on these Band- and Allottee-owned lands. US PFF ¶¶ 47, 52.
For purposes of the United States' trespass claim, the Town's actions constitute
"physical entry upon the surface of the land" of another "without authorization and
without privilege." *Imperial Irr. Dist.*, 799 F. Supp. at 1059. By this Court's definition, the
Town—having entered and remained on the Band's, the Allottees', and the United
States' real property by operating and maintaining those segments of the Roads as part
of the Town's road system, without an express or implied legal right—is in trespass. *See
Bad River Band I*, 626 F. Supp. 3d at 1040-41.[9]

---

[8] The Town asserts that, because the Roads were listed on the NTTFI from January 2001 to
March 2023, the Town was not required to comply with the requirements of the ROW Act.
*See* US PFF ¶¶ 56-57; *see also* Dkt. 76 at 8 n.4. We address the Town's and Homeowners'
arguments on this point in Section IV, *infra*.

[9] The Town also alleges that it "has not trespassed on the Roads because Defendant has
access permits from the Band." Dkt. 64 at 27 ¶ 25 (Town's Twenty-Fifth Aff. Def.). This
alleged defense lacks merit for two reasons. First, the Town only obtained the temporary
monthly access permits from the Band for the period beginning March 13, 2023, and ending
September 12, 2024. *See* Dkt. 92 (Decl. of Matthew Gaulke), ¶¶ 4-5, 7-9, 12, 15 & Dkts. 92-1
(Tribal Council Resolution and Temporary Access Permits), 92-2 (same), and 92-5
(Temporary Access Permits). And second, the permits state that "[i]ssuance of permit does
not imply any Tribal approval for treatment as public road." *See, e.g.*, Dkt. 92-5, at 1-4. Thus,
while the permits certainly authorized the Homeowners—whom the United States has not
sued in this action—to use the Roads to access their properties during the time period the
access permits were in effect, the permits by their express terms did not authorize the
Town, pursuant to its status as a "public authority," to use, maintain, and operate the
segments of the Roads crossing the trust and restricted-fee lands as public roads as part of
the Town's road system, and the permits thus do not constitute a defense to the continuing
trespass here.

II.      **THE TOWN IS SUBJECT TO EJECTMENT FOR ITS TRESPASS**

A.      **The Court Should Issue An Order Ejecting The Town From The Band's And The Allottees' Lands As A Matter Of Law.**

In a situation like the one presented here, where the Town is in trespass on Indian lands under the federal common law and maintaining a substantial and continuing presence on the lands, ejectment—to oust the Town and recover possession of the land—is both a proper legal remedy for the Town's trespass and a separate common-law cause of action used to remedy the trespass. *United States v. Pend Oreille Util. Dist. No. 1*, 28 F.3d 1544, 1549 n.8 (9th Cir. 1994) ("The Supreme Court has recognized a variety of Federal common law causes of action to protect Indian lands from trespass, including actions for ejectment, accounting of profits, and damages."); *Marsh v. Brooks*, 49 U.S. 223, 232 (1850) ("That an action of ejectment could be maintained on an Indian right to occupancy and use, is not open to question."); *Imperial Irr. Dist.*, 799 F. Supp. at 1068 (ejectment is not an "automatic" remedy for the tort of trespass, but must be pleaded separately); *United States v. Shaver*, No. 5:23-cv-02276-SB-SP, 2024 WL 4468026, at *2 and n.2 (C.D. Cal. May 15, 2024) (discussing the "distinction in the common law between trespass and ejectment as separate causes of action" and concluding that the treatment of "ejectment as a remedy for trespass rather than as a stand-alone claim" is "consistent with cases addressing trespass on Indian land"). This Court's recent treatment of an ejectment claim as "duplicative of [a] trespass claim" is consistent with this precedent because the Court appropriately considered whether

ejectment was an appropriate remedy for the trespass in that case. *See Bad River Band I*, 626 F. Supp. 3d at 1058-59.

Having established here that the Town is committing a continuing trespass on the Band's and the Allottees' lands,[10] the United States—as the holder of the legal title for the trust lands and of restrictions against alienation and encumbrance for the lands the Allottees jointly own in restricted fee—is entitled to an order ejecting the Town from the lands. *Marsh*, 49 U.S. at 229. *See* Dkt. 61 at 19 ¶ (d). This is true because, "when the government seeks to evict a trespassing person or thing from [federal] land, the courts are powerless to award damages in lieu of an order enjoining continued occupancy of the land." *United States v. Osterlund*, 671 F.2d 1267, 1267-68 (10th Cir. 1982).

*Osterlund* is particularly relevant to the current dispute. There, the United States sought removal of a home that was found to be encroaching upon National Forest land. The home had been constructed by defendant's predecessor-in-title and "[t]he actual national forest boundary was not clearly defined until decades after the house was built," when a survey was completed. *United States v. Osterlund*, 505 F. Supp. 165, 166 (D. Colo. 1981), *aff'd*, 671 F.2d 1267 (10th Cir. 1982). In addition, "the Forest Service had not taken any action to reclaim the lands" for at least "two decades." *Id.* After the

---

[10] The Town's trespass here is "continuing" because its use and occupation of the trust and restricted-fee lands underlying the Roads, and the permanent nature of the Roads themselves on those lands, constitutes a continued unauthorized invasion and use of the Band's, the Allottees', and the United States' real property. *See Davila*, 913 F.3d at 971 n.8; *accord Ebert v. Vill. of Gresham*, 2020 WI App 76, ¶ 13, 394 Wis. 2d 840, 953 N.W.2d 106 (table) ("[A]n unprivileged remaining on another's land is a continuing trespass for so long as the defendant wrongfully remains.") (quoting *Munger v. Seehafer*, 2016 WI App 89, ¶ 38, 372 Wis. 2d 749, 890 N.W.2d 22).

district court found the defendant in trespass, defendant argued against ejectment,

contending

> that it is equitable to allow him to remain on the land and pay damages to
> the plaintiff. In support of this contention it is alleged that defendant and
> his predecessors in title have been living on the land for years and they
> believed in good faith that they had acquired title by the purchase of
> government lot No. 43. In addition, the trespass has been longstanding and
> innocent. Since its discovery in the early sixties, the Forest Service has taken
> no action against defendant or his predecessors in title. In essence
> defendant argues that he has obtained rights to the land by his and his
> predecessor in title's continuous possession and occupancy of the subject
> lands and the failure of the Forest Service to take action to the contrary.
> Defendant cites numerous cases applying equitable principles in such
> circumstances between private owners.

*Id.* at 168 (footnote omitted). Concluding that "no right by prescription may be obtained

against the government," *id.*, the court granted the relief the United States requested,

ordering defendant "to cease and desist from trespassing" and to "remove all

structures, improvements and personalty" from the lands. *Id.* at 169.

> In affirming the district court, the Tenth Circuit explained:

> Once it was established that Mr. Osterlund was a trespasser[,] . . . the
> government had the right to enjoin his continued occupancy. . . . The courts
> have no power to adjust the parties' equities in determining title to federal
> lands as against the federal government because, as the Supreme Court has
> stated, the power over the public land thus entrusted to Congress is without
> limitations. And it is not for the courts to say how that trust shall be
> administered.

*Osterlund*, 671 F.2d at 1268 (citation and internal quotation marks omitted); *see also*

Section III, *infra*. The rationale of the district court and the court of appeals in *Osterlund*

should apply with equal, if not greater, force to the trust and restricted-fee lands at

issue here, which the United States owns not only in its own right, but in trust for the

benefit of the Band and the Allottees. *Cf. Imperial Granite Co. v. Pala Band of Mission Indians*, 940 F.2d 1269, 1272 (9th Cir. 1991) ("The whole purpose of trust land is to protect the land from unauthorized alienation.").

> ## B. Even If The Court Applies Equitable Principles, The United States Is Entitled To An Order Of Ejectment.

Under the governing precedent, the United States is entitled *as a matter of law* to an order ejecting the Town from the Band's and the Allottees' lands in light of the Town's continuing trespass. *See Bad River Band of Lake Superior Tribe of Chippewa Indians of the Bad River Reservation v. Enbridge Energy Co. Inc.*, No. 19-cv-602-wmc, 2023 WL 4043961, at *19 (W.D. Wis. June 16, 2023) ("*Bad River Band II*") ("[T]he court concludes that the Band is ultimately entitled to permanent injunctive relief on its trespass claim under a fair reading of the current law applicable to its sovereign rights."), *on appeal*, Nos. 23-2309, 23-2467 (7th Cir.) Equitable considerations should be left aside. *Osterlund*, 671 F.2d at 1267-68; *see also American Invs-Co Countryside, Inc. v. Riverdale Bank*, 596 F.2d 211, 217 n.10 (7th Cir. 1979) (plaintiff out of possession has an adequate legal remedy in an action for ejectment); *accord Beduhn v. Kolar*, 39 Wis. 2d 148, 152, 158 N.W.2d 346, 348 (1968) ("Ejectment is a legal action."). Nevertheless, in *Bad River Band I*, this Court exercised its discretion and applied the four-part test for permanent injunctive relief to determine whether to enjoin Enbridge's continuing trespass. *Bad River Band I*, 626 F. Supp. 3d at 1055-58; *see also Liebhart v. SPX Corp.*, 998 F.3d 772, 779 (7th Cir. 2021) (setting forth the test). Applying that test here, the United States is entitled to an order

ejecting the Town from the trust and restricted-fee lands underlying segments of the Roads.

### 1. Irreparable Harm And Inadequate Remedies At Law

"The first two injunction factors tend to coalesce when the question is whether a prevailing party is entitled to permanent injunction at the close of a case" or, as here, upon a determination of liability. *Ultratec, Inc. v. Sorenson Commc'ns, Inc.*, 323 F. Supp. 3d 1071, 1075 (W.D. Wis. 2018). That is so because "[h]arm is 'irreparable' if legal remedies available are inadequate, meaning they are 'seriously deficient as compared to the harm suffered.'" *PFS Investments Inc. v. Thompson*, No. 23-cv-50-wmc, 2023 WL 2327903, at *4 (W.D. Wis. Mar. 2, 2023) (quoting *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021)). And this Court previously determined that, in the case of a continuing trespass on Indian lands, "remedies available at law, such as monetary damages, would be inadequate compensation." *Bad River Band I*, 626 F. Supp. 3d at 1056.

"As a general rule, interference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity for which monetary compensation is an inadequate substitute." *Pelfresne v. Vill. of Williams Bay*, 865 F.2d 877, 883 (7th Cir. 1989). This general proposition applies with exceptional force to Indian lands. *See, e.g., Pueblo of Jemez v. United States*, 483 F. Supp. 3d 1024, 1093 n.52 (D.N.M. 2020) ("In the American legal landscape, the real property interests that American Indian Tribes hold 'represent a unique form of property right, one that is shaped by the federal trust over tribal land and statutory restraints against alienation.'")

(quoting COHEN'S HANDBOOK § 5.04[3][a], at 995), *aff'd in part, vacated in part, and rev'd in part on other grounds*, 64 F.4th 881 (10th Cir. 2023). The trust and restricted-fee lands at issue in this case constitute part of the Band's and Allottees' homeland, granted in the 1854 Treaty, and are inextricably intertwined with and largely define the Band's sovereignty. The harm of the Town's trespass—a violation of the Band's and Allottees' property rights, and the United States' as well—thus "dispossess[es] the Band of its *sovereign* right to control its own land." *Bad River Band I*, 626 F. Supp. 3d at 1056 (citing *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 141 (1982)); *see also Bad River Band II*, 2023 WL 4043961, at *19. Such "an invasion of tribal sovereignty . . . constitute[s] irreparable injury." *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Utah*, 790 F.3d 1000, 1005 (10th Cir. 2015) ("*Ute Indian Tribe*") (holding that even a partial infringement on a Tribe's sovereignty over its land constitutes an irreparable harm). And money damages are inadequate to rectify this violation of the Band's, the Allottees', and the United States' property rights. *Bad River Band I*, 626 F. Supp. 3d at 1056.

In a case like this one, where the Town has "committed repeated trespasses" for between six and thirteen years on the trust and restricted-fee lands underlying the Roads, and the Town, although wholly lacking any valid legal right to use and occupy those segments of the Roads under federal law, continues to do so, "the decree of permanent injunction is the only adequate remedy." *Computing Scale Co. v. Toledo Computing Scale Co.*, 279 F. 648, 671 (7th Cir. 1921).

2.      *Balance of Hardships*

In balancing the harms, the Band's and the Allottees' treaty and sovereign rights in their lands—rights the United States is obligated to respect—as well as the United States' own property rights in those lands, tip the scales of equity here dispositively in the United States' favor. The Town's continuing use of the trust and restricted-fee lands underlying the Roads in the absence of valid legal rights under federal law (and under the Band's laws as well) ignores the Band's sovereign rights under the 1854 Treaty, and the Band's and the Allottees' legal rights—and the United States' concomitant legal rights and obligations—under the ROW Act and the INA. To permit the Town to continue to disobey the clear requirements of federal law regarding the use of the lands at issue would "frustrate federal Indian land policy, effectively robbing [the Band, the Allottees,] and the government of meaningful control over alienation," *Davilla*, 913 F.3d at 967-68, in defiance of clear congressional intent.[11] But the Supreme Court has

_____

[11] At its core, this is a case about the Band's and the Allottees' property rights and their right to control how their property is used and by whom. *See*, *e.g.*, *Murr v. Wisconsin*, 582 U.S. 383, 394 (2017) ("Property rights are necessary to preserve freedom, for property ownership empowers persons to shape and to plan their own destiny in a world where governments are always eager to do so for them."). The Band's and the Allottees' right to preserve their own freedom and plan their own destinies through the use of their lands—and the Band's dominion and sovereignty over the Reservation—must be respected. The unique status of the trust and restricted-fee lands at issue here, the applicability of the ROW Act and the INA to those lands, and the fact of the United States' trusteeship amplify the Band's and the Allottees' rights in the balancing calculus. This is true even though ejectment may cause hardship to the Town and Homeowners from the resultant loss of use of the segments of the Roads crossing the Band's and the Allottees' lands. While that hardship "might be sufficient to outweigh a property owner's interests in a more common case of trespass, this case involves an infringement on the self-governance of Indian lands" that the hardship cannot overcome. *United States v. Osage Wind, LLC*, 710 F. Supp. 3d 1018, 1041 (N.D. Okla. 2023).

instructed: "[A] court sitting in equity cannot 'ignore the judgment of Congress, deliberately expressed in legislation.'" *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001) (quoting *Virginian R. Co. v. Ry. Employees*, 300 U.S. 515, 551 (1937)).

Moreover, whatever hardship the Town (and the Homeowners) alleges is of the Town's own making, and "self-inflicted harm does not preclude an injunction." *S.C. Johnson & Son, Inc. v. Minigrip, LLC*, No. 16-cv-244-jdp, 2017 WL 8727853, at *4 (W.D. Wis. Oct. 16, 2017) (citing *Helene Curtis Indus., Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1333–34 (7th Cir. 1977)); *see* US PFF ¶¶ 48-51. For fifty years, the Town owned valid ROWs for the segments of the Roads crossing the Band's and the Allottees' trust and restricted-fee lands. *Id.* ¶¶ 35-39. The Town decided not to seek renewal of those ROWs notwithstanding their finite term. US PFF ¶¶ 50-51. Under such circumstances, the Town's trespass is willful. *See Bad River Band I*, 626 F. Supp. 3d at 1052 ("Enbridge knew that: its easements had expired; and it was required by federal statute to have permission from the Band, as well as a valid easement from the BIA. Instead, Enbridge continued operating its pipeline on the allotment parcels."); *Osage Wind, LLC*, 710 F. Supp. 3d at 1041 ("The Court is also cognizant of Defendants' continuing trespass . . . and the fact that Defendants have ignored opportunities to address the failure to procure a lease over the last decade."). The Town's willful trespass means "the balance of hardship between the parties weighs heavily in the [United States'] favor." *Bad River Band I*, 626 F. Supp. 3d at 1056 (citing *Sierra Club v. Franklin Ctny. Power of Ill., LLC*, 546 F.3d 918, 935 (7th Cir. 2008)) ("[I]t is an accepted equitable principle that a court does

not have to balance the equities in a case where the defendant's conduct has been willful."). That is particularly true here, where the United States seeks relief that "would simply prohibit" the Town from doing "something [it has] no legal entitlement to do in the first place" in the absence of compliance with the ROW Act. *Ute Indian Tribe*, 790 F.3d at 1007. And when the relief sought simply would require compliance with governing federal law, any "claims to injury" the Town raises "should an injunction issue shrink to all but 'the vanishing point.'" *Id.* (citation omitted).

3.   *Public Interest*

Protecting the Band's, the Allottees', and the United States' sovereign rights in the trust and restricted-fee lands at issue in this case is a public interest of paramount importance. *See Bad River Band I*, 626 F. Supp. 3d. at 1056 ("the Band persuasively argues that the public interest is served by protecting the Band's treaty rights, sovereignty and rights of self-government, as well as advancing Congress's policy choices as articulated in the Nonintercourse Act's prohibition on unconsented conveyances of Tribal land"); *Osage Wind, LLC*, 710 F. Supp. 3d at 1041-42 ("abiding by the law," "respecting government sovereignty and the decisions of courts," and "preserving . . . tribal sovereignty" serve the public interest). Those sovereign land rights stem from the 1854 Treaty and include a "treaty right of occupancy" on the Reservation "with all its beneficial incidents," including the "power to exclude" others from the trust and restricted-fee lands at issue in this case. *See* 1854 Treaty, 10 Stat. 1109, Arts. 2, 11; *Merrion*, 455 U.S. at 141, 144; *Shoshone Tribe of Indians of Wind River Rsrv. v. United States*, 299 U.S. 476, 496 (1937); *see also Osterlund*, 671 F.2d at 1268 and n.3

(Congress' constitutional power "to manage and control federally owned lands . . . is unlimited.") (citing cases). And again, they also arise from Congress' "deliberately expressed" policy choices in the ROW Act and the INA with respect to the use and occupancy of, and the transfer of interests in, Indian lands. *See Oakland Cannabis Buyers' Co-op.*, 532 U.S. at 497.

The constitutional, treaty and statutory rights at issue here, coupled with the Town's flagrant violation of federal law, compel an order—in service of the public interest described above—promptly ejecting the Town from the Band's and the Allottees' lands. Whatever negative effects the Town and Homeowners might suffer if the segments of the Roads crossing the trust and restricted-fee lands are closed is outweighed by the requirements of the 1854 Treaty and federal law. In this case, like in most cases of trespass on Indian lands, the public interest thus should result in immediate ejectment as the only appropriate remedy.

## III. THE TOWN AND HOMEOWNERS HAVE NO IMPLIED EASEMENTS OR EASEMENTS BY NECESSITY ON THE INDIAN TRUST OR RESTRICTED-FEE LANDS UNDERLYING THE ROADS

The Town and Homeowners assert as counterclaims that they have implied easements, Dkt. 64 at 35-36 ¶¶ 32-38 (Town's Claim II); Dkt 62 at 53 ¶¶ 338-45 (Homeowners' Claim III), and easements by necessity, Dkt. 64 at 36-37 ¶¶ 39-45 (Town's Claim III); Dkt. 62 at 52 ¶¶ 330-37 (Homeowners' Claim II), to use and access

the trust and restricted-fee lands on which segments of the Roads are located.[12] But the Town and Homeowners point to no statute or title document granting them such rights over the trust and restricted-fee lands at issue here, let alone any that could defeat the ROW Act and the INA. Implying such easements over the Band's and the Allottees' trust and restricted-fee lands absent a clear statement of Congress to that effect would violate the INA and the principles undergirding that Founding Era statute, including the principle that only Congress can divest rights in or give rights to Indian lands. *See McGirt v. Oklahoma*, 591 U.S. 894, 904 (2020). A finding here of implied easements or easements by necessity over those trust and restricted-fee lands would render the ROW Act meaningless and nullify the express procedures and protections Congress put in place in passing it to govern the circumstances presented here. The Town and Homeowners cannot use theories of implied easement to nullify Federal law.[13] Absent a clear statement of Congress giving them use and access rights over the trust and restricted-fee lands underlying the Roads—which the Town and Homeowners have been unable to point to—the only way they can secure valid easements over the Roads is the ROW Act, as Congress clearly intended.

---

[12] The Town and Homeowners also assert as affirmative defenses that public and private necessity gives them the right to use the Roads "without obtaining additional permits and/or express easements." Dkt. 66 at 39 ¶ 9 (Homeowners' Ninth Aff. Def.); Dkt. 64 at 27 ¶ 22 (Town's Twenty-Second Aff. Def.). This section addresses and disposes of those affirmative defenses as well.

[13] Again, federal law governs this dispute over interests in Indian lands. *See* Section I.A, *supra*; *United States v. Schwartz*, 460 F.2d 1365, 1371 (7th Cir. 1972) ("a dispute over title to lands owned by the Federal Government is governed by federal law").

**A.**    **The Property Rights Of The United States, The Band, And The Allottees To The Trust And Restricted-Fee Lands Cannot Be Divested Or Diminished Without A Clear Statement Of Congress.**

The Town and Homeowners try to circumvent the ROW Act by arguing they have implied easements or easements by necessity on the trust and restricted-fee lands underlying the Roads. Dkt. 62 at 52-53 ¶¶ 330-345; Dkt 64 at 35-37 ¶¶ 32-45. But longstanding rules governing the conveyance of Indian lands and interests in those lands repudiate that argument. At the outset, Congress has plenary power over Indian affairs. *See*, *e.g.*, *Haaland v. Brackeen*, 599 U.S. 255, 272-73 (2023) (citing cases); *United States v. Cooley*, 593 U.S. 345, 350 (2021); *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014). The courts have "recognized a general trust relationship" between the United States and the Indian tribes "since 1831." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 474 n.3 (2003). Through this authority, Congress has the "plenary power to legislate in the field of Indian affairs," *United States v. Lara*, 541 U.S. 193, 200 (2004), and it has used this authority to tightly regulate the sale and alienation of Indian lands since the Founding Era.

Easements cannot be acquired in Indian trust and restricted-fee lands without a clear statement of Congress. *Imperial Granite Co.*, 940 F.2d at 1272 ("Imperial cannot acquire property rights in trust property by prescription"); *Confederated Salish & Kootenai Tribes v. Lake Cnty. Bd. of Comm'rs*, 454 F. Supp. 3d 957, 967 (D. Mont. 2020) ("tribal lands cannot be divested by implication"). Congress has used its plenary authority over Indian affairs to regulate the sale and alienation of Tribal lands since the Founding Era. No treaty or act of Congress granted—expressly or impliedly—rights of way over the

Indian lands at issue here, foreclosing a finding of implied easements and easements by necessity. *Cf. McGirt*, 591 U.S. at 903-04 (Congress must "clearly express its intent" to diminish Indian property rights). On the contrary, federal statutes confirm this understanding that there are no implied easements on Indian lands absent clear congressional assent. The ROW Act governs the Town's and Homeowners' use and access rights to the trust and restricted-fee lands underlying segments of the Roads and the INA prevents the alienation of those lands without compliance with the ROW Act. The Town and Homeowners have pointed to no congressional act that otherwise gives them use and access rights to the trust and restricted-fee lands underlying the Roads. Without such evidence, their implied-easement and easement-by-necessity claims must be rejected.

Congress passed the first INA in 1790, prohibiting the sale of Indian lands without the express consent of the United States. Act of July 22, 1790, ch. 33, § 4, 1 stat. 137. Since then, Congress has passed numerous iterations of the INA, making clear that title to and any other interests in Indian lands can only be acquired by a third party with the *clear consent* of the United States. The 1793 Act, for example, prohibited the "purchase or grant of lands, or of any title or claim thereto, from any Indians or nation or tribe of Indians," without a "treaty or convention entered into pursuant to the constitution." ch. 19, § 8, 1 Stat. 329, 330. The 1793, 1796, 1799, and 1802 versions of the INA all include nearly identical language prohibiting the sale or alienation of any interests in Indian land without the consent of the Federal Government. Act of 1793, ch. 19, § 12, 1 Stat. 329, 330; Act of 1796, ch. 30, § 12, 1 Stat. 469, 470; Act of 1799, ch. 46, § 12,

1 Stat. 743, 746; Act of 1802, ch. 13, § 12, 2 Stat. 139, 143. The 1834 version of the Act remains in effect today. From the beginning, the Federal Government, consistent with Congress' "significant constitutional authority" over Indian affairs, *McGirt*, 591 U.S. at 903, has tightly regulated the sale and alienation of Indian lands, and continues that practice today.[14]

Those special protections placed on trust and restricted-fee lands that foreclose the Town's and Homeowners' implied-easement claims are further supported by the Quiet Title Act, 28 U.S.C. § 2409a. The Quiet Title Act waives the United States' sovereign immunity regarding claims of disputed title to real property, but specifically "does not apply to trust or restricted Indian lands," § 2409a(a), creating yet another bar for anyone trying to assert rights in trust or restricted-fee lands without proof of a clear grant of Congress.

Thus, at every turn, history confirms that Congress alone exercises plenary authority over the alienation of Indian lands and has exercised that authority dating back to the First Congress through clear statutory action. Indeed, "[u]nquestionably it has been the policy of the Federal Government from the beginning to respect the Indian right of occupancy, which could only be interfered with or determined by the United

---

[14] The INA applies only to Tribal land, not to allotted land. *San Xavier Dev. Auth. v. Charles*, 237 F.3d 1149, 1151 (9th Cir. 2001). Because the Tribe owns an interest in each tract of trust and restricted-fee land at issue in this case, the mandatory protections of the INA apply to each of the tracts. *See* US PFF ¶¶ 19, 23, 27, and 31. And this is also the case because the INA "by its very language applies to conveyances"—like the expired grants of easement for ROW at issue here—"of less than complete divestment" of title. *Chemehuevi Indian Tribe v. Jewell*, 767 F.3d 900, 906 (9th Cir. 2014). *See also United States v. S. Pac. Transp. Co.*, 543 F.2d 676, 684 (9th Cir. 1976) (INA applies to easements granting ROWs on Tribal land).

States." *Oneida I*, 414 U.S. at 668 (quoting *Cramer v. United States*, 261 U.S. 219, 227 (1923)). The Supreme Court has definitively held that rights to Indian lands can be granted "only by or with the consent of the general government." *Oneida I*, 414 U.S. at 669 (citing *Johnson v. M'Intosh*, 21 U.S. 543 (1823)); *see also McGirt*, 591 U.S. at 903 (confirming that only Congress can disestablish or diminish a reservation, and noting that, if a State "could encroach on the tribal boundaries or legal rights Congress provided," with "enough time and patience," that State could "nullify the promises made in the name of the United States").

The deeply rooted principle that interests in Indian land cannot be transferred without clear authorization of the United States is supported by the nature of trust and restricted-fee lands. A Tribe's inherent sovereign authority often "centers on the land held by the tribe and on tribal members within the reservation." *Plains Commerce Bank v. Long Fam. Land & Cattle Co.*, 554 U.S. 316, 327 (2008). The Federal Government continues to hold "bare" legal title to trust lands "to increase the likelihood that Indian territory will remain Indian territory" and to "preserve tribal sovereignty" through its land base. *Oneida Tribe of Indians of Wis. v. Vill. of Hobart*, 732 F.3d 837, 838-39, 842 (7th Cir. 2013). Through its Tribal lands, a Tribe can generate revenue by, for example, leasing lands for commercial, recreational, mineral, or other uses, generating gaming revenue on trust land, and by granting rights-of-way over its lands. *E.g.*, 25 U.S.C. §§ 323-328 (rights-of-way); 25 U.S.C. § 396a (mineral leasing); 25 U.S.C. § 415 (leasing); 25 U.S.C. § 2701 *et seq.* (Indian gaming). Trust and restricted-fee lands held by a Tribe are also often shielded from a State's eminent domain power and State tax and zoning

authorities. *See Minnesota v. United States*, 305 U.S. 382 (1939) (State could not maintain eminent domain suit for Indian trust land without authorization from Congress); *Vill. of Hobart,* 732 F.3d at 841 ("federal law forbids states and local authorities to tax Indian lands"); *Santa Rosa Band of Indians v. Kings Cnty.*, 532 F.2d 655 (9th Cir. 1975) (county was without jurisdiction to enforce zoning ordinance on Tribal land unless authorized by Congress). In this way, a Tribe's trust and restricted-fee property acts as an "instrumentality of that [Tribal] government." *United States v. 7,405.3 Acres of Land*, 97 F.2d 417, 422 (4th Cir. 1938).

The adverse implications of a holding that use and access rights to trust and restricted-fee lands can be acquired without clear congressional consent cannot be overstated. *Imperial Granite Co.*, 940 F.2d at 1272. Such a holding would open Tribes' lands to be lost to States, States' political subdivisions, and private entities and individuals in contravention of the United States' plenary authority as demonstrated in treaties with Indian Tribes and statutes like the INA, the ROW Act, and the Quiet Title Act. And implying such rights would impermissibly strike a blow at Tribal sovereignty—again, in contravention of express statements of Federal law to the contrary. *See*, *e.g.*, *Bad River Band*, 626 F. Supp. 3d. at 1046-47 (citing cases). It is therefore only through a clear statement in the text of Indian treaties or federal statutes that interests in Indian lands may be obtained.[15]

---

[15] It is for all those reasons, too, that Indian trust and restricted-fee land cannot be lost through adverse possession or claims of prescriptive rights. *See* Section VII.B and VII.C, *infra*.

**B.     Congress Has Not Clearly Stated Its Intent To Grant Implied, Perpetual Easements For The Roads Over The Trust and Restricted-Fee Lands.**

The Reservation was allotted pursuant to Article 3 of the 1854 Treaty. US PFF ¶¶ 5-6. Due to the subsequent issuance of fee patents for some of the allotments, some tracts of land within the Reservation have transferred to private ownership. *Id.* ¶¶ 8-9. Tracts of privately owned non-Indian fee land thus lie amidst the Band's and Allottees' lands. *Id.* The Homeowners' properties are among those non-Indian fee lands, each homeowner having purchased their respective property from developers or other fee owners after the land left trust or restricted-fee status. *Id.* ¶ 10; Dkt. 62 at 12 ¶ 71. The Town and Homeowners allege that, ever since the allotments which now make up the Homeowners' properties were severed from common ownership, they have been "landlocked," and that the Roads have been "[t]he only means of access to the Homeowners' properties." Dkt. 62 at 52 ¶ 335. They argue, therefore, that those allotments must have implied easements and easements by necessity through the Band's and the Allottees' trust and restricted-fee lands to provide access those properties. *E.g.*, Dkt. 62 at 52-53 ¶¶ 330-45 (Homeowners' Counts II & III); Dkt. 64 at 36-37 ¶¶ 36-38, 42-45 (Town's Counts II and III).

However, as explained above, there can be no implied easements or easements by necessity over Indian trust and restricted-fee lands in the absence of a clear congressional statement granting such rights. And no treaty or act of Congress has established perpetual road easements in the Band's and the Allottees' lands. Nothing in the 1854 Treaty or the Dawes Act—under which the Homeowners claim the Reservation

-41-

was allotted and from which the implied easements or easements by necessity they

claim arise, Dkt. 62 at 10 ¶¶ 60-61, at 11 ¶¶ 66, 69—or any other act of Congress

illustrates congressional intent to grant easements across the trust and restricted-fee

lands, in perpetuity and without compensation to the Band or Allottees, to access the

fee land now owned by the Homeowners.[16] In fact, the Treaty supports the United

States' argument that Defendants must use the ROW Act to gain use and access rights

to the Roads.[17]

---

[16] The Homeowners allege that they are bona fide purchasers that were without notice that the ROWs would expire, since they were not recorded in the Register of Deeds office or Vilas County, or "any other searchable recording system available that would provide notice" of the ROW terms. Dkt. 66 at 37-38 ¶ 2 (Homeowners' Second Aff. Def.). The Homeowners bear the burden of proof for this affirmative defense. *See Oscar Gruss & Son v. First State Bank,* 582 F.2d 424, 432-33 (7th Cir 1978). What is more, the Homeowners—or their title companies—should have and could have discovered the ROW terms. *See In re Thulis*, 474 B.R. 668, 674 (W.D. Wis. 2012) (purchasers are "subject to any liabilities or interests which could have been discovered through a reasonable degree of care in consulting certain 'avenues of information'" (citations omitted)). Finally, it is important to note that the United States has not sued the Homeowners, only the Town, and the Homeowners' purported status as bona fide purchasers is not relevant to the issue of the Town's trespass liability.

[17] To be sure, this trespass litigation is not about the Band's power to exclude non-Indians from non-Indian fee lands or to regulate those non-Indians on non-Indian fee lands. *Cf.* Dkt. 118 (Preliminary Injunction Order) at 2 (the United States' suit is "essentially seeking to establish the Tribe's right to prevent non-Indian owners access to their property"), 10-11 (discussing "power to exclude"). *See New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333 (1983) (discussing power to exclude). Instead, this case is solely about the unauthorized use of *Tribal lands*—that is, the property rights of the Band, the Allottees, and the United States. The Supreme Court's dicta in *Brendale v. Confederated Tribes & Bands of Yakima Nation,* 492 U.S. 408 (1989), which dealt with the Yakima Nation's authority to zone non-Indian fee lands, therefore renders no help to the Town's and Homeowners' implied-easement and easement-by-necessity arguments. *See Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821) (what is said in judicial opinions "are to be taken in connection with the case in which those expressions are used"); *see also Evans v. Shoshone-Bannock Land Use Policy Comm'n*, 736 F.3d 1298, 1303-04 (9th Cir. 2013) ("The Supreme Court recently emphasized the narrow scope of *Brendale.*");  *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Evers*, 46 F.4th

"Courts normally construe federal land grants narrowly, under a longstanding 'rule that unless the language in a land grant is clear and explicit, the grant will be construed to favor the [granting] government so that nothing passes by implication.'" *Lyon v. Gila River Indian Cmty.*, 626 F.3d 1059, 1072 (9th Cir. 2010) (quoting *Fitzgerald Living Trust v. United States*, 460 F.3d 1259, 1265 (9th Cir. 2006)); *see also United States v. Union Pac. R.R. Co.*, 353 U.S. 112, 116 (1957) (explaining the "established rule that land grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language, and that if there are doubts they are resolved for the Government, not against it."). This principle rings especially true for trust and restricted-fee lands, where "the whole purpose of trust land is to protect the land from unauthorized alienation," *Imperial Granite Co.*, 940 F.2d at 1272, and "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985).

The Federal Government allotted the Reservation pursuant to Article 3 of the 1854 Treaty, as confirmed by a 1903 statute that expressly recognized that the Treaty governed allotment of the Reservation. US PFF ¶ 6; *Lac Courte Oreilles Band*, 46 F.4th at 562-63; *see* Act of Feb. 3, 1903, ch. 399, 32 Stat. 795.

> The treaty of September 30, 1854, is not repealed, changed, or modified by the act of February 8, 1887. The right of allotment is conferred by the treaty of 1854, and patents for allotments thereunder should be in accordance with

---

552, 571 (7th Cir. 2022) (rejecting use of *Brendale* in State taxation case since *Brendale* was "wholly divorced from the unique realm of state taxation of Indians on Indian reservations").

> the terms of said treaty, whether the selections and allotments were made, or the approvals signed before or after the passage of the act of 1887.

*Lac Du Flambeau Indians,* 9 Pub. Lands Dec. 392 (D.O.I.), 1889 WL 734 (Sept. 23, 1899).

Article 3 authorized the President, "at his discretion," to carve out 80-acre tracts from the Ojibwe reservations, including the Band's Reservation, to "assign" to individuals for "their separate use." 1854 Treaty, art. 3; *see also Lac Courte Oreilles Band*, 46 F.4th at 562-63. It was through this Treaty language that the lands that the Homeowners now own and/or reside on were allotted from common ownership. *See* US PFF ¶ 11.[18] The Town and Homeowners have not identified a clear statement in the 1854 Treaty, the allotment patents, or any other grant or deed in their respective chains of title indicating intent to convey access easements over the trust and restricted-fee lands underlying the Roads. According to the patents documenting the original allotments of the lands now owned by the Homeowners, the allotments were made "as contemplated by the Treaty," and lack any language indicating intent to also grant easement access rights across the lands reserved by the Band in the 1854 Treaty. *Id.*; *see also* Roy SJ Decl. ¶¶ 8-9 & Exs. D

---

[18] The Homeowners mistakenly argue that the Reservation was allotted under the General Allotment Act, or the "Dawes" Act, 24 Stat. 388 (1887). Dkt. 62 at 10-11 ¶¶ 60, 61, 66, 69. It was the Treaty that governed allotment on the Reservation, not the Dawes Act. *See* US PFF ¶¶ 5-6, 11; *Lac Courte Oreilles Band*, 46 F.4th at 562; 9 Pub. Lands Dec. at 392-93, 1889 WL 734. Even so, the arguments made in this section apply with equal force to allotment accomplished under the Dawes Act. Nothing in the language of the Dawes Act—a generally applicable statute that authorized the allotment of Indian reservation lands to individual Tribal members—grants non-Indians who acquired ownership of allotted trust lands an easement over trust and restricted-fee lands. To imply a congressional waiver in the Dawes Act of the Band's sovereign authority over the trust and restricted-fee lands underlying the Roads would be contrary to law. *See, e.g., Bad River Band*, 626 F. Supp. 3d at 1046-47 (citing cases).

through K (land patents issued to individual Band members between 1894 and 1938). In fact, the patents say that the grantee-allottee "shall not sell, lease, or in any manner alienate, said Tract without the consent of the President," US PFF ¶ 7; *see also Lac Courte Oreilles Band*, 46 F.4th at 560, further reflecting the Federal Government's plenary authority over the alienation of the allotted lands.

The text of the 1854 Treaty lacks any clear statement that could be read to grant the Town or Homeowners any rights to use and access the trust and restricted-fee lands underlying the Roads. Article 3 states that "[a]ll necessary roads, highways, and railroads, the lines of which may run through any of the reserved tracts, shall have the right of way through the same, *compensation made therefor as in other cases*." Art. 3, 1854 Treaty (emphasis added). In other words, all roads running through the Reservation—including necessary ones—needed to be accompanied by compensation made "as in other cases." While there was no unified right-of-way statute for Indian country at that time, from the Founding Era clear acts of the Federal Government were required to alienate Indian lands. *See* Section III.A, *supra*; *see also Neb. Pub. Power Dist.*, 719 F.2d at 958 ("Prior to 1948, access across Indian lands was governed by an amalgam of special purpose access statutes dating back as far as 1875."). Thus, at the time the 1854 Treaty was ratified, there were no (and still are not) implied rights to the trust and restricted-fee lands at issue here; instead, interests in such lands were granted through specific acts of Congress.

The 1888 congressional act granting a railroad the right-of-way through the Reservation demonstrates how Congress acts explicitly to grant such rights. On June 4,

1888, Congress granted a right-of-way through the Reservation to the Milwaukee, Lake Shore, and Western Railway Company. Act of June 4, 1888, ch. 345, 25 Stat. 169 ("1888 Act"). In the 1888 Act, Congress made clear that it was granting the right-of-way with the consent of the Band pursuant to the 1854 Treaty. *Id*. at § 1. The 1888 Act described the physical parameters of the right-of-way and made it the "duty of the Secretary of the Interior to fix the amount of compensation to be paid" not only for the right-of-way but for the "damages sustained by them by reason of the construction of said road." *Id*. at §§ 1-2. The Secretary was required to get the "consent of the Indians on said reservation as to the amount of said compensation," in a manner "satisfactory to the President of the United States." *Id*. at § 2. It was the Federal Government that granted rights to the railway company to the Band's lands, and Congress did so explicitly under the authority of the 1854 Treaty, with appropriate compensation consented to by the Band and affected Indian allottees. That is exactly what is lacking here—there is no federal act the Town or Homeowners can point to that gives them the perpetual, implied, and free-of-charge access rights to the Roads across the Band's and the Allottees' trust and restricted-fee lands that they claim.

That the Federal Government did not intend to grant easements over the Roads or the trust and restricted-fee lands underlying them when allotting the parcels now owned by the Homeowners is evidenced by the fact that the Roads did not exist until many decades after allotment. *Compare* Roy SJ Decl. ¶¶ 8-9 & Exs. D through K (land patents issued to individual Band members between 1894 and 1938 for lands that became Homeowners' properties), *with* US PFF ¶¶ 20 (detailing when Annie Sunn Lane

was constructed), 24 (detailing when Center Sugarbush Lane was constructed), 28 (detailing when East Ross Allen Lake Lane was constructed), and 32 (detailing when Elsie Lake Lane was constructed). Aerial photographs show that neither the east-west segment of Annie Sunn Lane, Center Sugarbush Lane, nor East Ross Allen Lake Lane existed prior to at least June 23, 1953. *Id.* ¶¶ 20, 24, and 28. Elsie Lake Lane did not exist prior to at least November 7, 1952. *Id.* ¶ 32. There is evidence that a road, trail, or path existed in the location of the north-south segment of Annie Sunn Lane sometime before June 23, 1953, but the east-west segment, which links the north-south segment with the Homeowners' properties in that area, clearly did not exist before that time. *Id.* ¶ 20.

The Roads in their current form did not come into existence until many years after allotment of the Reservation was completed, and therefore could not have provided access to the allotments by way of the segments of the Roads crossing the Band's and Allotees' trust and restricted-fee lands, as the Homeowners argue. Dkt. 62 at 52-53, ¶¶ 335, 344; *see Ronkowski v. United States*, No. 17-cv-226-bbc, 2018 WL 2376298, at *10 (W.D. Wis. May 23, 2018) (rejecting implied easement argument because, *inter alia*, there was "no evidence that the small access road even existed before the severance of plaintiffs' property in 1918 and 1919 from the larger tract"). Unlike the 1888 Act that clearly granted a railroad right-of-way through the Reservation and compensated the Band and allottees therefor, the 1854 Treaty and the governing patents simply do not contemplate the Roads coming into existence, let alone grant the Town and Homeowners access rights to them at some future date.

The language of the 1854 Treaty governed allotment and further divestiture of the Reservation, and that language cannot be ignored. *See McGirt,* 591 U.S. at 903-04; *Lac Courte Oreilles Band*, 46 F.4th at 569. The 1854 Treaty provided a promise of permanency to the Band. *Lac Courte Oreilles Band*, 46 F.4th at 569 (citing 1854 Treaty, Art. 11). Under the Treaty, the Band and individual Indian allottees could not be divested of their lands without a clear statement to that effect. Art. 3, 1854 Treaty. That promise is the supreme law of the land, *McGirt,* 591 U.S. at 903, and it supersedes any argument that opening the Roads to the public would serve "public policy," Dkt. 64 at 37 ¶ 45.[19] There has been no act by the Federal Government that has opened tracts of the Band's and the Allottees' trust and restricted-fee lands to the Town or Homeowners for access or any other purpose. Instead, the only way Defendants can obtain rights-of-way to the Roads is under the ROW Act.

### C. The ROW Act And Related Statutes Provide The Exclusive Means Under Federal Law By Which Defendants Can Obtain Easements Over The Trust and Restricted-Fee Lands.

The Town's and Homeowners' assertion that they have implied easements and easements by necessity over the trust and restricted-fee lands underlying the Roads fails to account for the ROW Act and the INA. This, in turn, contravenes both Acts and the

---

[19] The Town's public-policy justification should not compel the Court to find an easement by necessity. Whatever the state-law policy justification that might exist under the circumstances here, it is outweighed by the clearly expressed (and state-law preemptive) public-policy choices Congress made in the INA and the ROW Act to protect the property rights of Tribes and individual Indians, and the solemn obligations to the Band the United States undertook when it entered into the 1854 Treaty.

Band's, the Allottees', and the United States' rights under them. As this Court has noted:

> Further, Congress recognized the extent of tribal sovereign authority in this area by making tribal consent a statutory requirement to an encumbrance on tribal land. Under the Nonintercourse Act, a transfer of any rights in tribal land to a non-Indian person or entity requires the consent of both the Secretary of the Interior and the tribe itself. *See* 25 U.S.C. § 177; *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 119 (1960). With respect to right-of-way easements across tribal lands in particular, the Secretary of the Interior has the authority to grant an easement for a pipeline through a Reservation or individual Indian allotment, 25 U.S.C. § 321, but cannot authorize a right-of-way easement across land owned or co-owned by a tribe "without the consent of the proper tribal officials." 25 U.S.C. § 324; *see also* 25 C.F.R. § 169.4. Thus, in exercising its power to exclude non-Indians, the Band is acting not only as a landowner, but as a local government and sovereign. *Merrion [v. Jicarilla Apache Tribe]*, 455 U.S. [130,] 146, n.12 [(1982)] ("Over tribal lands, the tribe has the rights of a landowner as well as the rights of a local government, dominion as well as sovereignty.").

*Bad River Band I*, 626 F. Supp. 3d. at 1047 & n.6. The Court's statement applies with equal force to the Roads. *See* 25 U.S.C. § 311; *see also Lake Cty. Bd. of Comm'rs*, 454 F. Supp. 3d at 970-71 (County does not have a unilateral right to construct a road across trust land on allotted Flathead Reservation; County must comply with § 311 and obtain the permission of the Tribes); *Superior Oil Co. v. United States*, 353 F.2d 34, 36-38 (9th Cir. 1965) (no implied easement for fee patent issued on Hopi Reservation under statute authorizing issuance of such patents to religious organizations for missionary purposes; it was thus "within the authority of the individual appellees to bar appellant from such lands until such time as an easement had been secured in the manner provided by Federal Regulations").

The Town and Homeowners must follow the requirements of federal law to obtain a right to use and access the trust and restricted-fee lands underlying the Roads.

> When it comes to maintaining a pipeline over Indian allotted land, however, Congress has dictated the prerequisites of a right to enter by statute. Enable thus has no legal right to keep a structure on the Allottees' land unless and until it secures a right-of-way for that purpose from the Secretary of the Interior.

*Davilla*, 913 F.3d at 967. What the Town and Homeowners seem to forget is that the Town did have valid ROWs under the ROW Act, but chose to let those rights-of-way expire without renewing them. That decision does not entitle the Town to circumvent the ROW Act and the other "statutes governing acquisition of rights of way over Indian lands," which "constitute a comprehensive scheme which completely covers the subject of rights of way," *Plains Elec. Generation & Transmission Coop., Inc.*, 542 F.2d 1375, 1380 (10th Cir. 1976), with theories of implied easement and easement by necessity. Because neither the Town nor Homeowners have pointed to any clear statement by Congress giving them the use-and-access rights they claim in the trust and restricted-fee lands underlying the Roads, and because the Town failed to follow the prerequisites set by Congress in the ROW Act, they have no valid legal right to use and access the trust and restricted-fee lands underlying the Roads, and the Town remains in trespass.

## IV.   25 C.F.R. § 170.114(a) IS NOT A LEGAL SUBSTITUTE FOR THE TOWN'S AND HOMEOWNERS' COMPLIANCE WITH THE ROW ACT

Both the Town and Homeowners propound that the segments of the Roads crossing the Band's and the Allottees' trust and restricted-fee lands were "open and available for public use" pursuant to 25 C.F.R. § 170.114(a) by virtue of their listing on

the NTTFI, *see* US PFF ¶¶ 56-57, regardless of whether the Town held valid ROWs under the ROW Act. Dkt. 62 at 47-50, ¶¶ 304, 308, 322, 323 (Homeowners' Claim I); Dkt. 64 at 27 ¶¶ 21, 24 (Town's Twenty-First and Twenty-Fourth Aff. Def.), 34-35 ¶¶ 29a, 29g (Town's Claim I); Dkt. 66 at 38 ¶ 3 (Homeowners' Third Aff. Def.), 38 ¶ 4 (Homeowners' Fourth Aff. Def.). The Town further alleges that it is the "owner" of the segments of the Roads located on trust and restricted-fee lands as the public authority responsible for maintenance of the Roads, thereby refuting trespass liability. Dkt. 64 at 27 ¶¶ 17, 18 (Town's Seventeenth and Eighteenth Aff. Def.). But the Town and Homeowners never explain how the TTP—and specifically 25 C.F.R. § 170.114(a)—grant legal rights to use Indian lands in the face of Congress' clear directive to the contrary in the ROW Act and the INA.

The Town's and Homeowners' arguments rest on the faulty assumption that the Roads' listing on the TTP, from January 1, 2001, to March 24, 2023, *see* US PFF ¶¶ 56-57, grants the public a right to use the segments of the Roads crossing the trust and restricted-fee lands by operation of 25 C.F.R. § 170.114(a) in the absence of valid ROW grants. But the TTP was enacted only for the purpose of providing federal transportation funds to Tribes and, by its plain terms, grants no rights to third parties like the Town. Rather, as Congress intended, the ROW Act provides the means to obtain access and use rights for the right-of-way through trust and restricted-fee Indian lands. Defendants' argument that the TTP provides them legal access to the Roads, and thus shields them from trespass liability, is incorrect as a matter of law.

**A.     The TTP Is A Funding Program For Tribes' Surface Transportation Needs; It Does Not Convey Rights To The Defendants Or The Public.**

The TTP is a funding program that was established for the "benefit of Tribes." 25 C.F.R. § 170.2(h). It was designed to provide "safe and adequate transportation and public roads" within or providing access to Tribal lands, through the allocation of Federal funds. 81 Fed. Reg. at 78,457. For a road or other transportation facility to be eligible for the expenditure of TTP funds, it must be listed on the NTTFI. 23 U.S.C. § 202(b)(1)(B); *see also* 25 C.F.R. § 170.5. The purpose of the NTTFI is "limited to establishing eligibility for assistance using TTP funds." ROW Handbook at 8.

Contrary to the TTP's limited purpose of providing transportation funding for Indian country, both the Town and Homeowners seek to impermissibly broaden this limited purpose to create a legal right where none exists by virtue of the Roads' prior listing on the NTTFI. 25 C.F.R. § 170.114(a) provides: "All Tribal transportation facilities listed in the approved NTTFI must be open and available for public use as required by 23 U.S.C. 101(a)(31)." But § 170.114(a) never granted the Town or Homeowners the legal right to use the segments of the Roads located on trust and restricted-fee land; it was the ROWs, granted under the ROW Act, that provided valid use and access rights to each segment of the Roads for 50-year terms, until those ROWs expired. Section 170.114(a), on the other hand, merely recognizes that the Federal appropriations underwriting the TTP are spent for public—*i.e.,* not private—purposes, and that the Federal Government must receive a reasonable return on its investment when the TTP funds are spent on Tribal transportation infrastructure. *See* 23 U.S.C. § 101(a) (defining all roads and other

transportation facilities as "public"); *see also* n.3, *supra*. That is, roads constructed with funds authorized by the TTP must be maintained by a Tribe or other public authority until the Federal Government has received a reasonable return on its investment.

Other TTP regulations, and the ROW Act, support this reading that § 170.114(a) is not a self-executing grant of easement for right-of-way across Indian lands. For example, for construction of a Tribal transportation facility proposed by a public authority, the "project package must include" a "[c]ertification of compliance with the requirements of 25 C.F.R. part 169." 25 C.F.R. § 170.460; *see also* 25 C.F.R. § 170.473 (for a Tribal transportation facility to be "substantially complete," "all documents required by 25 C.F.R. part 169 must be complete [if applicable]"). As another example, if a Tribe wants to list a proposed facility on the NTTFI to be constructed using TTP funds in the future, the Tribe must submit to the BIA, among other things, "[d]ocumentation clearly identifying that easements or rights-of-way have been acquired or a clear written statement of willingness to provide a right-of-way from each landowner along the route." 25 C.F.R. § 170.443(a)(4). All these requirements would be superfluous if a transportation facility was open to the public by virtue of its mere listing on the NTTFI. Instead, the ROW Act provides the exclusive means for third parties to obtain use and access rights to Indian trust and restricted-fee lands, while the TTP provides a path for Tribes to get Federal funds for Tribal transportation facilities on those lands. Therefore, a road's status on the NTTFI is not a substitute for Tribal consent to a grant of right-of-way under the ROW Act. *See* 25 U.S.C. § 324. Such a reading of the TTP misunderstands the program's purpose, undermines its stated respect for Tribal self-determination, and

would effectively nullify the ROW Act. In short, Congress did not intend the TTP to "promote or protect access rights of the public or individual citizens who want to traverse Indian lands," *Pollard*, 694 F. Supp. 3d at 1086, because the ROW Act governs such access rights.

The Town further asserts that its status as "owner" and "public authority" of the Roads under the TTP gave it use and access rights to the segments of the Roads located on the Band's and the Allottees' trust and restricted-fee lands, despite the expired ROWs. Dkt. 64 at 27 ¶¶ 17, 18. Not so. The Town exaggerates what "owner" and "public authority" mean under the TTP and NTTFI. The "public authority" for NTTFI purposes is a "Federal, State, county, town, or township, Indian tribe, municipal or other local government or instrumentality with authority to finance, build, operate, or maintain" a road or other transportation facility. *See* 23 U.S.C. § 101(a)(22); *see also* 25 C.F.R. § 170.5. The "public authority" is sometimes called the "owner" of the facility for NTTFI purposes. ROW Handbook at 8 ("Transportation and other officials generally use the term 'owner' or 'road owner' when referencing the public authority that is responsible for operating and maintaining a particular road or transportation facility."). However, under the TTP, it is only Tribes that are the direct recipients of funds authorized by 23 U.S.C. § 202(b)(3), not the "public authority" or road "owner." *See* 23 U.S.C. § 202(b)(3)(A)(i). NTTFI data "should not be used for determining real property ownership," ROW Handbook at 8, and NTTFI data cannot overcome the fact that the Roads are situated on trust and restricted-fee lands, to which the Band, the Allottees, and the United States hold title. US PFF ¶¶ 18-19 (Annie Sunn Lane), 22-23 (Center

-54-

Sugarbush Lane), 26-27 (East Ross Allen Lake Lane), and 30-31 (Elsie Lake Lane). The sole function of the TTP and the NTTFI is to provide funding and to identify the transportations facilities eligible for the use of those funds, as determined by Tribes pursuant to an approved TTIP, for transportation infrastructure, maintenance, and other TTP-eligible activities. *See* 23 U.S.C. § 202(b)(1). The maintenance responsibilities that the Town had, as reflected in the NTTFI listing, gave it no legal rights over the segments of the Roads on those lands; the ROW Act is where the Town derived those use and access rights over the Indian trust and restricted-fee lands, and those rights have expired.

### B. The TTP Did Not Expressly Or Impliedly Repeal The ROW Act; The TTP And The ROW Act Must Be Read Together.

In arguing that 25 C.F.R. § 170.114(a) gives them use and access rights to the segments of the Roads located on the Band's and the Allottees' trust and restricted-fee lands, the Town and Homeowners attempt to circumvent the ROW Act, which provides the exclusive means by which the Secretary may issue an easement granting rights of entry to and use of trust or restricted-fee lands of the sort the Town and Homeowners claim. The Town ignores the ROW Act at its peril. "When two federal statutes" (or statutory schemes) work independently of each other, "address[ing] the same subject in different ways" (and for different purposes), one statute cannot be ignored at the expensive of the other. *Randolph v. IMBS, Inc.*, 368 F.3d 726, 730 (7th Cir. 2004). Rather, "the right question is whether one implicitly repeals the other—and repeal by implication is a rare bird indeed." *Id.* (citing *Branch v. Smith*, 538 U.S. 254, 273 (2003),

and *J.E.M. AG Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 141-44 (2001)); *see also Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142, 1153 (9th Cir. 2020) ("When a 'case involves the interplay between two statutory schemes created by Congress for different reasons and at different times,' we typically ask whether the later statute *repeals* the prior one." (quoting *Ray v. Spirit Airlines, Inc.*, 767 F.3d 1220, 1224 (11th Cir. 2014))). "The cardinal rule is that repeals by implication are not favored." *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936). "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Morton v. Mancari*, 417 U.S. 535, 550 (1974).

While the Town and Homeowners argue that the TTP, and specifically 25 C.F.R. § 170.114(a), provides them a legal right to use the segments of the Roads located on the trust and restricted-fee lands, they never explain where Congress in the TTP made that Act a source—coextensively with the ROW Act or otherwise—of legal rights in Indian lands. Instead, they attempt to use 25 C.F.R. § 170.114(a) to avoid ROW Act compliance. But "[t]he courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Mancari*, 417 U.S. at 551.[20] There is no congressional intention in the TTP to grant rights

---

[20] The Town's and Homeowners' reliance solely on 25 C.F.R. § 170.114(a), rather than the statutes authorizing the TTP, 23 U.S.C. §§ 201-202, leaves their argument wanting. As explained below, nothing in the statutes even remotely suggests that the Town or

to use Indian lands under that statutory scheme. The TTP and 25 C.F.R. § 170.114(a) thus do not repeal the ROW Act, either fully or partially. Once the Town's ROWs to the Roads expired, the Town lost any enforceable legal right to use and access the trust and restricted-fee lands underlying segments of the Roads, making its continued use and access of the Roads a trespass.

First, nothing in the TTP indicates that Congress intended that it repeal the ROW Act. It does not mention the ROW Act. And it does not mention the acquisition of rights-of-way or third-party access to Indian lands.[21] "The intention of the legislature to repeal must be clear and manifest." *United States v. Borden Co.*, 308 U.S. 188, 198 (1939) (citation and internal quotations omitted). The TTP—and certainly not the regulation— provide no indication of such congressional intent.

Second, the ROW Act "is a specific provision applying to a very specific situation"—the issuance of rights-of-way that permit third parties to use Indian trust or restricted-fee lands for, among other things, roads. *See Mancari*, 417 U.S. at 550. The TTP, on the other hand, deals in the broadest sense with surface-transportation issues in

---

Homeowners had rights to use and access the trust and restricted-fee lands underlying segments of the Roads solely by virtue of the Roads' listing in the NTTFI from 2001 to 2023.

[21] Consistent with the statutory scheme, the Final Rule announcing the current version of 25 C.F.R. Part 170 makes clear that nothing in the TTP is intended to excuse or provide an alternative means of compliance with the ROW Act. *See* 81 Fed. Reg. at 78,459 ("Other regulations address the requirements for rights-of-ways on Tribal lands held in trust by the United States (response to comment)), at 78,460 ("25 CFR part 169 controls the requirements for obtaining or otherwise administering right-of-ways, not 25 CFR part 170" (response to comment)). This understanding is reflected in the various Part 170 regulations that distinguish the TTP from the ROW Act. *See* 25 C.F.R. §§ 170.443, 170.460, 170.473.

Indian Country. In such a situation, "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Id.* at 550-51.[22] Finally, the TTP and the ROW Act, like the Interstate Commerce Commission Termination Act and the ROW Act at issue in *Swinomish Indian Tribal Cmty.*, "are easily reconcilable." 951 F.3d at 1160. Under the ROW Act, Tribes "retain sovereign authority to control their own lands and to enforce the terms of right-of-way easement agreements" setting forth the conditions under which access to their lands is permitted. *Id.* And the Federal Government, by issuing grants of easement consented to by Tribes, complies with the INA's mandate. In contrast, "Congress's intent in passing the Federal-Aid Highway Act and Tribal Transportation Program was to assist tribes in providing safe and adequate transportation and public road access to and within Indian lands, . . . while at the same time respecting Tribal self-determination and self-governance." *Pollard*, 694 F. Supp. 3d at 1086.

Considering the separate but intersecting purposes of the TTP and the ROW Act, the TTP's reference to public-road access and availability for public use must be placed in proper context. Congress understood that, where Federal transportation funds were appropriated and used for particular roads, those roads would be available for use by the public. But, at the same time, there is no suggestion, as the Town and Homeowners would have it, that Congress *sub silentio* intended to make the TTP an alternative source

---

[22] That the ROW Act implements the Federal Government's obligations under the INA only strengthens application of this proposition to the circumstances presented here.

of legal access to trust and restricted-fee Indian lands, effectively making any road or other transportation facility listed in the NTTFI and crossing Indian land permanently open to one and all even in the absence of a valid right-of-way easement. Such an outcome would not only turn the TTP's respect for Tribal self-determination and self-governance on its head but would also nullify the INA and ROW Act.

"Overlapping statutes do not repeal one another by implication; as long as people can comply with both, then courts can enforce both." *Randolph*, 368 F.3d at 731. The TTP funds transportation infrastructure to ensure that public roads in Indian country are safe and adequate. 23 U.S.C. §§ 201, 202. The ROW Act seeks to condition the use of roads located on trust and restricted-fee Indian lands on proper Tribal or individual-Indian consent and with the payment of just compensation. 25 U.S.C. §§ 324, 325. Harmonizing the ROW Act and the TTP in this way does not interfere with either's statutory purpose, with the authorities of the relevant Federal departments and agencies assigned to carry them out, or with surface transportation in Indian country. *See Swinomish Indian Tribal Cmty.*, 951 F.3d at 1160. And it is consistent with the notions of Tribal sovereignty, self-determination, and self-government made express in both.

Because the TTP does not repeal the ROW Act, the ROW Act provides the only means for the Town and Homeowners to obtain a valid legal right to access and use the trust and restricted-fee lands within the Reservation upon which segments of the Roads are located. Absent compliance with the ROW Act, § 170.114(a) does not give the Town and Homeowners any legal right to use those lands and therefore does not shield the Town from trespass liability.

V.     **THE 1933 UNEMPLOYMENT RELIEF ACT DOES NOT PROVIDE USE AND ACCESS RIGHTS TO THE TOWN OR HOMEOWNERS**

The Town and Homeowners allege in their respective counterclaims and as an affirmative defense that the Band and the Allottees granted permission for "public roadways" to be constructed on their lands in the 1930s pursuant to access permits (the "CCC documents") authorized by the Unemployment Relief Act, Pub. L. No. 73-5, 48 Stat. 22 (1933) (the "URA"). Dkt. 62 at 47 ¶ 306 (Homeowners' Count I); Dkt. 64 at 28 ¶ 29 (Town's Twenty-Ninth Aff. Def.), at 34 ¶ 29b (Town's Count I); *see also* Dkt. 62 at 13 ¶ 82, 15 ¶ 91, 17 ¶ 101, 22 ¶ 126, 47 ¶ 306; Dkt. 64 at 31 ¶ 16(b). The Town and Homeowners go so far as to argue that the URA and the CCC documents require the Roads to "remain open to public access in perpetuity," Dkt. 64 at 28 ¶ 29, and that the CCC documents granted "access to private properties," Dkt. 62 at 47 ¶ 306. Those assertions have no support in law or fact. As explained below, the CCC documents may have *granted the United States* use and access rights over certain tracts of Indian lands on the Reservation for the limited purpose of carrying out the directive of the URA, but did not authorize *third-party* public access to the subject Indian lands in perpetuity. And the United States' use and access rights under those permits terminated when the purposes for which the URA was enacted—that is, to complete public works projects to boost employment and stimulate the Reservation economy during the Great Depression—concluded. Finally, the Roads were not constructed until after the purpose for which the URA was enacted and the CCC documents were executed expired. For these reasons, and as further explained below, the arguments found in Homeowners' Count I, Dkt. 62

at 46-51, the Town's Count I, Dkt. 64 at 34-35, and the Town's twenty-ninth affirmative defense, Dkt. 64 at 28 ¶ 29, are without merit and should be rejected.

The URA was a New Deal-era law aimed to provide unemployment relief through the performance of useful public work. Specifically, the law was passed "for the purpose of relieving the acute condition of widespread distress and unemployment now existing in the United States, and in order to provide for the restoration of the country's depleted natural resources and the advancement of an orderly program of useful public works." Pub. L. No. 73-5, 48 Stat. 22. The URA aimed to ease unemployment by putting people to work on "timber production, the prevention of forest fires, floods and soil erosion, plant pest and disease control, the construction, maintenance, or repair of paths, trails, and fire-lanes in the national parks and national forests, and such other work . . . ." *Id*. The Civilian Conservation Corps was the labor force created by the URA tasked with carrying out the public works projects called for by that Act. On May 12, 1933, President Roosevelt entered Executive Order 6131, which set aside funds to be "available for accomplishment of the purposes specified in the act of March 31, 1933, on tribal or other lands within Indian reservations." *See* Declaration of Dena Ness ("Ness Decl."), ¶ 17 & Ex. F (Exec. Order No. 6131 (May 12, 1933)). Thus, funds were made available to complete the public-work projects contemplated by the URA in Indian country, subject to grants of access by Tribes and individual allottees.

The CCC documents, which were uniformly titled "Permission of The Allottee Or Owner To Place Improvements On And Across His (Their) Land for the Performance of Useful Public Works For the Relief of Unemployment Pursuant To

Executive Order of May 12, 1933," gave permission to the United States to enter certain tracts of a Tribe's and Indian allottee's lands for the limited purpose of completing URA work projects. Specifically, the CCC documents

> grant[ed] to the United States right of ways on and across said allotments and tracts of land on the said Reservation for the opening and establishing of necessary roadways, trails, and all other uses needed in carrying out the purposes of Executive Order of May 12, 1933, issued pursuant to the Unemployment Relief Act approved March 31, 1933, (Pub. 5, 73d Congress)[.]

*Id.* ¶ 15 & Ex. E (Allottee Permission Form). The CCC documents expressly gave use and access rights only to the United States—not to the Town, not to individual non-Indian homeowners, not to the public. The United States never transferred or assigned the temporary interests it was granted in the CCC documents to the Town or Homeowners. That textual reading alone precludes the Town's and Homeowners' arguments that they have perpetual use and access rights pursuant to the CCC documents and should be the end of the matter.

To get around the plain language of the CCC documents, the Town and Homeowners allege that the CCC documents called for the construction of "public roadways . . . for access to private properties[.]" Dkt. 62 at 47 ¶ 306; Dkt. 64 at 28 ¶ 29, 31 ¶ 16b. The CCC documents say no such thing, and the limited purpose of the URA and limited permissions contained in the CCC documents cut against the Town's and Homeowners' argument. The purpose of the CCC documents is plain: they were for the "opening and establishing of necessary roadways, trails, and all other uses needed in carrying out the purposes of Executive Order of May 12, 1933, issued pursuant to the

Unemployment Relief Act approved March 31, 1933[.]" Ness Decl., Ex. E at 1. The purpose of that Executive Order and the URA, in turn, was limited to relieving unemployment through public works projects. Pub. L. No. 73-5, 48 Stat. 22; Ness Decl., ¶ 17 & Ex. F. The CCC documents say nothing about "public access" or "access to private properties" because—consistent with the purposes of the URA—it was not their purpose to provide such access. What is more, the purpose for which the United States was granted the rights-of-way ceased to exist before the Roads were even constructed. *See* US PFF ¶¶ 20 (detailing when Annie Sunn Lane came into existence), 24 (detailing when Center Sugarbush Lane came into existence), 28 (detailing when East Ross Allen Lake Lane came into existence), and 32 (detailing when Elsie Lake Lane came into existence). The Great Depression ended and so too did the need for the public-works projects contemplated by the URA. Indeed, Congress terminated the funding for the Civilian Conservation Corps in June of 1942. *See* Labor-Federal Security Appropriations Act, Pub. L. No. 77-647, 56 Stat. 562, 569 (1943) (providing for the liquidation of the Civilian Conservation Corps); *see also* Labor-Federal Security Appropriations Act, Pub. L. No. 78-135, 57 Stat. 498 (1944) (further providing that the liquidation be completed by 1944). And the URA itself was repealed in 1966. Act of Sept. 16, 1966, Pub. L. No. 89-554, § 8(c), 80 Stat. 378, 648. The CCC documents never did, and surely cannot now, offer any use and access rights to the Town and Homeowners.[23]

---

[23] To be sure, the encumbrances granted by the CCC documents are listed as "perpetual" in BIA's Trust Asset and Accounting Management System ("TAAMS"). However, that "perpetual" categorization is not illustrative of what the encumbrance documents say. Rather, the "perpetual" categorization reflects a TAAMS user choice resulting from a

The consideration that the Band and the respective Indian allottees received in exchange for giving use and access rights to the United States in the CCC documents further illustrates the limited rights granted to the United States in those permits for public-work projects. The "consideration for the grants" was the "performance of such work and the benefits to accrue therefrom to the said Reservation and lands." Ness Decl., ¶ 15 & Ex. E. That is, the Band and allottees were the beneficiaries of the work done on their lands, not nearby private landowners—to the extent there might have been any at the time—or the public. In fact, the benefits stemming from the works projects were the only compensation given to the Band and Allottees in exchange for giving the United States access to their lands. The Band and Allottees did not receive any compensation for having their lands open to the public in perpetuity, because they never consented to such use and access rights and the CCC documents did not grant such rights.

Finally, Defendants' reading of the URA and the CCC documents is inconsistent with the federal Indian policy in place at the time the URA was enacted and the CCC documents were executed. While the Assimilation Era of the late 1800s to early 1900s was marked by the allotment and divestment of Indian lands and Tribal sovereignty, "[b]eginning in the 1920s, the federal outlook toward Native Americans shifted 'away from assimilation policies and toward more tolerance and respect for traditional aspects

---

software limitation that affects the encoding of the encumbrance-document information into the TAAMS system. Ness Decl. ¶¶ 23-26, 30. Because of the system limitation, the "perpetual" entry in TAAMs is not considered legally determinative. *See id.* at ¶ 29.

of Indian culture.'" *McGirt,* 591 U.S. at 911 (quoting COHEN'S HANDBOOK § 1.05). The centerpiece of this new era, which became known as the Indian Reorganization Era, was the Indian Reorganization Act (the "IRA"), ch. 576, 48 Stat. 984 (1934), codified at 25 U.S.C. § 5101 *et seq.* (1934). The IRA repealed the General Allotment Act's allotment program, 25 U.S.C. § 5101, and restored to Tribal ownership surplus lands within reservations, *id*. at § 5103. *See also* COHEN'S HANDBOOK § 1.05 at 81 (the IRA was "designed to improve the economic status of Indians by ending the alienation of tribal land and facilitating tribes' acquisition of additional acreage and repurchase of former tribal domains"). As the Seventh Circuit commented, the IRA was enacted "not only to stem the loss of Indian land holdings brought on by allotment but also to give tribes the opportunity to re-establish their governments and land holdings." *Oneida Nation v. Vill. of Hobart*, 968 F.3d 664, 671 (7th Cir. 2020).

The Town's and Homeowners' assertions, then, that the CCC documents granted them access carte blanche to the trust and restricted-fee lands currently underlying the Roads, runs headlong into the Federal Indian policy of that time. The Federal Government had shifted away from the policies of opening Indian lands to non-Indians and divesting Tribes of those lands in favor of a new policy prioritizing the retention of lands in Indian country. An argument that the CCC documents opened Indian country for public throughways, in the absence of any express provisions detailing the specific details of such grants, including the scope of the grant, the term of years, and the terms of compensation, among other things, is manifestly incongruent with Reorganization Era policies—and plainly contrary to the requirements of the INA and 25 U.S.C. § 311.

The Town's and Homeowners' arguments thus find no support in the text or purpose of the URA or the CCC documents, especially when considered against the prevailing federal policy of that time, are without any legal force, and should be rejected.

## VI.   THE UNITED STATES IS ENTITLED TO SUMMARY JUDGMENT ON THE TOWN'S FOURTH COUNTERCLAIM

The Town's Fourth Counterclaim ("Count IV") challenges the constitutionality, as applied to the Town, of 25 C.F.R. § 170.444, the regulation under which the BIA acted to remove the Roads from the NTTFI. Dkt. 64 at 37-38, ¶¶ 46-52. The United States moved to dismiss Count IV pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). Dkt. 68. The United States' Partial Motion to Dismiss is fully briefed. Dkts. 69 (United States' Mem. of Law), 76 (Town's Resp. in Opp'n), 78 (United States' Reply Br.). The Court to date has not ruled on the Partial Motion to Dismiss.

The United States renews its Partial Motion and incorporates the Motion and the parties' briefs here by reference. The United States notes that the Motion is ripe for decision at this stage of the proceedings under either Fed. R. Civ. P. 12 or 56; "there is no genuine dispute as to any material fact" underlying Count IV and the United States "is entitled to judgment as a matter of law" dismissing the claim. Fed. R. Civ. P. 56(a).

Specifically, for the reasons detailed in the United States' previously submitted briefs, the Court lacks subject-matter jurisdiction over Count IV because the United States has not waived its sovereign immunity to the claim. Dkt. 69 at 14-20; Dkt. 78 at 14-15. Alternatively, the Court lacks subject-matter jurisdiction because the Town does not have standing to assert Count IV. Dkt. 69 at 20-24; Dkt. 78 at 15-17. Finally, were it

to reach the merits of Count IV, the Court should dismiss it as a matter of law for failure to state a claim to relief because the Town is not a "person" within the meaning of the Fifth Amendment and lacks a property or liberty interest in the Band's and the Allottees' trust and restricted-fee lands on which segments of the Roads are located. Dkt. 69 at 24-32; Dkt. 78 at 18-20.[24]

## VII.   NONE OF THE REMAINING AFFIRMATIVE DEFENSES SHIELDS THE TOWN FROM TRESPASS LIABILITY

In this section, the United States addresses the Town's and the Homeowners' remaining affirmative defenses that are not specifically identified and addressed above. Because the burden of establishing all of the elements of their respective affirmative defenses rests squarely upon the Town and the Homeowners, *Cap. Indem. Corp.*, 357 F. Supp. at 410, and they have failed to meet that burden, each of these remaining defenses is either legally insufficient or otherwise lacks merit.[25]

---

[24] Disposal of Count IV also disposes of the Homeowners' affirmative defense challenging the constitutionality under the Fourth, Fifth, and Fourteenth Amendments of "the acts and regulations cited by Plaintiff," Dkt. 66 at 38 ¶ 5 (Homeowners' Fifth Aff. Def.), because, like the Town, the Homeowners as a matter of law lack any property or liberty interest in the Band's and the Allottees' trust and restricted-fee lands and their fifth affirmative defense is thus legally insufficient.

[25] The United States addresses in this Memorandum of Law each affirmative defense raised by the Town and Homeowners except (i) those that deal only with the issue of damages, which are beyond the scope of the United States' Motion for Partial Summary Judgment, and (ii) the Town's and the Homeowners' "catchall" affirmative defenses. Specifically, for those reasons, the United States does not address the Town's fourteenth, fifteenth, twentieth, and thirtieth affirmative defenses, *see* Dkt. 64 at 27 ¶¶ 14-15, 20, at 28 ¶ 30, and the Homeowners' fourteenth, fifteenth, and eighteenth affirmative defenses, *see* Dkt. 66 at 39, ¶¶ 14-15, 18.

### A.     Failure To State A Claim Is Not A Proper Affirmative Defense.

The Town and Homeowners both assert as an affirmative defense that the United States has failed to state a claim for which relief can be granted. Dkt. 64 at 26 ¶ 1 (Town's First Aff. Def.); Dkt. 66 at 37 ¶ 1 (Homeowners' First Aff. Def.). "[F]ailure to state a claim" is not an affirmative defense. *Oregon Potato Co. v. Kerry, Inc.*, No. 20-cv-92-jdp, 2020 WL 4586401, at * 2 (W.D. Wis. Aug 10, 2020). That purported defense is not enumerated in Fed. R. Civ. P. 8(c), nor does it limit or excuse the Town's "liability even if the plaintiff establishes a *prima facie* case." *Tober v. Graco Children's Prods., Inc.*, 431 F.3d 572, 579 n.9 (7th Cir. 2005). Moreover, an affirmative defense "is an issue that the defendant bears the burden of proving," *Kerry*, 2020 WL 4586401, at * 2, and the Town's and Homeowners' respective conclusory assertions that the United States failed to state a claim for relief fails to specify on what grounds Defendants believe the United States so failed. *See Dace v. Chicago Pub. Schs.*, No. 19 C 6819, 2020 WL 1861671, at *3 (N.D. Ill. Mar. 18, 2020). Nor did either the Town or the Homeowners file a Rule 12(b) motion. Neither purported affirmative defense raised here shields the Town from liability for its trespass.

### B.     Equitable Defenses Do Not Apply To The United States.

The Town and Homeowners assert the equitable defenses of *in pari delicto*, Dkt. 64 at 26 ¶ 2 (Town' Second Aff. Def.); Dkt. 66 at 39 ¶ 12 (Homeowners' Twelfth Aff. Def.); promissory and equitable estoppel, Dkt. 64 at 26 ¶¶ 4-5 (Town's Fourth and Fifth Aff. Defs.); Dkt. 66 at 39 ¶ 10 (Homeowners' Tenth Aff. Def.); unclean hands, Dkt. 64 at

26 ¶ 6 (Town's Sixth Aff. Def.); Dkt. 66 at 39 ¶ 11 (Homeowners' Eleventh Aff. Def.);

laches, Dkt. 64 at 26 ¶ 8 (Town's Eighth Aff. Def.); Dkt. 66 at 39 ¶ 17 (Homeowners'

Seventeenth Aff. Def.); and waiver, Dkt. 64 at 26 ¶ 9 (Town's Ninth Aff. Def.); Dkt. 66 at

39 ¶ 10 (Homeowners' Tenth Aff. Def.). But none of these equitable defenses is of any

help to the Town and Homeowners here because, as a matter of law, the defenses do

not apply to the United States when acting in its sovereign capacity. *See United States v.*

*California*, 332 U.S. 19, 39-40 (1947) (explaining that the United States cannot be "barred

from enforcing its rights by reason of principles similar to laches, estoppel, or adverse

possession"); *see also Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1090 (7th Cir.

1992) ("As a general rule, the United States is not subject to the equitable defense of

laches in enforcing its rights"); *Lake Berryessa Tenants' Council v. United States*, 588 F.2d

267, 271 (9th Cir. 1978) ("The Government . . . and officers who have no authority at all

to dispose of Government property cannot by their conduct cause the Government to

lose its valuable rights by their acquiescence, laches, or failure to act."); *U.S. Commodity*

*Futures Trading Comm'n v. Kraft Foods Group, Inc.*, 195 F. Supp. 3d 996, 1009 (N.D. Ill.

2016) ("the unclean hands defense is not available in actions brought by the government

in the public interest"); *Israel v. U.S. Dep't of Ag.*, 135 F. Supp. 2d 945, 953 (W.D. Wis.

2001) ("In general, equitable estoppel will not lie against the government."). This rule

clearly applies when the United States seeks to protect title to trust and restricted-fee

land. *Bd. of Comm'rs of Jackson Cnty. v. United States*, 308 U.S. 343, 351 (1939) ("[S]tate

notions of laches . . . have no applicability to suits by the Government, whether on

behalf of Indians or otherwise").

Simply put, when the United States seeks to protect Federal title held in trust for Tribes, it is acting in both its sovereign capacity and as the protector of its property, and it is not subject to equitable defenses such as those asserted by Defendants. *See United States v. City of Tacoma*, 332 F.3d 574, 581 (9th Cir. 2003) ("there can be no argument that equitable estoppel bars the United States' action because, when the government acts as trustee for an Indian tribe, it is not at all subject to that defense"). Because the United States is acting in its sovereign capacity as trustee for the Band and the Allottees, the United States is not subject to the equitable defenses asserted by the Town and the Homeowners. Thus, those affirmative defenses are legally insufficient as raised against the United States' trespass and ejectment claims.

## C.   Adverse Possession Does Not Apply To The United States.

Both the Town and the Homeowners also state affirmative defenses claiming that their respective "open and obvious" use of the Roads defeats the United States' trespass and ejectment claims. Dkt. 64 at 27 ¶ 16 (Town's Sixteenth Aff. Def.); Dkt. 66 at 39 ¶ 8 (Homeowners' Eighth Aff. Def.). To the extent that the Town and the Homeowners are arguing that they have prescriptive rights to use the Roads based on adverse possession, that argument fails as a matter of law. Because possession of trust and restricted-fee land is "exclusively a matter of federal law," *Oneida II*, 470 U.S. at 241, such state property-law defenses are preempted, and the Town and the Homeowners cannot claim that they possess a valid legal interest in the Roads that arose "by long-continued use, adverse possession, or prescription." COHEN'S HANDBOOK, § 15.09[4] at 1064-65; *see also Oneida II*, 470 U.S. at 240 n.13 ("Under the Supremacy Clause, state-law

time bars, *e.g.*, adverse possession and laches, do not apply of their own force to Indian land title claims."); *Schwartz*, 460 F.2d at 1371 ("adverse possession under a state statute of limitations cannot run against Indians if the land is not alienable by them, so long as such restrictions exist" (citing *7,405.3 Acres of Land*, 97 F.2d at 422-423)); *United States v. Ahtanum Irr. Dist.*, 236 F.2d 321, 334 (9th Cir. 1956) (25 U.S.C. § 177, prohibiting alienation of Indian lands other than by treaty or convention, provides "special reason why the Indians' property may not be lost through adverse possession").

### D.   The United States' Trespass Case Is Not Barred By The Statute Of Limitations.

The Town and Homeowners both allege, without citing to any statute, that the United States' trespass case against the Town is barred by the statute of limitations. Dkt. 64 at 26 ¶ 3 (Town's Third Aff. Def.); Dkt. 66 at 39 ¶ 17 (Homeowners' Seventeenth Aff. Def.). In the present motion, the United States moves for partial summary judgment to establish the Town's liability on the United States' trespass and ejectment claims, the only claims in the United States' Complaint. Dkt. 61 ¶¶ 60-76. Those claims are subject to no statute of limitations. 28 U.S.C. § 2415(c) ("Nothing herein shall be deemed to limit the time for bringing an action to establish the title to, or right of possession of, real or personal property."). The Town's and Homeowners' respective affirmative defenses based on some unknown statute(s) of limitation are thus legally insufficient to defeat the United States' claims of liability against the Town.

E.       **Failure To Join Indispensable Parties.**

The Town and Homeowners each allege an affirmative defense claiming that the United States "may have failed to join certain third parties who are necessary and indispensable to this action." Dkt. 64 at 26 ¶ 10 (Town's Tenth Aff. Def.); Dkt. 66 at 39, ¶ 16 (Homeowners' Sixteenth Aff. Def.). Neither the Town nor the Homeowners "has given any indication of which party needed to be joined or why, thereby rendering these affirmative defenses implausible." *Kochan v. Kowalski*, 478 F. Supp. 3d 440, 454 (W.D.N.Y. 2020) (citation and internal quotations omitted). The United States assumes the Town and the Homeowners mean the Band, on whose behalf the United States holds legal title to portions of the land on which the Roads are located, and the Allottees, who themselves own portions of the land, for which the United States holds restrictions against alienation and encumbrance. *See* US PFF ¶¶ 18-19 (Annie Sunn Lane), 22-23 (Center Sugarbush Lane), 26-27 (East Ross Allen Lake Lane), and 30-31 (Elsie Lake Lane).

Neither the Band nor the Allottees are necessary and indispensable to this case. It is well-settled that, when the United States brings an action in its capacity as trustee to enforce Tribal- and allottee-land interests, the Tribe or the allottees are not necessary parties. *See Heckman v. United States*, 224 U.S. 413, 444-45 (1912). The litigation at issue in *Heckman* concerned the Federal Government's authority to represent members of the Cherokee Nation in a case seeking to cancel certain conveyances of allotted land made by those members. 224 U.S. at 415. The Supreme Court held that the United States' representation, in its capacity as trustee, of an Indian Tribe or its members in litigation

that results in the entry of a judgment or decree, ordinarily binds the Tribal interests to

the decree. In reaching that result, the Court dismissed concerns that the individual

Indian owners were necessary parties. The Court stated:

> It is further urged that there is a defect of parties, on account of the absence of the Indian grantors. It is said that they are the owners of the lands and hence sustain such a relation to the controversy that final decree cannot be made without affecting their interest.
>
> The argument necessarily proceeds upon the assumption that the representation of these Indians by the United States is of an incomplete or inadequate character; that although the United States, by virtue of the guardianship it has retained, is prosecuting this suit for the purpose of enforcing the restrictions Congress has imposed, and of thus securing possession to the Indians, their presence as parties to the suit is essential to their protection. This position is wholly untenable.

*Id.* at 444 (citations omitted).

*Heckman* remains binding law. *See United States v. Torlaw Realty, Inc.*, 348 F. App'x

213, 216-17 (9th Cir. 2009) (action for trespass and ejectment brought by United States;

citing *Heckman* in support of conclusion that "[Rule] 19(a) did not require the district

court to join the allottees as necessary parties"); *Seneca Nation of Indians v. New York*, 213

F.R.D. 131, 137 (W.D.N.Y.2003) (citing *Heckman* for proposition that "in the unique

context of enforcing restrictions on the alienation of Indian lands, the United States is

best situated to provide complete representation of tribal interests and no other party is

necessary"); COHEN'S HANDBOOK, *supra*, § 7.04[1][b] at 617. The Town's and the

Homeowners' affirmative defenses to the contrary are without merit.

**F.      Failure to Identify And Obtain The Consent Of The Allottees.**

For similar reasons, the Town's two related affirmative defenses claiming that the United States "failed to identify all Allottees whose alleged ownership of the Roads is at issue in this action," and also "may have failed to obtain the consent of all [the] Allottees" to bring this action, lack any merit. Dkt. 64 at 26 ¶¶ 11, 12 (Town's Eleventh and Twelfth Aff. Defs.).

Regarding the United States' alleged failure to identify the Allottee-landowners, the United States has met its burden to establish its (and the Allottees') property interests in the restricted-fee lands at issue in this case by producing undisputed, documentary evidence of those interests, including all the BIA records documenting the Allottees' ownership of their restricted-fee lands, *see* US PFF ¶¶ 18-19 (Annie Sunn Lane), 22-23 (Center Sugarbush Lane), and 30-31 (Elsie Lake Lane), which the United States has produced to both the Town and Homeowners in discovery. *See id.* ¶ 11; *see also* Hoffman Decl., ¶ 6 and Att. C (Resps. and Objs. of the United States to Intervenor Defs.' First Combined Discovery Requests), United States' Resp. to Request for Production No. 1. Based on that indisputable evidence, there is no doubt that the United States can prosecute this action both on its own behalf and in its capacity as trustee for the Allottees. Having established its governmental interest in the restricted-fee allotted lands at issue here, for the reasons discussed and the authority cited in Section VII.E above, the United States did not need to seek the Allottees' consent to proceed with this action, and the Town's claims to the contrary are without legal merit.

G.     Defenses Based On The Tenth Amendment.

The Town asserts two affirmative defenses based on the Tenth Amendment of

the United States Constitution. First, the Town alleges that its "maintenance and use of

the Roads is authorized by its plenary authority to exercise its police powers." Dkt. 64 at

27 ¶ 23 (Town's Twenty-Third Aff. Def.). Relatedly, the Town alleges that, "[t]o the

extent the acts and regulations cited by Plaintiff preclude Defendant from fulfilling its

statutory obligations" under Wisconsin law, those "acts and regulations are

unconstitutional and in violation of the Tenth Amendment to the Constitution of the

United States." *Id.* at 28 ¶ 27 (Town's Twenty-Seventh Aff. Def.). [26] These defenses are

insufficient for two reasons.

First, to the extent that the Town attempts to use the Tenth Amendment to assert

a state-law property interest in or some other state-law right to use and occupy the

segments of the Roads crossing the Band's and the Allottees' trust and restricted-fee

lands, to "read the Tenth Amendment as incorporating *specific* guarantees of procedural

fairness would exceed even an expansive reading of the Amendment's proper scope."

*Ariz. State Dep't of Pub. Welfare v. HEW*, 449 F.2d 456, 479 (9th Cir. 1971). The Tenth

Amendment reserves certain rights to states, but it "assuredly does not incorporate a

Bill of Procedural Rights for the states." *Id.* Second, any maintenance authority or use

and access rights the Town had over the segments of the Roads located on the Band's

---

[26] This section also addresses and disposes of the Homeowners' affirmative defense
challenging the constitutionality under the Tenth Amendment of "the acts and regulations
cited by Plaintiff." Dkt. 66 at 38 ¶ 5 (Homeowners' Fifth Aff. Def.).

and the Allottees' trust and restricted-fee lands flowed from federal law, not state police powers. The Town was the "public authority" due to those segments of the Roads being listed on the NTTFI, by consent of the Band, and its use and access rights were granted under the ROW Act. Congress' authority over Indian lands is plenary and "paramount to the authority of any state" or its political subdivisions. *Dick v. United States*, 208 U.S. 340, 353 (1908); *see* Section III.A, *supra*. Any purported police powers that the Town has cannot override Congress' plenary authority over Indian lands, the INA, or the ROW Act. The Town's affirmative defenses based on those purported Tenth-Amendment rights are without merit.

## CONCLUSION

For all of the reasons stated above, the Court should grant the United States' Motion for Summary Judgment on trespass liability and ejectment, deny the Town's and Homeowners' counterclaims, and dismiss the Town's and Homeowners' affirmative defenses.

DATED:  December 13, 2024

Respectfully submitted,

TIMOTHY M. O'SHEA, United States Attorney
Western District of Wisconsin

TODD KIM, Assistant Attorney General
Environment and Natural Resources Division

_____/s/_____
SAMUEL D. GOLLIS, Trial Attorney
Massachusetts BBO No. 561439
Indian Resources Section
Environment and Natural Resources Division
United States Department of Justice
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Tel.: (303) 844-1351
Fax: (303) 844-1350
Email: samuel.gollis@usdoj.gov

_____/s/_____
HILLARY K. HOFFMAN, Trial Attorney
Minnesota Bar No. 0402027
Indian Resources Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044
Tel.: (202) 598-3147
Fax: (202) 305-0275
Email: hillary.hoffman@usdoj.gov

*Attorneys for the United States of America*

OF COUNSEL:

KARA G. PFISTER, Senior Attorney
Office of the Solicitor – Northeast Region
United States Department of the Interior

ANDREW S. CAULUM, Senior Attorney
Office of the Solicitor – Division of Indian Affairs
United States Department of the Interior