IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

                    Plaintiff,

      v.

TOWN OF LAC DU FLAMBEAU,

                  Defendant and
                  counterclaimant,           OPINION and ORDER

and                                        23-cv-355-wmc

GORDON ANDERSON, *et al.*,

                  Intervenor defendants and
                  Intervenor counterclaimants.

---

GORDON ANDERSON, *et al.*,

                  Plaintiffs,

      v.                                  OPINION and ORDER

BRYAN NEWLAND, *et al.*,               23-cv-777-wmc

                  Defendants.

---

TOWN OF LAC DU FLAMBEAU,

                  Plaintiff,

      v.                                  OPINION and ORDER

BRYAN NEWLAND, *et al.*,               23-cv-541-wmc

                  Defendants.

---

These three, captioned cases all arise out of a decision by the Lac du Flambeau Band of the Lake Superior Chippewa Indians ("Tribe") to place blockades on four roads ("Roads") within the Lac du Flambeau Indian Reservation that had provided long-term access to property and homes owned by non-tribal members within the Reservation. After a homeowners' lawsuit attempting to challenge the blockade was dismissed for lack of jurisdiction over the tribal defendants in August 2023, *Pollard, et al. v. Johnson, et al.*, 23-cv-135-wmc (W.D. Wis.), the United States filed a trespass and ejectment action on its own behalf and as trustee for the Tribe, as well as 76 individual, Indian landowners ("Allotees") against the Town of Lac du Flambeau ("Town"), which had been maintaining the Roads for decades. *United States v. Town of Lac du Flambeau*, 23-cv-355-wmc.[1]

Specifically, the United States contends that the Town's use and maintenance of the road is a trespass because it lacks a valid, unexpired right-of-way under the Indian Right of Way Act, 25 U.S.C. §§ 323, *et seq.* More than 50 homeowners who rely on the Roads to reach their property ("Homeowners") also intervened as defendants in the case, and both the Town and Homeowners filed several counterclaims against the United States seeking to establish their respective rights to access.[2]

The Town then filed a separate lawsuit against several federal defendants,[3] alleging violations of the Administrative Procedures Act and Constitution, stemming from the Bureau

---

[1] Unless noted otherwise, docket citations in this opinion are to Case No 23-cv-355.

[2] As discussed below, the court granted the Homeowners' early motion for a preliminary injunction (dkt. #88), which the Town joined (dkt. #107), preventing the United States from restricting access to the four Roads during the pendency of this lawsuit. The Roads have remained open since entry of that injunction. (Dkt. #118.)

[3] The federal defendants are Bryan Newland, in his official capacity as Assistant Secretary for Indian Affairs of the United States Department of the Interior; Tammie Poitra, in her official capacity as

of Indian Affairs' decision to remove the Roads from the Tribal Transportation Program's National Tribal Transportation Facilities Inventory ("National Inventory"), which according to the Town, require the Roads to be open to the public. *Town of Lac du Flambeau v. Newland, et al.*, Case No. 23-cv-541-wmc. The Homeowners then filed their own lawsuit against several of the same federal defendants and agencies, alleging similar violations of the APA and Constitution. *Anderson, et al. v. Newland, et al.*, 23-cv-777-wmc.

Before the court are the parties' cross motions for summary judgment filed in Case No. 23-cv-355-wmc, (Homeowners' Mtn. (dkt. #125); (United States' Mtn. (dkt. #136); Town's Mtn. (dkt. #142)), and the United States' motions to dismiss the Town's and Homeowners' claims and counterclaims challenging the BIA's removal of the Roads from the National Inventory. (Dkt. #68 in 23-cv-355; Dkt. #10 in 23-cv-541; Dkt. #9 in 23-cv-777.) As explained in more detail below, the court now concludes as a matter of law that the Town and Homeowners have a legal right to use and access the four Roads because: (1) the Town has an unexpired easement under the ROW Act for the north-south segment of Annie Sunn Lane; (2) the Roads were required to remain open to the public during the time listed on the National Inventory; (3) the BIA's removal of the Roads from the National Inventory was improper; and (4) the Homeowners have an implied easement over the Roads to access their properties. Therefore, the United States' motions to dismiss and for summary judgment will be denied in full, and the Town's and Homeowner's motions for summary judgment will be granted.

---

Midwest Regional Director of the BIA; Deb Haaland, in her official capacity as United States Secretary of the Interior; the United States Department of the Interior; the United States Bureau of Indian Affairs; and the United States Bureau of Indian Affairs—Division of Transportation.

Further, the court will issue a separate, permanent injunction requiring that the Roads remain open and accessible barring a demonstrated change in circumstances and order of this court.

UNDISPUTED FACTS[4]

**A.  Lac du Flambeau Indian Reservation**

The Lac du Flambeau Indian Reservation was established by the Treaty with the Chippewas in 1854.  It is now one of several reservations in this country sometimes referred to as "checkerboard" reservations, meaning that there are multiple parcels of land on the Reservation owned in fee simple by non-tribal members, including the Homeowners involved in this case.

In substantial part, the Reservation's checkerboard nature is the result of the allotment provision in Article 3 of the Treaty with the Chippewa, 10 Stat. 1109 (Sept. 30, 1854), which permitted the United States to assign tracts of Reservation land to individual tribal members by way of federal land patents.[5]  Then, by the Act of February 3, 1903, ch. 399, 32 Stat. 795 (the "1903 Allotment Act"), those tribal allottees were further deemed "competent" by the Department of Interior, enabling them to sell their individual allotments in fee simple to non-

---

[4] Although the court has described some of the complicated historical and procedural background of this case in earlier decisions (dkt. #118 in 23-cv-355-wmc and dkt. #68 in 23-cv-135-wmc), historical facts about the Lac du Flambeau Indian Reservation and the four Roads at issue are integral to this court's resolution of the parties' summary judgment motions.  Thus, the court provides these detailed, background facts as drawn from the parties' proposed findings of fact, responses to those proposed findings, and the evidence in the record.  All parties agree that there are no genuine disputes of material fact that preclude resolution of this case on summary judgment.

[5] The United States took this role because under the 1854 Treaty, the United States government held the Reservation land in its entirety in trust for the benefit of the Tribe.  *See Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin v. Evers*, 46 F.4th 552, 560 (7th Cir. 2022) (describing history of allotment on Ojibwe lands in Wisconsin).

tribal members.  By 1904, with many members in financial distress, there were already 115 allotments made on the Lac du Flambeau Reservation, and by 1935, 600 allotments had been made.

Over time, the many of these allotted properties were sold to non-tribal developers, who further divided that land and conveyed title of vacant lots to others, including the intervening Homeowners in this case or their predecessors-in-interest.  Thus, the individual parcels of land currently owned by Homeowners are traceable back to land patents initially granted by the United States to members of the Tribe under the 1854 Treaty or the 1903 Allotment Act, resulting in the checkerboard parcels owned in fee simple by non-tribal members, including the Homeowners, within the boundaries of the Reservation.[6]  In 1900, shortly before the Allotment Act passed, the Town of Lac du Flambeau was established, located in the center of the Tribe's Reservation.

This allotment process ended with the Indian Reorganization Act in 1934, which was intended to stem the loss of Tribal land holdings and give tribes the opportunity to reestablish their governments and consolidate their land holdings.[7]  In 1948, Congress passed the Indian Right-of-Way Act, 25 U.S.C. §§ 323–28 ("ROW Act"), to ensure a process was in place to control access further within and across Indian trust lands.  However, lands that had already

---

[6] As the court noted in its preliminary injunction decision, the United States' allotment policies coincided with shameful congressional efforts to dissolve reservations and extinguish tribal sovereignty.  (Dkt. #118, at 3.)  Congress's passage of the General Allotment Act in 1887 ("Dawes Act"), 25 U.S.C. § 331, *et seq.*, adopted a nationwide version of the allotment provisions found in treaties like the 1854 Treaty with the Chippewa, resulting in similar checkerboard reservations across the country.

[7] *See Oneida Nation v. Vill. of Hobart*, 968 F.3d 664, 671 (7th Cir. 2020) (discussing effect of Indian Reorganization Act of 1934 on another, now Wisconsin-based tribe).

passed to non-Indians did *not* return to Tribal control under the Indian Reorganization Act or ROW Act.  Today, the Lac du Flambeau Reservation is 86,500 acres in total (approximately 135 square miles), comprising 33,134 acres of Tribal trust land (38%), 10,087 acres of Allottee land (12%), and 43,279 acres of private, alienated fee land (50%).

### B. Four Roads at Issue

The parties' dispute concerns four Roads, portions of which cross Reservation land owned by the Tribe or Allottees: Annie Sunn Lane; Center Sugarbush Lane; East Ross Allen Lake Lane; and Elsie Lake Lane.  The Roads were built by two development companies in the 1960s, though some portions of the Roads followed existing roadbeds or paths.  The total length of the roadways on Reservation land is just over 1.3 miles.  The Roads currently provide the only vehicular access to the Homeowners' homes and fee property.[8]

#### 1. Annie Sun Lane

In 1962, the president of the Northwoods Land Office contacted the BIA about obtaining an easement to build a road -- the east-west portion of Annie Sun Lane -- that would reach new homes to be built in the area.  (Dkt. #144-2 at 17.)  Northwoods noted that the road would be "immediately turned over" to the Town after it was built.  (*Id.*)  The Superintendent for the BIA Great Lakes Agency responded, confirming that the right-of-way was "being applied for in [Northwood's] name, but will then be turned over to the Town of Flambeau at a later date as a public road, or upon completion of survey and construction[,]" and as such, would need to "comply with local Town right-of-way requirements[.]" (*Id.* at 19.)

---

[8] All but one Homeowner has a home on their property.

After Northwoods obtained consent of the Tribe and affected allottees several months later, it then applied to the BIA for a right-of-way "for a public road," that would eventually become the east-west portion of Annie Sunn Lane. (*Id.* at 13.) Within the application materials, Northwoods also included a map sketch, which referred to the proposed road as a "Town Right of Way." (*Id.* at 16.) In June 1963, Northwoods further requested a change to its application, so that an "old road bed" could be used instead of a "new road." (*Id.* at 22.) Approximately one month after submitting the application, Northwoods also sent a follow-up letter to the BIA asking if it could start work on the "proposed town road." (*Id.* at 23.)

In April 1964, the Superintendent for the Great Lakes Agency formally approved Northwoods' right-of-way application. The BIA memorandum approving the right-of-way further stated that the "[p]urpose of the right-of way is to provide permanent and legal access to privately-owned property of the applicant." (*Id.* at 26.) However, the actual language of the right-of-way as issued for the east-west segment of Annie Sunn Lane limited this right to a period of 50 years from date of approval, subject to renewal for a like term upon compliance with applicable regulations. (*Id.* at 3; dkt. #61-1.) While the Superintendent did not explain why the right-of-way was limited to 50 years, he sent a memorandum to the BIA Area Director that same day with the approved right-of-way stating that the "[p]urpose of the right-of-way is to provide permanent and legal access to privately-owned property of the applicant." (Dkt. #144-2 at 26.)

Northwoods also developed the north-south segment of Annie Sunn Lane, along an abandoned roadbed that runs across Tribal trust land for approximately one-half mile. Northwoods proposed construction of this portion of the road to the BIA in 1967, stating: it was important that the segment "run to our successors and assigns" to provide access to a

subdivision; and it was "quite possible that we would want to dedicate this road to the Town of Flambeau for the purpose of a town highway, which the town would maintain." (Dkt. #144-3, at 14.) Because "private road rights-of-way are limited as to length of time that they may be used," the Superintendent for the BIA Great Lakes Agency responded that "a public right-of-way be issued in your name, with the stipulation that it may run to your successors and assigns, as requested." (*Id.* at 15.) In reply, Northwoods submitted a formal application for a "public road right-of-way." (*Id.* at 11.)

In February 1968, the BIA Office of the Area Director also advised the Superintendent of the Great Lakes Agency in writing that "all grants for public road purposes should be made to governmental entities qualified and willing to maintain them," but "[p]rivate individuals and corporations should only receive private grants of easement for [] limited terms[s]." (*Id.* at 17.) Nonetheless, in March 1968, the Superintendent of the Great Lakes Agency approved Northwoods' application, stating, "normally, public road rights-of-way are not issued to private individuals," but "[a]n exception was made in this case, inasmuch as development of your subdivision will probably see the assignment of the right-of-way to the Town of Flambeau." (*Id.* at 18.) Later, the right-of-way for the north-south segment of Annie Sunn Lane *was* approved as a public road right-of-way by the Superintendent of the Great Lakes Agency without any expiration date, and with the right-of-way grant specifically stating that the applicant could transfer the right-of-way by assignment, grant, or otherwise to its successors and assigns. (Dkt. #61-2.)

In 1971, after construction of both the east-west and north-south segments of Annie Sunn Lane, Northwoods formally assigned its rights-of-way in both segments to the Town.

(Dkt. #144-2, at 4; dkt. #144-3, at 4–8.)[9]  The Tribe further approved that assignment of:  the east-west segment as a "public road right-of-way" "in accordance with Departmental Regulations 25 C.F.R. 161" (dkt. #144-2, at 4); and the north-south segment as having no "limitation as to the term of years."  (Dkt. #144-3, at 8.)

### 2.  Center Sugarbush Lane

The segment of Center Sugarbush Lane that crosses over trust or restricted fee land on the Reservation is approximately 0.25 miles.  Like Annie Sunn Lane, Northwoods Land Office developed Center Sugarbush Lane.  In 1963, Northwoods filed an application with the BIA for a right-of-way for Center Sugarbush Lane to "provide permanent and legal access to privately-owned property[.]" (Dkt. #144-4, at 7.)  In 1964, the BIA approved that application, granting the right-of-way for a period of 50 years.  (*Id.* at 3.)  The Superintendent for the BIA Great Lakes Agency sent a memorandum to the BIA Area Director with the approved right-of-way, stating that the "[p]urpose of the right-of-way is to provide permanent and legal access to privately-owned property of the applicant."  (*Id.* at 11.)  In 1965, Northwoods also formally transferred its right-of-way to the Town.

### 3.  East Ross Allen Lake Road

The 0.03-mile segment of East Ross Allen Lake Lane at issue in this case crosses over one parcel of Tribal land.  In 1963, Northwoods contacted the BIA about a right-of-way for

---

[9] Although not at issue in this case, there is a third segment of Annie Sunn Lane running east-west to which the BIA granted a right-of-way to Northwoods in 1971, which was later assigned to the Town as well.  (Dkt. #144-3, at 23.) The United States concedes that this right-of-way is perpetual, as the grant includes express language making it perpetual.  (United States' Br. in Opp. (dkt. #151) 12–13.)

the segment on which there was already an existing road, which would later be turned over to the Town as well.  (Dkt. #144-5, at 11.)  In 1964, the BIA approved that right-of-way by memorandum, stating that the "[p]urpose of the right-of-way is to provide permanent and legal access to privately-owned property owned by the applicant."  (*Id.* at 12.)  However, Northwoods' approved right-of-way was for a period of 50 years.  (*Id.* at 3.)  In 1965, Northwoods deeded its rights, title and interest in the right-of-way to the Town as a public road.

### 4.  Elsie Lake Lane

Finally, two segments of Elsie Lake Lane cross over trust or restricted fee land on the Reservation, but only a 0.2-mile segment running north-south is at issue in this case.  That segment traverses one parcel of Tribal land.  In 1961, the BIA approved an application submitted by the developer, Patterson Brothers, Inc., for a right-of-way on this road segment as well.  While the right-of-way was limited to a period of 50 years, subject to renewal for a like term upon compliance with applicable regulations, that developer similarly assigned or deeded its right-of-way to the Town after the road was completed.

### C.  Expiration of Rights-of-Way and Blockage of Roads

After these four Roads were built and the rights-of-way transferred to the Town, the Town proceeded to maintain the Roads, treating them as public for the next 50 years or more. During that time, the Town expended significant funds maintaining the Roads as part of the Town's road system, including by patching, crack sealing, and snow plowing the Roads.  The Town also coordinated and was responsible for providing the Town's residents with certain emergency services via the Roads, including fire protection and ambulance services consistent with its statutory obligations under Wisconsin law.  Further, the express rights-of-way were

never recorded in the Register of Deeds for Vilas County or any other readily searchable recording system available to the public, though they would have been available on request to the BIA. As a result, when many, if not all, of the Homeowners took title to their respective properties, they did so without notice of any qualification as to the permanence of the Town's rights-of-way on the respective Roads.

In 2013, the BIA sent letters to some Homeowners, notifying them that the easement across a portion of the Roads would be expiring. (Dkt. #46-1–46-4, in *Pollard, et al.*, 23-cv-135-wmc.) In January 2014, the Town also sent a letter to some of the Homeowners (dkt. #91-19), stating that it would take care of communicating with the BIA regarding their rights-of-way and asking that no Homeowners pursue an individual right-of-way. As the Town and the Tribe began negotiating, the Tribe also issued a statement that "it will not deny any resident of Lac du Flambeau access to their home, nor will any 'fee' be imposed on residents." (Dkt. #91-5.)

In 2017, however, after negotiations between the Town and the Tribe broke down, some of the Homeowners applied for individual rights-of-way under the procedures afforded by the ROW Act. The BIA then sought formal appraisals of the Roads, which placed the total fair market value for another 50-year term as to all of the rights-of-way at $79,000.[10] Because the Tribe demanded significantly more money -- ranging at various times from $10 to $20 million -- further negotiations over the appropriate value of new rights-of-way had stalled completely by early 2023, at which time the Tribe stated that it would not approve any new

---

[10] Unbeknownst to the Homeowners, BIA had also conducted appraisals in 2014 for the purpose of potentially renewing the rights-of-way for the Town. (Suppl. B. Hubing Decl., ¶¶ 4-7, Exs. C–F (dkt. #129-3).) Those appraisals valued a new 50-year right-of-way over East Ross Allen Lane at $500, Center Sugarbush Lane at $3,300, and Annie Sunn Lane at $4,400.

long-term easements over the Roads under the ROW Act.  The Lac du Flambeau Tribal Council further sent letters to the Town, Homeowners and title insurance companies stating that:  any rights-of-way on the Roads had expired five to more than 10 years ago; the Town and Homeowners were considered in trespass; and the Tribe reserved the right to limit access to the Roads, including by posting signs, road checkpoints and physical barriers.  On January 31, 2023, the Tribal Council made good on this threat, erecting barriers across the four Roads that consisted of large concrete blocks with chains between the blocks, as well as wooden barricades in front of the chains.  At least one camera was also installed to monitor the use of the Roads by Homeowners or others.

These barriers remained in place between January 31 and March 13, 2023.  During that time, the Homeowners could not use the Roads to come and go from their homes except for medical appointments, and even then, only by calling tribal police to unlock the chains on the barricades.  If they left their home for any other reason than a medical appointment, Homeowners were not always allowed back through the barricades to return home, even if they left solely to obtain necessities such food, pet supplies and home repair materials.  As a result, some Homeowners suffered from anxiety and distress from not being allowed back through the barricades to return home.[11]  Other Homeowners reported not receiving mail for weeks.

### D. Litigation History

In February 2023, a group of Homeowners who relied on the Roads to access their homes filed a lawsuit, naming as defendants the 12 individual members of the Tribe making

---

[11] One child was reportedly hospitalized due to a panic attack after being unable to return to her home from school.

up the Lac du Flambeau Tribal Council.  *See Pollard, et al. v. Johnson, et al.*, 23-cv-135-wmc (W.D. Wis.).  The Homeowners claimed that the Tribe's interference with access to the Roads violated the Federal-Aid Highway Act, 23 U.S.C. § 101 *et seq.*, the Tribal Transportation Program, 23 U.S.C. §§ 201–202, and implementing regulations at 25 C.F.R. Part 170.  More specifically, the Homeowners argued that because the four Roads had been listed under those statutes on the National Tribal Transportation Facilities Inventory ("Inventory") since 2001, the Tribe was required to keep the Roads open to the public.  They also asserted state-law nuisance and implied easement claims.  Ultimately, however, that case was dismissed for lack of subject matter jurisdiction.

On March 13, 2023, while the *Pollard* lawsuit was pending, the Tribe opened the Roads under temporary access permits issued by the Tribe to the Town at a substantial monthly cost fee.  On March 15, 2023, the Tribe also asked the BIA to remove the four Roads from the Inventory and to act on behalf of the Tribe to pursue remedies against the Town for trespass.  The BIA complied with this request, removing the four Roads from the Inventory on March 24, 2023.  In a letter dated March 30, 2023, the Midwest Regional Director of the Bureau of Indians Affairs, Tammie Poitra, indicated that the Band had passed a resolution and submitted documentation seeking the removal of the Roads from the Inventory.  (Dkt. #1-2, in 23-cv-541.)  This letter further indicated that the BIA had verified the Tribe had not expended federal transportation funds on the Roads and approved the update request, removing the Roads from the Inventory under 25 C.F.R. § 170.444(b)(3).  (*Id.*)  A few days after the Roads were no longer listed on the Inventory, the Tribe moved to dismiss the Homeowners' suit, arguing that "any alleged applicability of the Federal-Aid Highway Act, the Tribal Transportation Program, and its implementing regulations are immaterial."  (Tribe's Br. (dkt. #38) 9.)

13

After the Town and Homeowners learned of the BIA's decision to remove the Roads from the Inventory, the Town appealed BIA Regional Director Poitra's decision to the Interior Board of Indian Appeals, while the Homeowners sent an appeal to Poitra. After Poitra notified the Homeowners that they had no appeal rights under the TTP regulations, they, too, sent an appeal to the Interior Board of Indian Appeals. On May 5, 2023, Brian Newland, the Assistant Secretary for Indian Affairs at the Department of the Interior, decided to exercise his authority under 25 C.F.R. § 2.4(c), 25 C.F.R. § 2.20(c), and 43 C.F.R. § 4.332(b) to assume jurisdiction over both the Town's and Homeowners' appeals.

Two months later, on July 5, 2023, Interior Assistant Secretary Newland issued an order dismissing the Town's appeal. (Dkt. #1-3, in 23-cv-541.) In his order, Newland recited the procedural history of the appeal and noted that the Town sought to appeal Poitra's decision pursuant to 25 C.F.R. Part 2. However, Newland found that 25 C.F.R. Part 2's appeal procedure does not apply where "any other regulation or Federal statute provides a different administrative appeal procedure applicable to a specific type of decision." (*Id.*) Instead, Newland explained that 25 C.F.R. § 170.444(c) provides a "limited administrative appeal procedure" that grants a "right of appeal to a Tribe, which may only appeal 'the rejection of submitted data on a new or existing facility included in the [Inventory] by filing a written notice of appeal to the Director, Bureau of Indian Affairs, with a copy to the BIA Regional Director." (*Id.*) In other words, Newland concluded that only the Tribe itself could appeal removal of roads from the Inventory, not third parties.

Just days after Newland issued his decision, the Town was sued by a homeowner in Wisconsin State Circuit Court in Vilas County for injuries stemming from alleged statutory, common law, and constitutional violations under state and federal law for alleging denying

14

public access across one of the Roads -- East Ross Allen Lake Lane -- in *Hornbostel v. Town of Lac du Flambeau, et al.*, Vilas Cty. Cir. Ct. Case No. 2023-cv-68.  Two weeks later, the Town was again sued by another set of homeowners alleging similar claims for denied public access across another one of the Roads -- Elsie Lake Lane -- in *Beer v. Town of Lac du Flambeau, et al.*, Vilas Cty. Cir. Ct. Case No. 2023-cv-78.  In addition to those lawsuits, the Town has received several other notices of claim, which seek in total more than $6,000,000 in damages.  The Town then filed another lawsuit in this court, *Town of Lac du Flambeau v. Newland*, et al., 23-cv-541-wmc, against Interior Assistant Secretary Newland and other federal defendants, seeking review under the Administrative Procedures Act and challenging the federal defendants' actions and federal regulations on which Newland relied.  The Homeowners filed their own lawsuit against the BIA and several federal officials as well.

Meanwhile, on May 31, 2023, the United States filed this lawsuit as trustee for the Tribe, as well as on its own behalf in its sovereign governmental capacity, for trespass and ejectment action against the Town under the ROW Act.  The Town responded by filing several counterclaims, including Counterclaim IV, alleging that the regulation under which the BIA removed the four Roads from the Inventory, 25 C.F.R. § 170.444, is unconstitutional because it deprived the Town of its Fifth Amendment procedural and substantive due process rights.  The United States moved to dismiss that counterclaim specifically.  In addition, the Homeowners intervened in this suit as defendants, filing their own counterclaims for implied and necessary easements.

After the Town's entire road budget for 2024 was depleted due to the monthly payments for temporary access totally $600,000, the Town claimed it could no longer pay to keep the Roads open.  The Town then requested monetary assistance from local, state and

federal governments, but received no additional funds.  After the last temporary access permits expired for lack of payment on September 12, 2024, the Tribe began threatening to reinstall the barricades and the Homeowners moved for a preliminary injunction, which the Town joined, seeking an order prohibiting the United States and Tribe from restricting access to the four Roads during the pendency of the lawsuit.  On September 26, 2024, the court granted that motion in part, enjoining the United States from restricting or limiting access to the Roads, but declining to enter an injunction expressly enjoining the BIA or Tribe.  (Dkt. #118.)

Approximately one month later, on October 18, 2024, the Tribe sent a letter to the Town, notifying that it was in default and that if it did not pay all outstanding Temporary Access Permit fees by January 16, 2025, the Tribe would restrict access to the four Roads. (Dkt. #122-1.)  On January 14, 2025, the Homeowners filed an emergency motion to amend the preliminary injunction order to prohibit the Tribe from restricting access to the Roads. (Dkt. #161.)  On January 15, this court amended its injunction to require the United States "to take immediate action to prevent an effort by anyone to restrict access to the four Roads" pending a decision on the merits.  (Dkt. #167.)

On January 17, the Tribe nevertheless issued a press release stating that it would be issuing citations to anyone who used the Roads (dkt. #169-1), and posted "no trespassing" signs on the Roads.  (Dkt. #188.)  At the request of the Homeowners, the court held a status conference on February 21, 2025, to clarify the terms of its injunction.  On February 25, the Tribe notified the court that it would refrain from issuing citations for uses of the four Roads and would keep the Roads open during the pendency of this litigation.  (Dkt. #201-1.)  The Roads have remained open since that date.

OPINION

In considering whether the United States or the Tribe can exclude the Town and Homeowners from using segments of the four Roads running on tribal land, the court begins by acknowledging the long-standing principle that Indian tribes possess inherent sovereign powers, including the authority to exclude unless Congress clearly says otherwise.  *See New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 333, (1983) ("A tribe's power to exclude nonmembers entirely or to condition their presence on the reservation is ... well established."); *United States v. Lara,* 541 U.S. 193, 200 (2004) (recognizing that "the Constitution grants Congress broad general powers to legislate in respect to Indian tribes, powers that we have consistently described as 'plenary and exclusive'" (citations omitted)); *Santa Clara Pueblo,* 436 U.S. 49, 58, 60 (1978) (recognizing Congress's "superior and plenary control" over matters of tribal sovereignty and noting that "a proper respect both for tribal sovereignty itself and for the plenary authority of Congress in this area cautions that we tread lightly in the absence of clear indications of legislative intent").  Thus, unless the Tribe or Congress has authorized a non-tribal member's access, use or possession of tribal land, the non-tribal member may be liable for trespass.

Here, the United States contends that the only way the Town and Homeowners can lawfully access the Roads within the Reservation is by holding unexpired rights-of-way under the Indian Right-of-Way Act, 25 U.S.C. §§ 311–328.  The United States further contends that because the Town has no remaining, valid rights-of-way under the ROW Act, the Town's and Homeowners' use of the Roads amounts to a trespass.  In response, the Town and Homeowners argue that: (1) the Town *does* hold valid rights-of-way under the ROW Act; and even if they do not, (2) the Tribe and BIA authorized public access to the four Roads by listing them as "public

roads" on the Indian Reservation Road inventory; and (3) the United States granted implied easements on the four Roads when it authorized allotments to the Homeowners' predecessors-in-interest.  The court addresses each of these arguments in turn.

## I.  Indian Right of Way Act

The ROW Act authorizes the Secretary of the Interior to grant rights-of-way across trust and restricted lands owned by both Tribes and individual Indians.  25 U.S.C. §§ 311–328. However, statutory provisions and implementing regulations place certain conditions on the Secretary's exercise of power in granting certain easements.  For tribal trust land, the ROW Act contains two requirements for granting such rights-of-way: (1) consent of the proper tribal officials; and (2) payment of such compensation as the Secretary of the Interior shall determine to be just.  *Id.* § 325.

At one time, the record confirms that the Town held valid rights-of-way under the ROW Act for each of the four Roads via assignment from private developers.  However, the United States contends that all of these rights-of-way expired after 50 years and that any subsequent use of the Roads by the Town constitutes a trespass.  Specifically, the rights-of-way approvals, except for the north-south segment of Annie Sunn Lane, expressly state they were for "a period of fifty years."  Even with respect to the north-south segment of Annie Sunn Lane, the United States argues that the grant should have been limited to 50 years, so the court should interpret it that way.  In opposition, the Town asks the court to interpret *all* the rights-of-way at issue as permanent based on the historical record and ROW-Act regulations existing at the time of the grants.

18

There is some validity in both sides' arguments. The court agrees with the Town that the historical record shows the BIA, the Band, the developers, and the Town understood that the Roads in dispute were all intended to be public roads, which guaranteed permanent access from existing Town roads to landlocked properties within the Town's boundaries. (Town's PFOF (dkt. #146) ¶¶ 37, 38, 55, 56, 66, 67) ("[p]urpose of the right-of-way[s] [was] to provide permanent and legal access to privately owned property of the applicant"). To that end, the developers and local BIA officials understood that the Roads were be assigned to the Town, at least eventually, for ownership and maintenance as part of the Town's road system. For example, the BIA instructed a developer to comply with Town right-of-way requirements for the east-west segment of Annie Sunn Lane on the assumption that the right-of-way would be turned over to the Town. Consistent with that understanding, the rights-of-way were assigned to the Town soon after each of the four Roads were constructed, and the Town assumed and performed maintenance responsibilities on the Roads for more than half a century.

The Town's position is also supported by implementing regulations under the ROW Act. As stated expressly in the grants themselves, the rights-of-way were issued pursuant to the ROW Act and Departmental Regulation 25 C.F.R. Part 161, and were subject to any prior, valid existing right or adverse claim. (Dkt. #152 ¶ 76; Dkt. 61-2 ("Public road right-of-way approved pursuant to the provisions of the Act of February 5, 1948 (62 Stat. 17), and 25 C.F.R. Part 161, and subject to any prior, valid, existing right or adverse claim . . . .").) The relevant provision of that regulation in effect at the time the grants issued stated that rights-of-way granted for "public highways" were "without limitation as to term of years." *See* 25 C.F.R. § 161.19 (1968) ("Rights-of-way for railroads, telephone lines, telegraph lines, public highways, and water control projects including but not limited to dams, reservoirs, flowage

easements, ditches and canals *shall be without limitation as to term of years*.") (emphasis added). Nor does § 161.19 limit rights-of-way for "public highways" or other projects to grants given to governmental entities alone.  Rather, under the regulation, it appears that if a road was intended to be public, the right-of-way *should* have been issued as permanent easements regardless who obtained the initial right-of-way.  Indeed, that is expressly what the BIA granted with respect to the right-of-way on the north-south segment of Annie Sunn Lane, when originally granted to a private developer as a "public road right-of-way" without any expiration date, which specifically stated that the applicant could transfer the right-of-way by assignment, grant, or otherwise to its successors and assigns. (Dkt. #61-2.)  In its communication with the developer, the Superintendent of the BIA Great Lakes Agency BIA further noted that the right-of-way would *not* be a time-limited, private right-of-way, but would instead would be a "public road right-of-way" to be assigned to the Town.  (Dkt. #144-3, at 11–18.)

Although the United States now argues that this express, unlimited grant of the north-south segment was done in error and should now be corrected by the court and limited to 50 years, that argument is unpersuasive.  As the United States points out, when the BIA's Area Director reviewed the request for the north-south Annie Sunn Lane right-of-way, the Area Director opined that "public road" grants should be given only to a governmental entity.  (Dkt. #139-16.)  Nonetheless, the Superintendent of the BIA Great Lakes Agency granted the "public road right-of-way" to a private developer, noting that an exception had been made because the road *would* eventually be made public and assigned to the Town.  (Dkt. #144-3, at 18.)  That this was no mistake is further supported by the BIA's grant of a similar, permanent public road right-of-way to another private developer on another portion of Annie Sunn Lane,

not at issue in this case, around the same time period.  (Dkt. #139, ¶ 9 & Att. F; Dkt. #139-6 at 295-96) (Grant of Easement for Right-of-Way No. 432 1673).)

That said, the BIA's apparent willingness to issue permanent, public road rights-of-way to private developers around the same time period also undermines the Town's claim that all rights-of-way at issue were meant to be permanent since the BIA obviously knew how to issue permanent, public road rights-of-way and could have done so.  Instead, the language in four of the five rights-of-way were unambiguously limited to 50-year terms.  Moreover, in contrast to the north-west Annie Sunn Lake grant which was titled a "*public* road right-of-way," the other rights-of-way are referred to only as "road" rights-of-way.  Nor is there a record that the BIA told the other private developers that an exception had also been made to its general practice of granting permanent public rights-of-way only to government entities for these other rights-of-way.

Even so, there is no explanation in the record why the rights-of-way on the east-west segment of Annie Sunn Lane, Center Sugarbush Lane, East Ross Allen Lake Lane, and Elsie Lake Lane were limited to 50 years when it appears that the developers, BIA, Town, and Tribe *all* knew the right-of-way application process was to culminate in the Roads being dedicated or signed over to the Town as part of its public road system.  In particular, the court cannot find any significant difference between the segments of Annie Sunn Lane over which permanent rights-of-way were granted and the segment over which the right-of-way was limited to 50 years except that the BIA chose to look past the initial, impermanent grant to a developer in some cases, since the ultimate intent in all was to grant public road status to the Town.  However, the Town has cited no legal authority permitting this court to ignore the plain language of the 50-year grants.  Rather, well-established, controlling precedent requires this court to strictly

construe land grants from the United States government. *See United States v. Union Pac. R. Co.*, 353 U.S. 112, 116 (1957) ("[L]and grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language."); *United States v. Grand River Dam Auth.*, 363 U.S. 229, 235 (1960) ("all federal grants are construed in favor of the Government lest they be enlarged to include more than what was expressly included"). Therefore, based on the express language of the rights-of-way at issue, the court concludes that the Town holds a permanent, public road right-of-way under the ROW Act over the north-south segment of Annie Sunn Lane, but all other rights-of-way at issue in this case have expired.

Understandably enough, the United States argues that this conclusion should resolve the entire case, but that argument is wrong. The ROW Act's implementing regulations explicitly identify several reasons why "[y]ou do not need a right-of-way to cross Indian land," including if "you are . . . [o]therwise authorized by law." 25 C.F.R. § 169.4(b)(3)(iv). In other words, and contrary to the United States' repeated arguments in its briefs, the ROW Act is *not* the exclusive means by which the Town or Homeowners could gain access rights to the Roads in this case. Specifically, the court must also consider whether another statutory or common law provision aside from the ROW Act provides the Town and Homeowners legal authorization to continued access to the four Roads despite the elapsed grant of 50-year rights of way.

## II.    Tribal Transportation Program

The Town contends that they have legal authorization to use and maintain the four Roads because they were part of the Tribal Transportation Program ("TTP"), which requires that federally funded roads be open to the public. As discussed below, the court agrees with the Town that at minimum the TTP authorizes public access during the time the Roads were listed on the National Tribal Transportation Facility Inventory ("Inventory").

22

Authorized by Congress at 23 U.S.C. §§ 201–202, and implemented by Department of Interior regulations in 25 C.F.R. Part 170, the TTP is part of the Federal-Aid Highway Program, which is jointly administered by the BIA and the Federal Highway Administration.  The TTP was established to assist tribes in providing safe and adequate transportation and public road access to and within Indian lands through the allocation of federal funds, 23 U.S.C. § 202, while at the same time respecting Tribal self-determination and self-governance.  25 C.F.R. §§ 170.2(h), 170.102.  Tribes receiving funding through the TTP can expend those funds on surface transportation needs, including transportation planning and construction, roadway and facility maintenance, environmental mitigation as it relates to transportation facilities, and other critical transportation infrastructure needs.  23 U.S.C. § 202(a)(1) (use of federal funds).

For a road or transportation facility to be eligible for the expenditure of TTP funds, it must be listed on the Inventory.  23 U.S.C. § 202(b)(1)(B); see also 25 C.F.R. § 170.5 (further defining the Inventory).  While the Secretary of the Interior maintains the Inventory, tribes must submit certain documentation to the Secretary to have a road or facility listed on the Inventory.  Once a roadway or facility is listed on the Inventory, the tribe may expend its TTP funds on that road or facility in accordance with the tribe's Federal Highway Administration-approved "tribal transportation improvement program.  23 U.S.C. § 202(b)(4)(B).  Tribes are eligible for federal funding based on the Secretary's inclusion of transportation facilities on the Inventory (e.g., roads).  23 U.S.C. § 202(b)(1)(B).  As a result, if an Indian tribe has a greater number of eligible roads on the inventory, it could lead to a greater share of TTP funding, although the listing of a road on the Inventory does not require funds to be expended on that particular road.  Rather, funds are determined based on several factors, including the total mileage of all eligible roads. *See* 23 U.S.C. § 202(b)(3).  Finally, if a Tribe wants to update data

23

for a road already on the Inventory, the Tribe may submit an update to the BIA.  25 C.F.R. § 170.444(b).

Until 2012, the TTP was known as the Indian Reservation Road ("IRR") Program.[12] Between 1982 and 2012, the IRR program's defined "Indian reservation road" as "a *public road* that is located within or provides access to an Indian reservation or Indian trust land or restricted Indian land." 23 U.S.C. § 101(a)(12) (2012) (emphasis added).  The statute further defined "public road" as: "any road or street under the jurisdiction of and maintained by a public authority and *open to public travel*." *Id.* § 101(a)(27) (2012) (emphasis added).  In 2012, the statute dropped the term "Indian reservation road" and began using "Tribal transportation facility," which is defined as "a public highway, road, bridge, trail, or transit system that is located on or provides access to tribal land and appears on the national tribal transportation facility inventory." *Id.* § 101(a)(33) (2025).  Still, the definition of "public road" has remained unchanged, as has the definition of "public authority," also called the road "owner," which is defined as the government entity responsible for upkeep of the transportation facility, regardless of legal ownership of the lands underlying the facility.  In particular, the statute and regulations continue to define the "public authority" as having the "authority to finance, build, operate, or maintain toll or toll-free facilities." 23 U.S.C. §101(a)(22) (definition of "public authority"); *see also* 25 C.F.R. § 170.5 (same).  Similarly, the implementing regulations in 25 C.F.R. Part 170 require "all Tribal transportation facilities listed in the [Inventory] to "be open

---

[12] The IRR program was initially established in 1928, and was incorporated into the Federal Lands Highway Program in 1982. *See* Surface Transportation Assistance Act of 1982, Pub. L. No. 97-424, 96 Stat. 2106.  In 2012, the IRR program was replaced by the TTP with Congress's passage of the Moving Ahead for Progress in the 21st Century Act (MAP-21), Pub. L. No. 122-141.

and available for public use." *See* 25 C.F.R. § 170.114 (2016–2025); 25 C.F.R. § 170.120 (2004–2016).

The *only* exceptions noted in the regulation are that the public authority responsible for the roads can restrict or close them, if necessary, (1) for public health and safety; (2) to conduct engineering and traffic analysis; or (3) to erect, maintain and enforce compliance with signs and pavement markings. *Id.* In addition, "[a] Tribal transportation facility owned by a Tribe or BIA may be permanently closed only when the Tribal government and Secretary agree." *Id.* § 170.114(c). If an agreement to close a road is reached, the BIA "must remove the facility from the [Inventory] and it will be ineligible for expenditure of any TTP funds." *Id.* This leaves a question as to the import of the BIA's removal of the Roads at issue from the Inventory, which is the focus of the next three subsections of this opinion.

### A. Time Period when Roads were Listed on National Inventory

Relying on the statutory and regulatory language regarding "public roads," the Town contends that the segments of the Roads crossing the Tribe's and the Allottees' trust and restricted-fee lands remained "open and available for public use" even after expiration of any 50-year right-of-way under 23 U.S.C. § 101(a)(12) (2012), 23 U.S.C. § 101(a)(33) (2025), and 25 C.F.R. § 170.114(a), at least while they were listed on the Inventory from January 1, 2001 to March 24, 2023. Specifically, the Roads were listed on the Inventory until March of 2023 as follows:

- 0.5 miles of Annie Sunn Lane;

- 0.8 miles of Center Sugarbush Lane;

- 0.6 miles of East Ross Allen Lake Lane; and

25

- 0.8 miles of Elsie lake Lane.

(Dkt. #144-1, at 3.)  In addition, the Town was identified in the Inventory as the "public authority" for the Roads.  (*Id.* at 2.)  Thus, as the "public authority" responsible for maintaining the Roads under the TTP, the Town argues that it cannot have been trespassing on the Roads.

The United States disagrees, arguing that it was not the TTP, Inventory, or the Town's status as the public authority that gave the Town its right to access the roads.  Rather, it was the easements under the ROW Act that permitted the Town to fulfill its duties as public authority.  Further, the United States argues all references to Inventory roads being open to the public merely recognize that federal appropriations underwriting the TTP must be spent for public—not private—purposes.  Finally, the United States maintains that the federal government must merely receive a reasonable return on its investment when the TTP funds are spent on Tribal transportation infrastructure, not a right to permanent public access to roads funded in part by TTP funds.  (United States' Opp. Br. (dkt. #51) 45 ("[R]oads constructed with funds authorized by the TTP must be maintained by a Tribe or other public authority until the Federal Government has received a reasonable return on its investment.")

The Town's position is more persuasive.  A road listed on the TTP Inventory is a "public road" by definition, and nothing in the statutory definition of "public road" requires the existence of an ongoing easement or right-of-way under the ROW Act.  Instead, the definition of "public road" under the TTP includes three factors: the given road be under the jurisdiction of a public authority; it be maintained by that authority; and it be open to public travel.  23 U.S.C. § 101(a)(23) (2025).  Here, there is no question that the Town is a public authority that maintained the four Roads for decades, or that the Roads have been "open to public travel" for over fifty years.  Although the Roads were developed initially by private developers, the

historical record shows that they were all consistently created to serve multiple properties, connect multiple road systems together, and serve the general public, not just individual property owners.  For these reasons, all four Roads have been open to public travel virtually throughout their existence.[13]

The United States has cited *no* authority indicating that the Town or individual non-tribal Homeowners need an easement to access a public road.[14]  Nor has the court found any.  To the contrary, the only authority this court has found suggests the opposite.  For example, in an April 1988 letter decision, the Acting Assistant Secretary of the BIA decided that the public should be allowed to use roads on Tribal land that were constructed with public funds because "BIA regulations mandate 'free public use' of BIA roads," and "[i]f a road is a public road, a traveler need not have an easement in order to use it."  Letter from James S. Bergmann, Acting Assistant Secretary, Indian Affairs, of April 8, 1988, reprinted in App. to Brief for Pet. in No. 87-1622, *Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408, 439 (1989); *see also* Leonard, M. Brent, *The Public Nature of Indian Reservation Roads*, vol. 0, American Indian L. J., 29–40 (2012) ("[A]ny roads on the IRR inventory must be treated as public roads and the BIA has no authority to restrict access to those roads except as specifically

---

[13] Federal Highway Administration regulations define "open to public travel" as meaning that "the road section is available, except during scheduled periods, extreme weather or emergency conditions, passable by four-wheel standard passenger cars, and open to the general public for use without restrictive gates, prohibitive signs, or regulation other than restrictions based on size, weight, or class of registration.  Toll plazas of public toll roads are not considered restrictive gates." 23 C.F.R. § 460.2.

[14] The United States cites certain TTP regulations that it says show compliance with the ROW Act is required, including 25 C.F.R. §§ 170.460, 170.473, and 170.443(a)(4).  However, these regulations state that compliance with the ROW Act is required, "if applicable," and in any event, these regulations concern post-2016, *proposed* construction of *new* Inventory roads, offered for consideration by a Tribe to the BIA and FHWA.  Because the four Roads at issue do not fall into this category, the regulations cited by the United States are inapplicable.

enumerated in the Code of Federal Regulations."); *Ronkowski v. United States*, No. 17-CV-226-BBC, 2018 WL 2376298, at *8 (W.D. Wis. May 23, 2018) ("A member of the public would not generally need an easement to gain access to a 'public' road."), *aff'd*, 911 F.3d 887 (7th Cir. 2018) ("We know of no authority indicating that a party needs an easement to access a public road.").

Nor should the fact that a public road runs on Tribal trust or allotted land change the outcome, as Congress explained when bringing the IRR system into the Federal Lands Highways program, Indian reservation roads should be treated the same as other Federal Lands Highway Program roads:

> Recognizing the need for all Federal roads which are public roads to be treated under the same uniform policies as roads which are on the Federal-aid systems, there is established a coordinated Federal lands highways program which shall consist of … Indian reservation roads as defined in section 101 of this title.

23 U.S.C. § 204(a)(1) (1983–2012).  Further, if Congress wanted to condition being on the Inventory and under a Federal-aid system with having a separate grant under the ROW Act, it could have.  Instead, Congress passed a statute requiring that Indian reservation roads and Tribal transportation facilities be "public" and "open to public travel" in exchange for the Tribe receiving federal funds.  25 U.S.C. § 101(a)(33).  Congress's decision makes sense: under the TTP, a Tribe is eligible for federal funding—paid for by taxpayers—so long as the roads listed on the Inventory are open and available for public use.

Finally, the court agrees with the Town that the United States' argument would not only render the express statutory provisions regarding "public roads" as meaningless, but would lead to absurd results.  As the United States concedes, the Roads are part of the Town's public road system and the Town was "responsible for operation and maintenance of the road

segments at issue." (United States' Br. in Opp. (dkt. #151) 47.) Thus, the applicable regulation requires the "public authority" to "finance, build, operate, or maintain" the roads. 25 C.F.R. § 170.5. Indeed, in 2007, the BIA, the Band, and the Town signed an "Acknowledgement of Public Authority Responsibility," agreeing that the Roads "will continue to be owned by the Town and opened to the public for travel." (Dkt. #144-1.) It was further agreed that "[i]f needed improvements are made to any of the [Roads], the Town will continue to own the route and will continue to be responsible for all maintenance." (*Id.*) In a March 2011 letter, the BIA Midwest Regional Director further informed the Town that the Roads "belong[] to the Town" and "must be open to the public." (Dkt. #77-2.) The Regional Director also advised that "the LDF Band cannot alter or maintain roads owned by LDF Town without written consent," and "the LDF Town Board has not provided this consent." (*Id.*)

Nevertheless, the United States now argues that the Town is trespassing by continuing to maintain and operate the Roads for the public, even while they were on the Inventory, because the Tribe refused to renew rights-of-way under the ROW Act. This position is untenable, since *nothing* in the statute or regulations suggest Congress intended for a public authority to be liable for common law trespass for complying with its obligations under federal and state law.[15] In sum, the court concludes that while the Roads were on the Inventory, the Town was the public authority responsible for operation and maintenance for the roads, which

---

[15] The United States also argues that this court already rejected the claim that the TTP granted access rights to the Town or Homeowners by dismissing that same claim in *Pollard, et al. v. Johnson, et al.*, 23-cv-135-wmc (W.D. Wis.). However, the court dismissed that case on grounds that the TTP did not create a *private right of action* under which the Homeowners could sue and because state law claims would be barred by tribal sovereign immunity. (Sept. 15, 2023 Op. & Order (dkt. #64) 6, in 23-cv-135.) Regardless, the court did not address, much less reach, the question whether the TTP required roads to remain open to the public.

had to remain open for public use.  Thus, neither the Town nor Homeowners were trespassing during the time period when the Roads were listed on the Inventory.

### B.  BIA's Removal of Roads from the National Inventory

The next question is what happened to the Town's and Homeowners' rights to access after the BIA removed the Roads from the Inventory at the request of the Tribe on March 24, 2023.  Arguably, if those Roads were properly removed from the Inventory list, then neither the Town nor Homeowners can rely on their public nature to authorize their access of the Roads.  However, the Town and Homeowners contend that the BIA's removal of the Roads violated the TTP regulations and deprived them of due process, asserting claims under the APA for review of the BIA's compliance with the TTP regulations, as well as due process claims.

The United States has moved to dismiss the Town's and Homeowners' claims on the grounds that: (1) each lacks standing; (2) each fall outside the "zone of interest" for the Highway Act and TTP regulations, so they have no right to seek judicial review; and (3) their allegations fail to state a claim on which relief may be granted.[16]  The court will address the

---

[16] In the 23-cv-355 action, the Town and Homeowners raised their APA and due process claims as counterclaims against the United States and the United States moved to dismiss them based on standing, sovereign immunity, zone of interest, and failure to state a claim.  The Town and Homeowners then filed separate lawsuits against the federal defendants (individuals and agencies, but not the United States) raising the same APA and due process claims.  *Town of Lac du Flambeau v. Newland, et al.,* 23-cv-541-wmc (Town), and *Anderson, et al. v. Newland, et al.,* 23-cv-777-wmc (Homeowners).  The federal defendants did not raise a sovereign immunity argument in this case, and do not dispute that the APA provides a waiver of the United States' sovereign immunity for claims of injunctive relief against a federal defendant for a challenge to an agency action.  *See Cook Cnty., Illinois v. Wolf,* 962 F.3d 208, 233 (7th Cir. 2020) (citing 5 U.S.C. § 702).  Because the APA and due process claims are proceeding in the 23-cv-541 and 23-cv-777 cases, the court sees no reason to resolve any sovereign immunity defense raised in the 23-cv-355 case alone.

United States' dismissal arguments first, as they relate to this court's jurisdiction, and will then turn to the merits of the Town's claims.

### 1. Standing

To establish constitutional standing, the Town and Homeowners must show that they suffered: (1) an injury in fact; (2) that is fairly traceable to the United States' challenged conduct; and (3) likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). In its motion to dismiss, the United States contends that the Town and Homeowners have not adequately pleaded the second and third elements of standing.

*First*, the United States argues that the Town and Homeowners have not alleged that their putative injuries are fairly traceable to removal of the Roads from the Inventory under 25 C.F.R. § 170.444, because their claims rely on a faulty premise that listing a road on the Inventory ensures public access. The United States further argues that the BIA's removal of the roads did not "close" the roads to public access, but merely affected the Tribe's eligibility for TTP Funds and had no effect on the Town's or public's access to the roads. Thus, the United States argues, the Town and Homeowners cannot show injury stemming from the BIA's invocation of § 170.444 to remove the roads from the Inventory.

However, this is not a *standing* argument. Rather, the United States' argument implicates the merits of the Town's and Homeowners' claim, as it depends on the court accepting the United States' interpretation of the Federal Aid Highway Act and TTP regulations, as well as the implication of listing roads on the Inventory. Further, as already discussed above, the court *agrees* with the Town and Homeowners that listing the Roads on the Inventory required they be kept open and available for public use at least while on that list. Thus, the Town and Homeowners have adequately pleaded that the BIA's and Tribe's decision

to remove the Roads from the Inventory had the direct, negative effect of purporting to have the right to close and, but for this court's preliminary injunction, closing the Roads to the public, which caused various injuries, including: decreased property values; interference with the Town's ability to provide necessary public and emergency services; interference with the Homeowners' right to travel and access their homes and property; and subjecting the Town and Homeowners to trespass actions for using the Roads.

The Town and Homeowners have likewise pleaded constitutional and procedural injuries that are fairly traceable to the federal defendants' actions. Specifically, they point to the BIA's failure to provide notice and an opportunity to be heard before the Roads were removed from the Inventory. Such injuries were also directly caused by the BIA, and so are "fairly traceable" to defendants' actions.

*Second*, the United States argues that the Town and Homeowners have failed to plausibly allege that a favorable decision would redress its injuries. To satisfy the redressability element of standing at the pleading stage, the Town and Homeowners must plausibly allege "that there is a substantial likelihood that the relief requested will redress the injury claimed" by providing them with "effectual relief." *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 501 (7th Cir. 2005). Here, the United States argues that even if the Town and Homeowners receive all the relief requested, their alleged injuries would not be redressed because the TTP and the Inventory do not govern use or access to the Roads. However, these arguments again go to the *merits* of the Town's claim because they rely on the United States' interpretation of the TTP, which the court has also already rejected. Setting aside the United States' merits arguments, therefore, the Town and Homeowners have adequately pleaded that a favorable decision would result in the Roads being placed back on

the Inventory, at least temporarily, while the Town and Homeowners are given a chance to be heard on their removal. The Town has also requested that the court declare § 170.444 unconstitutional as applied against the Town, because it wrongfully allowed the BIA to remove the roads from the Inventory without input or approval from the Town. These allegations, too, are sufficient to plead redressability and, therefore, standing.

### 2. Zone of Interest

For standing to invoke a statutory cause of action, a plaintiff must also be within the "zone of interest" that the statute protects. *Food & Drug Admin. v. R. J. Reynolds Vapor Co.*, 145 S. Ct. 1984, 1990 (2025). This means that the court must consider "whether the statute arguably protects the sort of interest a would-be plaintiff seeks to advance." *T.S. v. Heart of CarDon*, 43 F.4th 737, 741 (7th Cir. 2022). In an APA case, the relevant statute "is the statute whose violation is the gravamen of the complaint." *Air Courier Conf. of Am. v. Am. Postal Workers Union AFL-CIO*, 498 U.S. 517, 529 (1991). Here, the federal defendants argue that the Town and Homeowners' APA and due process claims fall outside the "zone of interests" of the Federal Aid Highway Act and TTP regulations. Specifically, the federal defendants argue that because the TTP is a funding program established to help provide safe and adequate transportation and public road access to and within Indian reservations and lands for the benefit of tribes, *only* tribes or tribal members can seek review of an agency decision under the TTP regulations and APA. They further contend that because the TTP is a program of "limited scope and purpose," intended only to provide funding to tribes, the Town and Homeowners are not within the zone of interest. (Dkt. #10, at 20 in 23-cv-777.)

However, the zone-of-interest test is particularly lenient in APA cases, starting with a presumption *in favor* of judicial review of agency actions so long as the statute "arguably"

protects the plaintiff's interests. *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014). Thus, "[a] plaintiff may sue under the APA unless her interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *R.J. Reynolds Vapor*, 145 S. Ct. at 1991 (citation and quotation marks omitted); *see also Lexmark*, 572 U.S. at 130 (the benefit of any doubt [in the zone-of-interest test] goes to the plaintiff").

Here, while the court agrees with the federal defendants that the primary purpose of the TTP is to protect Tribal interests, *see* 23 U.S.C. § 202 & 25 C.F.R. § 170, the TTP also regulates public road access for roadways listed on the Inventory as discussed above. Specifically, the Inventory roads are "public roads," meaning roads that are maintained by a "public authority," 23 U.S.C. § 101(a)(22) & 25 C.F.R. § 170.5, and are open for public use as required by 23 U.S.C. § 101 & 25 C.F.R. § 114(a). Indeed, "the *public authority* (here, the Town) having jurisdiction over these roads or the Secretary, in consultation with a Tribe *and* applicable *private landowners* (here, the Homeowners), may restrict road use or close roads temporarily." 25 C.F.R. § 170.114(a) (emphasis added). While this right applies only in limited, enumerated circumstances and after consultation with the Tribe and affected landowners, unless there is a concern about "immediate safety or life-threatening situation," *id.*, this language in the Federal Aid Highway Act and TTP regulations protect, at least *arguably*, the interests of the Town responsible for maintaining the Roads, and the Homeowners directly affected by and reliant upon the public access component of the Federal Aid Highway Act and its regulations. *See Lexmark*, 572 U.S. at 130 (Court "often 'conspicuously included the word '*arguably*' in the [zone of interest] test to indicate that the benefit of any doubt goes to the

34

plaintiff") (emphasis added).  As the TTP regulations expressly acknowledge, given the interests of the Town as a "public authority" responsible for maintaining the Roads, and the Homeowners as "applicable private landowners," the court has little difficulty concluding that both groups fall within the zone of interests of the Act and TTP.

### C. Administrative Procedures Act

Having found standing for the Town's and Homeowners' APA counterclaims, the court turns to the merits.  The APA requires courts to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  It also requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be":

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence . . .; or
>
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

*Id.* § 706(2)(A)–(F).  Agency action is "arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency.'"  *Animal Legal Defense Fund, Inc. v. Perdue*, 872 F.3d 602, 611 (D.C.

Cir. 2017) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The Town and Homeowners contend that the BIA's action in removing the Roads from the Inventory by relying on 25 C.F.R. §170.444 was arbitrary and capricious and violated their due process rights because that regulation (1) does not give them notice and an opportunity to be heard; and (2) does not apply to removals of roads from the Inventory in any event. They also point out that most decisions by the BIA may be challenged by "persons who may be adversely affected by such decisions." 25 C.F.R. § 2.3. [17] The regulations did not define "adversely affected," but did define "person" as "any Indian or non-Indian individuals, corporation, tribe or other organization." *Id.* § 2.2. Finally, the regulations required the BIA to provide written notice of decisions and appeal procedures to "all interested parties," *id.* § 2.7, with "interested party" defined as "any person whose interests could be adversely affected by a decision in an appeal." *Id.* § 2.2.

In response, the federal defendants point to: 25 C.F.R. 2.3(b), which states that the rules regarding notice and appeal rights do "not apply if any other regulation or Federal statute provides a different administrative appeal procedure applicable to a specific type of decision"; and that the four Roads were removed from the Inventory under 25 C.F.R. § 170.444, which provides different requirements for notice and appeal. Specifically, the latter regulation – entitled, "How is the [Inventory] updated?" -- provides in relevant part:

> (b) Updating the data on a facility currently listed in the [Inventory] is carried out as follows:

---

[17] These regulations were amended in September 2023, but no party has argued that the newer regulations apply. So the court will cite to the versions of the regulations in effect at the time the Town and Homeowners attempted to appeal the BIA's removal of the Roads from the Inventory.

(1) At any time, a Tribe may submit a request to the BIA Region asking for the [Inventory] data of an existing facility to be updated. The request must include the Tribe's updated data and background information on how and why the data was obtained. At the request of a Tribe, FHWA may assist BIA and the Tribe in updating the [Inventory] data as required under this part.

(2) The BIA Region must review the submitted data and respond to the Tribe within 30 days of its receipt.

(i) If approved, the BIA Region validates the data and forwards it to BIADOT for review and approval.

(ii) If not approved, the BIA Region returns the submittals to the Tribe along with a detailed written explanation and supporting documentation of the reasons for the disapproval. The Tribe must correct the data entries and return the corrected submittals back to the BIA Region.

(3) BIADOT approves the current inventory year submittals from BIA Regional Offices or returns the submittals to the BIA Regional Office if additional work is required.

(c) A *Tribe* may appeal the rejection of submitted data on a new or existing facility included in the [Inventory] by filing a written notice of appeal to the Director, Bureau of Indian Affairs, with a copy to the BIA Regional Director.

25 C.F.R. § 170.444(b)–(c) (emphasis added). Relying on these provisions, the federal defendants argue that when a decision is made to update the Inventory under § 170.444, *only* the affected Tribe may appeal the decision.

However, the court finds the federal defendants' argument unpersuasive for at least four reasons. First, even assuming that § 170.444 can be used to *remove* a public road from the Inventory, the regulation does not *preclude* the Town or Homeowners from appealing a removal decision. Rather, the regulation provides only how a *tribe* can appeal the BIA's *rejection* of a request to update the Inventory; it does *not* address how a *non-tribal* entity or person can appeal the BIA's *acceptance* of an update request to remove roads from the Inventory. Certainly, this

reading makes more sense given the different type of decisions that a tribe or interested party would be appealing.  Regardless, because § 170.444 does not specify any appeal procedure for interested parties, the default appeal procedures in 25 C.F.R. Part 2 would appear to apply. [18]

Second, if the regulation is read to preclude any appeal by the Town or Homeowners, then the court would have no option but to conclude that § 170.444 violates their due process rights. This is because both the Town and Homeowners have liberty and property interests implicated by the BIA's decision to remove the Roads from the Inventory for reasons already discussed, including that the Roads had to remain open for public use while they were on the Inventory.  Similarly, closing the Roads to public use affects the Town's and Homeowners' property and liberty interests by, among other things, decreasing property values and property taxes, restricting access to travel freely and enjoy their property, and preventing the Town from performing maintenance and other critical services.  Before depriving the Town and Homeowners of liberty and property interests, the federal defendants were required by the Constitution to provide them notice *and* an opportunity to be heard.  *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("[I]ndividuals whose property interests are at stake are entitled to 'notice and an opportunity to be heard.'") (Citing U.S. Const. Amend. 5, 14.)

Third, § 170.444 does not appear to address *removal* of a public road from the Inventory at all.  Rather, that provision applies to tribal requests to "update data" regarding a road or other transportation facility, which is not what the Tribe asked for here.  Rather, the Tribe

---

[18] Interpreting the regulation to be silent on the appeal rights of the Town and Homeowners is also supported by the "constitutional-doubt" cannon of statutory interpretation.  *See United States v. UCB, Inc.*, 970 F.3d 835, 846 (7th Cir. 2020) ("The canon of constitutional doubt teaches that when two interpretations of a statute are 'fairly possible,' one of which raises a 'serious doubt' as to the statute's constitutionality and the other does not, a court should choose the interpretation 'by which the question may be avoided.'")

passed a resolution asking the BIA to "immediately remove the Four Roads from its entries on the [Inventory]." (Dkt. #43-5, in 10-cv-135.) The BIA then proceeded to remove the Roads from the Inventory; thus, no "updating" of data was involved at all. Instead, the BIA took up the Tribe's resolution without obviously interested parties being notified or given an opportunity to be heard.

Fourth, as the Town and Homeowners point out, 25 C.F.R. § 170.114 is the only regulation addressing *removal* of roads from the Inventory. Under that regulation, which has been discussed extensively in this opinion already, all roads listed on the Inventory "must be open and available for public use," and can be restricted or closed *only*: (1) for public health and safety; (2) to conduct engineering and traffic analysis; or (3) to erect, maintain and enforce compliance with signs and pavement markings. 25 C.F.R. § 170.114(a). Moreover, unless there is an immediately safety risk, such restrictions can occur only after the public authority responsible for the roads consults with both the Tribe *and* "applicable private landowners." *Id.* Further, "[a] Tribal transportation facility owned by a Tribe or BIA may be permanently closed only when the Tribal government *and* Secretary agree." *Id.* § 170.114(c) (emphasis added). If an agreement to close a road is reached, the BIA "must *remove* the facility from the [Inventory] and it will be ineligible for [further] expenditure of any TTP funds." *Id.* (emphasis added). Since § 170.114 is expressly concerned with the detrimental effects that Inventory-listed road closures have on "applicable private landowners" and "public authorities," that section requires the Town and Homeowners be heard in deciding whether to even temporarily delist the Roads from Inventory, and the Secretary of the Interior herself must consent to closing Inventory-listed Roads. Indeed, in 2007, the BIA *assured* the Town that the Roads could not be closed without its input, acknowledging that the Roads would remain open for public travel (dkt.

#15-1 in 23-cv-541), and also advised the Town that the Tribe could not "alter or maintain roads owned by the Town without written consent." (Dkt. #15-2 in 23-cv-541.)

In light of the regulatory provisions and the BIA's own prior interpretations of the regulations, it was unreasonable, arbitrary and capricious for the federal defendants to interpret § 170.444 as permitting them to remove public roads from the Inventory without notice or any review, especially where: those Roads have been paid for and opened to the public for more than a half century; and the Roads provided the only access to dozens of homes; the Town has been acting as the "owner" responsible for the Roads; and closure of the Roads has subjected the Town to numerous lawsuits and claimed damages. In sum, the court concludes that the BIA's removal of the four Roads from the Inventory was improper and contrary to law. Thus, the court will grant summary judgment to the Homeowners and Town on their APA claims, which results in vacating the BIA's removal of the Roads from the Inventory until such time when done properly, if at all.

## III.    Easement Implied from Congressional Intent

The parties' final arguments concern the existence of easements over the Tribe's and Allottees' trust and restricted-fee land. All parties agree that in determining whether the Homeowners have implied easements to use the Roads to access their homes and property, the court must discern the intent of the federal government.[19] (United States' Br. (dkt. #151) 14

---

[19] All parties also agree that federal common law applies to easement claims over tribal trust or restricted fee land. *See McFarland v. Kempthorne*, 545 F.3d 1106, 1110 (9th Cir. 2008) (citing *Superior Oil Co. v. United States*, 353 F.2d 34, 37 n.4 (9th Cir. 1965)); *Confederated Salish & Kootenai Tribes v. Namen*, 380 F. Supp. 452, 466 (D. Mont. 1974) ("[w]here the United States holds title in trust for Indian Tribes, federal common law is applicable"); *Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 965 (10th Cir. 2019) ("When a dispute arises over possessory rights in Indian

("The pertinent inquiry for these Reservation lands is the intent of the federal government.); Homeowner' Br. (dkt. #126) 19 ("An implied easement exists if Congress intended to grant an easement for access.").)   The court agrees that this is the relevant question, as originally explained in its preliminary injunction decision in this case.  (Dkt. #118, at 10–14.)   In addition, as it also concluded in that decision, the court again finds that Congress intended for there to be implied rights of access over the tribal trust lands at issue in this case when it passed the various Indian Allotment Acts that resulted in private ownership of some tribal lands.  (*Id*.)

Unfortunately, the parties provide little help in how the court should determine the intent of the federal government here, so it turns to the Ninth Circuit's *Superior Oil* decision, which found three factors to be relevant.  The question in that case was whether the patent issued by the United States granting five acres of land inside the Hopi Indian Reservation included an "implied easement of access to the parcel" for use by a lesee oil company over which tribal and federal officials "had no authority to interfere."  353 F.2d 34, 35.  If an implied easement existed, then the federal and tribal officials could not lawfully "bar access" to the road, and the oil company was not required to proceed under the ROW Act to secure a right of access.  *Id.* at 36.  Specifically, in determining the intent of the United States, the court considered:  (1) the purpose of the grant; (2) consideration for the grant; and (3) the position of the grantor.  *Id.* at 37.[20]

---

allotted land, federal law governs."); *Fitzgerald v. United States*, 932 F. Supp. 1195, 1203 (D. Ariz. 1996) (same).

[20] In *Superior Oil*, the court ultimately concluded that there was no implied easement permitting the oil company to move heavy equipment on the road because: (1) the purpose of the grant was specifically for work being done by missionaries on behalf of Indians; (2) the grant was without consideration, meaning it was limited to what "was required to permit the Mission to enjoy the granted premises in a manner contemplated and in fulfilment of the purpose of the grant"; and (3)

Applying those same factors to this case, the court finds that Congress and the United States intended the Homeowners (and their predecessors) to have implied easements over public roads to access their properties over tribal land.  Here, the Homeowners' parcels in particular are all included in the land set aside by the Treaty of 1854.  Subsequently, under the Treaty of 1854 and 1903 Allotment Act, reservation land was split up into hundreds of allotments and conveyed to tribal members by way of federal patents, allowing allottees to alienate their lands freely by selling parcels in fee simple to non-tribal members.  As the United States concedes, whatever dubious underlying motives may have been at play, the purpose of both the Treaty and Allotment Act was to enable individuals to own, occupy and use lands inside the boundaries of the Reservation.  Then, when "the allottees were deemed 'competent' by the [Department of Interior], the restrictions [against alienation] were removed, and the allottees . . . freely [sold] their allot[ted]" lands.  (USA's Resp. to Homeowners PFOF No. 17 (dkt. #153) ¶ 17.)

As to the consideration factor, the Homeowners are arguing only for use of the Roads to access their properties, which appropriately limits their easement to provide "no greater access than was required to permit [the Homeowners] to enjoy the granted premises in manner contemplated and in fulfilment of the purpose of the grant." *Superior Oil*, 353 F.2d at 38.

Finally, with respect to the position of the grantor, when "authoriz[ing] the sale of a parcel of land in a reservation," Congress "implicitly grant[ed] the purchaser access to that property." *Brendale v. Confederated Tribes & Bands of Yakima Nation*, 492 U.S. 408, 437 (1989) (Stevens, J., concurring); *see also Evans v. Shoshone-Bannock Land Use Policy Comm'n*, 736 F.3d

---

the United States was acting as trustee for the Hopi Indians in furthering the public policy of encouraging their education.  353 F.2d at 37.

1298, 1304 n.6 (9th Cir. 2013) ("[T]he transfer of tribal land to nonmembers 'must implicitly grant the purchaser access to that property.'" (quoting *Brendale*, 492 U.S. at 437 (Stevens, J.)); *Lyon v. Gila River Indian Cmty.*, 626 F.3d 1059, 1073 (9th Cir. 2010) ("[T]he federal government must have intended some right of access to the land or the purpose of the land grants would fail."). As Justice Stevens explained, "Congress could not possibly have intended in enacting the Dawes Act that tribes would maintain the power to exclude bona fide purchasers of reservation land from that property." *Id.* at 437; *see also Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 141 (1982) ("When a tribe grants a non-Indian the right to be on Indian land, the tribe agrees not to exercise its ultimate power to oust the non-Indian as long as the non-Indian complies with the initial conditions of entry."). Although *Brendale* addressed the Dawes Act in particular, the reasoning would apply equally to the 1854 Treaty and 1903 Allotment Act, as they also authorized the sale of parcels of land in a reservation. 492 U.S. at 437 (Stevens, J., concurring). Thus, because the Homeowners (and their predecessors) acquired land under the 1854 Treaty and 1903 Allotment Act, their land was accompanied by an implicit grant of access intended by Congress.

In fairness, as the United States correctly points out, the *Brendale* case was about Tribal zoning authority and did not actually resolve the question now at issue before this court as to whether a Tribe can preclude non-tribal members' long-standing access to their fee property via Tribal land. The United States further argues, correctly, that easements, or encumbrances generally, should not be *implied* on Tribal trust land due to the Tribe's sovereign authority; instead, Congress has designated the ROW Act as the proper mechanism for obtaining rights-of-way on Tribal land. *See Fitzgerald Living Tr. v. United States*, 460 F.3d 1259, 1267 (9th Cir. 2006) ("The intent to grant an easement must be so manifest on the face of the instrument

that no other construction can be placed on it."); *Imperial Granite Co. v. Pala Band of Mission Indians*, 940 F.2d 1269, 1272 (9th Cir. 1991) (no easement by implication or necessity over tribal land); *Confederated Salish and Kootenai Tribes v. Lake Cnty. Bd. of Commissioners*, 454 F. Supp. 3d 957 (D. Mont. 2020) (same).

Although *Brendale* is not directly on all fours, therefore, Justice Stevens' concurring observations about the outcome in *Brendale*, in which Justice Thomas joined, as to Congress's intent in permitting the sale of allotments of Tribal lands to non-tribal members are persuasive, not just in terms of practical reasoning, but also in light of other, persuasive authority concerning federal common law access rights and Congressional intent. In addition to the Ninth Circuit Court of Appeals' reliance on *Brendale* in two cases, *Evans* and *Lyon*, as cited above, two district courts have already relied on Congressional intent in implying access rights for non-Indian landowners on Tribal trust land. In *Brendale v. Olney*, c-78-145 (E.D. Wash. 1981), the United States had barred a non-Indian who owned fee land within the boundaries of the Yakima Reservation from using BIA roads without a permit to access his property. (Dkt. #91-3.)[21] In response, the landowner argued that he had a common law easement to access his land via the BIA road, and the district court agreed, holding that a right-of-access easement accompanied the original allotment of the land now owned by the plaintiff. *Id.* at 3, 5–7. Similarly, in *Confederated Salish & Kootenai Tribes v. Namen*, 380 F. Supp. 452, 459 (D. Mont. 1974), *aff'd*, 534 F.2d 1376 (9th Cir. 1976), which concerned a dispute over a non-Indian landowner's riparian rights, the district court held that through allotment policies, Congress "must have intended that the [allotments] would include the customary riparian rights of access

---

[21] This *Brendale* case involved the same non-Indian landowner who was involved in the *Brendale* case before the Supreme Court, but was a separate case that was not appealed.

and wharfage." *Id.* at 466. As that court further held, "[t]he fact that Congress did not expressly delineate these rights does not negate their existence. It was not necessary for Congress to specify every incident of ownership which accompanies a patent to lands on an Indian Reservation." *Id.*

Court decisions involving the Homestead Act, 43 U.S.C. § 161 (repealed 1976), likewise provide further, persuasive authority to support the Homeowners' claim for rights of access. In particular, the Homestead Act (1862) was passed shortly before the General Allotment Act, and its purpose was to grant public land to individuals in fee simple for use as homes and farmland, which was also at least one of the purposes of the Allotment Acts. Thus, at least two courts have found that the Homestead Act implied a "right of access" across public lands to reach an otherwise landlocked homestead property. *See Fitzgerald Living Tr. v. United States*, 460 F.3d 1259, 1265 (9th Cir. 2006) ("[W]e accept the Fitzgeralds' argument that the Homestead Act contemplated an inholder's access to his property over public lands."); *United States v. Jenks*, 129 F.3d 1348, 1354 (10th Cir. 1997) (same).

Again, in fairness, neither the *Fitzgerald* court nor the *Jenks* court implied an "easement" over federal land. Rather, the *Fitzgerald* court held that the Homestead Act "sanctioned the longstanding customary use of public lands by a settler"; and the Forest Service could require an inholder to apply for a permit with "reasonable" conditions, *id.* at 1265, 1268; while the *Jenks* court held that the Homestead Act created an implied "right of access" in the form of an "implied license" to use public lands to access their property, 129 F.3d at 1354. In so holding, the *Jenks* court appears to distinguish between an "easement" and a "license" based on the extent to which the government could regulate access, describing easements as access "free from reasonable government regulation," whereas a license would permit the government to impose

requirements so long as they were not arbitrary and capricious.  *Id.* at 1354.  As explained in this court's preliminary injunction decision, however, "[a] right-of-way is a type of easement." *United States Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 613 (2020).  "Specifically, a right-of-way grants the limited 'right to pass ... through the estate of another.'" *Id.*

Finally, neither the United States nor the Tribe have attempted to impose *reasonable* restrictions on the Homeowners' or Town's access.  Instead, to date, the Tribe has attempted to block access altogether and demanded that the Town pay an exorbitant, monthly fee to keep the Roads open or a one-time $20 million fee for permanent public access.  Accordingly, the court concludes that the Town and Homeowners have an implied easement to use and access the Roads to reach their homes and properties. [22]

ORDER

IT IS ORDERED that:

(1) The United States' motions to dismiss (dkt. #68 in 23-cv-355; dkt. #10 in 23-cv-541; dkt. #9 in 23-cv-777)  and motion for summary judgment (dkt. #136 in 23-cv-355) are DENIED.

---

[22] In addition to implied easements, the Town and Homeowners argue that the Tribe and Allottees granted *express* easements when they agreed to permit the United States to build "necessary roadways" on their lands under the 1933 Unemployment Act.  In particular, in the 1930s, the then-allottees of all several parcels, now including segments of the Roads, signed forms titled, "Permission of the Allottee or Owner to Place Improvements On and Across His (Their) Land for the Performance of Useful Public Work for the Relief of Unemployment Pursuant to Executive Order of May 12, 1933."  (Dkt. ##129-8, 129-9, 129-10.)  Specifically, these grants gave the United States "rights of ways on and across said allotments and tracts of land on the said Reservation of the opening and establishing of necessary roadways, trails, and other uses" to carry out the public purposes of the Unemployment Relief Act.  Because the court has concluded that the Town and Homeowners may access the Roads pursuant to the TTP and an implied easement, the court need not consider this alternative express easement argument.  The court likewise need not separately address the parties' "easement by necessity" arguments, which overlap with their implied easement arguments.

(2) The Town of Lac du Flambeau's motion for summary judgment (dkt. #142 in 23-cv-355) is GRANTED.

(3) The Homeowners' motion for summary judgment (dkt. #125 in 25-cv-355) is GRANTED.

(4) The court DECLARES that the Homeowners hold valid, enforceable easements that run with the land, for ingress and egress, between their respective parcels and a public road.

(5) The court DECLARES that the Town of Lac du Flambeau has permanent easement rights over the north-south segment of Annie Sunn Lane at issue in this case.

(6) The court DECLARES that the four Roads at issue in this case MUST REMAIN OPEN FOR PUBLIC USE at least so long as they are listed on the National Tribal Transportation Inventory.

(7) The court DECLARES that the Bureau of Indian Affairs removal of the four Roads at issue in this case from the Inventory WAS UNLAWFUL AND IS VOID.

(8) The United States and by implication the Tribe is PERMANENTLY ENJOINED from using any means to restrict access by the Town or Homeowners to the four Roads at issue in this case barring further order of this court.

(9) A status conference as to what, if anything, remains to be addressed by this court before entry of a final judgment SHALL BE HELD on September 5, 2025, at 2:00 p.m.

Entered this 5th day of August, 2025.

BY THE COURT:
/s/
WILLIAM M. CONLEY
District Judge

47